**FILED**

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

THE WASHINGTON GROUP, INC.,

        Plaintiff,

  -against-

HARRY SPORIDIS,

        Defendant.

No. _____

**COMPLAINT**

Case: 1:07-cv-01892
Assigned To : Walton, Reggie B.
Assign. Date : 10/19/2007
Description: TRO/PI

Plaintiff The Washington Group, Inc. ("TWG," the "Company," or "Plaintiff") by its attorneys Littler Mendelson LLP, for its complaint against Defendant Harry Sporidis ("Sporidis" or "Defendant") alleges as follows:

## NATURE OF ACTION

1.     This is an action to prevent defendant Sporidis, a former Senior Vice President for TWG, from unfairly soliciting TWG's clients to a competitor using client relationships and goodwill that Sporidis developed at TWG's expense. In exchange for a grant of stock in Omnicom Group, Inc. ("Omnicom"), of which TWG is an affiliate, Sporidis executed an agreement with reasonable post-employment restrictions against soliciting and servicing TWG clients, soliciting and hiring TWG employees, and using or disclosing TWG's confidential information. While still employed by TWG, Sporidis used relationships that he developed at TWG to divert at least two of TWG's significant clients to his new employer, Powell Goldstein LLP. In breach of his agreement, and in breach of his fiduciary duties of loyalty as TWG's employee, Sporidis used and continues to use client relationships and goodwill gained at TWG's expense to unfairly solicit business from TWG's clients so that Sporidis can service those clients

1

at Powell Goldstein. TWG seeks injunctive relief, monetary damages and other relief as a result Sporidis' unlawful actions.

## THE PARTIES

2.    Plaintiff TWG is a Washington, D.C. corporation with its principal place of business in Washington, D.C. TWG is a well-respected and established bipartisan government relations and strategic consulting firm, serving a mix of clients, including healthcare, technology, telecommunications, environmental, defense, trade, real estate and transportation entities, in virtually all areas of legislative and regulatory activity. TWG is a subsidiary of Ketchum, Inc., one of the world's largest and most respected public relations firms, and a member of Omnicom's network of companies.

3.    TWG advises its clients on political positioning, provides them with lobbying strategies and programs, tracks and analyzes pending legislation, assists with congressional testimony preparation and crisis management, writes legislative and regulatory language, and drafts position papers. TWG spends significant resources developing and maintaining its client relationships, many of which have lasted for years.

4.    Defendant Sporidis is a resident of the state of Maryland. Sporidis was employed by TWG as a Senior Vice President until October 12, 2007. Upon information and belief, as of October 22, 2007, Sporidis will begin working for Powell Goldstein LLP.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332 as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, excluding interest and costs.

2

6.      Venue is proper in this District under 28 U.S.C. § 1391.

## ALLEGATIONS COMMON TO ALL CLAIMS

### Sporidis' Employment And Protective Covenants

7.      Sporidis joined TWG on June 6, 2001 as Vice President. Several years later, he was promoted to Senior Vice President, servicing a number of TWG's clients. Sporidis was well-compensated for his services, earning annual pay of $230,000 at the time he resigned, and receiving $40,000 in cash bonuses over the past two years.

8.      During his over six and a half years working with TWG, Sporidis, at TWG's expense, developed and maintained relationships with some of TWG's most significant clients, including but not limited to Mentor Corporation ("Mentor"), a leading supplier of breast implants and other medical products for the global aesthetic medicine market, the American Society of Clinical Oncology ("ASCO"), a non-profit organization, dedicated to improving cancer care and prevention, and the Society for Human Resource Management ("SHRM"), a professional association devoted to serving the needs of HR professionals. Sporidis was TWG's chief contact for these clients.

9.      As a Senior Vice President and employee of TWG, Sporidis, like other selected employees of TWG (and other Omnicom affiliates) periodically received bonuses from TWG and Omnicom, in the form of grants of Omnicom restricted stock. In order to receive these stock grants, eligible employees are required to agree to and accept the terms and conditions of Omnicom's Restricted Stock Agreement.

3

10.     In or about May 2005, Sporidis learned that he was eligible for a grant of Omnicom restricted stock, consisting of 180 shares (the "2005 Award"), at a grant price of $0.15 each. In order to receive the 2005 Award, Sporidis was required to visit a website maintained by Fidelity Investments, the administrator of Omnicom's Restricted Stock Plan, to review and accept the terms and conditions of Omnicom's 2005 Restricted Stock Agreement (the "2005 RSA"), and to electronically elect to receive the 2005 Award.

11.     Sporidis visited the Fidelity website and accepted the 2005 Award on or about July 27, 2005. In accepting the 2005 Award, Sporidis represented that he reviewed and accepted the terms and conditions of the 2005 RSA.

12.     The 2005 RSA that Sporidis reviewed and accepted provides, *inter alia*,

In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group the Employee will not...

i)          during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

ii)          for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expect to do with members of the Group; provided, *however*, that solely with respect to this 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either

4

(A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; . . .

2005 RSA, § 6(a). (A copy of the 2005 RSA is attached hereto as Exhibit A.)

13.    Upon information and belief, Sporidis continues to hold the shares he received in the 2005 Award to date. As of, Wednesday, October 17, 2007, these shares (which have split, resulting in Sporidis' possession of 360 shares) were worth $$52.35 each, or $18,846.00 in total.

## Sporidis Gives Notice at TWG

14.    Following his acceptance of the 2005 Award, Sporidis continued working for TWG. On or about September 26, 2007, however, Sporidis approached Susan Molinari, TWG's Chairman and Chief Executive Officer, and Paul Lobo, TWG's Chief Financial Officer, and notified them that he would be leaving TWG effective sometime in mid-October.

15.    Sporidis further told Ms. Molinari and Mr. Lobo that he planned to continue his government relations and strategic consulting practice at a small law firm, and that he intended to take two of TWG's clients with him. Mr. Lobo told Sporidis that he may be subject to protective covenants, but Sporidis refused to acknowledge those covenants.

16.    The following day, September 27, 2007, Sporidis circulated an e-mail to the members of TWG notifying them that he would be leaving. Shortly thereafter, TWG learned that Sporidis was planning on working for Powell Goldstein.

## Sporidis' Breaches of the 2005 RSA's Protective Covenants and His Common Law Duties

17.    While still employed by TWG, Sporidis engaged in the following conduct, in breach of the 2005 RSA and of his common law duties to TWG, as discussed in more detail below:

- Sporidis solicited TWG's client Mentor to terminate its agreement with TWG and to do business with Powell Goldstein;

- Sporidis solicited TWG's client ASCO to terminate its business relationship with TWG and to do business with Powell Goldstein;

- Upon information and belief, Sporidis solicited TWG's client SHRM to terminate its agreement with TWG, and to do business with Powell Goldstein;

- Upon information and belief, Sporidis solicited the business of the American Society of Plastic Surgeons ("ASPS") on behalf of Powell Goldstein

*Sporidis Solicits SHRM*

18.    On September 7, 2007, William Maroni, SHRM's Chief External Affairs Officer, sent a puzzling e-mail to TWG, stating that, as per a conversation he had with Sporidis on August 7, SHRM's 30-day notice period for terminating its agreement with TWG would be expiring the following day.

19.    Sporidis had never notified TWG of any conversation in which SHRM had given notice of termination.  In fact, at approximately the same time, TWG was preparing a report on anticipated business for the coming year, and Sporidis told TWG that SHRM should be included in that report, giving no indication that SHRM had terminated its contract.

20.    Further, as of the date of Maroni's message, TWG and SHRM were scheduled to meet together with a United States Senator, in the course of TWG's servicing of SHRM.  After learning of the termination, Ms. Molinari indicated that the meeting would no longer need to go forward, but Sporidis asked her not cancel the meeting, but to keep it scheduled and at least let SHRM go on its own.  At the time, Sporidis couched this request in terms of TWG's potential future business with SHRM, but, upon information and belief, Sporidis' had solicited SHRM to

6

terminate its agreement with TWG, and Sporidis' true intention in asking that the meeting go forward was to allow himself to continue servicing SHRM on behalf of Powell Goldstein.

*Sporidis Solicits Mentor and ASCO*

21.     On September 27, 2007, the same day that Sporidis circulated his e-mail notifying TWG of his resignation, Joshua Levine, Mentor's President and Chief Executive Officer, e-mailed Sporidis and notified him that Mentor was terminating its agreement with TWG.

22.     TWG later discovered that earlier that day, Sporidis had e-mailed Mr. Levine and specifically asked him to send that e-mail terminating Mentor's contract with TWG.

23.     Further, on September 26, 2007, Sporidis e-mailed Deborah Kamin, a member of ASCO's Government Relations Council, to inform her that he would be "moving to [his] new firm on October 22nd," and to ask her how he should proceed with respect to a new engagement agreement for ASCO.

24.     The next day, September 27, Sporidis e-mailed Shelagh Foster, another member of ASCO's Government Relations Council, seeking information regarding what terms ASCO wished to have included in its prospective agreement with Powell Goldstein.

25.     Also on September 27, 2007, Sporidis e-mailed Cynthia Berry, a partner at Powell Goldstein, and forwarded her a copy of Mentor's agreement with TWG. In that e-mail, Sporidis discussed arrangements for Powell Goldstein to send to both Mentor and ASCO contracts containing terms similar to their arrangements with TWG. Berry later e-mailed Sporidis to notify him that she had sent a draft of the requested Mentor contract to Sporidis' other e-mail address for review, and that she would sign the contract and send it to Mentor upon Sporidis' approval.

7

*Sporidis Solicits ASPS*

26.     Also September 27, 2007, Sporidis e-mailed Joshua Levine at Mentor and notified him that Sporidis had been asked by ASPS to submit a proposal to service ASPS's government relations needs.  Sporidis described the ASPS request as an opportunity to "coordinate ASPS' efforts along with ours" going forward – after having already notified TWG and Mentor that he was resigning from TWG and moving to Powell Goldstein.  Upon information and belief, Sporidis solicited ASPS to do business with Powell Goldstein, rather than TWG.

## Sporidis Is Exploiting Valuable Client Relationships and Goodwill Developed at TWG's Expense

27.     It was through TWG that Sporidis formed his relationships with Mentor, ASCO, and SHRM, and got the opportunity to work closely with them, and TWG paid Sporidis to develop and maintain relationships with its contacts at Mentor, ASCO, and SHRM.  TWG also provided the office, staff, and other resources necessary to provide the services that those clients demanded, and spent significant sums to develop and maintain those relationships.

28.     Mentor had been a major client of TWG for over five years, and for at least the past three years had been paying TWG monthly retainers of $25,000.  Prior to Sporidis' aforementioned acts, there was no indication from Mentor, nor any reason for TWG to believe, that Mentor would be terminating or reducing its business with TWG.

29.     Similarly, ASCO had been a client of TWG for over three years, and for at least the past three years had been paying TWG monthly retainers of $20,000.  Until Sporidis' aforementioned acts, there was no indication from ASCO, nor any reason for TWG to believe, that ASCO would be terminating or reducing its business with TWG.

30.    Finally, SHRM was referred to TWG during 2007 by Ketchum, TWG's parent company, which was also providing services to SHRM. SHRM had been paying TWG monthly retainers of $12,000 since May 2007, paying TWG a total of over $100,000 for the year. Like Mentor and ASCO, until William Maroni's cryptic September 7 e-mail from SHRM, referencing a conversation with Sporidis regarding SHRM's termination with TWG, there was no indication from SHRM, nor any reason for TWG to believe, the SHRM would be terminating or reducing its amount of business done with TWG.

## TWG Is Entitled To Injunctive Relief

31.    Sporidis is unfairly competing with TWG in breach of the 2005 RSA by exploiting client relationships that were developed and maintained during Sporidis' employment with, and at the expense of, TWG.

32.    Sporidis' unlawful interference with TWG's client relationships will cause TWG to suffer irreparable and incalculable harm.

33.    Sporidis is able to work in the field of government relations and strategic consulting without soliciting or servicing clients that he serviced for TWG within the one year prior to the termination of his employment with TWG.

## COUNT I
### (Breach of Contract)

34.    TWG repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

35.    The 2005 RSA is a valid and enforceable contract by and between Omnicom and Sporidis.

9

36.    By the terms of the 2005 RSA, TWG is an intended beneficiary of the 2005 RSA.

37.    Omnicom fully performed its obligations under the 2005 RSA.

38.    As fully described above, Sporidis has breached his obligations under the 2005 RSA.

39.    TWG has suffered, and will continue to suffer, irreparable injury and monetary damages in an amount to be determined at trial (but in no event less than $530,000) as a direct and proximate result of Sporidis's breaches of the 2005 RSA

## COUNT II
### (Breach of Fiduciary Duty and Duty of Loyalty)

40.    TWG repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

41.    At all relevant times, until October 12, 2007, Sporidis was employed by TWG as a Senior Vice President.  As TWG's employee and Senior Vice President, Sporidis owed TWG the fiduciary duty and duty of loyalty to act at all times in the utmost good faith and in TWG's best interests.

42.    While still employed and receiving compensation from TWG, Sporidis breached his duties to TWG by soliciting and/or servicing TWG clients on behalf of Powell Goldstein, and/or by inducing those clients to cease or reduce the amount of business they did with TWG.

43.    Such conduct constitutes breaches of Sporidis' common law duties to TWG.

44.    As a result of Sporidis' breaches of his duty to TWG, TWG has suffered and will continue to suffer irreparable injury, in addition to monetary damages in an amount to be determined at trial (but in no event less than $530,000).

10

45.    Due to Sporidis' willful and wanton misconduct, TWG is entitled to an award of punitive damages.

## COUNT III
### (Tortious Interference With Prospective Economic Relations)

46.    TWG repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

47.    TWG has long-standing business relationships with the clients with which Sporidis developed relationships while employed by TWG.   Those relationships provided economic benefits to TWG, and were likely to provide future economic benefit to TWG.

48.    Sporidis has intentionally, and without legitimate business justification, wrongfully interfered with TWG's prospective client relationships, and thereby has wrongfully deprived TWG of the future economic advantage that it was likely to derive from these relationships.

49.    Sporidis' conduct, as fully described above, was willful, wanton, malicious and in reckless disregard for his contractual and common law duties to TWG.

50.    As a result of Sporidis' conduct, TWG has suffered and will continue to suffer irreparable injury, in addition to monetary damages in an amount to be determined at trial (but in no event less than $530,000).

11

45.    Due to Sporidis' willful and wanton misconduct, TWG is entitled to an award of punitive damages.

## COUNT III
### (Tortious Interference With Prospective Economic Relations)

46.    TWG repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

47.    TWG has long-standing business relationships with the clients with which Sporidis developed relationships while employed by TWG.   Those relationships provided economic benefits to TWG, and were likely to provide future economic benefit to TWG.

48.    Sporidis has intentionally, and without legitimate business justification, wrongfully interfered with TWG's prospective client relationships, and thereby has wrongfully deprived TWG of the future economic advantage that it was likely to derive from these relationships.

49.    Sporidis' conduct, as fully described above, was willful, wanton, malicious and in reckless disregard for his contractual and common law duties to TWG.

50.    As a result of Sporidis' conduct, TWG has suffered and will continue to suffer irreparable injury, in addition to monetary damages in an amount to be determined at trial (but in no event less than $530,000).

**WHEREFORE,** plaintiff The Washington Group, Inc. demands judgment against defendant Harry Sporidis, in the form of an Order:

11

(A)    immediately and for one year from the entry of such order, enjoining Sporidis from directly or indirectly soliciting, rendering services to or for, or accepting from any client of TWG (with which Sporidis had a servicing relationship, supervisory responsibility or other involvement, or for which Sporidis participated in, supervised, or otherwise was involved in a new business presentation or similar offering of services), any business of the type performed by TWG for such client, or persuading or attempting in any manner to persuade such client to cease to do business or to reduce the amount of business which that client has customarily done or is reasonably expect to do with TWG;

(B)    awarding plaintiff compensatory and punitive damages in an amount to be determined at trial, but in no event less than $530,000, plus attorneys' fees and costs of suit; and

(C)    granting such other and further relief as this Court may deem just and proper.

Dated: October 19, 2007

Respectfully submitted,

By: _____

Elizabeth A. Lalik, Esq. (#447052)
LITTLER MENDELSON, P.C.
1650 Tysons Blvd., Suite 700
McLean, Virginia 22102
(703) 286-3131 (Direct Dial)
(703)842-8517 (Fax)

And

David S. Greenberg
DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019
(212) 468-4895

*Attorneys for Plaintiff The Washington Group, Inc.*

12

# OMNICOM GROUP INC.

## RESTRICTED STOCK AGREEMENT

**RESTRICTED STOCK AGREEMENT**, dated as of _____ (this "**Agreement**"), by and between Omnicom Group Inc., a New York corporation, ("**Omnicom**"), and _____ (the "**Employee**").

**WHEREAS**, Omnicom has implemented the Omnicom Group Inc. Equity Incentive Plan, as amended, restated or otherwise modified from time to time (the "**Plan**"); and

**WHEREAS**, capitalized terms used and not otherwise defined herein or in the Plan shall have the meanings set forth in Section 4 hereof;

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, and as an inducement to the Employee to continue as an employee of the Company and to promote the success of the business of the Company, the parties hereto agree as follows:

1.    **Grant**.  Omnicom hereby grants to the Employee, and the Employee hereby accepts, an award of restricted stock, effective as of the date hereof (the "**Grant Date**"), of _____ shares of the common stock, par value $0.15 per share, of Omnicom (the "**Restricted Shares**"), subject to the conditions, limitations and restrictions set forth in the Plan and this Agreement.  On the Grant Date, the Employee shall pay to Omnicom an amount equal to $0.15 multiplied by the number of Restricted Shares being granted hereunder (such amount being the aggregate par value of the Restricted Shares) (the "**Aggregate Par Value**").  Such payment shall either be (i) deducted by the administrator of Omnicom's Equity Incentive Plan ("**Omnicom's Agent**") from the Employee's brokerage account or participant trust maintained with Omnicom's Agent ("**Employee's Brokerage Account**"), (ii) if the entire Aggregate Par Value is not on deposit in Employee's Brokerage Account, deposited in cash by the Employee to Employee's Brokerage Account, or (iii) made as otherwise directed by Omnicom.  The Restricted Shares shall be deemed to include associated Stock Dividends (as defined below).

2.    **Ownership, Rights as a Shareholder and Custody**.  The Employee is the owner of the Restricted Shares and has all the rights of a shareholder with respect thereto, including the right to vote such Restricted Shares and to receive all dividends or other distributions paid with respect to such Restricted Shares; provided, that, dividends and distributions in shares of Omnicom common stock (the "**Stock Dividends**") shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Shares with respect to which such Stock Dividends have been distributed.  Accordingly, the Employee shall only be entitled to receive such Stock Dividends when the Restricted Shares (with respect to which such Stock Dividends have been distributed) vest pursuant to Section 3 below.  Such ownership of Restricted Shares and Stock Dividends shall be evidenced by book entries on the records of Omnicom.  Promptly following the vesting of Restricted Shares pursuant to this Agreement, shares evidencing such Restricted Shares and Stock Dividends shall be transferred into Employee's Brokerage Account or, at

07 1892     **FILED**

Exh A

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Omnicom's sole discretion, stock certificate(s) shall be issued and delivered to the Employee (or his/her permitted transferees) by Omnicom.

3.  **Vesting and Forfeiture**.

      (a)    Provided that the Employee has remained in the continuous employ of Omnicom or an Omnicom Affiliate through the respective Vesting Date (as defined below), the Restricted Shares shall automatically vest and become transferable and nonforfeitable as to 20% of such Restricted Shares on (i) the first anniversary date of the Grant Date (the "**First Vesting Date**") and (ii) each of the next four anniversary dates of the First Vesting Date (each of such dates being referred to herein as a "**Vesting Date**").

      (b)    In the event of a Termination of Employment prior to a Vesting Date by reason of the death of the Employee, all of the Restricted Shares not yet vested shall vest and become transferable and nonforfeitable on the Termination Date.

      (c)    In the event of a Termination of Employment prior to a Vesting Date by reason of the Total Disability of the Employee, a portion of the then unvested Restricted Shares shall vest and become transferable and nonforfeitable on the Termination Date, such portion (rounded up to the nearest full Restricted Share) to be equal to the sum for each remaining Vesting Date of (i) the total number of Restricted Shares which would vest on such Vesting Date multiplied by (ii) a fraction, (A) the numerator of which shall be the number of full calendar months between the Grant Date and the Termination Date and (B) the denominator of which shall be the number of full calendar months between the Grant Date and such Vesting Date.

      (d)    In the event of a Change of Control prior to a Vesting Date, all of the Restricted Shares not yet vested shall vest, and shall become transferable and nonforfeitable as of the effective time of such transaction or at such earlier time as may be fixed by the Compensation Committee of the Board (the "**Omnicom Compensation Committee**").

      (e)    Any Restricted Shares not vested on the Termination Date shall be forfeited and Omnicom shall repurchase such Restricted Shares from the Employee or the Employee's legal representative at a price equal to the product of (i) the par value of such Restricted Shares multiplied by (ii) the number of Restricted Shares being repurchased. Omnicom shall pay or cause to be paid such amount to the Employee or the Employee's legal representative no later than 60 days following the Termination Date.

      (f)    Notwithstanding anything contained herein to the contrary, the Employee shall make arrangements satisfactory to Omnicom for the satisfaction of any withholding tax obligations that arise in connection with his/her Restricted Shares, including, without limitation, by electing to have Omnicom's Agent withhold a portion of the vested Restricted Shares on the Vesting Date in payment of the relevant withholding taxes or maintaining sufficient cash in Employee's Brokerage Account for payment of the relevant withholding taxes.

4.    **Definitions**. For purposes of this Agreement, the terms set forth below shall have the following meanings:

(a)    "**Affiliate**" of Omnicom or the Company, as the case may be, shall mean any person, firm, corporation or other form of entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Omnicom or the Company, as the case may be.

(b)    "**Board**" means the Board of Directors of Omnicom.

(c)    "**Change of Control**" means and includes each of the following: (i) the acquisition, in one or more transactions, of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) by any person or entity or any group of persons or entities who constitute a group (within the meaning of Section 13(d)(3) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of Omnicom or a Subsidiary, of any securities of Omnicom such that, as a result of such acquisition, such person, entity or group either (A) beneficially owns (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, more than 20% of Omnicom's outstanding voting securities entitled to vote on a regular basis for a majority of the members of the Board or (B) otherwise has the ability to elect, directly or indirectly, a majority of the members of the Board; (ii) a change in the composition of the Board such that a majority of the members of the Board are not Continuing Directors; or (iii) the consummation of a merger or consolidation of Omnicom with any other corporation which has been approved by the shareholders of Omnicom, other than a merger or consolidation which would result in the voting securities of Omnicom outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 80% of the total voting power represented by the voting securities of Omnicom or such surviving entity outstanding immediately after such merger or consolidation, or the consummation of a plan of complete dissolution or liquidation of the Company or an agreement for the sale or disposition by Omnicom of (in one or more transactions) all or substantially all of Omnicom's assets which has been approved by the shareholders of Omnicom.

(d)    "**Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the Employment Period or (ii) had made a Pitch at any time during the Employment Period, or the six months immediately following, the Termination Date.

(e)    "**Company**" means the Omnicom Affiliate by whom the Employee is employed as of the date of this Agreement and each other Omnicom Affiliate by whom the Employee is employed at any time during the Employment Period.

(f)    "**Continuing Director**" means, as of any date of determination, any member of the Board who (i) was a member of such Board on the effective date of the Plan or (ii) was nominated for election or elected to such Board with the affirmative vote of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election.

3

(g) **"Employment Period"** means the period that the Employee is employed by any member of the Group.

(h) **"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time.

(i) **"Group"** means (i) if the Company operates within an Omnicom network, all of the companies, group of companies and divisions operating under a global or national brand of such Omnicom network, and (ii) if the Company operates as part of a division or separate company independent of an Omnicom network, all companies and divisions operating under such independent brand.

(j) **"Pitch"** means a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(k) **"Restricted Client"** shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the one-year period prior to the Termination Date, or (ii) had made a Pitch at any time during the one-year period immediately preceding, or the six months immediately following, the Termination Date.

(l) **"Subsidiary"** means any corporation that is a subsidiary of Omnicom within the meaning of Section 424(f) of the Internal Revenue Code of 1986, as amended from time to time, and any entity that is organized as a limited liability company in which Omnicom, directly or indirectly, possesses 50% or more of the voting power of all members of such limited liability company entitled to vote.

(m) **"Termination Date"** means the date on which the Termination of Employment occurs.

(n) **"Termination of Employment"** means the time when the Employee is no longer employed by any Omnicom Affiliate for any reason whatsoever.

(o) **"Total Disability"** means the inability of the Employee to substantially perform the duties of his/her position as a result of illness or physical or mental incapacity or disability (from any cause or causes whatsoever). All determinations as to the disability of any Employee shall be made by the Omnicom Compensation Committee or the Board of Directors of the Omnicom Affiliate, as the case may be, who is then the Employee's employer, upon the basis of such evidence as such Omnicom Compensation Committee or Board of Directors deems necessary or desirable. In the event of a conflict between the determination made by the Omnicom Compensation Committee and the Board of Directors of the Omnicom Affiliate, the determination of the Omnicom Compensation Committee shall prevail.

5. **Nontransferability**. Prior to the date upon which the Restricted Shares become vested pursuant to paragraph 3 hereof, the Restricted Shares may not be pledged, encumbered or hypothecated to, or in favor of, or subject to any lien, obligation or liability of the Employee to

4

any party, or assigned or transferred by the Employee otherwise than by will or the laws of descent and distribution; provided, however that such Restricted Shares may be transferred without consideration to immediate family members (*i.e.*, children, grandchildren or spouse), to trusts for the benefit of such immediate family members and to partnerships in which such family members are the only partners, provided that any such family member, trust and/or partnership shall be subject to all terms, conditions and restrictions of this Agreement by signing a joinder hereto.

6.    **Non-Solicitation/Non-Servicing and Protection of Confidential Information Agreement**.

(a)    In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group, the Employee will not, as an individual, employee, consultant, independent contractor, partner, shareholder, member or in association with any other person, firm, corporation or other form of entity, directly or indirectly, and regardless of the Employee continuing to be employed by a member of the Group or the reason for the Employee ceasing to be so employed by any member of the Group; provided, however, the restrictions set forth below in clauses (ii) and (iii) below shall only apply with respect to periods following the Termination Date if any Restricted Shares have vested under this Agreement:

(i) during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the same nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

(ii)    for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with members of the Group; provided, *however*, that solely with respect to this Section 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; and

(iii)    for a one-year period following the Termination Date, employ as an employee or retain as a consultant any person, firm, corporation or other form of entity who is then or at any time during the one-year period prior to the Termination Date was, an employee of or exclusive consultant to a member of the

5

Group, or persuade or attempt to persuade any employee of or exclusive consultant to a member of the Group to leave the employ of such member of the Group or to become employed as an employee or retained as a consultant by any other person, firm, corporation or other form of entity; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of any member of the Group shall not be deemed to be a breach of this provision.

(b)    As a professional in a highly service-oriented and creative business, the Employee understands and agrees that his/her position with the Company requires and will continue to require services which are of a special character and which places him/her in a position of confidence and trust with the Clients and employees of members of the Group. The Employee further acknowledges that his/her services to the Clients necessarily require that the Employee have access to Confidential Information (as defined below) of members of the Group and their respective Clients and that, in the course of his/her employment with or rendering of services to the Company, the Employee will develop personal relationships with the Clients and knowledge of those Clients' affairs and requirements. Accordingly, the Employee acknowledges that the type and periods of restrictions imposed in this Agreement are fair and reasonable, are reasonably required in order to protect and maintain the proprietary interests of the members of the Group, other legitimate business interests of members of the Group, and the goodwill associated with the members of the Group. The Employee further understands and agrees that the Restricted Clients may be serviced from any location and accordingly it is reasonable that the covenants set forth herein are not limited by narrow geographic area but generally by the location of such Restricted Clients. In the event that any covenant contained in this Agreement shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, (i) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court or other tribunal making such determination, and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made.

(c)    The Employee hereby acknowledges and agrees that for so long as the Employee has been employed by the Company (which term, as used in this Section 6(c) and Section 6(d) shall be deemed to include any Affiliate of the Company), the Employee has acquired and will continue to acquire and have access to confidential or proprietary information about the Company and/or its Clients, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Company and its Clients, Client contacts, creative policies and ideas, advertising campaigns, public relations campaigns, creative and media materials, graphic design, budgets, practices, concepts, strategies, methods of operation, financial or business projections of the Company, and information about or received from its Clients (collectively, "**Confidential Information**"). Accordingly, in consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this

6

Agreement, for so long as the Employee is employed by a member of the Group and thereafter, the Employee will retain in strictest confidence all Confidential Information and shall not disclose any such Confidential Information to anyone outside the members of the Group and Omnicom, except in the course of the Employee's duties for the Company or with Omnicom's express written consent. The Employee hereby acknowledges that he/she is aware that such Confidential Information is not readily available to the public, and agrees that he/she will not at any time utilize such Confidential Information for his/her own benefit or for the benefit of third parties.

        (d)    The Employee hereby acknowledges and agrees that all materials created or modified by the Employee for so long as the Employee is employed by the Company, including, without limitation, all works of authorship, inventions, processes, ideas, methods, concepts and other tangible and intangible materials (collectively, "**Work Product**"), shall be "work for hire" and that the Company and/or Omnicom shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire", the Employee hereby assigns ownership of all such Work Product to the Company and/or Omnicom and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company and/or Omnicom. The Employee hereby appoints the Company and/or Omnicom as his/her attorney-in-fact with the limited power to execute assignments of such Work Product. If the Employee is an employee in the State of California, the parties hereto agree and acknowledge that the terms of this paragraph shall be subject to the terms of Section 2870 of the California Labor Code, a copy of which is annexed to this Agreement. The Employee hereby agrees to advise the Company and/or Omnicom promptly in writing of any inventions that he/she believes meet the criteria set forth in Section 2870.

        (e)    Each of the covenants and agreements contained in this Section 6 (collectively, the "**Protective Covenants**") is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this Section 6 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law, in this Section 6 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The provisions of this Section 6 are not in lieu of, but are in addition to the continuing obligations of the Employee (which the Employee hereby acknowledges) to not use or disclose Confidential Information known to the Employee until any particular piece of Confidential Information becomes generally known to the public (through no action of the Employee), whereupon the restriction on use and disclosure shall cease as to that particular item. The existence of any claim, demand, action or cause of action that the Employee may have against Omnicom or any of its Affiliates, whether predicated pursuant to this Section 6 or otherwise, shall not constitute a defense to the enforcement of the provisions of this Section 6 or any other provision or provisions of this Agreement. The covenants contained in this Section 6 for the benefit of Omnicom and the members of the Group, shall survive any termination of this Agreement and may be waived in whole or in part by Omnicom without the consent of any other person, firm, corporation or other form of entity. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which the Employee is in violation of any of such Protective Covenants, and all such Protective Covenants shall automatically be extended by the period of

7

such violation. The Employee further acknowledges that he/she is a highly regarded executive who considered the terms and conditions upon which he/she is electing to be granted the Restricted Shares and that he/she has been advised and has had the opportunity to obtain counsel of his/her choice in connection with reviewing and executing this Agreement.

(f)    By acceptance of the grant of Restricted Shares, the Employee agrees that if the Employee were, without authority, to use or disclose Confidential Information, or otherwise breach any of the Protective Covenants, or threaten to do so, in addition to all other available remedies (including without limitation seeking such damages as it can show it has sustained by reason of such breach), (i) Omnicom and/or any member of the Group shall be entitled to specific performance and injunctive and other appropriate relief (without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law) to prevent the Employee from doing so, and/or (ii) Omnicom (by action of the Chairman, Chief Executive Officer, President, Chief Financial Officer or General Counsel of Omnicom) may cause any or all of the following actions to occur: (x) the Restricted Shares granted hereunder shall become void, shall be forfeited and shall terminate effective the date on which the Employee entered into such activity, (y) any vested shares of Omnicom common stock acquired by the Employee pursuant to the grant hereunder shall be forfeited and returned to Omnicom, and (z) any gain realized by the Employee from the sale or transfer of shares of Omnicom common stock acquired through the grant hereunder, shall be returned by the Employee to Omnicom. The Employee acknowledges that the harm caused to Omnicom and/or members of the Group by the breach or anticipated breach of this Agreement is by its nature irreparable because, among other things, it is not readily susceptible of proof as to the monetary harm that would ensue. The Employee consents that any interim or final equitable relief entered by a court of competent jurisdiction shall, at the request of Omnicom and/or a member of the Group be entered on consent and enforced by any court having jurisdiction over the Employee, without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

(g)    During the Employment Period and the one-year period after the Termination Date, prior to accepting employment with any subsequent employer, the Employee shall notify any prospective employer in writing of his/her obligations under this Agreement. In addition, immediately after accepting employment with a subsequent employer, the Employee shall provide Omnicom with a copy of the notice that was sent by him/her to such subsequent employer.

7.    **Investment Representation and Compliance With Applicable Law**.    The Employee hereby represents and covenants that (a) the Restricted Shares will be acquired for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), unless such acquisition has been registered under the Securities Act and any applicable state securities law; and (b) any subsequent sale of any such Restricted Shares, unless their acquisition had been so registered, shall be made either pursuant to an effective registration statement under the Securities Act and any applicable state securities laws, or pursuant to an exemption from registration under the Securities Act and such state securities laws.

8

8.    **No Understandings as to Employment**. Nothing in the grant of the Restricted Shares or in this Agreement shall constitute or be evidence of any understanding, express or implied, on the part of Omnicom or any Omnicom Affiliate to employ the Employee for any period.

9.    **Plan Incorporated**. The Employee accepts the Restricted Shares herein subject to all of the provisions of the Plan, which are incorporated into this Agreement, including the provisions that authorize the Omnicom Compensation Committee to administer and interpret the Plan and which provide that the Omnicom Compensation Committee's decisions, determinations and interpretations with respect to the Plan are final and conclusive on all persons affected hereby. In the event of a conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan shall govern. Terms not otherwise defined in this Agreement shall have the meanings ascribed in the Plan.

10.    **Amendment**. This Agreement may be amended only by an instrument in writing executed and delivered by the Employee and Omnicom.

11.    **Assignment**. The parties hereto agree that the Omnicom shall have the right to assign this Agreement, and accordingly, this Agreement shall inure to the benefit of, and may be enforced by, any and all successors and assigns of Omnicom, including, without limitation, by asset assignment, stock sale, merger, consolidation or other corporate reorganization. Subject to Section 5, the Employee agrees that his/her obligations under this Agreement are personal to him/her, and the Employee shall not have the right to assign or otherwise transfer his/her obligations hereunder. Any purported assignment or transfer by the Employee shall be void and ineffective.

12.    **Governing Law**. The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of New York without regard to any conflicts or choice of laws provisions of the State of New York that would result in the application of the law of any other jurisdiction.

13.    **Notice**. Any notice to be given to Omnicom under the terms of this Agreement shall be addressed to the Office of the General Counsel of Omnicom at 437 Madison Avenue, New York, New York 10022, and any notice to be given to the Employee shall be addressed to the Employee at the address set forth beneath his or her signature hereto, or at such other address for a party as such party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if mailed, postage prepaid, addressed as aforesaid.

14.    **Headings**. All section titles and captions in this Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend or describe the scope or intent of any provisions of this Agreement.

15.    **Further Assurances**. The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement.

16.    **Entire Agreement**. This Agreement, together with the Plan, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto. Notwithstanding the foregoing, any other confidentiality agreement, non-solicitation/non-servicing agreement or any other type of restrictive covenant agreement that the Employee has entered into prior to the date hereof or may enter into after the date hereof with Omnicom or one of its Affiliates shall remain in full force and effect. No oral understandings, oral statements, oral promises or oral inducements between the parties hereto relating to this Agreement exist. No representations, warranties, covenants or conditions, express or implied, whether by statute or otherwise, other than as set forth in this Agreement, have been made by the parties hereto.

17.    **Remedies**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

18.    **Counterparts**. This Agreement may be executed in two or more counterparts, or by facsimile transmission, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

19.    **Waiver**. By signing and returning this Agreement, the Employee agrees that the Employee's rights in respect of the Restricted Shares (including upon Termination of Employment) shall be defined solely by the Plan and the provisions of this Agreement. Accordingly, the Employee waives all other claims he/she may have against Omnicom or any of its Affiliates, and their respective officers, directors, agents and employees for any losses or damages arising out of the forfeiture of any Restricted Shares as a result of such Termination of Employment, or otherwise in relation to the Plan with respect to such Restricted Shares.

20.    **Third Party Beneficiaries**. Nothing in this Agreement is intended to confer upon any other person except the Employee, Omnicom and the Affiliates of Omnicom any rights or remedies hereunder or shall create any third party beneficiary rights in any person (other than Affiliates of Omnicom).

21.    **No Strict Construction**. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto. The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.

*[The remainder of this page is left blank intentionally]*

**IN WITNESS WHEREOF**, Omnicom, by its duly authorized officer, and the Employee, each has executed this Agreement as of the day and year first above written.

**OMNICOM GROUP INC.**

By: _____

Name: Michael J. O'Brien
Title: Senior Vice President,
General Counsel and
Secretary

**EMPLOYEE**

_____

Name:

11

**Annex I**
**to Restricted Stock Agreement**

## California Labor Code Section 2870

Employment agreements; assignment of rights

    (a)  Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

        (i)  relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

        (ii)  result from any work performed by the employee for the employer.

    (b)  To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

12

07-1892
RBW

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

**I (a) PLAINTIFFS**

The Washington Group, Inc.

11001

**DEFENDANTS**

Harry Sporidis

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    11001
**(EXCEPT IN U.S. PLAINTIFF CASES)**

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Elizabeth A. Link, Esq.
Leora Mientkowic P.C.
1650 Tysons Blvd., Suite 700
McLean, VA 22102
(703) 442-8474
I.D.C. Bar No. 44/0762

David E. Greenberg, Esq.
Davis & Gilbert LLP
1740 Broadway
New York, NY 10019
(212) 468-4895

Case: 1:07-cv-01892
Assigned To : Walton, Reggie B.
Assign. Date : 10/19/2007
Description: TRO/PI

---

**II. BASIS OF JURISDICTION**

(PLACE AN X IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

◉ 4 Diversity
(Indicate Citizenship of
Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ◉ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

◉ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    **OR**    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

①

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
The Washington Group, Inc. asserts claims against Harry Sporidis for breach of contract and breach of fiduciary duties. 28 USC 1332

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint   JURY DEMAND: YES ☐ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☒ If yes, please complete related case form.

DATE October 19, 2007   SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C., 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.