**FILED**

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE WASHINGTON GROUP, INC.,       )
                                  )
            Plaintiff,            )
                                  )
      v.                          )      Case: 1:07-cv-01892
                                  )      Assigned To : Walton, Reggie B.
HARRY SPORIDIS,                   )      Assign. Date : 10/19/2007
                                  )      Description: TRO/PI
            Defendant.            )

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff The Washington Group, Inc. ("Plaintiff"), by and through undersigned counsel, hereby moves this Court to enter an order temporarily restraining and preliminary enjoining Defendant, Harry Sporidis ("Defendant") from further breaching the protective covenants in his 2005 Restricted Stock Agreement and his common law duties, permitting limited expedited discovery, and granting other relief as the Court deems just and proper.

The instant motion is based upon the accompanying Memorandum of Law and supporting documentation.

Dated: October 19, 2007                 Respectfully submitted,

                                        LITTLER MENDELSON, P.C.


                                By:     _Elizabeth A. Lalik_____
                                        Elizabeth A. Lalik (#447052)
                                        LITTLER MENDELSON, P.C.
                                        1650 Tysons Blvd.
                                        Suite 700
                                        McLean, VA  22102
                                        Phone: (703)442-8425

3

And

David S. Greenberg
DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019
(212) 468-4895

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The foregoing Plaintiff's Motion for Temporary Restraining Order and Preliminary

Injunction was served by e-mail and hand-delivery on October 19, 2007 upon:

Alan Strasser, Esq.
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W.
Suite 411-L
Washington, D.C.  20006

*Attorneys for Defendant*

Elizabeth A. Lalik

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| THE WASHINGTON GROUP, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **07 1892** |
| v. | ) | |
| | ) | October 19, 2007 |
| HARRY SPORIDIS, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Elizabeth A. Lalik (#447052)
LITTLER MENDELSON, P.C.
1650 Tysons Blvd.
Suite 700
McLean, VA  22102
Phone: (703)442-8425
Fax:    (703)442-8428

And

David S. Greenberg
DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019
(212) 468-4895

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT .................................................................…... 1

STATEMENT OF FACTS...........……………………………………………..… 2

ARGUMENT……………………………………………………................................ 10

I.      STANDARDS FOR INJUNCTIVE RELIEF.......................................... 10

II.     TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS
        CLAIMS AGAINST SPORIDIS. ................................................. 11

A.      TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS
        BREACH OF CONTRACT CLAIM AGAINST SPORIDIS................................ 11

        *1.Sporidis Breached His Protective Covenants. ................................................. 11*

        *2.The Protective Covenants Are Enforceable.......................................................... 12*

        a) TWG Has A Legitimate Business Interest In Protecting Its Goodwill And
        Its Client Relationships. ........................................................................ 12

        b) Sporidis' Restrictive Covenants Are Reasonable......................................... 13

        c) Enforcement Of The Restrictive Covenants Is Not Unduly Burdensome
        Or Harmful To The Public ..................................................................... 15

III.    TWG WILL SUFFER IRREPARABLE HARM ABSENT
        INJUNCTIVE RELIEF ............................................................................ 15

IV.     THE INJUNCTION TWG REQUESTS WILL NOT
        SUBSTANTIALLY INJURE SPORIDIS.................................................. 17

V.      THE PUBLIC INTEREST WILL BE FURTHERED BY THE
        ISSUANCE OF TWG'S REQUESTED INJUNCTION ......................................... 18

VI.     TWG IS ENTITLED TO LIMITED EXPEDITED DISCOVERY ...................... 18


CONCLUSION……………………………………………………………………..19

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*,
   682 F.2d 382 (2d Cir. 1982) ........................................................................ 16

*Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,
   234 F.R.D. 4 (D.D.C. 2006) .................................................................. 18, 19

*Ecolab, Inc. v. Paolo*,
   753 F. Supp. 1100 (E.D.N.Y. 1991) ............................................................ 16

*Ellis v. James V. Hurson Assocs., Inc.*,
   565 A.2d 615 (D.C. 1989) ........................................................................... 12

*Lutz App. Printers, Inc. v. Busby*,
   No. 89-2870-OG, 1989 U.S. Dist. LEXIS 13633 (D.D.C. 1989)................ 15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*,
   298 F. Supp. 2d 27 (D.D.C. 2002)................................................... 10, 16, 18

*Morgan Stanley DW Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001)...................................... 10-11, 12, 16, 18

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998).................................................................. 10

*Ticor Title Ins. Co. v Cohen*,
   173 F.3d 63 (2d Cir. 1999) .................................................................... 15-16

### STATE CASES

*BDO Seidman v. Hirshberg*,
   93 N.Y.2d 382 (1999)....................................................................... 12-13, 14

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*,
   234 A.D.2d 200, 651 N.Y.S.2d 504 (1st Dep't 1996).................................. 15

*Contempo Commc'ns, Inc. v. MJM Creative Servs., Inc.*,
   182 A.D.2d 351, 582 N.Y.S.2d 667 (1st Dep't 1992)...................... 14, 15, 16

*Healthworld Corp. v. Gottlieb*,
   12 A.D.3d 278, 786 N.Y.S.2d 8 (1st Dep't 2004)............................ 14, 15, 16

*Mallory Factor, Inc. v. Schwartz,*
  146 A.D.2d 465, 536 N.Y.S.2d 752 (1st Dep't 1989).............................................14, 16

*Uniform Rental Div., Inc. v. Moreno,*
  441 N.Y.S.2d 538 (2d Dep't 1981) ...........................................................................14

## FEDERAL STATUTES

Fed. R. Civ. P. 65.......................................................................................................1, 10, 19

Plaintiff The Washington Group, Inc. ("TWG" or the "Company") submits this brief in support of its application, pursuant to Fed. R. Civ. P. 65, for an order temporarily restraining and preliminarily enjoining its former employee, defendant Harry Sporidis ("Sporidis" or "Defendant") from breaching protective covenants contained in an agreement that he signed while employed by TWG.

## PRELIMINARY STATEMENT

This case arises out of defendant Sporidis' breaches of his duty of loyalty while employed by TWG, and his brazen violations of protective covenants contained in an agreement he signed while employed by TWG. TWG commenced this lawsuit upon learning about Sporidis' breaches of the protective covenants, and after Sporidis made it clear that he did not intend to abide by those protective covenants. TWG has uncovered evidence that Sporidis breached not only his protective covenants, but his fiduciary duties and duty of loyalty as well.

In exchange for an award of stock in 2005, Sporidis, a Senior Vice President at TWG, signed an agreement containing covenants that he would not solicit or render competing services to certain TWG clients for one year following his departure from TWG. Regardless of this agreement, while still employed as a Senior Vice-President at TWG, Sporidis began speaking with a competitor, Powell Goldstein LLP, about the possibility of leaving TWG and joining Powell Goldstein. In connection with this move, and in breach of his protective covenants and his duties as TWG's employee, Sporidis has solicited at least two (and possibly three) of TWG's clients to terminate their relationships with TWG, so that he could bring those clients with him to Powell Goldstein.

Sporidis is currently exploiting client relationships and the goodwill developed at great expense by TWG to divert clients to his new employer, Powell Goldstein LLP. Absent injunctive relief, TWG will suffer irreparable harm: there is a substantial risk that Sporidis will

improperly solicit additional significant business away from TWG and to Powell Goldstein, resulting in an incalculable loss of income and goodwill by TWG. Accordingly, TWG should be granted an order enforcing the terms of the protective covenants to which Sporidis agreed, and restraining and enjoining Sporidis from further breaches of his common law duties.

**STATEMENT OF FACTS**

**The Parties**

TWG is a well-respected and established bipartisan government relations and strategic consulting firm, serving a mix of clients, including healthcare, technology, telecommunications, environmental, defense, trade, real estate and transportation entities, in virtually all areas of legislative and regulatory activity. (Patrone Dec., ¶ 4.)[1]  TWG is a subsidiary of Ketchum, Inc., one of the world's largest and most respected public relations firms, and a member of the Omnicom Group, Inc. ("Omnicom") network of companies. (*Id.*) TWG advises its clients on political positioning, provides them with lobbying strategies and programs, tracks and analyzes pending legislation, assists with congressional testimony preparation and crisis management, writes legislative and regulatory language, and drafts position papers. (*Id.*) TWG spends significant resources developing and maintaining its client relationships, many of which have lasted for years. (*Id.*) Despite its success and reputation, TWG employs only 15 professionals, along with five administrative support personnel. (*Id.*, ¶ 5.) As a result, although certain TWG professionals (including Sporidis) have a primary relationship with certain TWG clients, TWG relies on all members of its staff to service the needs of all of TWG's clients. (*Id.*)

---

[1]    As used herein, "Patrone Dec." refers to the Declaration of Eugene Patrone, dated October 18, 2007, submitted herewith.

Sporidis joined TWG as a Vice President on June 6, 2001, and later became a Senior Vice President, servicing many of TWG's clients. (Patrone Dec., ¶ 6.) Sporidis was well-compensated for his services, earning annual pay of $230,000 at the time he resigned, and receiving $40,000 in cash bonuses over the past two years alone. (*Id.*) During his over six and a half years working with TWG, Sporidis, at TWG's expense, developed and maintained relationships with some of TWG's most significant clients, including but not limited to Mentor Corporation ("Mentor"), a leading supplier of breast implants and other medical products for the global aesthetic medicine market, the American Society of Clinical Oncology ("ASCO"), a non-profit organization, dedicated to improving cancer care and prevention, and the Society for Human Resource Management ("SHRM"), a professional association devoted to serving the needs of HR professionals. (*Id.* ¶ 7.) Sporidis was TWG's chief contact for these clients. (*Id.*)

**Sporidis' Protective Covenants**

Selected employees of TWG (and of other Omnicom affiliates) periodically receive performance bonuses from TWG and Omnicom, in the form of grants of restricted Omnicom stock. (Patrone Dec., ¶ 8; Azzopardi Dec., ¶ 2.)[2] In exchange for receiving these awards of stock, the employees are required to agree to the terms and conditions of Omnicom's Restricted Stick Agreement, which are updated periodically. (Patrone Dec., ¶ 8; Azzopardi Dec., ¶ 2.) In or about June 2005, Sporidis was notified by letter (the "Notification Letter") that he had received such an award of Omnicom stock (the "2005 Award"), and that he could visit a website maintained by Fidelity Investments, the administrator of Omnicom's Restricted Stock Plan, to

---

[2]     As used herein, "Azzopardi Dec." refers to the Declaration of Steven Azzopardi, dated October 18, 2007, submitted herewith.

accept the 2005 Award. (Patrone Dec., ¶ 9; Retter Dec., ¶ 7.)[3]  Unlike previous occasions, in 2005 Sporidis was the only member of TWG to receive an award, consisting of 180 shares (which later split into 360 shares), at a grant price of $0.15 each. (Patrone Dec., ¶ 9)

The Notification Letter instructed Sporidis that he had to log onto the "NetBenefits" website operated by Fidelity Investments, the administrator of Omnicom's Restricted Stock Plan, where he could view the 2005 Award and accept or decline it. (Retter Dec., ¶ 6.) The Notification Letter further specifically informed Sporidis that in order to accept the 2005 Award, he would be required to accept the terms and conditions of Omnicom's 2005 Restricted Stock Agreement (the "2005 RSA"), which would be available at the NetBenefits site for review. (*Id.*) The Notification Letter also specifically informed Sporidis that he would not be receiving a manually-signed copy of the 2005 RSA (as recipients had in the past), although he could print a copy at the NetBenefits website. (*Id.*) Finally, the Notification Letter also specifically notified Sporidis that the terms and conditions of the 2005 RSA included provisions protecting Omnicom's and its affiliates' intellectual property and confidential information, and restricting employees from soliciting or servicing clients or soliciting or hiring certain employees. (*Id.*) The Notification Letter asked Sporidis to review these provisions carefully upon logging in to accept his stock award. (*Id.*)

Sporidis logged onto the NetBenefits site on or about July 27, 2005, and accepted the 2005 Award. (Patrone Dec., ¶ 11; Azzopardi Dec., ¶ 5 and Ex. A.) In the process of accepting the 2005 Award, Sporidis was again notified that he had to review and accept the terms and conditions of the 2005 RSA, and Sporidis was further required to represent that he had done so in order to receive the 2005 Award. (Azzopardi Dec., ¶¶ 5-8 and Exs. B & C.)

---

[3]    As used herein, "Retter Dec." refers to the Declaration of Cynthia Retter, dated October 18, 2007, submitted herewith.

The 2005 RSA that Sporidis accepted provides, *inter alia*,

In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group the Employee will not...

i) during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

ii) for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expect to do with members of the Group; provided, *however*, that solely with respect to this 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; . . .

By acceptance of the grant of Restricted Shares, the Employee agrees that of the Employee were... to breach any of the Protective Covenants, or threated to do so, in addition to all other available remedies... Omnicom and/or any member of the Group shall be entitled to specific performance and injunctive   and other appropriate relief (without being required to post bond or other security ans without having to prove the inadequacy of the available remedies at law to prevent the Employee from doing so...   The Employee acknowledges that the harm caused to

> Omnicom and/or members of the Group by the breach or
> anticipated breach of this Agreement is by its nature irreparable
> because, among other things, it is not readily susceptible of proof
> as to the monetary harm that would ensue.

(Patrone Dec., ¶ 12; Azzopardi Dec., Ex. C, § 6(a), (f).) Sporidis continues to hold these shares

to date; as of Wednesday, October 17, 2007, these shares were worth $52.35 each, or $18,846.00

in total. (Patrone Dec., ¶ 9.)

## Sporidis Gives Notice at TWG

Following his acceptance of the 2005 Award, Sporidis continued working for

TWG. (Patrone Dec., ¶ 13.) On or about September 26, 2007, however, Sporidis approached

Susan Molinari, TWG's Chairman and Chief Executive Officer, and Paul Lobo, TWG's Chief

Financial Officer, and notified them that he would be leaving TWG in mid-October. (*Id.*)

Sporidis made reference to his compensation at TWG, stating that he had "left a lot of money on

the table over the past few years." (*Id.*) Sporidis further told Ms. Molinari and Mr. Lobo that he

planned to continue his government relations and strategic consulting practice at a small law

firm, and that he intended to take two of TWG's clients with him. (*Id.* ¶ 14) Mr. Lobo

mentioned to Sporidis that he may be subject to protective covenants, but Sporidis refused to

acknowledge those covenants. (*Id.*) The following day, September 27, 2007, Sporidis circulated

an e-mail to the members of TWG notifying them that he would be leaving TWG. (*Id.* ¶ 15 and

Ex. A.) Shortly thereafter, TWG learned that Sporidis was planning on working for a

Washington, D.C. law office named Powell Goldstein LLP. (*Id.* ¶ 15.)

## Sporidis' Breach of the 2005 RSA's Protective Covenants

On September 7, 2007, William Maroni, SHRM's Chief External Affairs Officer,

sent a puzzling e-mail to Ms. Molinari, notifying her that, as per a conversation he had with

Sporidis on August 7, SHRM's 30-day notice period for terminating its agreement with TWG would be expiring the following day. (Patrone Dec., ¶ 16 and Ex. B.) Sporidis, however, had never notified TWG of any conversation in which SHRM had given notice of termination. (*Id.* ¶ 17.) In fact, at approximately the same time, TWG was preparing a report on anticipated business for the coming year, and Sporidis told TWG that SHRM should be included in that report, giving no indication that SHRM had terminated its contract. (*Id.*) Further, as of the date of Maroni's message, TWG and SHRM were scheduled to meet together with and Senator Olympia Snowe, in the course of TWG's servicing of SHRM. (*Id.* ¶ 18.) After learning of the termination, Ms. Molinari indicated that the meeting would no longer need to go forward, but Sporidis asked her not to cancel the meeting, but to keep it scheduled and at least let SHRM go on its own. (*Id.*) Sporidis couched this request in terms of TWG's potential future business with SHRM. (*Id.*)

On September 27, 2007, the same day that Sporidis circulated his e-mail notifying TWG of his resignation, Joshua Levine, Mentor's President and Chief Executive Officer e-mailed Sporidis and notified him that Mentor was terminating its agreement with TWG. (Patrone Dec., ¶ 20 and Ex. C.)   Because Sporidis had told TWG that he intended to take TWG's clients with him to Powell Goldstein, TWG inspected Sporidis' company e-mail account. TWG discovered that earlier that day, Sporidis had e-mailed Mr. Levine – who was apparently already aware that Sporidis was planning to leave TWG – and specifically asked him to send that e-mail terminating Mentor's contract with TWG. (*Id.* ¶ 21 and Ex. D.)

TWG Further discovered that on September 26, Sporidis had also e-mailed Deborah Kamin, a member of ASCO's Government Relations Council, to inform her that he would be "moving to [his] new firm on October 22nd," and to ask her how he should proceed

with respect to a new engagement agreement for ASCO. (Patrone Dec., ¶ 22 and Ex. E.) Ms. Kamin's response – including the inquiry, "How did it go with Susan?" (apparently referring to Ms. Molinari) – indicates that Sporidis had already discussed his departure with Kamin prior to giving notice. (*Id.*) The next day, Sporidis e-mailed Shelagh Foster, another member of ASCO's Government Relations Council, seeking information regarding what terms ASCO wished to have included in its prospective agreement with Powell Goldstein. (*Id.* ¶ 23 and Ex. F)

TWG's search of Sporidis' e-mail account further revealed that shortly before his resignation, Sporidis had been communicating with Powell Goldstein to move Mentor's and ASCO's business to Powell Goldstein, and that Sporidis had discussed dicverting potential clients away from TWG to Powell Goldstein. (Patrone Dec., ¶ 24.) For example, on September 27, 2007, Sporidis had e-mailed Cynthia Berry, a partner at Powell Goldstein, and forwarded her a copy of Mentor's agreement with TWG. In that e-mail, Sporidis discussed arrangements for Powell Goldstein to send to both Mentor and ASCO contracts containing terms similar to their arrangements with TWG. (*Id.* ¶ 25 and Exs. F, G.) Berry later e-mailed Sporidis to notify him that she had sent a draft of the requested Mentor contract to Sporidis' other e-mail address for review, and that she would sign the contract and send it to Mentor upon Sporidis' approval. (*Id.*)

Also on September 27, 2007, Sporidis e-mailed Joshua Levine at Mentor and notified him that Sporidis had been asked by the American Society of Plastic Surgeons ("ASPS") to submit a proposal to service ASPS's government relations needs. (Patrone Dec. ¶ 26 and Ex. D.) Sporidis had, in fact, submitted a proposal to ASPS on behalf of TWG earlier, but it appears from Sporidis' e-mails that while still employed by TWG, Sporidis also pursued this opportunity on behalf of Powell Goldstein. This is clear from Sporidis' September 27 e-mail exchange with Levine, in which he described the ASPS request as an opportunity to "coordinate ASPS' efforts

8

along with ours" going forward – after having already notified TWG and Mentor that he was resigning from TWG. (*Id.*) Further, also while still employed by TWG, Sporidis notified at least one other potential TWG client, Novo Nordisk, Inc., that he was joining Powell Goldstein, and may have solicited Novo Nordisk to deal with Powell Goldstein rather than TWG. (*Id.* ¶ 27 and Ex. H.)

On October 6, 2007, TWG's counsel, Davis & Gilbert LLP ("D&G") wrote to Sporidis, copying his counsel, demanding that Sporidis cease all conduct in breach of the 2005 RSA's protective covenants, provide a list of any TWG clients that he had solicited, and certifying that he would comply with the protective covenants if he indeed left TWG. (Patrone Dec., ¶ 28 and Ex. I.) The October 6, 2007 letter further advised Sporidis that TWG would commence legal action if he continued to breach his obligations under the 2005 RSA. (*Id.*) Nevertheless, Sporidis and his counsel have refused to acknowledge Sporidis' obligations under the 2005 RSA to service clients for whom he provided services while at TWG, including Mentor and ASCO, and have refused to provide the information and certification requested in the October 6 letter. (*Id.* ¶ 29.)

Mentor had been a major client of TWG for over five years, and for at least the past three years had been paying TWG monthly retainers of $25,000. (Patrone Dec. ¶ 32.) Prior to Sporidis' aforementioned acts, there was no indication from Mentor, nor any reason for TWG to believe, that Mentor would be terminating or reducing its business with TWG. (*Id.*) Similarly, ASCO had been a client of TWG for over three years, and for at least the past three years had been paying TWG monthly retainers of $20,000. (*Id.* ¶ 33.) Until Sporidis' aforementioned acts, there was no indication from ASCO, nor any reason for TWG to believe, that ASCO would be terminating or reducing its business with TWG. (*Id.*) Finally, SHRM was

referred to TWG during 2007 by Ketchum, which was also providing services to SHRM, and SHRM had paid TWG over $100,000 in 2007. (*Id.* ¶ 34.) Like Mentor and ASCO, until the cryptic September 7 e-mail from SHRM, referencing a conversation with Sporidis regarding SHRM's termination with TWG, there was no indication from SHRM, nor any reason for TWG to believe, the SHRM would be terminating or reducing its amount of business done with TWG. (*Id.*)

Sporidis began working with Mentor, ASCO and SHRM while employed by TWG, which enabled him to develop relationships with them. (*Id.* ¶ 35.) Before he started working for TWG, Sporidis had no business relationship with those clients. (*Id.*) TWG spent significant amounts of money to develop and maintain its relationship with these clients and TWG provided the necessary support—in terms of marketing, business development assistance, labor, specialty services, administrative support, production support, and financing – for Sporidis to develop relationships with them. (*Id.*)

## ARGUMENT

## I.    STANDARDS FOR INJUNCTIVE RELIEF.

In order to obtain injunctive relief pursuant to Fed. R. Civ. P. 65, TWG must demonstrate: "1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 30-31 (D.D.C. 2002) (enforcing covenants not to solicit, and enjoining former employees from soliciting, clients of former employer). The court considers these same four factors in ruling on a motion for a temporary restraining order. *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C.

2001).  In deciding on such a motion, the four factors are not considered in isolation of each other, and "a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors." *Id.* At 72.  Regardless, as set forth below, TWG can demonstrate each of the four factors, and TWG is therefore entitled to a temporary restraining order and a preliminary injunction under this standard.

## II.    TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST SPORIDIS.

### A.    TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS BREACH OF CONTRACT CLAIM AGAINST SPORIDIS.

#### 1.    *Sporidis Breached His Protective Covenants.*

There is no serious dispute over the fact that Sporidis breached the protective covenants in the 2005 RSA. *While still employed* as a Senior Vice President of TWG, Sporidis e-mailed Mentor's Chairman and C.E.O., and asked him to terminate Mentor's contract with TWG, in order to enable Sporidis to bring Mentor with him to Powell Goldstein, his new employer. (Patrone Dec., ¶ 21 and Ex. D.)  Further, *also while still employed* by TWG, Sporidis e-mailed ASCO personnel to inform them that he would be joining Powell Goldstein on October 22, and to discuss with them what terms ASCO wished to have in a contract with Powell Goldstein. (Patrone Dec. ¶¶ 22-23 and Exs. E, F.)  These e-mails make it clear that Sporidis had discussed his departure with ASCO before notifying TWG. (*Id.*)

Further still, *again while still employed* by TWG, Sporidis e-mailed Powell Goldstein to make arrangements for contracts to be sent to Mentor and ASCO, and provided Powell Goldstein with those clients' current arrangements with TWG. (*Id.* ¶ 25.)  And Sporidis appears to have solicited SHRM as well, or has at least indicated that he intends to do so, failing to tell TWG of SHRM's termination of its agreement with TWG, and asking that TWG not cancel a meeting TWG arranged in the course of servicing SHRM's account, presumably so that

11

Sporidis could attend the meeting with SHRM (and thus service SHRM) on behalf of Powell Goldstein. (Patrone Dec. ¶¶ 16-19 and Ex. B.) In fact, Sporidis himself informed TWG that he was planning on taking TWG clients with him to Powell Goldstein. (*Id.* ¶ 14.) Sporidis has therefore breached the protective covenants in the 2005 RSA by soliciting TWG's clients to do business with Powell Goldstein rather than TWG, and it is undisputed that he will continue to do so absent injunctive relief, by soliciting and/or servicing these additional TWG clients and by servicing Mentor, ASCO, and, most likely, SHRM, on Powell Goldstein's behalf. (*Id.* ¶¶ 14, 25-26.)

### 2.    *The Protective Covenants Are Enforceable.*

Under New York law,[4] a restrictive covenant is enforceable against a former employee if it is (a) necessary to protect the employer's legitimate interests, (b) reasonable in terms of duration and geographic area, and (c) not harmful to the general public and not unreasonably burdensome to the employee. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999) (New York applies a standard of *reasonableness* to determine the validity of a restrictive covenant).

### a)    *TWG Has A Legitimate Business Interest In Protecting Its Goodwill And Its Client Relationships.*

New York courts have consistently recognized that protecting an employer's goodwill, client relationships and confidential information constitutes a legitimate business interest that justifies injunctive relief. As the New York Court of Appeals explained in *BDO*

---

[4]    Under the explicit terms of the 2005 RSA, New York law governs this dispute. (Azzopardi Dec., Ex. C, at § 12.) In any event, however, the results would be the same under District of Columbia law. *See, e.g.; Morgan Stanley DW Inc.*, 150 F. Supp 2d. at 74-75; *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 617 (D.C. 1989)

*Seidman*, an "employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *Id.* at 392. In that case, the employer was entitled to enforce a restrictive covenant to protect against the "use of client relationships which [the employer] enabled [the former employee] to acquire through his performance of accounting services for the firm's clientele during the course of his employment." *Id.* (internal citation omitted).

As set forth in detail above, Sporidis used client relationships that he developed at TWG to solicit business on behalf of his new employer, Powell Goldstein. Accordingly, TWG has legitimate business interests in preventing Sporidis' use of client relationships developed at TWG's expense.

### b)   *Sporidis' Restrictive Covenants Are Reasonable.*

The duration and scope of Sporidis' protective covenants are reasonable in scope, as they seek only to prevent Sporidis from soliciting business or providing services "of the type provided by" TWG and other Omnicom affiliates, and only with respect to "the particular product, brand or service of such Restricted Client[5] in respect of which... [Sporidis himself] had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch[6]... ." (Azzopardi Dec.,

---

[5]     As relevant to this provision The 2005 RSA defines "Restricted Client" as "any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the one-year period prior to the Termination Date, or (ii) had made a Pitch at any time during the one-year period immediately preceding... the Termination Date." (Azzopardi Dec., Ex. C, § 4 (k).)

[6]     The 2005 RSA defines "Pitch" as "a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch." (Azzopardi Dec., Ex. C, § 4 (j).)

Ex. C, at § 6(a)(ii).) Those restrictions fall squarely within the scope of restrictions deemed reasonable by courts in New York. *See BDO Seidman*, 93 N.Y.2d at 389; *Healthworld Corp. v. Gottlieb*, 12 A.D.3d 278, 279, 786 N.Y.S.2d 8, 9 (1st Dep't 2004); *Mallory Factor, Inc. v. Schwartz*, 146 A.D.2d 465, 466-68, 536 N.Y.S.2d 752, 753-54 (1st Dep't 1989).

The duration of the protective covenants is also reasonable, as they only last for one year. In *BDO Seidman*, the court held that eighteen months represented a "reasonably brief interlude to enable the [former employer] to replace the client relationship and goodwill [the former employee] was permitted to acquire with some of its clients." 93 N.Y.2d at 393. Courts also regularly enforce restrictions of one to two years. *See Healthworld Corp.*, 12 A.D.3d at 278-79, 786 N.Y.S.2d at 9 (one-year restriction against soliciting and accepting business was reasonable); *Contempo Commc'ns, Inc. v. MJM Creative Servs., Inc.*, 182 A.D. 2d 351, 353-54, 582 N.Y.S.2d 667, 669 (1st Dep't 1992) (two-year covenant barring former employees from working for customers was reasonable); *Uniform Rental Div., Inc. v. Moreno*, 441 N.Y.S.2d 538 (2d Dep't 1981) (two-year covenant barring solicitation of certain customers was reasonable).

In addition, even if the Court deemed the scope of the restrictive covenants overbroad in some respect, the Court should enforce the covenant to the extent that it deems reasonable. In *BDO Seidman*, the lower courts refused to enforce a covenant that imposed restraints on the defendant-employee's ability to work for *any* of the plaintiff-employer's clients. 93 N.Y.2d at 394-95. The Court of Appeals held that the lower courts erred by failing to "rewrite" the covenant, and should have enforced the restriction with respect to clients that the employee had served while employed by the plaintiff. *Id.* In so holding, the Court of Appeals explained that, when partially enforcing restrictive covenants, courts are not limited to crossing out portions that can be "mechanically severed." *Id.* Accordingly, even if Sporidis' protective

14

covenants were overbroad in some respects (which, as discussed, they are not), they should be enforced in a limited form that the Court deems reasonable.

c)    **Enforcement Of The Restrictive Covenants Is Not**
**Unduly Burdensome Or Harmful To The Public**

Sporidis will not be unduly burdened by the enforcement of the 2005 RSA's protective covenants. He is free to pursue his livelihood in any geographic location, and can directly compete with TWG. TWG merely seeks to prevent Sporidis from soliciting and servicing those clients that he himself serviced or pitched during the year before he left TWG. Meanwhile, Sporidis is free to compete with TWG with respect to every other company he did not service or pitch in the one-year period prior to his resignation. Courts have regularly granted preliminary injunctions under similar circumstances. *See, e.g., Healthworld Corp.*, 12 A.D.3d at 278-79, 786 N.Y.S.2d at 9 (enjoining former employee from accepting business from former employer's clients which whom she had previously had contact); *Contempo Commc's,* 182 A.D.2d at 353-54, 582 N.Y.S.2d at 669 (enjoining former employees from working for former employer's clients that they had previously serviced).

## III.    TWG WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

If an injunction is not granted, TWG is threatened with irreparable harm to its goodwill and client relationships. With respect to client relationships and goodwill, courts have readily held that a "plaintiff would suffer irreparable harm should its clients terminate their relationships with it in order to use defendant's services." *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 203, 651 N.Y.S.2d 504, 506 (1st Dep't 1996); *see Lutz App. Printers, Inc. v. Busby*, No. 89-2870-OG, 1989 U.S. Dist. LEXIS 13633, at *3 (D.D.C. 1989). Courts have similarly recognized that harm to goodwill and client relationships constitutes irreparable harm, and that "it would be very difficult to calculate monetary damages that would

15

successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *see Morgan Stanley*, 150 F. Supp. 2d at 77; *Merrill Lynch*, 298 F. Supp. 2d at 34; *see also Healthworld Corp.*, 12 A.D.3d at 278-79, 786 N.Y.S.2d at 9 (affirming preliminary injunction against use of client relationships and goodwill); *Contempo Commc'ns, Inc.*, 582 N.Y.S.2d at 669 (enforcing restrictive covenant to protect "special relationship" with clients); *Mallory Factor, Inc.*, 536 N.Y.S.2d at 754 (non-solicitation agreement enforced where necessary to protect misappropriation of former employer's goodwill); *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 388 (2d Cir. 1982) ("New York courts have upheld covenants prohibiting employees from soliciting former customers to the extent necessary to protect the goodwill of the employer"); *Ecolab, Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) ("Loss of goodwill constitutes irreparable harm which cannot be compensated by money damages").

TWG has already suffered irreparable harm in Sporidis' solicitation of Mentor, SHRM, and ASCO. Sporidis used his client relationships obtained while at TWG, and at TWG's expense, to divert business from TWG, and to reduce the amount of business clients do with TWG. (*See* Patrone Dec., ¶¶ 3, 14, 16-27.) It was through TWG that Sporidis formed his relationships with Mentor, ASCO, and SHRM, and got the opportunity to work closely with them, and TWG paid Sporidis to develop and maintain relationships with its contacts at Mentor, ASCO, and SHRM. (*Id.* ¶ 31) TWG also provided the office, staff, and other resources necessary to provide the services that those clients demanded, and spent significant sums to develop and maintain those relationships. (*Id.*). Because of Sporidis' violation of his protective covenants, TWG's goodwill and customer relationships with Mentor, SHRM, and ASCO have

16

been damaged, and TWG has lost an indeterminate amount of future business from those clients. (*See id.* at ¶¶ 31-36.)

Further, it would be impracticable, if not impossible, to quantify the harm to TWG if Sporidis is allowed to continue misappropriating TWG's client relationships and goodwill. (Patrone Dec., ¶ 36.) As a Senior Vice-President, Sporidis developed relationships with many of TWG's significant clients. Aside from Mentor, ASCO, and SHRM, there are dozens of other clients with whom Sporidis developed relationships while at TWG. (*Id.*) In light of Sporidis having already diverted three of TWG's significant clients – whose monthly fees would have totaled $57,000 each month for the undetermined future – Sporidis has made clear that his intent is to loot TWG of its clients without regard for his protective covenants. (*Id.*)

Finally, upon executing the 2005 RSA, Sporidis himself acknowledged that his breach of the protective covenants would result in irreparable harm, and he further agreed that TWG would be entitled to enforce the protective covenants by means of the requested injunction for that reason. (*See* Azzopardi Dec., Ex. C, at § 6 (f).)

## IV.   THE INJUNCTION TWG REQUESTS WILL NOT SUBSTANTIALLY INJURE SPORIDIS

The injunction TWG seeks will not substantially injure Sporidis. If Sporidis is allowed to exploit the client relationships and goodwill that she developed at TWG expense, he is likely to divert many longstanding TWG client. In contrast, TWG does not seek to prevent Sporidis from pursuing his career, nor from competing with TWG generally. Sporidis is free to compete with TWG so long as he does not use client relationships and goodwill that he developed while serving as Senior Vice President of TWG. In other words, an injunction will simply allow TWG to protect its goodwill, business reputation, and contract rights, while it will not prevent Sporidis from earning a living. Under circumstances like this, this Court has found

that the "balance of the equities" favors the former employer seeking the injunction. *See Morgan Stanley*, 150 F. Supp. 2d at 78. The Court has further found in similar circumstances that a former employee will not be harmed by being enjoined from engaging in activity he specifically agreed to avoid in signing a previous agreement. *Merrill Lynch*, 298 F. Supp. 2d at 34. Accordingly, Sporidis should be enjoined from soliciting and servicing TWG clients who he serviced during the one year preceding his resignation from TWG.

## V.    THE PUBLIC INTEREST WILL BE FURTHERED BY THE ISSUANCE OF TWG'S REQUESTED INJUNCTION

Finally, the issuance of the injunction requested by TWG will further the public interest. This Court has held on numerous occasions that the public interest is served by the prevention of a former employee from engaging in unfair competition, and by the enforcement of reasonable contractual provisions to protect an employers goodwill and client relationships. *See Morgan Stanley*, 150 F. Supp. 2d at 79; *Merrill Lynch*, 298 F. Supp. 2d at 34-35. Again, the injunction TWG seeks will not prevent Sporidis from pursuing his livelihood, nor will it even restrict TWG's clients from engaging the firm of their choice to service their governmental relations needs; it will merely protect TWG's goodwill and investments of time and resources in developing its client relationships by preventing Sporidis himself, for a limited period, from soliciting and servicing those same clients he serviced on behalf of TWG in the year prior to his resignation. *See Morgan Stanley*, 150 F. Supp. At 79.

## VI.   TWG IS ENTITLED TO LIMITED EXPEDITED DISCOVERY

In evaluating a request for expedited discovery related to a preliminary injunction, courts have adopted a "reasonableness" test. *Disability Rights Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 6 (D.D.C. 2006).

> Under the reasonableness test, courts consider the reasonableness of the request in light of the entire record to date and all of the surrounding circumstances. Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.

*Id.* (internal citations omitted).

Although the accompanying Complaint, Patrone Declaration, Azzopardi Declaration, and Retter Declaration provide a factual basis upon which to enforce the protective covenants in the 2005 RSA, TWG should be permitted to conduct limited expedited discovery in order to investigate the full extent to which Sporidis has breached the terms of the 2005 RSA, to further demonstrate the necessity for a preliminary injunction. TWG anticipates that Sporidis's deposition, the deposition of Powell Goldstein, and limited document requests relating to Sporidis's solicitation and/or servicing of TWG's clients, will provide further support for its application for more permanent relief. The burden on Sporidis will be relatively minimal, limited to his time spent answering questions at his deposition and gathering whatever responsive documents he has in his possession. Under the totality of the circumstances, the Court should grant TWG's request for limited expedited discovery.

## CONCLUSION

For the foregoing reasons, this Court should grant TWG's application pursuant to Fed. R. Civ. P. 65, and issue an order enforcing the terms of the 2005 RSA and restraining and enjoining Sporidis from further breaches of his protective covenants in the 2005 RSA and of his common law duties, permitting limited expedited discovery, and granting such other relief as the Court deems just and proper.

Dated: October 19, 2007

Respectfully submitted,

By: _____

Elizabeth A. Lalik, Esq. (#447052)
LITTLER MENDELSON, P.C.
1650 Tysons Blvd., Suite 700
McLean, Virginia 22102
(703) 286-3131 (Direct Dial)
(703)842-8517 (Fax)

And

David S. Greenberg
DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019
(212) 468-4895

*Attorneys for Plaintiff The Washington Group, Inc.*

## CERTIFICATE OF SERVICE

The foregoing Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction was served by e-mail and hand-delivery on October 19, 2007 upon:

Alan Strasser, Esq.
ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W.
Suite 411-L
Washington, D.C. 20006

*Attorneys for Defendant*

_____
Elizabeth A. Lalik

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**FILED**

OCT 1 9 2007

THE WASHINGTON GROUP, INC.,

                Plaintiff,

  -against-

HARRY SPORIDIS,

                Defendant.

No. ——— **07 1892** NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**DECLARATION OF EUGENE
PATRONE IN SUPPORT OF THE
WASHIGNTON GROUP, INC.'S
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
INJUNCTIVE RELIEF**

**EUGENE PATRONE**, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares as follows:

    1.    I am the Senior Vice President and Chief Operating Officer of The Washington Group, Inc. ("TWG" or the "Company"), plaintiff in the above-captioned action. I make this declaration in support of TWG's application for an order temporarily restraining and preliminarily enjoining its former employee, defendant Harry Sporidis ("Sporidis" or "Defendant") from continuing his ongoing breach of written protective covenants that Sporidis agreed to during his employment with TWG. I am fully familiar with the facts and circumstances set forth herein. Such familiarity is based upon my own personal knowledge, review of the books and records of the Company, and discussions with the Company's other employees and agents.

    2.    Sporidis is a former Senior Vice-President of TWG. While at TWG, he received a grant of stock, in exchange for which he agreed that he would not solicit or render competing services to certain TWG clients for one year following his departure from TWG. His employment with TWG ended on Friday, October 12, 2007, and I understand that he is scheduled to begin working for his new employer, Powell Goldstein LLP, on Monday, October 22, 2007. While still employed by TWG, however, and in breach of the protective covenants in his

agreement and his duties as TWG's employee, Sporidis contacted TWG's clients to induce them to move with him to Powell Goldstein. TWG has found hard evidence from Sporidis' e-mail account of at least two, and possibly three TWG instances of Sporidis' pre-departure solicitation of TWG clients.

3.    Sporidis has exploited and continues to exploit client relationships and the goodwill developed at great expense by TWG to divert its clients to his new employer. Absent injunctive relief, TWG will suffer irreparable harm: Sporidis has already solicited at least two clients away from TWG, and possibly a third; there is a substantial risk that Sporidis will improperly solicit additional significant business away from TWG and to Powell Goldstein, resulting in an incalculable loss of income and goodwill by TWG.

4.    TWG is a well-respected and established bipartisan government relations and strategic consulting firm, serving a mix of clients, including healthcare, technology, telecommunications, environmental, defense, trade, real estate and transportation entities, in virtually all areas of legislative and regulatory activity. TWG is a subsidiary of Ketchum, Inc., one of the world's largest and most respected public relations firms, and a member of the Omnicom Group, Inc. ("Omnicom") network of companies. TWG advises its clients on political positioning, provides them with lobbying strategies and programs, tracks and analyzes pending legislation, assists with congressional testimony preparation and crisis management, writes legislative and regulatory language, and drafts position papers. TWG spends significant resources developing and maintaining its client relationships, many of which have lasted for years.

5.    Despite its success and reputation, TWG employs only 15 professionals, along with five administrative support personnel. As a result, although certain TWG

2

professionals (including Sporidis) have a primary relationship with certain TWG clients, TWG relies on all members of its staff to service the needs of all of TWG's clients.

6.    Sporidis joined TWG as a Vice President on June 6, 2001, and later became a Senior Vice President, servicing many of TWG's clients. Sporidis was well-compensated for his services, earning annual pay of $230,000 at the time he resigned, and receiving $40,000 in cash bonuses over the past two years.

7.    During his over six and a half years working with TWG, Sporidis, at TWG's expense, developed and maintained relationships with some of TWG's most significant clients, including but not limited to Mentor Corporation ("Mentor"), a leading supplier of breast implants and other medical products for the global aesthetic medicine market, the American Society of Clinical Oncology ("ASCO"), a non-profit organization, dedicated to improving cancer care and prevention, and the Society for Human Resource Management ("SHRM"), a professional association devoted to serving the needs of HR professionals. Sporidis was TWG's chief contact for these clients. Sporidis was TWG's chief contact for these clients.

## Sporidis' Protective Covenant Agreement

8.    Selected employees of TWG (and of other Omnicom affiliates) periodically receive bonuses from TWG and Omnicom, in the form of grants of restricted Omnicom stock. For example, Sporidis received such a grant in 2003, as did eight other members of TWG, including me. In exchange for receiving these awards of stock, the employees are required to agree to the terms and conditions of Omnicom's Restricted Stock Agreement, which are updated periodically.

9.    In or about June 2005, Sporidis was notified by letter (the "Notification Letter") that he was eligible to receive another such award of Omnicom stock (the "2005

Award"), and that he could visit a website maintained by Fidelity Investments, the administrator of Omnicom's Restricted Stock Plan, to accept the 2005 Award. (A copy of the Notification Letter is attached to the Declaration of Cynthia B. Retter, submitted herewith, as Exhibit B.) Unlike 2003, in 2005 Sporidis was one of only five members of TWG to receive an award, consisting of 180 shares, at a grant price of $0.15 each. (These shares split in or about May 2007, converting Sporidis' original 180 shares into 360 shares.) I understand that Sporidis continues to hold the shares he got in the 2005 Award to date. As of October 17, 2007, these shares were worth $52.35 each, or $18,846.00 in total.

10.     The Notification Letter specifically instructed Sporidis that he should review Omnicom's 2005 Restricted Stock Agreement (the "2005 RSA"), which would be available at the Fidelity "NetBenefits" site, and that the 2005 RSA had been updated, and contained the protective covenants at issue in this case.

11.     Sporidis visited the NetBenefits site and accepted the 2005 Award on or about July 27, 2005. In the process of accepting the 2005 Award at the NetBenefits site, Sporidis was, in fact, required to represent that he had reviewed and accepted the terms and conditions of the 2005 RSA. The online process by which Sporidis accepted the 2005 Award (including his review of the 2005 RSA) is set forth in more detail in the Declaration of Steven Azzopardi, submitted herewith. (A copy of the 2005 RSA is attached to the Azzopardi Declaration as Ex. C.)

12.     The 2005 RSA that Sporidis executed provides, *inter alia,*

> In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group the Employee will not...

> i)     during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other

4

affiliation in, any business or other endeavor, which is engaged in the business of the nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

ii)    for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expect to do with members of the Group; provided, _however_, that solely with respect to this 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; . . .

2005 RSA, § 6(a). (Azzopardi Dec., Ex. C.)

**Sporidis Gives Notice at TWG**

13.    Following his acceptance of the 2005 Award, Sporidis continued working for TWG. On or about September 26, 2007, however, Sporidis approached Susan Molinari, TWG's Chairman and Chief Executive Officer, and Paul Lobo, TWG's Chief Financial Officer, and notified them that he would be leaving TWG effective sometime in mid-October. Sporidis made reference to his compensation at TWG, stating that he had "left a lot of money on the table over the past few years."

14.    Sporidis further told Ms. Molinari and Mr. Lobo that he planned to continue his government relations and strategic consulting practice at a small law firm, and that

he intended to take two of TWG's clients with him. Mr. Lobo mentioned to Sporidis that he may be subject to protective covenants, but Sporidis refused to acknowledge those covenants.

15.     The following day, September 27, 2007, Sporidis circulated an e-mail to the members of TWG notifying them that he would be leaving. (A copy of Sporidis' September 27, 2007 e-mail notifying TWG of his departure is attached hereto as Exhibit A.) Shortly thereafter, TWG learned that Sporidis was planning on working for a Washington, D.C. law office, Powell Goldstein LLP.

## Sporidis' Breach of the 2005 RSA's Protective Covenants

16.     On September 7, 2007, William Maroni, SHRM's Chief External Affairs Officer, sent a puzzling e-mail to Ms. Molinari, notifying her that, as per a conversation he had with Sporidis on August 7, SHRM's 30-day notice period for terminating its agreement with TWG would be expiring the following day. (A copy of Maroni's September 7 e-mail, included within a string of e-mail communications, is attached hereto as Exhibit B.)

17.     Sporidis, however, had never notified TWG of any conversation in which SHRM had given notice of termination. In fact, at approximately the same time, TWG was preparing a report on anticipated business for the coming year, and when Mr. Lobo and I asked Sporidis if SHRM should be included in that report, Sporidis said that they should, giving no indication that SHRM had terminated its contract.

18.     Further, as of the date of Maroni's message, TWG and SHRM were scheduled to meet together with a United States Senator, in the course of TWG's servicing of SHRM. After learning of the termination, Ms. Molinari indicated that the meeting would no longer need to go forward, but Sporidis asked her not to cancel the meeting, but to keep it

scheduled and at least let SHRM go on its own.  Sporidis couched this request in terms of

TWG's potential future business with SHRM.

19.    At the time, while certainly unusual, TWG did not suspect anything

improper about the events surrounding SHRM's termination.  In light of TWG's recent

discoveries (as discussed below), however, it appears that Sporidis may have solicited SHRM to

terminate its contract with TWG, and that Sporidis's true intentions in asking for the planned

meeting to proceed were to continue servicing SHRM after joining Powell Goldstein.

20.    On September 27, 2007, the same day that Sporidis circulated his e-mail

notifying TWG of his resignation, Joshua Levine, Mentor's President and Chief Executive

Officer, e-mailed Sporidis and notified him that Mentor was terminating its agreement with

TWG.  Sporidis forwarded this e-mail to other members of TWG.  (A copy of Levine's

September 27, 2007 e-mail is attached hereto as Exhibit C.)

21.    Because Sporidis had told TWG that he intended to take TWG's clients

with him to Powell Goldstein, TWG decided to inspect his company e-mail account.  TWG

discovered that, earlier that day, Sporidis had e-mailed Mr. Levine -- who was apparently already

aware that Sporidis was planning to leave TWG – and specifically asked him to send that e-mail

terminating Mentor's contract with TWG.  (A copy of Sporidis' September 27, 2007 e-mail to

Levine, included in a string of e-mail communications, is attached hereto as Exhibit D.)

22.    TWG further discovered that on September 26, Sporidis had e-mailed

Deborah Kamin, a member of ASCO's Government Relations Council, to inform her that he

would be "moving to [his] new firm on October 22nd," and to ask her how he should proceed

with respect to a new engagement agreement for ASCO.  Ms. Kamin's response – including the

inquiry, "How did it go with Susan?" (apparently referring to Ms. Molinari) – indicates that

Sporidis had already discussed his departure with Kamin prior to giving notice. (A copy of Sporidis' September 26 e-mail to Kamin is attached hereto as Ex. E.)

23.    The next day, Sporidis e-mailed Shelagh Foster, another member of ASCO's Government Relations Council, seeking information regarding what terms ASCO wished to have included in its prospective agreement with Powell Goldstein. (A copy of September 27 e-mail to Foster are attached hereto as Exhibit F.)

24.    TWG's search of Sporidis' e-mails further revealed that shortly before his resignation, Sporidis had also been communicating with Powell Goldstein to move Mentor's and ASCO's business there, and that Sporidis had discussed diverting potential clients away from TWG to Powell Goldstein as well.

25.    For example, on September 27, 2007, Sporidis e-mailed Cynthia Berry, a partner at Powell Goldstein, and forwarded her a copy of Mentor's agreement with TWG. In that e-mail, Sporidis had discussed arrangements for Powell Goldstein to send to both Mentor and ASCO contracts containing terms similar to their arrangements with TWG. Berry later e-mailed Sporidis to notify him that she had sent a draft of the requested Mentor contract to Sporidis' other e-mail address for review, and that she would sign the contract and send it to Mentor upon Sporidis' approval. (Copies of Sporidis' communications with Berry dated September 27, 2007, are attached hereto as Exhibits F and G.)

26.    Also on September 27, 2007, Sporidis e-mailed Joshua Levine at Mentor and notified him that Sporidis had been asked by the American Society of Plastic Surgeons ("ASPS") to submit a proposal to service ASPS's government relations needs. Sporidis had, in fact, submitted a proposal to ASPS on behalf of TWG earlier, but it appears from Sporidis' e-mails that while still employed by TWG, Sporidis also pursued this opportunity on behalf of

Powell Goldstein. This is clear from Sporidis' September 27 e-mail exchange with Levine, in which he described the ASPS request as an opportunity to "coordinate ASPS' efforts along with ours" going forward – after having already notified TWG and Mentor that he was resigning from TWG. (*See* Exhibit D.)

27.    Further, also while still employed by TWG, Sporidis notified at least one other potential TWG client, Novo Nordisk, Inc., that he is joining Powell Goldstein, and may have solicited Novo Nordisk to deal with Powell Goldstein rather than TWG. (A copy of Sporidis' e-mail to Lauren Semeniuk, Novo Nordisk's Manager, Government Affairs, is attached hereto as Exhibit H.)

28.    On October 6, 2007, TWG's counsel, Davis & Gilbert LLP ("D&G") wrote to Sporidis, copying his counsel, demanding that Sporidis cease all conduct in breach of the 2005 RSA's protective covenants, provide a list of any TWG clients that he had solicited, and certifying that he would comply with the protective covenants if he indeed left TWG. (A copy of D&G's October 6, 2007 letter to Sporidis and his counsel, Gary Marx, is attached hereto as Exhibit I). The October 6, 2007 letter further advised Sporidis that TWG would commence legal action if he continued to breach his obligations under the 2005 RSA.

29.    Nevertheless, Sporidis and his counsel have refused to acknowledge Sporidis' obligations under the 2005 RSA to service clients for whom he provided services while at TWG, including Mentor and ASCO, and have refused to provide the information and certification requested in the October 6 letter.

## TWG Will Suffer Irreparable Harm If Sporidis Is Allowed To Continue Breaching His Protective Covenants

30.    Sporidis has demonstrated that he will not abide by the terms of the 2005 RSA's protective covenants, and it is clear that, absent injunctive relief, he will continue to breach the covenants, causing TWG irreparable harm.

31.    Sporidis has already used his client relationships obtained while at TWG, and at TWG's expense, to divert business from TWG, and to reduce the amount of business clients do with TWG. It was through TWG that Sporidis formed his relationships with Mentor, ASCO, and SHRM, and got the opportunity to work closely with them, and TWG paid Sporidis to develop and maintain relationships with its contacts at Mentor, ASCO, and SHRM. TWG also provided the office, staff, and other resources necessary to provide the services that those clients demanded, and spent significant sums to develop and maintain those relationships. Accordingly, TWG has a legitimate interest in protecting the goodwill and client relationships that were developed at its expense and further has a legitimate interest in preventing Sporidis from further exploiting TWG's goodwill and interfering with its client relationships.

32.    It causes irreparable harm when an employee like Sporidis—who for years has developed client relationships at TWG's expense—misappropriates that goodwill to divert business to a competitor. Mentor has been a major client of TWG for over five years, and for at least the past three years had been paying TWG monthly retainers of $25,000. Prior to Sporidis' aforementioned acts, there was no indication from Mentor, nor any reason for TWG to believe, that Mentor would be terminating or reducing its business with TWG.

33.    Similarly, ASCO had been a client of TWG for over three years, and for at least the past three years had been paying TWG monthly retainers of $20,000. Until Sporidis' aforementioned acts, there was no indication from ASCO, nor any reason for TWG to believe, that ASCO would be terminating or reducing its business with TWG.

34.     Finally, SHRM was referred to TWG during 2007 by Ketchum, which was also providing services to SHRM. SHRM had been paying TWG monthly retainers of $12,000 since May 2007, and had been a month-to-month client of TWG since March 2007, paying TWG a total of over $100,000 for the year. Like Mentor and ASCO, until William Maroni's cryptic September 7 e-mail from SHRM, referencing a conversation with Sporidis regarding SHRM's termination with TWG, there was no indication from SHRM, nor any reason for TWG to believe, the SHRM would be terminating or reducing its amount of business done with TWG.

35.     Sporidis began working with Mentor, ASCO and SHRM while employed by TWG, which enabled him to develop relationships with those clients. Before he started working for TWG, Sporidis had no business relationship with those clients. TWG spent significant amounts of money to develop and maintain its relationship with those clients, and TWG provided the necessary support—in terms of marketing, business development assistance, labor, specialty services, administrative support, production support, and financing – for Sporidis to develop relationships with those clients.

36.     It is impracticable, if not impossible, to quantify the harm to TWG if Sporidis is allowed to continue misappropriating TWG's client relationships and goodwill. As Senior Vice-President, Sporidis developed relationships with many of TWG's significant clients. Aside from Mentor, ASCO, and SHRM, there are dozens of other clients with whom Sporidis developed relationships while at TWG. In light of Sporidis having already diverted at least two, and possibly three, of TWG's significant clients – whose monthly fees would have totaled $57,000 each month for the undetermined future – Sporidis has made clear that his intent is to loot TWG of its clients without regard for his protective covenants.

37.    For the foregoing reasons, TWG should be granted an order enjoining Sporidis from servicing TWG clients with whom he worked during the year before he resigned.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Washington, D.C
         October 18, 2007

                                        *Eugene F. Patrone III*
                                        EUGENE PATRONE

12

**Greenberg, David**

From:     Sporidis, Harry [hsporidis@thewashingtongroup.com]
Sent:     Thursday, September 27, 2007 2:40 PM
To:       TWG-Email; Gelfond, Noam; McLean, Liz; Tindall, Zachary; Jeavons, Kathy; Colpitts, Jennifer; Gerry Kavanaugh; Nelson, Chris; Tyre, Sarah

Subject: Please read

Dear Colleagues,

I wanted to come by to each and everyone of you to let you know of my new news, but since everyone's schedule is so different it does not seem possible to do so.  I also do not want anyone to feel slighted so I thought it best to send out an e-mail, as impersonal as it is but truly the best way to let everyone know my plans.

I will be leaving The Washington Group in October.  The exact date is still somewhat up in the air so you will be seeing me these next few weeks, but I will be transitioning.

I wanted to let you all know that I am thankful for being associated with such an amazing group of people over the past 6 years.  I am even more thankful for your friendship.

I will be sending out new contact information in the next few days.  In the meantime, if you need any assistance from me please do not hesitate to ask, I am always happy to help.

Thanks again for all your support and friendship over the past 6 years.

**Harry Sporidis**
*The Washington Group*
*1401 K Street, NW*
*10th Floor*
*Washington, DC 20005*
*Phone:  202-789-2111*
*Fax:    202-789-4883*
*Mobile: 202-669-7399*

*www.thewashingtongroup.com*



FILED

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

—   Exh A   —

10/18/2007

## Greenberg, David

**From:** Sporidis, Harry [hsporidis@thewashingtongroup.com]
**Sent:** Monday, September 10, 2007 9:58 AM
**To:** Molinari, Susan
**Cc:** Patrone, Eugene; Lobo, Paul
**Subject:** RE: Termination of Contract for Services

Sue,

I would rather us not cancel the meeting that has been set up on the 31st.  We should just let them SHRM people go to the Snowe meeting on their own, unless you would still like to escort their CEO to the meeting.

The thing with SHRM is that they are going to need us again so there is no reason to just disconnect with them entirely.

-----Original Message-----
From: Molinari, Susan
Sent: Friday, September 07, 2007 6:18 PM
To: Sporidis, Harry
Subject: Re: Termination of Contract for Services

Halloween is back on my schedule

-----Original Message-----
From: Sporidis, Harry
To: Maroni, William <WMaroni@SHRM.org>; Molinari, Susan
CC: Aitken, Mike <maitken@SHRM.org>; Hammer, Nancy <nhammer@SHRM.org>; Dennison, Anita
<adennison@shrm.org>; Delgado, Madeline <MDelgado@SHRM.org>; Lobo, Paul

Sent: Fri Sep 07 17:50:59 2007
Subject: RE: Termination of Contract for Services

Bill,

It has been great working with your team at SHRM.  In the future, should you need  assistance, please let us know.

As for the rooms for the annual fly-in event, all have been set up except for a breakfast room on the Senate side.  I am sure that Sen. Enzi's office would be more then happy to assist you again should you want to place the request through him.

I will discuss with Mike and Nancy how we will proceed with any meetings that have been scheduled.

Thanks again.

Harry


-----Original Message-----
From: Maroni, William [mailto:WMaroni@SHRM.org]
Sent: Fri 9/7/2007 5:38 PM
To: Molinari, Susan

FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

10/18/2007

–  Exh B  –

Cc: Sporidis, Harry; Aitken, Mike; Hammer, Nancy; Dennison, Anita; Delgado, Madeline
Subject: Termination of Contract for Services

Dear Ms. Molinari,

Thank you for the services The Washington Group (TWG) has provided to the Society for Human Resource Management (SHRM) for the past several months. We have greatly enjoyed working with Mr. Harry Sporidis and the rest of the team.

This letter serves to re-affirm our verbal termination notice provided to Mr. Sporidis in a meeting held at the TWG office on August 8, 2007. According to the terms of our engagement letter, termination is effective upon thirty (30) days notice of either party making our termination effective September 8, 2007. Please invoice us for any outstanding charges including the pro-rated retainer fee for September 1 - September 8 of $3,200.

Mr. Mike Aitken, director of government affairs for SHRM, and I look forward to speaking with Mr. Sporidis about the current status of meeting requests and room reservation requests to ensure a smooth transition as we take over the projects previously assigned to TWG.

Again, it has been a pleasure working with TWG and we will certainly keep you in mind should we need additional assistance in the future.

Sincerely,

William J. Maroni

Chief External Affairs Officer

Society for Human Resource Management

1800 Duke Street

Alexandria, VA 22314-3499 USA

Phone: 703-535-6042

Fax: 703-535-6492

Cell: 301-802-3375

E-mail: wmaroni@shrm.org

10/18/2007

**Greenberg, David**

| | |
|---|---|
| **From:** | Sporidis, Harry [hsporidis@thewashingtongroup.com] |
| **Sent:** | Thursday, September 27, 2007 7:36 PM |
| **To:** | Lobo, Paul; Gray, Tracey |
| **Subject:** | Fw: Termination Notice |

Josh's termination is below

-----Original Message-----
From: Levine, Josh <JHL1@mentorcorp.com>
To: Sporidis, Harry
Sent: Thu Sep 27 19:19:18 2007
Subject: Termination Notice

Harry,


This communication will serve as official notice that Mentor Corporation wishes to terminate it's agreement with The Washington Group.


This formally serves notice on the 30 day termination window.


Thank You,


Josh Levine

FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

—  Exh C  —

**Mersky, Craig**

| | |
|---|---|
| From: | Sporidis, Harry |
| Sent: | Thursday, September 27, 2007 4:18 PM |
| To: | Levine, Josh |
| Subject: | RE: ASPS |

Thanks Josh,

The name of the firm is Powell Goldstein LLP.  Its an Atlanta based firm that has offices in DC and Dallas.  I will be part of the government relations practice of the firm which has a very strong health background.

The address is:

901 New York Ave., NW
3rd Floor
Washington, DC 20001

Would you be able to send me an e-mail today that would terminate the agreement with the Washington Group and I will in turn send you a new agreement to begin on October 24th.

Thanks Josh.  Please call me should you have any questions.

-----Original Message-----
From: Levine, Josh [mailto:JHL1@mentorcorp.com]
Sent: Thu 9/27/2007 4:13 PM
To: Sporidis, Harry
Subject: Re: ASPS

I would like to see a copy of the proposal before it goes out. Can you identify the name of the firm you're moving to?

Thx
J
--------------------------
Sent from my BlackBerry Wireless Handheld


----- Original Message -----
From: Sporidis, Harry <hsporidis@tnewashingtongroup.com>
To: JHL1@mentorcorp.com <JHL1@mentorcorp.com>
Sent: Thu Sep 27 05:35:49 2007
Subject: ASPS

Josh,

I have been asked to submit a proposal to ASPS to assist them in their gov't relation's activities.  This I believe presents some great opportunities for us in being able to coordinate ASPS' efforts along with ours.

Please let me know if you feel this may be a conflict.  ASPS has not yet made a decision and will be selecting three firms to present to their board in Baltimore this October.

In addition, if you would like to have a copy of the proposal please let me know.

Thanks Josh.

Harry

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from

1

— Exh D —

disclosure. Dissemination, distribution or copying of this e-mail or the information
herein by anyone other than the intended recipient, or an employee or agent responsible
for delivering the message to the intended recipient, is prohibited. If you have received
this e-mail by mistake, please delete it from your system immediately and notify
helpdesk@thewashingtongroup.com.

**Mersky, Craig**

| | |
|---|---|
| From: | Sporidis, Harry |
| Sent: | Wednesday, September 26, 2007 6:41 PM |
| To: | 'Kamind@asco.org' |
| Subject: | Re: Heads up |

It went great. I'll call you in the AM and give you the download

-----Original Message-----
From: Deborah Kamin <Kamind@asco.org>
To: Sporidis, Harry
Sent: Wed Sep 26 17:47:14 2007
Subject: Re: Heads up

Yes, I talked to Dina and she has said you should send an engagement letter from your new firm. How did it go with Susan?

>>> "Sporidis, Harry" <hsporidis@thewashingtongroup.com> 9/26/2007 3:30
>>> PM >>>
Deborah,

I wanted to let you know that I had a conversation with Susan today about my departure from TWG.

I will be moving to my new firm on October 22nd. I wanted to discuss with you how we should proceed on the new agreement. Should I send a contract over to you that will pick up on October 22nd and we can move forward from there?

I know that you are about to get on a call so if you have time let's discuss this tomorrow.

Thanks

Harry Sporidis
The Washington Group
1401 K Street, NW
10th Floor
Washington, DC 20005
Phone: 202-789-2111
Fax:     202-789-4883
Mobile: 202-669-7399

www.thewashingtongroup.com <http://www.thewashingtongroup.com/>

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

--------------------------------------------------------------------------
----------------------
Privacy Notice:
The contents of this electronic message, including any prior messages, files, or attachments transmitted with it, are CONFIDENTIAL and are intended solely for the use of the individual(s) to whom the message is addressed. This message may contain legally protected or privileged information. Do not read, copy, disclose or forward this message without authorization from the originator of this message. If you have received this message in error, please notify the sender immediately and delete all copies from your

1

— ExhE

## Mersky, Craig

**From:**    Sporidis, Harry
**Sent:**    Thursday, September 27, 2007 2:22 PM
**To:**      'Shelagh Foster'
**Subject:** FW:

Shelagh,

Since I don't have a copy of the Ketchum contract, would you assist me on this?  Just let me know what you would like the scope of the agreement to be.

**From:** Berry, Cynthia [mailto:CBerry@pogolaw.com]
**Sent:** Thursday, September 27, 2007 2:14 PM
**To:** Sporidis, Harry
**Subject:** RE:

Can you tell me the specific issues and other pertinent info to be included in the ASCO contract?

Cynthia E. Berry, Esq.
Powell Goldstein LLP
901 New York Ave., NW
3rd Floor
Washington, DC 20001
(202) 624-3976
(202) 624-7222 (fax)

-----Original Message-----
**From:** Sporidis, Harry [mailto:hsporidis@thewashingtongroup.com]
**Sent:** Thursday, September 27, 2007 1:39 PM
**To:** Berry, Cynthia
**Subject:**

Cindi,

Again, my apologies on not having you on the e-mails.

Attached is the agreement that I have had with Mentor Corp.

ASCO has also asked that we send out the agreement letter ASAP.  The Agreement should begin on October 24th for both ASCO and Mentor.

ASCO is $20k a month and Mentor is $25k a month.

The person that we need to send the letter to at ASCO is:

Deborah Kamin
Senior Director Cancer Policy and Clinical Affairs
1900 Duke Street
Suite 200
Alexandria, VA 22314

FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

I am also forwarding you the e-mail that I sent to Josh Levine at Mentor.

**Harry Sporidis**
*The Washington Group*
*1401 K Street, NW*
*10th Floor*
*Washington, DC 20005*
*Phone: 202-789-2111*
*Fax:    202-789-4883*
*Mobile: 202-669-7399*

*www.thewashingtongroup.com*

---

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this communication in error, and delete the copy you received.

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this e-mail or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

Thank you.

10/8/2007

**Mersky, Craig**

| | |
|---|---|
| **From:** | Sporidis, Harry |
| **Sent:** | Thursday, September 27, 2007 7:38 PM |
| **To:** | 'cberry@pgfm.com' |
| **Subject:** | Fw: Termination Notice |

Hi Cindi.

Josh at Mentor formally terminated the agreement today. Let me know if you want me to come over tomorrow. I was hoping we could FedEx a new agreement to Josh sometime tomorrow.

Thanks!!!

-----Original Message-----
From: Levine, Josh <JHL1@mentorcorp.com>
To: Sporidis, Harry
Sent: Thu Sep 27 19:19:18 2007
Subject: Termination Notice

Harry,


This communication will serve as official notice that Mentor Corporation wishes to terminate it's agreement with The Washington Group.


This formally serves notice on the 30 day termination window.


Thank You,


Josh Levine

*FILED*

*OCT 1 9 2007*

*NANCY MAYER WHITTINGTON, CLERK*
*U.S. DISTRICT COURT*

1

— Exh G

**Mersky, Craig**

| | |
|---|---|
| From: | Sporidis, Harry |
| Sent: | Thursday, September 27, 2007 8:50 PM |
| To: | 'CBerry@pogolaw.com' |
| Subject: | Re: Termination Notice |

You're the best!   I'll take a look at it and get back to you.

Thanks Cindi

-----Original Message-----
From: Berry, Cynthia <CBerry@pogolaw.com>
To: Sporidis, Harry
Sent: Thu Sep 27 20:19:13 2007
Subject: Re: Termination Notice

Harry

I emailed a draft letter and contract terms to your other email. Please review and let me
know if you have any changes. I have to sign it on behalf of PoGo (it's a GA partnership
law requirement) so you don't need to come over to sign anything. Once you approve the
content, I'll sign and fed ex it. Of course you are always welcome to come over!  It's not
necessary though. Per your instructions, I made the agreement effective as of Oct 24 but
that is less than 30 days from today. Is that ok?

----- Original Message -----
From: Sporidis, Harry <hsporidis@thewashingtongroup.com>
To: Berry, Cynthia
Sent: Thu Sep 27 19:37:49 2007
Subject: Fw: Termination Notice

Hi Cindi.

Josh at Mentor formally terminated the agreement today. Let me know if you want me to come
over tomorrow.  I was hoping we could FedEx a new agreement to Josh sometime tomorrow.

Thanks!!!

-----Original Message-----
From: Levine, Josh <JHL1@mentorcorp.com>
To: Sporidis, Harry
Sent: Thu Sep 27 19:19:18 2007
Subject: Termination Notice

Harry,


This communication will serve as official notice that Mentor Corporation wishes to
terminate it's agreement with The Washington Group.


This formally serves notice on the 30 day termination window.


Thank You,


Josh Levine

1

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this communication in error, and delete the copy you received.

IRS CIRCULAR 230 Disclosure:  Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this e-mail or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

Thank you.

**Mersky, Craig**

| | |
|---|---|
| **From:** | Sporidis, Harry |
| **Sent:** | Friday, September 28, 2007 8:19 AM |
| **To:** | LSME (Lauren Semeniuk) |
| **Subject:** | RE: Stearns B'fast 10/2/07 |

Lauren,

Lunch was great.   I should let you know that I am leaving the Washington Group and
heading over to the Powell Goldstein offices next month.   Just announced this yesterday.

As for the breakfast, these are hard for me to get to these days because of all of the
kids in my house.  I can do a lunch if you ever do one.


-----Original Message-----
From: LSME (Lauren Semeniuk) [mailto:lsme@novonordisk.com]
Sent: Thu 9/27/2007 6:38 PM
To: Sporidis, Harry
Subject: Stearns B'fast 10/2/07

Hi Harry! What a lovely lunch last Friday! Wish they could all be so relaxed. Anyway,
Harry, I, as an alumni of Rep. Stearns, am co-hosting a breakfast for him next Tuesday,
and thought I'd toss it your way in case you can make it.

See you soon, regardless. Take care,

Lauren


Lauren Semeniuk
Manager, Government Affairs
Novo Nordisk Inc.
500 New Jersey Avenue NW
Suite 350
Washington, DC 20001
USA
+1 202-626-4531 (direct)
+1 609-751-4050 (mobile)
LSME@novonordisk.com

This e-mail (including any attachments) is intended for the addressee(s) stated above only
and may contain confidential information protected by law. You are hereby notified that
any unauthorised reading, disclosure, copying or distribution of this e-mail or use of
information contained herein is strictly prohibited and may violate rights to proprietary
information. If you are not an intended recipient, please return this e-mail to the sender
and delete it immediately hereafter. Thank you.

FILED

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

— Exh A

DAVIS & GILBERT LLP
1740 BROADWAY
NEW YORK, NEW YORK 10019
(212) 468-4800

DIRECT DIAL NUMBER
(212) 468-4840
EMAIL ADDRESS
gbrochin@dglaw.com

MAIN FACSIMILE
(212) 468-4888
PERSONAL FACSIMILE
(212) 974-6940

October 6, 2007

**VIA EMAIL & FEDERAL EXPRESS**

Mr. Harry A. Sporidis
10124 Sorrel Ave.
Potomac, Maryland 20854

Re:    **The Washington Group**

Dear Mr. Sporidis:

This firm represents The Washington Group (the "Company"). It is our understanding that you recently gave notice of your intent to resign from the Company. It is also our understanding that you plan to begin working for a Company competitor. We are writing to address two very serious matters: (1) your legal obligations to the Company under common law and (2) your Restricted Stock Agreement with the Company, which you entered into by electronically accepting its terms and conditions on July 27, 2005 (the "Agreement").

As a Senior Vice President of the Company, you owe an undivided duty of loyalty and fair dealing to the Company. This obligation is both set forth in the Agreement and required under common law and prohibits you from soliciting any Company clients on your own behalf on or behalf of anyone other than the Company, including your future employer, prior to the termination of your employment with the Company. It is our understanding that at least one Company client with which you have worked has given notice that they are terminating their engagement with the Company. Your solicitation of this client while still an employee of Company, clearly constitutes a breach of your obligations under common law and the terms and conditions of the Agreement.

In addition, in consideration for the restricted shares awarded to you pursuant to the Agreement, a copy of which is enclosed for your reference, you agreed to abide by the terms and conditions of several protective covenants. Under section 6 of the Agreement, you agreed, among other things, that except on behalf of the Group (as defined in the Agreement):

FILED

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

— Exh I

Mr. Harry A. Sporidis
October 6, 2007
Page 2

i)         during the Employment Period. [you] shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent [you] from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

ii)        for a one-year period following the Termination Date, [you will not] solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expect to do with members of the Group; provided, *however*, that solely with respect to this [paragraph], the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, [you] had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; . . .

Under these circumstances, we demand that you immediately cease and desist soliciting Company clients. We further demand that within 3 days of this letter, you provide us with a written list of any and all Company clients that you have solicited for non-Company work. Finally, if you decide to leave the Company, we demand that you certify to us in writing within 3 days that you will comply with your obligations under the Agreement, including your paragraph 6(g) obligation to inform your future employers of your obligations under the Agreement.

Mr. Harry A. Sporidis
October 6, 2007
Page 3


Please be advised that the Company takes these matters very seriously and will continue to monitor this situation. If you fail to comply with the demands set forth above, or if we learn of additional conduct that violates your obligations under the Agreement, the Company will take appropriate action. If legal action is necessary, the Company may seek (1) monetary damages from you and those acting in concert with you attributable to your wrongful actions, (2) disgorgement of any salary or other compensation paid to you during any period of disloyalty, (3) voiding of the restricted shares granted under the Agreement; (4) forfeiture of any vested shares of Omnicom common stock acquired by you pursuant to the Agreement; (5) disgorgement of any gain realized by you from the sale or transfer of the Omnicom common stock acquired by you pursuant to the Agreement; (6) an injunction against you and all those acting in concert with you, (7) reimbursement for its reasonable attorney's fees and court costs, and (8) all the other relief it deems appropriate.

This letter shall not be considered a waiver of any rights or remedies by the Company, including those with respect to any of your actions to date, all of which are expressly reserved.

Very truly yours,

Gregg L. Brochin


Enclosure

cc:    Craig Mersky Esq.
       Gary Marx, Esq.

# OMNICOM GROUP INC.

## RESTRICTED STOCK AGREEMENT

**RESTRICTED STOCK AGREEMENT**, dated as of _____ (this "**Agreement**"), by and between Omnicom Group Inc., a New York corporation, ("**Omnicom**"), and _____ (the "**Employee**").

**WHEREAS**, Omnicom has implemented the Omnicom Group Inc. Equity Incentive Plan, as amended, restated or otherwise modified from time to time (the "**Plan**"); and

**WHEREAS**, capitalized terms used and not otherwise defined herein or in the Plan shall have the meanings set forth in Section 4 hereof;

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, and as an inducement to the Employee to continue as an employee of the Company and to promote the success of the business of the Company, the parties hereto agree as follows:

1.     **Grant**. Omnicom hereby grants to the Employee, and the Employee hereby accepts, an award of restricted stock, effective as of the date hereof (the "**Grant Date**"), of _____ shares of the common stock, par value $0.15 per share, of Omnicom (the "**Restricted Shares**"), subject to the conditions, limitations and restrictions set forth in the Plan and this Agreement. On the Grant Date, the Employee shall pay to Omnicom an amount equal to $0.15 multiplied by the number of Restricted Shares being granted hereunder (such amount being the aggregate par value of the Restricted Shares) (the "**Aggregate Par Value**"). Such payment shall either be (i) deducted by the administrator of Omnicom's Equity Incentive Plan ("**Omnicom's Agent**") from the Employee's brokerage account or participant trust maintained with Omnicom's Agent ("**Employee's Brokerage Account**"), (ii) if the entire Aggregate Par Value is not on deposit in Employee's Brokerage Account, deposited in cash by the Employee to Employee's Brokerage Account, or (iii) made as otherwise directed by Omnicom. The Restricted Shares shall be deemed to include associated Stock Dividends (as defined below).

2.     **Ownership, Rights as a Shareholder and Custody**. The Employee is the owner of the Restricted Shares and has all the rights of a shareholder with respect thereto, including the right to vote such Restricted Shares and to receive all dividends or other distributions paid with respect to such Restricted Shares; provided, that, dividends and distributions in shares of Omnicom common stock (the "**Stock Dividends**") shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Shares with respect to which such Stock Dividends have been distributed. Accordingly, the Employee shall only be entitled to receive such Stock Dividends when the Restricted Shares (with respect to which such Stock Dividends have been distributed) vest pursuant to Section 3 below. Such ownership of Restricted Shares and Stock Dividends shall be evidenced by book entries on the records of Omnicom. Promptly following the vesting of Restricted Shares pursuant to this Agreement, shares evidencing such Restricted Shares and Stock Dividends shall be transferred into Employee's Brokerage Account or, at

Omnicom's sole discretion, stock certificate(s) shall be issued and delivered to the Employee (or his/her permitted transferees) by Omnicom.

3.    **Vesting and Forfeiture**.

(a)    Provided that the Employee has remained in the continuous employ of Omnicom or an Omnicom Affiliate through the respective Vesting Date (as defined below), the Restricted Shares shall automatically vest and become transferable and nonforfeitable as to 20% of such Restricted Shares on (i) the first anniversary date of the Grant Date (the "**First Vesting Date**") and (ii) each of the next four anniversary dates of the First Vesting Date (each of such dates being referred to herein as a "**Vesting Date**").

(b)    In the event of a Termination of Employment prior to a Vesting Date by reason of the death of the Employee, all of the Restricted Shares not yet vested shall vest and become transferable and nonforfeitable on the Termination Date.

(c)    In the event of a Termination of Employment prior to a Vesting Date by reason of the Total Disability of the Employee, a portion of the then unvested Restricted Shares shall vest and become transferable and nonforfeitable on the Termination Date, such portion (rounded up to the nearest full Restricted Share) to be equal to the sum for each remaining Vesting Date of (i) the total number of Restricted Shares which would vest on such Vesting Date multiplied by (ii) a fraction, (A) the numerator of which shall be the number of full calendar months between the Grant Date and the Termination Date and (B) the denominator of which shall be the number of full calendar months between the Grant Date and such Vesting Date.

(d)    In the event of a Change of Control prior to a Vesting Date, all of the Restricted Shares not yet vested shall vest, and shall become transferable and nonforfeitable as of the effective time of such transaction or at such earlier time as may be fixed by the Compensation Committee of the Board (the "**Omnicom Compensation Committee**").

(e)    Any Restricted Shares not vested on the Termination Date shall be forfeited and Omnicom shall repurchase such Restricted Shares from the Employee or the Employee's legal representative at a price equal to the product of (i) the par value of such Restricted Shares multiplied by (ii) the number of Restricted Shares being repurchased. Omnicom shall pay or cause to be paid such amount to the Employee or the Employee's legal representative no later than 60 days following the Termination Date.

(f)    Notwithstanding anything contained herein to the contrary, the Employee shall make arrangements satisfactory to Omnicom for the satisfaction of any withholding tax obligations that arise in connection with his/her Restricted Shares, including, without limitation, by electing to have Omnicom's Agent withhold a portion of the vested Restricted Shares on the Vesting Date in payment of the relevant withholding taxes or maintaining sufficient cash in Employee's Brokerage Account for payment of the relevant withholding taxes.

4.    **Definitions**.  For purposes of this Agreement, the terms set forth below shall have the following meanings:

(a)    "**Affiliate**" of Omnicom or the Company, as the case may be, shall mean any person, firm, corporation or other form of entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Omnicom or the Company, as the case may be.

(b)    "**Board**" means the Board of Directors of Omnicom.

(c)    "**Change of Control**" means and includes each of the following: (i) the acquisition, in one or more transactions, of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) by any person or entity or any group of persons or entities who constitute a group (within the meaning of Section 13(d)(3) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of Omnicom or a Subsidiary, of any securities of Omnicom such that, as a result of such acquisition, such person, entity or group either (A) beneficially owns (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, more than 20% of Omnicom's outstanding voting securities entitled to vote on a regular basis for a majority of the members of the Board or (B) otherwise has the ability to elect, directly or indirectly, a majority of the members of the Board; (ii) a change in the composition of the Board such that a majority of the members of the Board are not Continuing Directors; or (iii) the consummation of a merger or consolidation of Omnicom with any other corporation which has been approved by the shareholders of Omnicom, other than a merger or consolidation which would result in the voting securities of Omnicom outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 80% of the total voting power represented by the voting securities of Omnicom or such surviving entity outstanding immediately after such merger or consolidation, or the consummation of a plan of complete dissolution or liquidation of the Company or an agreement for the sale or disposition by Omnicom of (in one or more transactions) all or substantially all of Omnicom's assets which has been approved by the shareholders of Omnicom.

(d)    "**Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the Employment Period or (ii) had made a Pitch at any time during the Employment Period, or the six months immediately following, the Termination Date.

(e)    "**Company**" means the Omnicom Affiliate by whom the Employee is employed as of the date of this Agreement and each other Omnicom Affiliate by whom the Employee is employed at any time during the Employment Period.

(f)    "**Continuing Director**" means, as of any date of determination, any member of the Board who (i) was a member of such Board on the effective date of the Plan or (ii) was nominated for election or elected to such Board with the affirmative vote of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election.

3

(g)    "**Employment Period**" means the period that the Employee is employed by any member of the Group.

(h)    "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

(i)    "**Group**" means (i) if the Company operates within an Omnicom network, all of the companies, group of companies and divisions operating under a global or national brand of such Omnicom network, and (ii) if the Company operates as part of a division or separate company independent of an Omnicom network, all companies and divisions operating under such independent brand.

(j)    "**Pitch**" means a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(k)    "**Restricted Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the one-year period prior to the Termination Date, or (ii) had made a Pitch at any time during the one-year period immediately preceding, or the six months immediately following, the Termination Date.

(l)    "**Subsidiary**" means any corporation that is a subsidiary of Omnicom within the meaning of Section 424(f) of the Internal Revenue Code of 1986, as amended from time to time, and any entity that is organized as a limited liability company in which Omnicom, directly or indirectly, possesses 50% or more of the voting power of all members of such limited liability company entitled to vote.

(m)    "**Termination Date**" means the date on which the Termination of Employment occurs.

(n)    "**Termination of Employment**" means the time when the Employee is no longer employed by any Omnicom Affiliate for any reason whatsoever.

(o)    "**Total Disability**" means the inability of the Employee to substantially perform the duties of his/her position as a result of illness or physical or mental incapacity or disability (from any cause or causes whatsoever).  All determinations as to the disability of any Employee shall be made by the Omnicom Compensation Committee or the Board of Directors of the Omnicom Affiliate, as the case may be, who is then the Employee's employer, upon the basis of such evidence as such Omnicom Compensation Committee or Board of Directors deems necessary or desirable.  In the event of a conflict between the determination made by the Omnicom Compensation Committee and the Board of Directors of the Omnicom Affiliate, the determination of the Omnicom Compensation Committee shall prevail.

5.    **Nontransferability**.  Prior to the date upon which the Restricted Shares become vested pursuant to paragraph 3 hereof, the Restricted Shares may not be pledged, encumbered or hypothecated to, or in favor of, or subject to any lien, obligation or liability of the Employee to

4

any party, or assigned or transferred by the Employee otherwise than by will or the laws of descent and distribution; provided, however that such Restricted Shares may be transferred without consideration to immediate family members (*i.e.*, children, grandchildren or spouse), to trusts for the benefit of such immediate family members and to partnerships in which such family members are the only partners, provided that any such family member, trust and/or partnership shall be subject to all terms, conditions and restrictions of this Agreement by signing a joinder hereto.

6.    **Non-Solicitation/Non-Servicing and Protection of Confidential Information Agreement**.

(a)    In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group, the Employee will not, as an individual, employee, consultant, independent contractor, partner, shareholder, member or in association with any other person, firm, corporation or other form of entity, directly or indirectly, and regardless of the Employee continuing to be employed by a member of the Group or the reason for the Employee ceasing to be so employed by any member of the Group; provided, however, the restrictions set forth below in clauses (ii) and (iii) below shall only apply with respect to periods following the Termination Date if any Restricted Shares have vested under this Agreement:

(i)    during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the same nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

(ii)    for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with members of the Group; provided, *however*, that solely with respect to this Section 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; and

(iii)    for a one-year period following the Termination Date, employ as an employee or retain as a consultant any person, firm, corporation or other form of entity who is then or at any time during the one-year period prior to the Termination Date was, an employee of or exclusive consultant to a member of the

5

Group, or persuade or attempt to persuade any employee of or exclusive consultant to a member of the Group to leave the employ of such member of the Group or to become employed as an employee or retained as a consultant by any other person, firm, corporation or other form of entity; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of any member of the Group shall not be deemed to be a breach of this provision.

(b)    As a professional in a highly service-oriented and creative business, the Employee understands and agrees that his/her position with the Company requires and will continue to require services which are of a special character and which places him/her in a position of confidence and trust with the Clients and employees of members of the Group. The Employee further acknowledges that his/her services to the Clients necessarily require that the Employee have access to Confidential Information (as defined below) of members of the Group and their respective Clients and that, in the course of his/her employment with or rendering of services to the Company, the Employee will develop personal relationships with the Clients and knowledge of those Clients' affairs and requirements. Accordingly, the Employee acknowledges that the type and periods of restrictions imposed in this Agreement are fair and reasonable, are reasonably required in order to protect and maintain the proprietary interests of the members of the Group, other legitimate business interests of members of the Group, and the goodwill associated with the members of the Group. The Employee further understands and agrees that the Restricted Clients may be serviced from any location and accordingly it is reasonable that the covenants set forth herein are not limited by narrow geographic area but generally by the location of such Restricted Clients. In the event that any covenant contained in this Agreement shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, (i) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court or other tribunal making such determination, and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made.

(c)    The Employee hereby acknowledges and agrees that for so long as the Employee has been employed by the Company (which term, as used in this Section 6(c) and Section 6(d) shall be deemed to include any Affiliate of the Company), the Employee has acquired and will continue to acquire and have access to confidential or proprietary information about the Company and/or its Clients, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Company and its Clients, Client contacts, creative policies and ideas, advertising campaigns, public relations campaigns, creative and media materials, graphic design, budgets, practices, concepts, strategies, methods of operation, financial or business projections of the Company, and information about or received from its Clients (collectively, **"Confidential Information"**). Accordingly, in consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this

6

Agreement, for so long as the Employee is employed by a member of the Group and thereafter, the Employee will retain in strictest confidence all Confidential Information and shall not disclose any such Confidential Information to anyone outside the members of the Group and Omnicom, except in the course of the Employee's duties for the Company or with Omnicom's express written consent. The Employee hereby acknowledges that he/she is aware that such Confidential Information is not readily available to the public, and agrees that he/she will not at any time utilize such Confidential Information for his/her own benefit or for the benefit of third parties.

(d)     The Employee hereby acknowledges and agrees that all materials created or modified by the Employee for so long as the Employee is employed by the Company, including, without limitation, all works of authorship, inventions, processes, ideas, methods, concepts and other tangible and intangible materials (collectively, "**Work Product**"), shall be "work for hire" and that the Company and/or Omnicom shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire", the Employee hereby assigns ownership of all such Work Product to the Company and/or Omnicom and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company and/or Omnicom. The Employee hereby appoints the Company and/or Omnicom as his/her attorney-in-fact with the limited power to execute assignments of such Work Product. If the Employee is an employee in the State of California, the parties hereto agree and acknowledge that the terms of this paragraph shall be subject to the terms of Section 2870 of the California Labor Code, a copy of which is annexed to this Agreement. The Employee hereby agrees to advise the Company and/or Omnicom promptly in writing of any inventions that he/she believes meet the criteria set forth in Section 2870.

(e)     Each of the covenants and agreements contained in this Section 6 (collectively, the "**Protective Covenants**") is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this Section 6 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law, in this Section 6 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The provisions of this Section 6 are not in lieu of, but are in addition to the continuing obligations of the Employee (which the Employee hereby acknowledges) to not use or disclose Confidential Information known to the Employee until any particular piece of Confidential Information becomes generally known to the public (through no action of the Employee), whereupon the restriction on use and disclosure shall cease as to that particular item. The existence of any claim, demand, action or cause of action that the Employee may have against Omnicom or any of its Affiliates, whether predicated pursuant to this Section 6 or otherwise, shall not constitute a defense to the enforcement of the provisions of this Section 6 or any other provision or provisions of this Agreement. The covenants contained in this Section 6 for the benefit of Omnicom and the members of the Group, shall survive any termination of this Agreement and may be waived in whole or in part by Omnicom without the consent of any other person, firm, corporation or other form of entity. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which the Employee is in violation of any of such Protective Covenants, and all such Protective Covenants shall automatically be extended by the period of

7

such violation. The Employee further acknowledges that he/she is a highly regarded executive who considered the terms and conditions upon which he/she is electing to be granted the Restricted Shares and that he/she has been advised and has had the opportunity to obtain counsel of his/her choice in connection with reviewing and executing this Agreement.

(f)     By acceptance of the grant of Restricted Shares, the Employee agrees that if the Employee were, without authority, to use or disclose Confidential Information, or otherwise breach any of the Protective Covenants, or threaten to do so, in addition to all other available remedies (including without limitation seeking such damages as it can show it has sustained by reason of such breach), (i) Omnicom and/or any member of the Group shall be entitled to specific performance and injunctive and other appropriate relief (without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law) to prevent the Employee from doing so, and/or (ii) Omnicom (by action of the Chairman, Chief Executive Officer, President, Chief Financial Officer or General Counsel of Omnicom) may cause any or all of the following actions to occur: (x) the Restricted Shares granted hereunder shall become void, shall be forfeited and shall terminate effective the date on which the Employee entered into such activity, (y) any vested shares of Omnicom common stock acquired by the Employee pursuant to the grant hereunder shall be forfeited and returned to Omnicom, and (z) any gain realized by the Employee from the sale or transfer of shares of Omnicom common stock acquired through the grant hereunder, shall be returned by the Employee to Omnicom. The Employee acknowledges that the harm caused to Omnicom and/or members of the Group by the breach or anticipated breach of this Agreement is by its nature irreparable because, among other things, it is not readily susceptible of proof as to the monetary harm that would ensue. The Employee consents that any interim or final equitable relief entered by a court of competent jurisdiction shall, at the request of Omnicom and/or a member of the Group be entered on consent and enforced by any court having jurisdiction over the Employee, without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

(g)     During the Employment Period and the one-year period after the Termination Date, prior to accepting employment with any subsequent employer, the Employee shall notify any prospective employer in writing of his/her obligations under this Agreement. In addition, immediately after accepting employment with a subsequent employer, the Employee shall provide Omnicom with a copy of the notice that was sent by him/her to such subsequent employer.

7.     **Investment Representation and Compliance With Applicable Law**. The Employee hereby represents and covenants that (a) the Restricted Shares will be acquired for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), unless such acquisition has been registered under the Securities Act and any applicable state securities law; and (b) any subsequent sale of any such Restricted Shares, unless their acquisition had been so registered, shall be made either pursuant to an effective registration statement under the Securities Act and any applicable state securities laws, or pursuant to an exemption from registration under the Securities Act and such state securities laws.

8

8.    **No Understandings as to Employment**. Nothing in the grant of the Restricted Shares or in this Agreement shall constitute or be evidence of any understanding, express or implied, on the part of Omnicom or any Omnicom Affiliate to employ the Employee for any period.

9.    **Plan Incorporated**. The Employee accepts the Restricted Shares herein subject to all of the provisions of the Plan, which are incorporated into this Agreement, including the provisions that authorize the Omnicom Compensation Committee to administer and interpret the Plan and which provide that the Omnicom Compensation Committee's decisions, determinations and interpretations with respect to the Plan are final and conclusive on all persons affected hereby. In the event of a conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan shall govern. Terms not otherwise defined in this Agreement shall have the meanings ascribed in the Plan.

10.    **Amendment**. This Agreement may be amended only by an instrument in writing executed and delivered by the Employee and Omnicom.

11.    **Assignment.** The parties hereto agree that the Omnicom shall have the right to assign this Agreement, and accordingly, this Agreement shall inure to the benefit of, and may be enforced by, any and all successors and assigns of Omnicom, including, without limitation, by asset assignment, stock sale, merger, consolidation or other corporate reorganization. Subject to Section 5, the Employee agrees that his/her obligations under this Agreement are personal to him/her, and the Employee shall not have the right to assign or otherwise transfer his/her obligations hereunder. Any purported assignment or transfer by the Employee shall be void and ineffective.

12.    **Governing Law**. The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of New York without regard to any conflicts or choice of laws provisions of the State of New York that would result in the application of the law of any other jurisdiction.

13.    **Notice**. Any notice to be given to Omnicom under the terms of this Agreement shall be addressed to the Office of the General Counsel of Omnicom at 437 Madison Avenue, New York, New York 10022, and any notice to be given to the Employee shall be addressed to the Employee at the address set forth beneath his or her signature hereto, or at such other address for a party as such party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if mailed, postage prepaid, addressed as aforesaid.

14.    **Headings**. All section titles and captions in this Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend or describe the scope or intent of any provisions of this Agreement.

15.    **Further Assurances**. The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement.

9

16.    **Entire Agreement**. This Agreement, together with the Plan, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto. Notwithstanding the foregoing, any other confidentiality agreement, non-solicitation/non-servicing agreement or any other type of restrictive covenant agreement that the Employee has entered into prior to the date hereof or may enter into after the date hereof with Omnicom or one of its Affiliates shall remain in full force and effect. No oral understandings, oral statements, oral promises or oral inducements between the parties hereto relating to this Agreement exist. No representations, warranties, covenants or conditions, express or implied, whether by statute or otherwise, other than as set forth in this Agreement, have been made by the parties hereto.

17.    **Remedies**. No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

18.    **Counterparts**. This Agreement may be executed in two or more counterparts, or by facsimile transmission, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

19.    **Waiver**. By signing and returning this Agreement, the Employee agrees that the Employee's rights in respect of the Restricted Shares (including upon Termination of Employment) shall be defined solely by the Plan and the provisions of this Agreement. Accordingly, the Employee waives all other claims he/she may have against Omnicom or any of its Affiliates, and their respective officers, directors, agents and employees for any losses or damages arising out of the forfeiture of any Restricted Shares as a result of such Termination of Employment, or otherwise in relation to the Plan with respect to such Restricted Shares.

20.    **Third Party Beneficiaries**. Nothing in this Agreement is intended to confer upon any other person except the Employee, Omnicom and the Affiliates of Omnicom any rights or remedies hereunder or shall create any third party beneficiary rights in any person (other than Affiliates of Omnicom).

21.    **No Strict Construction**. The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto. The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.

*[The remainder of this page is left blank intentionally]*

10

**IN WITNESS WHEREOF**, Omnicom, by its duly authorized officer, and the Employee, each has executed this Agreement as of the day and year first above written.

OMNICOM GROUP INC.

By: _____
Name: Michael J. O'Brien
Title: Senior Vice President,
General Counsel and
Secretary

**EMPLOYEE**

_____
Name:

11

**Annex I**
**to Restricted Stock Agreement**

## California Labor Code Section 2870

Employment agreements; assignment of rights

      (a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

          (i)    relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

          (ii)    result from any work performed by the employee for the employer.

      (b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

12

**FILED**

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

THE WASHINGTON GROUP, INC.,

        Plaintiff,

  -against-

HARRY SPORIDIS,

        Defendant.

No. ___07 1892___

**DECLARATION OF STEVEN
AZZOPARDI IN SUPPORT OF
THE WASHIGNTON GROUP,
INC.'S MOTION FOR A
TEMPORARY RESTRAINING
ORDER AND INJUNCTIVE
RELIEF**

**STEVEN AZZOPARDI,** under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares as follows:

    1.    I am the Director of Finance for Omnicom Group, Inc. ("Omnicom"). I make this declaration in support of The Washington Group's ("TWG") application for an order temporarily restraining and preliminarily enjoining its former employee, defendant Harry Sporidis ("Sporidis" or "Defendant") from continuing his ongoing breach of written protective covenants that Sporidis agreed to during his employment with TWG. I am fully familiar with the facts and circumstances set forth herein. Such familiarity is based upon my own personal knowledge, review of the books and records of Omnicom, and discussions with the Omnicom's other employees and agents.

    2.    Omnicom periodically rewards the employees of its affiliates (including TWG) with grants of restricted Omnicom stock. Before the employees can receive such grants, Omnicom and its affiliates require the employees to agree to a

Restricted Stock Agreement ("RSA"), containing terms and conditions regarding the grant of stock.

3.    In order to protect Omnicom's and its affiliates' client and employee relationships and confidential marketing strategies, the RSA includes reasonable protective covenants that restrict the employees, *inter alia*, from soliciting or servicing clients whom they serviced while employed by Omnicom or its affiliate for one year following the end of employment.

4.    In or about May 2005, Sporidis received an award of Omnicom restricted stock (the "2005 Award"). Sporidis was notified of this 2005 Award by letter sent to him in or about May or June 2005, and was instructed in that letter to log on to the "NetBenefits" website operated by Fidelity Investments, the administrator of Omnicom's Restricted Stock Plan, where Sporidis could view his award and accept or decline it.

5.    Sporidis indeed visited Fidelity's NetBenefits website on or about July 27, 2005 and accepted his 2005 Award. (Copies of Fidelity's Online Grant Agreement Report, showing a record of Sporidis's acceptance of the 2005 Award, and a computer screen capture from Fidelity's benefits administration system displaying the same, are attached hereto as Exhibit A.)

6.    Attached hereto as Exhibit B is a copy of a "walk through" demonstrating the process for accepting grants of stock though Fidelity's NetBenefits website, including screen shots of that process.    As Exhibit B demonstrates, employees who log onto the site are notified that they are required to review and accept the terms and conditions of the RSA – which is available via a hyperlink located immediately below this notice – before proceeding. Upon clicking the hyperlink, the RSA opens on

2

the employee's screen, and is reviewable and printable. The employees are then required to check a box – located immediately below the hyperlink to the RSA – representing that they have indeed reviewed and accepted the terms and conditions of the RSA. Without checking this box, the employees are unable to successfully click the "Accept" button – located directly below the notice and checkbox – and therefore are unable to receive their stock.

7.    Though these screen shots attached as Exhibit B demonstrate the current grant acceptance process, aside from some minor changes, the acceptance process in 2005 was essentially the same as it is today. As is the case today, employees accepting stock grants in 2005 were presented with the notification that they had to review and accept the RSA, available by hyperlink from the same screen, and were required to check the box representing that they had done so before they were able to accept the grant and receive their stock.

8.    Attached hereto as Exhibit C is a true and correct copy of the 2005 RSA. This was the RSA presented to award recipients at the Fidelity NetBenefits in July 2005, at the time Sporidis accepted his 2005 Award. Upon clicking the hyperlink presented at the NetBenefits site, this document -- with the date, the recipient's name, and the number of shares filled automatically -- opened for the employee's review.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      October 18, 2007

                                                    STEVEN AZZOPARDI

3



## Online Grant Agreement Report
10/05/2007

**Client Name:** OMNICOM GROUP
**Locale:** DOMESTIC
**Country:** USA
**Division:** DAS

| Participant Name | Participant ID | Grant ID / Client Grant ID | Accepted / Declined | Special Instruction Clauses | Date | Time | Channel |
|---|---|---|---|---|---|---|---|
| | | | Grant Type: RESTRICTED STOCK AWARDS | | | | |
| | | | Grant Sub Type: RSA | | | | |
| | | | Plan Name: EQUITY INCENTIVE PLAN | | | | |
| | | | Product Name: 2005 5-20 | | | | |
| Grant Date:05/23/2005 | Grant Price: $0.15 | | Shares Granted 360 | | | | |
| SPORIDIS, HARRY | 217045179 | 2005 5-20 / 0518000000062 | Accepted | N/A | 07/27/2005 | 08:40 PM | Web |

*Fidelity Stock Plan Services LLC*
Page 1 of 1

10/08/07 03:20 AM



– Exh A



Func: SRAN                ** Stock Option Administration **          Date: 10/11/2007
Prog: FBC1465             OGA Accept/Decline History Information      Time: 10:33:51

            Action: I (I=Inquiry, A=Add, U=Update, D=Delete)

            Client Id: 03          Name: OMNICOM GROUP
         Participant Id: 21/005129          SPORIDIS, HARRY
    Confirmation Number: 2403 854

        Plan Number: EIP              Name: EQUITY INCENTIVE PLAN
         Product Id: 2005 5-20        Name: 2005 5-20
   Sub-Product Type: ISO (rsa,rsu)          MPT Status:        (e,p,s)
   Transaction Date: 07/27/2005 (mm/dd/yyyy)  MPT Journaled:    (y,s)
   Units/Shs Granted:          180.0000    Cost of Grant:          27.0000
        Grant Date: 05/23/2005 (mm/dd/yyyy)
   Sequence Number: 002                     Regrep: NNN
        Grant Price:        0.1500
       FBSI Account: X313G1924        Offset Account: X9/005916
      Accept/Decline: A (a=accept,d=decline)  Feedback: Y (y,n)
   Accept/Decline Date: 07/27/2005 (mm/dd/yyyy)  Confirm: Y (y,n)
   Accept/Decline Time: 20:40:03:00 (hh:mm:ss:tt) Bkpg Cash: Y (y,n)

   PF3=Exit  PF7=Scroll-Back  PF8=Scroll-Forward  PF12=Refresh

# Grant Agreement Walk Through on Netbenefits

**FILED**

OCT 1 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Exh b

After logging in to your account you will see a section entitled "Stock Plans" under this heading you will see a link for Stock Options as well as Restricted Stock. To accept a grant click on the product you wish to proceed with.

**THETA** CORPORATION

| Home | Savings & Retirement | Health & Insurance | Pay | Your Profile |
|------|---------------------|--------------------|----|--------------|

Log Out | Help

Savings & Retirement >

**Theta Stock Option Plan**

View

- Summary
- Transaction History
- Pending Exercises
- Statements/Records
- Plan Information & Documents

Act

- **Accept Grant**
- Decline Grant
- Estimate Gain
- Exercise Grant

- Tools & Learning

## Summary

Help | Glossary | Print This Page

**Account:** Theta Stock Option Plan  [Go]

◘ About Stock Plans: Learn more about your stock plan and brokerage account

**Grant Totals** As of 10/9/2007 4:09 P.M.

| Total Options | Total Value of Options* | Exercisable Options | Total Value of Exercisable Options* |
|---------------|------------------------|---------------------|-------------------------------------|
| 3,000 | $50,625.00 | 2,500 | $42,187.50 |

◘ Quick Quote

## Unaccepted Grants

| Grant Type | Grant Date | Grant ID | Expiration Date | Grant Price | Exercisable Options | Unaccepted Grants | Action |
|-----------|-----------|----------|-----------------|-------------|---------------------|-------------------|--------|
| NSO | 01/02/2002 | THTAOPTION3 | 01/01/2012 | $45.0000 | $45.000 | 1,000 | · Accept Grant · Decline Grant |
| ISO | 01/02/2003 | THTAOPTION4 | 01/01/2013 | $50.000 | $50.000 | 8500 | · Accept Grant · Decline Grant |

## Grant Summary

| Grant Type | Grant Date | Expiration Date | Grant ID | Grant Price | Exercisable Options | Unvested Options | Total Options | Total Value of Options* | Action |
|-----------|-----------|-----------------|----------|-------------|---------------------|------------------|---------------|------------------------|--------|
| NSO | 02/28/2001 | 02/28/2011 | THTAOPTION1 | $38.125 | 1,500 | 0 | 1,500 | $25,312.50 | · View Details · Estimate Gain · Exercise & Sell · Exercise & Hold |

From here, you will notice a box titled "Unaccepted Grants" this box will display any grants that have yet to be accepted. From this point you can choose to "accept" or "decline" your grant by clicking on the associated links to the right.



**THETA CORPORATION**

Home | Savings & Retirement | Health & Insurance | Pay | Your Profile

Log Out | Help

Savings & Retirement >

**Theta Stock Option Plan**

**View**
- Summary
- Transaction History
- Pending Exercises
- Statements/Records
- Plan Information & Documents

**Act**
- Accept Grant
- Decline Grant
- Estimate Gain
- Exercise Grant

Tools & Learning

## Summary

Help | Glossary | Print This Page

Account: Theta Stock Option Plan ▾ Go

About Stock Plans: Learn more about your stock plan and brokerage account

**Grant Totals** As of 11/9/2007 4:09 P.M.

Quick Quote

| Total Options | Total Value of Options* | Exercisable Options | Total Value of Exercisable Options* |
|---|---|---|---|
| 3,000 | $50,625.00 | 2,500 | $42,187.50 |

**Unaccepted Grants**

| Grant Type | Grant Date | Expiration Date | Grant ID | Grant Price | Exercisable Options | Unaccepted Grants | Unvested Options | Total Options | Total Value of Options* | Action |
|---|---|---|---|---|---|---|---|---|---|---|
| NSO | 01/02/2002 | 01/01/2012 | THTAOPTION3 | $45.0000 | | 1,000 | 0 | 1,500 | $25,312.50 | · Accept Grant · Decline Grant |
| ISO | 01/02/2003 | 01/01/2013 | THTAOPTION4 | $50.000 | | 8500 | | | | · Accept Grant · Decline Grant |

**Grant Summary**

| Grant Type | Grant Date | Expiration Date | Grant ID | Grant Price | Exercisable Options | Unvested Options | Total Options | Total Value of Options* | Action |
|---|---|---|---|---|---|---|---|---|---|
| NSO | 02/28/2001 | 02/28/2011 | THTAOPTION1 | $36.125 | 1,500 | 0 | 1,500 | $25,312.50 | · View Details · Estimate Gain · Exercise & Sell · Exercise & Hold |

**ACCEPTING:** If you choose to accept the grant, you will be brought to a section entitled "Plan Document". From this point you can click on the .pdf to view the document or print for your records. To proceed check the agreement and hit "Next".

---

**THETA**
CORPORATION

| Home | Savings & Retirement | Health & Insurance | Pay | Your Profile |

Log Out | Help

Tuesday, October 09, 2007

Savings & Retirement > Accept Grant >

## Plan Document

**Theta Stock Option Plan**

**View**
- **Summary**
- **Transaction History**
- **Pending Exercises**
- **Statements/Records**
- **Plan Information & Documents**

**Act**
- **Accept Grant**
- **Decline Grant**
- **Estimate Gain**
- **Exercise Grant**

☐ **Tools & Learning**

### Selected Grant

| Grant Date | Grant ID | Expiration Date | Grant Price | Unaccepted Options |
|---|---|---|---|---|
| 01/02/2002 | THTAOPTION3 | 01/02/2012 | $45.000 | 1,000 |

### Plan Document

**You must certify that you have read your Plan Document to continue.**

🖺 Plan Document (PDF)

☐ I have read and accept the Plan Document

You must click Next to complete the process. If you leave this page before clicking Next or if you click the Cancel link, your agreement will not be recorded and you will not have accepted the grant.

[ Next > ]

Read and Accept
Grant Agreement

❌ Cancel and select another grant

PDFs require Adobe® Reader®.

NetBenefits provided by

Copyright © 1996-2007 FMR Corp.

**Grant Terms & Conditions:** This is the final step in accepting your grant. From here you can view/print the grant agreement which will have the specifications for the grant you are electing to accept. Once you have read the agreement, click on the terms and click "Accept".

## Grant Terms and Agreement

### Selected Grant

| Grant Date | Grant ID | Expiration Date | Grant Price | Unaccepted Options |
|---|---|---|---|---|
| 01/02/2002 | THTAOPTION3 | 01/02/2012 | $45.000 | 1,000 |

### Grant Terms and Agreement

**You must read your Grant Agreement and review the terms to continue.**

📖 Grant Agreement (PDF)

☐  I have read and accept the Grant Agreement

Your grant acceptance will be final once you click Accept. To cancel this transaction, click the Cancel link.

[ ◄ Previous ]    [ Accept ► ]

Read Plan     Submit Grant
Document      Acceptance

✖ Cancel and select another grant

PDFs require Adobe® Reader®.

**Confirmation:** The final step will provide you with a confirmation number along with the "Terms of the Grant" and a second chance to review/print your plan documents and agreement. The next time you log in, you will notice that the grant has been moved to the section titled "Grant Summary".



THETA CORPORATION

Home | Savings & Retirement | Health & Insurance | Pay | Your Profile

Log Out | Help

Used by October 15, 2007

Savings & Retirement > Accept Grant >

**Theta Stock Option Plan**

View
- Summary
- Transaction History
- Pending Exercises
- Statements/Records
- Plan Information & Documents

Act
- Accept Grant
- Decline Grant
- Estimate Gain
- Exercise Grant

Tools & Learning

**Confirmation**                    Help | Glossary | Print This Page

Confirmation: Your grant acceptance has been received and recorded by Fidelity.

**Confirmation Number: 132R4628**

This unique number is confirmation of your grant acceptance. If you contact Fidelity, please use this number. Please print this confirmation for your records.

**Terms of Grant**

Grant Date: 01/02/2002
Grant ID: THTAOPTION3
Expiration Date: 01/01/2012
Accepted Grants: 1,000
Acceptance Date: 10/9/2007

**Next Steps**

- Review Accepted Grant Agreement (PDF)
- Review Plan Document (PDF)
- View your plan summary

PDFs require Adobe® Reader®.

NetBenefits provided by Fidelity

Copyright © 1996-2007 FMR Corp. All rights reserved.

# OMNICOM GROUP INC.

## RESTRICTED STOCK AGREEMENT

**RESTRICTED STOCK AGREEMENT**, dated as of _____ (this "**Agreement**"), by and between Omnicom Group Inc., a New York corporation, ("**Omnicom**"), and _____ (the "**Employee**").

**WHEREAS**, Omnicom has implemented the Omnicom Group Inc. Equity Incentive Plan, as amended, restated or otherwise modified from time to time (the "**Plan**"); and

**WHEREAS**, capitalized terms used and not otherwise defined herein or in the Plan shall have the meanings set forth in Section 4 hereof;

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, and as an inducement to the Employee to continue as an employee of the Company and to promote the success of the business of the Company, the parties hereto agree as follows:

1. **Grant**. Omnicom hereby grants to the Employee, and the Employee hereby accepts, an award of restricted stock, effective as of the date hereof (the "**Grant Date**"), of _____ shares of the common stock, par value $0.15 per share, of Omnicom (the "**Restricted Shares**"), subject to the conditions, limitations and restrictions set forth in the Plan and this Agreement. On the Grant Date, the Employee shall pay to Omnicom an amount equal to $0.15 multiplied by the number of Restricted Shares being granted hereunder (such amount being the aggregate par value of the Restricted Shares) (the "**Aggregate Par Value**"). Such payment shall either be (i) deducted by the administrator of Omnicom's Equity Incentive Plan ("**Omnicom's Agent**") from the Employee's brokerage account or participant trust maintained with Omnicom's Agent ("**Employee's Brokerage Account**"), (ii) if the entire Aggregate Par Value is not on deposit in Employee's Brokerage Account, deposited in cash by the Employee to Employee's Brokerage Account, or (iii) made as otherwise directed by Omnicom. The Restricted Shares shall be deemed to include associated Stock Dividends (as defined below).

2. **Ownership, Rights as a Shareholder and Custody**. The Employee is the owner of the Restricted Shares and has all the rights of a shareholder with respect thereto, including the right to vote such Restricted Shares and to receive all dividends or other distributions paid with respect to such Restricted Shares; provided, that, dividends and distributions in shares of Omnicom common stock (the "**Stock Dividends**") shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Shares with respect to which such Stock Dividends have been distributed. Accordingly, the Employee shall only be entitled to receive such Stock Dividends when the Restricted Shares (with respect to which such Stock Dividends have been distributed) vest pursuant to Section 3 below. Such ownership of Restricted Shares and Stock Dividends shall be evidenced by book entries on the records of Omnicom. Promptly following the vesting of Restricted Shares pursuant to this Agreement, shares evidencing such Restricted Shares and Stock Dividends shall be transferred into Employee's Brokerage Account or, at

— Exh C —

Omnicom's sole discretion, stock certificate(s) shall be issued and delivered to the Employee (or his/her permitted transferees) by Omnicom.

3.    **Vesting and Forfeiture**.

(a)    Provided that the Employee has remained in the continuous employ of Omnicom or an Omnicom Affiliate through the respective Vesting Date (as defined below), the Restricted Shares shall automatically vest and become transferable and nonforfeitable as to 20% of such Restricted Shares on (i) the first anniversary date of the Grant Date (the "**First Vesting Date**") and (ii) each of the next four anniversary dates of the First Vesting Date (each of such dates being referred to herein as a "**Vesting Date**").

(b)    In the event of a Termination of Employment prior to a Vesting Date by reason of the death of the Employee, all of the Restricted Shares not yet vested shall vest and become transferable and nonforfeitable on the Termination Date.

(c)    In the event of a Termination of Employment prior to a Vesting Date by reason of the Total Disability of the Employee, a portion of the then unvested Restricted Shares shall vest and become transferable and nonforfeitable on the Termination Date, such portion (rounded up to the nearest full Restricted Share) to be equal to the sum for each remaining Vesting Date of (i) the total number of Restricted Shares which would vest on such Vesting Date multiplied by (ii) a fraction, (A) the numerator of which shall be the number of full calendar months between the Grant Date and the Termination Date and (B) the denominator of which shall be the number of full calendar months between the Grant Date and such Vesting Date.

(d)    In the event of a Change of Control prior to a Vesting Date, all of the Restricted Shares not yet vested shall vest, and shall become transferable and nonforfeitable as of the effective time of such transaction or at such earlier time as may be fixed by the Compensation Committee of the Board (the "**Omnicom Compensation Committee**").

(e)    Any Restricted Shares not vested on the Termination Date shall be forfeited and Omnicom shall repurchase such Restricted Shares from the Employee or the Employee's legal representative at a price equal to the product of (i) the par value of such Restricted Shares multiplied by (ii) the number of Restricted Shares being repurchased. Omnicom shall pay or cause to be paid such amount to the Employee or the Employee's legal representative no later than 60 days following the Termination Date.

(f)    Notwithstanding anything contained herein to the contrary, the Employee shall make arrangements satisfactory to Omnicom for the satisfaction of any withholding tax obligations that arise in connection with his/her Restricted Shares, including, without limitation, by electing to have Omnicom's Agent withhold a portion of the vested Restricted Shares on the Vesting Date in payment of the relevant withholding taxes or maintaining sufficient cash in Employee's Brokerage Account for payment of the relevant withholding taxes.

2

4.    **Definitions**.  For purposes of this Agreement, the terms set forth below shall have the following meanings:

(a)    "**Affiliate**" of Omnicom or the Company, as the case may be, shall mean any person, firm, corporation or other form of entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Omnicom or the Company, as the case may be.

(b)    "**Board**" means the Board of Directors of Omnicom.

(c)    "**Change of Control**" means and includes each of the following: (i) the acquisition, in one or more transactions, of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) by any person or entity or any group of persons or entities who constitute a group (within the meaning of Section 13(d)(3) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of Omnicom or a Subsidiary, of any securities of Omnicom such that, as a result of such acquisition, such person, entity or group either (A) beneficially owns (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, more than 20% of Omnicom's outstanding voting securities entitled to vote on a regular basis for a majority of the members of the Board or (B) otherwise has the ability to elect, directly or indirectly, a majority of the members of the Board; (ii) a change in the composition of the Board such that a majority of the members of the Board are not Continuing Directors; or (iii) the consummation of a merger or consolidation of Omnicom with any other corporation which has been approved by the shareholders of Omnicom, other than a merger or consolidation which would result in the voting securities of Omnicom outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 80% of the total voting power represented by the voting securities of Omnicom or such surviving entity outstanding immediately after such merger or consolidation, or the consummation of a plan of complete dissolution or liquidation of the Company or an agreement for the sale or disposition by Omnicom of (in one or more transactions) all or substantially all of Omnicom's assets which has been approved by the shareholders of Omnicom.

(d)    "**Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the Employment Period or (ii) had made a Pitch at any time during the Employment Period, or the six months immediately following, the Termination Date.

(e)    "**Company**" means the Omnicom Affiliate by whom the Employee is employed as of the date of this Agreement and each other Omnicom Affiliate by whom the Employee is employed at any time during the Employment Period.

(f)    "**Continuing Director**" means, as of any date of determination, any member of the Board who (i) was a member of such Board on the effective date of the Plan or (ii) was nominated for election or elected to such Board with the affirmative vote of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election.

3

(g)     "**Employment Period**" means the period that the Employee is employed by any member of the Group.

(h)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

(i)     "**Group**" means (i) if the Company operates within an Omnicom network, all of the companies, group of companies and divisions operating under a global or national brand of such Omnicom network, and (ii) if the Company operates as part of a division or separate company independent of an Omnicom network, all companies and divisions operating under such independent brand.

(j)     "**Pitch**" means a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(k)     "**Restricted Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the one-year period prior to the Termination Date, or (ii) had made a Pitch at any time during the one-year period immediately preceding, or the six months immediately following, the Termination Date.

(l)     "**Subsidiary**" means any corporation that is a subsidiary of Omnicom within the meaning of Section 424(f) of the Internal Revenue Code of 1986, as amended from time to time, and any entity that is organized as a limited liability company in which Omnicom, directly or indirectly, possesses 50% or more of the voting power of all members of such limited liability company entitled to vote.

(m)     "**Termination Date**" means the date on which the Termination of Employment occurs.

(n)     "**Termination of Employment**" means the time when the Employee is no longer employed by any Omnicom Affiliate for any reason whatsoever.

(o)     "**Total Disability**" means the inability of the Employee to substantially perform the duties of his/her position as a result of illness or physical or mental incapacity or disability (from any cause or causes whatsoever).  All determinations as to the disability of any Employee shall be made by the Omnicom Compensation Committee or the Board of Directors of the Omnicom Affiliate, as the case may be, who is then the Employee's employer, upon the basis of such evidence as such Omnicom Compensation Committee or Board of Directors deems necessary or desirable.  In the event of a conflict between the determination made by the Omnicom Compensation Committee and the Board of Directors of the Omnicom Affiliate, the determination of the Omnicom Compensation Committee shall prevail.

5.     <u>**Nontransferability**</u>.  Prior to the date upon which the Restricted Shares become vested pursuant to paragraph 3 hereof, the Restricted Shares may not be pledged, encumbered or hypothecated to, or in favor of, or subject to any lien, obligation or liability of the Employee to

4

any party, or assigned or transferred by the Employee otherwise than by will or the laws of descent and distribution; provided, however that such Restricted Shares may be transferred without consideration to immediate family members (*i.e.*, children, grandchildren or spouse), to trusts for the benefit of such immediate family members and to partnerships in which such family members are the only partners, provided that any such family member, trust and/or partnership shall be subject to all terms, conditions and restrictions of this Agreement by signing a joinder hereto.

6.     **Non-Solicitation/Non-Servicing and Protection of Confidential Information Agreement**.

(a)     In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group, the Employee will not, as an individual, employee, consultant, independent contractor, partner, shareholder, member or in association with any other person, firm, corporation or other form of entity, directly or indirectly, and regardless of the Employee continuing to be employed by a member of the Group or the reason for the Employee ceasing to be so employed by any member of the Group; provided, however, the restrictions set forth below in clauses (ii) and (iii) below shall only apply with respect to periods following the Termination Date if any Restricted Shares have vested under this Agreement:

(i) during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the same nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

(ii)     for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with members of the Group; provided, *however*, that solely with respect to this Section 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; and

(iii)     for a one-year period following the Termination Date, employ as an employee or retain as a consultant any person, firm, corporation or other form of entity who is then or at any time during the one-year period prior to the Termination Date was, an employee of or exclusive consultant to a member of the

5

Group, or persuade or attempt to persuade any employee of or exclusive consultant to a member of the Group to leave the employ of such member of the Group or to become employed as an employee or retained as a consultant by any other person, firm, corporation or other form of entity; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of any member of the Group shall not be deemed to be a breach of this provision.

(b)    As a professional in a highly service-oriented and creative business, the Employee understands and agrees that his/her position with the Company requires and will continue to require services which are of a special character and which places him/her in a position of confidence and trust with the Clients and employees of members of the Group. The Employee further acknowledges that his/her services to the Clients necessarily require that the Employee have access to Confidential Information (as defined below) of members of the Group and their respective Clients and that, in the course of his/her employment with or rendering of services to the Company, the Employee will develop personal relationships with the Clients and knowledge of those Clients' affairs and requirements. Accordingly, the Employee acknowledges that the type and periods of restrictions imposed in this Agreement are fair and reasonable, are reasonably required in order to protect and maintain the proprietary interests of the members of the Group, other legitimate business interests of members of the Group, and the goodwill associated with the members of the Group. The Employee further understands and agrees that the Restricted Clients may be serviced from any location and accordingly it is reasonable that the covenants set forth herein are not limited by narrow geographic area but generally by the location of such Restricted Clients. In the event that any covenant contained in this Agreement shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, (i) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court or other tribunal making such determination, and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made.

(c)    The Employee hereby acknowledges and agrees that for so long as the Employee has been employed by the Company (which term, as used in this Section 6(c) and Section 6(d) shall be deemed to include any Affiliate of the Company), the Employee has acquired and will continue to acquire and have access to confidential or proprietary information about the Company and/or its Clients, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Company and its Clients, Client contacts, creative policies and ideas, advertising campaigns, public relations campaigns, creative and media materials, graphic design, budgets, practices, concepts, strategies, methods of operation, financial or business projections of the Company, and information about or received from its Clients (collectively, "**Confidential Information**"). Accordingly, in consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this

6

Agreement, for so long as the Employee is employed by a member of the Group and thereafter, the Employee will retain in strictest confidence all Confidential Information and shall not disclose any such Confidential Information to anyone outside the members of the Group and Omnicom, except in the course of the Employee's duties for the Company or with Omnicom's express written consent. The Employee hereby acknowledges that he/she is aware that such Confidential Information is not readily available to the public, and agrees that he/she will not at any time utilize such Confidential Information for his/her own benefit or for the benefit of third parties.

       (d)    The Employee hereby acknowledges and agrees that all materials created or modified by the Employee for so long as the Employee is employed by the Company, including, without limitation, all works of authorship, inventions, processes, ideas, methods, concepts and other tangible and intangible materials (collectively, "**Work Product**"), shall be "work for hire" and that the Company and/or Omnicom shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire", the Employee hereby assigns ownership of all such Work Product to the Company and/or Omnicom and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company and/or Omnicom. The Employee hereby appoints the Company and/or Omnicom as his/her attorney-in-fact with the limited power to execute assignments of such Work Product. If the Employee is an employee in the State of California, the parties hereto agree and acknowledge that the terms of this paragraph shall be subject to the terms of Section 2870 of the California Labor Code, a copy of which is annexed to this Agreement. The Employee hereby agrees to advise the Company and/or Omnicom promptly in writing of any inventions that he/she believes meet the criteria set forth in Section 2870.

       (e)    Each of the covenants and agreements contained in this Section 6 (collectively, the "**Protective Covenants**") is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this Section 6 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law, in this Section 6 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The provisions of this Section 6 are not in lieu of, but are in addition to the continuing obligations of the Employee (which the Employee hereby acknowledges) to not use or disclose Confidential Information known to the Employee until any particular piece of Confidential Information becomes generally known to the public (through no action of the Employee), whereupon the restriction on use and disclosure shall cease as to that particular item. The existence of any claim, demand, action or cause of action that the Employee may have against Omnicom or any of its Affiliates, whether predicated pursuant to this Section 6 or otherwise, shall not constitute a defense to the enforcement of the provisions of this Section 6 or any other provision or provisions of this Agreement. The covenants contained in this Section 6 for the benefit of Omnicom and the members of the Group, shall survive any termination of this Agreement and may be waived in whole or in part by Omnicom without the consent of any other person, firm, corporation or other form of entity. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which the Employee is in violation of any of such Protective Covenants, and all such Protective Covenants shall automatically be extended by the period of

such violation. The Employee further acknowledges that he/she is a highly regarded executive who considered the terms and conditions upon which he/she is electing to be granted the Restricted Shares and that he/she has been advised and has had the opportunity to obtain counsel of his/her choice in connection with reviewing and executing this Agreement.

(f)    By acceptance of the grant of Restricted Shares, the Employee agrees that if the Employee were, without authority, to use or disclose Confidential Information, or otherwise breach any of the Protective Covenants, or threaten to do so, in addition to all other available remedies (including without limitation seeking such damages as it can show it has sustained by reason of such breach), (i) Omnicom and/or any member of the Group shall be entitled to specific performance and injunctive and other appropriate relief (without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law) to prevent the Employee from doing so, and/or (ii) Omnicom (by action of the Chairman, Chief Executive Officer, President, Chief Financial Officer or General Counsel of Omnicom) may cause any or all of the following actions to occur: (x) the Restricted Shares granted hereunder shall be forfeited and shall terminate effective the date on which the Employee entered into such activity, (y) any vested shares of Omnicom common stock acquired by the Employee pursuant to the grant hereunder shall be forfeited and returned to Omnicom, and (z) any gain realized by the Employee from the sale or transfer of shares of Omnicom common stock acquired through the grant hereunder, shall be returned by the Employee to Omnicom. The Employee acknowledges that the harm caused to Omnicom and/or members of the Group by the breach or anticipated breach of this Agreement is by its nature irreparable because, among other things, it is not readily susceptible of proof as to the monetary harm that would ensue. The Employee consents that any interim or final equitable relief entered by a court of competent jurisdiction shall, at the request of Omnicom and/or a member of the Group be entered on consent and enforced by any court having jurisdiction over the Employee, without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

(g)    During the Employment Period and the one-year period after the Termination Date, prior to accepting employment with any subsequent employer, the Employee shall notify any prospective employer in writing of his/her obligations under this Agreement. In addition, immediately after accepting employment with a subsequent employer, the Employee shall provide Omnicom with a copy of the notice that was sent by him/her to such subsequent employer.

7.    **Investment Representation and Compliance With Applicable Law**.    The Employee hereby represents and covenants that (a) the Restricted Shares will be acquired for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), unless such acquisition has been registered under the Securities Act and any applicable state securities law; and (b) any subsequent sale of any such Restricted Shares, unless their acquisition had been so registered, shall be made either pursuant to an effective registration statement under the Securities Act and any applicable state securities laws, or pursuant to an exemption from registration under the Securities Act and such state securities laws.

8

8.  **No Understandings as to Employment**. Nothing in the grant of the Restricted Shares or in this Agreement shall constitute or be evidence of any understanding, express or implied, on the part of Omnicom or any Omnicom Affiliate to employ the Employee for any period.

9.  **Plan Incorporated**. The Employee accepts the Restricted Shares herein subject to all of the provisions of the Plan, which are incorporated into this Agreement, including the provisions that authorize the Omnicom Compensation Committee to administer and interpret the Plan and which provide that the Omnicom Compensation Committee's decisions, determinations and interpretations with respect to the Plan are final and conclusive on all persons affected hereby. In the event of a conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan shall govern. Terms not otherwise defined in this Agreement shall have the meanings ascribed in the Plan.

10.  **Amendment**. This Agreement may be amended only by an instrument in writing executed and delivered by the Employee and Omnicom.

11.  **Assignment.** The parties hereto agree that the Omnicom shall have the right to assign this Agreement, and accordingly, this Agreement shall inure to the benefit of, and may be enforced by, any and all successors and assigns of Omnicom, including, without limitation, by asset assignment, stock sale, merger, consolidation or other corporate reorganization. Subject to Section 5, the Employee agrees that his/her obligations under this Agreement are personal to him/her, and the Employee shall not have the right to assign or otherwise transfer his/her obligations hereunder. Any purported assignment or transfer by the Employee shall be void and ineffective.

12.  **Governing Law**. The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of New York without regard to any conflicts or choice of laws provisions of the State of New York that would result in the application of the law of any other jurisdiction.

13.  **Notice**. Any notice to be given to Omnicom under the terms of this Agreement shall be addressed to the Office of the General Counsel of Omnicom at 437 Madison Avenue, New York, New York 10022, and any notice to be given to the Employee shall be addressed to the Employee at the address set forth beneath his or her signature hereto, or at such other address for a party as such party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if mailed, postage prepaid, addressed as aforesaid.

14.  **Headings**. All section titles and captions in this Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend or describe the scope or intent of any provisions of this Agreement.

15.  **Further Assurances**. The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement.

9

16.    **Entire Agreement**.  This Agreement, together with the Plan, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto. Notwithstanding the foregoing, any other confidentiality agreement, non-solicitation/non-servicing agreement or any other type of restrictive covenant agreement that the Employee has entered into prior to the date hereof or may enter into after the date hereof with Omnicom or one of its Affiliates shall remain in full force and effect. No oral understandings, oral statements, oral promises or oral inducements between the parties hereto relating to this Agreement exist. No representations, warranties, covenants or conditions, express or implied, whether by statute or otherwise, other than as set forth in this Agreement, have been made by the parties hereto.

17.    **Remedies**.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

18.    **Counterparts**.  This Agreement may be executed in two or more counterparts, or by facsimile transmission, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

19.    **Waiver**.  By signing and returning this Agreement, the Employee agrees that the Employee's rights in respect of the Restricted Shares (including upon Termination of Employment) shall be defined solely by the Plan and the provisions of this Agreement. Accordingly, the Employee waives all other claims he/she may have against Omnicom or any of its Affiliates, and their respective officers, directors, agents and employees for any losses or damages arising out of the forfeiture of any Restricted Shares as a result of such Termination of Employment, or otherwise in relation to the Plan with respect to such Restricted Shares.

20.    **Third Party Beneficiaries**.  Nothing in this Agreement is intended to confer upon any other person except the Employee, Omnicom and the Affiliates of Omnicom any rights or remedies hereunder or shall create any third party beneficiary rights in any person (other than Affiliates of Omnicom).

21.    **No Strict Construction**.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto.  The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.

*[The remainder of this page is left blank intentionally]*

10

**IN WITNESS WHEREOF**, Omnicom, by its duly authorized officer, and the Employee, each has executed this Agreement as of the day and year first above written.

**OMNICOM GROUP INC.**

By: _____
     Name: Michael J. O'Brien
     Title: Senior Vice President,
           General Counsel and
           Secretary

**EMPLOYEE**

_____
Name:

11

**Annex I**
**to Restricted Stock Agreement**

## California Labor Code Section 2870

Employment agreements; assignment of rights

(a)    Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(i)    relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(ii)    result from any work performed by the employee for the employer.

(b)    To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

12

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**FILED**

OCT 1 9 2007

THE WASHINGTON GROUP, INC.,

    Plaintiff,

    -against-

HARRY SPORIDIS,

    Defendant.

No. _____ 07 1892 NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**DECLARATION OF CYNTHIA B.
RETTER IN SUPPORT OF THE
WASHINGTON GROUP, INC.'S
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
INJUNCTIVE RELIEF**

**CYNTHIA B. RETTER**, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares as follows:

        1.     I am the Vice President, Employee Financial Benefits Manager, for Ketchum, Inc. ("Ketchum"). I make this declaration in support of The Washington Group's ("TWG") application for an order temporarily restraining and preliminarily enjoining its former employee, defendant Harry Sporidis ("Sporidis" or "Defendant") from continuing his ongoing breach of written protective covenants that Sporidis agreed to during his employment with TWG. I am fully familiar with the facts and circumstances set forth herein. Such familiarity is based upon my own personal knowledge, review of the books and records of Ketchum, and discussions with Ketchum's other employees and agents.

        2.     Ketchum is TWG's parent company. Both Ketchum and TWG are affiliates of Omnicom Group, Inc. ("Omnicom").

        3.     Attached hereto as Exhibit A is a copy of a letter dated June 23, 2005 (the "June 23 Letter"), sent by Ketchum's New York office to Ketchum's Pittsburgh office (where I am located) on or about June 28, 2005. As is evident from the

June 23 Letter, that letter was originally sent to Ray Kotcher, Ketchum's Chief Executive Officer in New York, by Thomas Harrison, Chief Executive Officer of Diversified Agency Services ("DAS"), a division of Omnicom.  The June 23 Letter notified Mr. Kotcher of the names of Ketchum's and TWG's employees who were receiving awards of restricted Omnicom stock in 2005, including Harry Sporidis.

4.    Upon receiving the June 23 Letter (on or about June 28), our department spoke with Rob Lorfink, Ketchum's Chief Financial Officer in New York, who informed us that, along with the June 23 Letter, the New York office had received a package of individual letters (the "Notification Letters") addressed to Ketchum's and TWG's employees receiving stock awards, notifying them of their stock awards and instructing them on how to accept those awards.  Mr. Lorfink told us that he would be removing from the package the Notification Letters that were addressed to Ketchum's New York employees, and that he would be sending the rest of the Notification Letters to us at the Pittsburgh office for distribution to all remaining recipients.

5.    On or about June 29, we received the Notification Letters, including one addressed to Sporidis, via interoffice mail.  (A copy of a Notification Letter is attached hereto as Exhibit B.)  Aside from the recipients' names, their addresses, the number of shares being awarded, and their par value, these letters were all identical.

6.    As Exhibit B demonstrates, the Notification Letters instructed recipients that they had to log onto the "NetBenefits" website operated by Fidelity Investments, the administrator of Omnicom's Restricted Stock Plan, where they could view their award and accept or decline it.  The Notification Letters further specifically informed the recipients that in order to accept their stock award, they would be required

2

to accept the terms and conditions of Omnicom's 2005 Restricted Stock Agreement (the "2005 RSA"), which would be available at the NetBenefits site for review. The Notification Letters also specifically informed recipients that they would not be receiving a manually-signed copy of the 2005 RSA (as recipients had in the past), although they could print a copy at the NetBenefits website. Finally, the Notification Letters also specifically notified recipients that the terms and conditions of the 2005 RSA included provisions protecting Omnicom's and its affiliates' intellectual property and confidential information, and restricting employees from soliciting or servicing clients or soliciting or hiring certain employees. The Notification Letters asked recipients to review these provisions carefully upon logging in to accept their stock awards.

7.      Upon receiving the Notification Letters at the Pittsburgh office, Karen Wilkinson, Ketchum's Employee Financial Services Administrator (who reports to me), sent an e-mail to all of the stock recipients, including Sporidis, informing them that they should expect to receive a Notification Letter in their interoffice mail that day or the following day, and that action was required on their part. (A copy of Ms. Wilkinson's June 29 e-mail is attached hereto as Exhibit C.) We then placed the Notification Letters in individual envelopes marked "Confidential," and sent them to the stock recipients (including Sporidis) via Ketchum's interoffice mail.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Pittsburgh, Pennsylvania
        October 18, 2007

CYNTHIA B. RETTER

3

Jun-28-2005  01:53pm  From-KETCHUM EXECUTIVE OFC                8489353823              T-039  P.001/004  F-866

D I V E R S I F I E D   A G E N C Y   S E R V I C E S



THOMAS L. HARRISON
CHAIRMAN
CHIEF EXECUTIVE OFFICER

June 23, 2005

Ray Kotcher
Senior Partner, CEO
Ketchum
1285 Avenue of the Americas
New York, NY 10019

Dear Ray:

This package contains the 2004 Restricted Stock Awards for Ketchum.  You should review the
package thoroughly, then personally distribute the enclosed materials to the individuals listed who
are receiving stock awards reflecting their performance.

I would like to extend my personal appreciation to you and to your stock recipients for the
Company's performance last year and for continuing to strengthen the business relationships with
your clients.  This stock award is a reflection of Omnicom management's genuine appreciation both
of your leadership and your colleagues' performance throughout the year.

Please review each letter to determine that it represents your understanding of the 2004 stock
distribution.  If there are any issues, please let me know as soon as practicable.

| Name | 2004 Restricted Stock Award |
|------|------------------------------|
|  | 2,350 |
|  | 2,350 |
|  | 590 |
|  | 590 |
|  | 590 |
|  | 590 |
|  | 410 |
|  | 350 |
|  | 290 |
|  | 240 |
|  | 180 |
| Harry Spondis | 180 |
|  | 150 |
|  | 140 |
|  | 120 |

• letter sent from Ayh *
* others distributed in NY
   by Rob

9/20

FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

— Exh A

Jun-29-2005   01:53pm   From-KETCHUM EXECUTIVE                8460951923                T-030   P.002/004   F-668

Ray Kotcher
June 23, 2005
Page Two

| Name | 2004 Restricted Stock Award |
|---|---|
| ██████████ | 90 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 60 |
| ██████████ | 50 |
| ██████████ | 40 |
| ██████████ | 40 |
| ██████████ | 40 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |
| ██████████ | 30 |

*Handwritten annotations:* 90, 600, 50, 120, 510, 1400

Ray Kotcher
June 23, 2005
Page Three

| Name | 2004 Restricted Stock Award |
|---|---|
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 30 |
| | 90 |
| | 30 |
| | 30 |
| | 30 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |
| | 25 |

450

275

725

Jun-20-2005  01:53pm  From-KETCHUM EXECUTIVE                  5459353928         T-039  P.004/004  F-866

Ray Kotcher
June 23, 2005
Page Four

| Name | 2004 Restricted Stock Awards |
|---|---|
| | 25 |
| | 880 |
| | 870 |
| | 190 |
| | 130 |
| | 120 |
| | 100 |
| | 60 |
| | 60 |
| | 60 |
| | 30 |
| | 30 |

2,555

Sincerely.

*Thomas L. Harrison*

Thomas L. Harrison
Chairman & CEO

TLH:db
Enc.

```
                          0 · C

                 9 , 1 2 0 · 0 0   +
                 1 , 4 0 0 · 0 0   +
                     7 2 5 · 0 0   +
                 2 , 5 5 5 · 0 0   +
    004
                1 3 , 8 0 0 · 0 0   *
```

copy letter for file

total shares granted

Jun-28-2005  01:55pm  From-KETCHUM EXECUTIVE CEO  +000000  T-000  8480953923          T-039  P.001/004  F-866

D I V E R S I F I E D     A G E N C Y     S E R V I C E S



OMNICOM GROUP GROUP
437 MADISON AVENUE
NEW YORK, NEW YORK 10022
2126 5 2026  FAX (2 1 6) 7800
www.omnicomgroup.com

THOMAS L. HARRISON
CHAIRMAN
CHIEF EXECUTIVE OFFICER

June 23, 2005

Ray Kotcher
Senior Partner, CEO
Ketchum
1285 Avenue of the Americas
New York, NY 10019

Dear Ray:

This package contains the 2004 Restricted Stock Awards for Ketchum. You should review the package thoroughly, then personally distribute the enclosed materials to the individuals listed who are receiving stock awards reflecting their performance.

I would like to extend my personal appreciation to you and to your stock recipients for the Company's performance last year and for continuing to strengthen the business relationships with your clients. This stock award is a reflection of Omnicom management's genuine appreciation both of your leadership and your colleagues' performance throughout the year.

Please review each letter to determine that it represents your understanding of the 2004 stock distribution. If there are any issues, please let me know as soon as practicable.

| Name | 2004 Restricted Stock Award |
|------|------------------------------|
| ▪▪▪▪▪▪▪▪▪▪▪ | 2,350 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 2,350 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 590 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 590 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 590 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 590 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 410 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 350 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 290 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 240 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 180 — |
| Harry Spondis | 180 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 150 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 140 — |
| ▪▪▪▪▪▪▪▪▪▪▪ | 120 — |

9/20

• letter sent from Ash *
* others distributed in NY
by Rob

Jun-28-2005  01:53pm  From-KETCHUM EXECUTIVE          8489953928          T-070  P.002/004  F-069

Ray Kotcher
June 23, 2005
Page Two

| Name | 2004 Restricted Stock Award |
|------|-----------------------------|
| ▮▮▮▮▮ | 90 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 60 |
| ▮▮▮▮▮ | 50 |
| ▮▮▮▮▮ | 40 |
| ▮▮▮▮▮ | 40 |
| ▮▮▮▮▮ | 40 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |
| ▮▮▮▮▮ | 30 |

90

600

50

120

510

1400

Jun-28-2005  01:53pm  From-KETCHUM EXECUTIVE                6469363923              T-030  P:003/004  F-866

Ray Kotcher
June 23, 2005
Page Three

| Name | 2004 Restricted Stock Award |
|------|------------------------------|
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 30 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |
|      | 25 |

450

275

725

Ray Kotcher
June 23, 2005
Page Four

| Name | 2004 Restricted Stock Award | |
|---|---|---|
| ▓▓▓▓ | 25 | |
| ▓▓▓▓ | 880 | |
| ▓▓▓▓ | 870 | 0 |
| ▓▓▓▓ | 190 | |
| ▓▓▓▓ | 130 | 0 |
| ▓▓▓▓ | 120 | |
| ▓▓▓▓ | 100 | |
| ▓▓▓▓ | 60 | |
| ▓▓▓▓ | 60 | 0 |
| ▓▓▓▓ | 60 | |
| ▓▓▓▓ | 30 | |
| ▓▓▓▓ | 30 | |

2,555

Sincerely,

*Thomas L. Harrison*

Thomas L. Harrison
Chairman & CEO

TLH:db
Enc.

copy letter for file

```
                              0·C

                   9,120·00  +
                   1,400·00  +
                     725·00  +
                   2,555·00  +
            004
                  13,800·00  =
```

total shares granted



D I V E R S I F I E D   A G E N C Y   S E R V I C E S

DIVISION OF OMNICOM GROUP
437 MADISON AVENUE
NEW YORK, NEW YORK 10022
212 415 3064   FAX 212 812 6552
tom harrison@dasglobal.com

<u>**PERSONAL AND CONFIDENTIAL**</u>

**THOMAS L. HARRISON**
CHAIRMAN
CHIEF EXECUTIVE OFFICER

June 23, 2005

Tome
Ketchum

I am pleased to inform you that Omnicom Group Inc. ("***Omnicom***") granted you an award of **30 shares** of Omnicom restricted stock under the Equity Incentive Plan. Fidelity Investments is the administrator and exclusive broker/dealer of Omnicom's Restricted Stock Plan(s). If you are a first time recipient of Omnicom restricted stock, you will soon receive a welcome kit from Fidelity that will provide greater detail on how your restricted stock will be administered. If you already hold Omnicom restricted stock, you should have received this information in an earlier mailing.

In the next few weeks, you will receive an e-mail or other communication from Fidelity informing you that your restricted stock is available on the Fidelity NetBenefits ® website (netbenefits.fidelity.com). Assuming you have activated your account, you may access and review your restricted stock agreement and choose whether to accept or decline the award on the NetBenefits website. If you have not yet activated your account, please do so as soon as possible so that you may accept your award. In order to electronically accept your restricted stock award, go to the NetBenefits website and select the Omnicom Group Inc. Restricted Stock Award link. Go to the Restricted Stock Award – "Unaccepted Awards" heading and select "Accept Award". From there, simply follow the instructions provided. You can view the plan documents associated with your award online on the NetBenefits website under "Tools and Resources" by selecting "Plan Documents". **Please be advised that accepting your award on NetBenefits will constitute acceptance of the terms and conditions of the restricted stock agreement. If you need a hard copy of the agreement, please print out the on-line version. Please note that you will no longer be receiving a manually signed copy of your agreement from Omnicom.**

As in the past, when you accept the award you will be responsible for the par value of $0.15 per share awarded. The aggregate par value of the shares you are being awarded is **$4.5**. If sufficient funds are available in your Fidelity brokerage account to cover the cost of accepting your award, Fidelity will automatically deduct the amount from your account when you accept. If you do not have sufficient funds available in your Fidelity brokerage account at the time you go online to accept your award, you will not be able to accept the award at that time. You will then be prompted to call a Fidelity Stock Plan Services Representative to arrange for the deposit or transfer of funds into your account to cover the par value payment. Once you have deposited the cash necessary to complete the transaction, and the cash has settled in your brokerage account, you may go online and complete the award acceptance process.

Following your acceptance of the award, you will have the rights of a shareholder with respect to the shares, including the right to vote the shares and receive dividends on the shares. Please

A GLOBAL
ENTERPRISE
OF LEADING
MARKETING
SERVICES &
SPECIALTY
ADVERTISING
COMPANIES

FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

— Exh B

note that if you accept the award you will be receiving the upcoming dividend that was declared by the Omnicom Board of Directors on May 24, 2005. As a reminder, dividends on your restricted shares will be paid directly into your Fidelity brokerage account net of standard tax withholdings. **[Under the terms of the award, restrictions on 20% of the shares are to lapse (and therefore "vest") on (i) May 23, 2006, and (ii) each of the next 4 anniversary dates thereof, provided you remain in the employ of Omnicom or one of its subsidiaries through the relevant lapse date.]** When the restrictions on the shares lapse, shares will be transferred into your Fidelity brokerage account, subject to the collection of restricted stock tax withholdings (as outlined below).

When the restrictions lapse you will be deemed to have received taxable compensation equal to the fair market value of the vested shares on the vesting date, less $0.15 per share (the par value of such shares). The company is required to collect income taxes from you on the amount of compensation attributable to the vesting of restricted stock. You are also required to pay any FICA and Medicare taxes that may be due.

Fidelity will provide for two ways for taxes to be settled upon the vesting of a restricted stock award. You may either elect to have Fidelity withhold vested shares to cover your estimated tax obligations, or pay cash to Fidelity. If you elect to withhold shares, the shares withheld will be deemed sold at the fair market value on the vesting date. If you choose to pay cash, you will need to have sufficient cash available in your Fidelity brokerage account to cover your total estimated tax withholding obligations prior to the vesting date(s). A default election of net shares has been made for you. If you have not already done so, when you establish your online access you may change your election to pay cash. Please note that if you elect to pay cash to cover your tax withholding obligations and you have insufficient cash at the time of vesting to cover your total tax obligation, your election will automatically default to net shares and Fidelity will withhold vested shares to cover your tax withholding obligation.

When you review your restricted stock agreement, if you have previously received an award, you will find that certain changes have been made to the form agreement. In the current business environment, it has become imperative for a company to protect its intellectual property and adequately guard against client and employee solicitation. These issues are of great importance to our companies and our clients. This year, therefore, the agreement includes provisions in Section 6 that provide greater protection of intellectual property and confidential information and that restrict employees from soliciting or servicing certain of Omnicom's clients and soliciting or hiring certain employees after they leave the company. Please read these provisions carefully. In addition, the agreement now allows 100% accelerated vesting of the restricted stock in case of the participant's death.

If you have any questions, please call a Fidelity Stock Plan Services Representative at 1-800-544-9354 from 8 a.m. to midnight ET, Monday through Friday.

Sincerely,

*Thomas L. Harrison*

**Wilkinson, Karen**

**Distribution List Name:**    Restricted Stock - June 2005 letters

**Members:**



@thewashingtongroup.com
@ketchum.com
@ketchum.com
@ketchum.com
@thewashingtongroup.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@thewashingtongroup.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.fr
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.fr
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com



FILED
OCT 1 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1        —    Exh C



Sporidis, Harry



@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.fr
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
hsporidis@thewashingtongroup.com
@ketchum.com
@ketchum.com
@thewashingtongroup.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com
@ketchum.com

## Wilkinson, Karen

**From:** Wilkinson, Karen
**Sent:** Wednesday, June 29, 2005 11:29 AM
**Cc:** Retter, Cindy
**Subject:** Restricted Stock - issued in May 2005

Hi all,

We received letters this week from Omnicom regarding the Restricted Stock awards that were granted in April 2005, the purchase / vesting date is May 23rd. Please look for your letter in the inner office mail today or tomorrow. The letters for the international offices were mailed today.

Please read the letters carefully. They contain a lot of information and require action from you.

Thanks,
Karen

**Karen Wilkinson**
Employee Financial Services Administrator
regular workdays Tu-We-Th; 8a-4p
412-456-3837

Ketchum.  Passion and Precision in Communication.