IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE WASHINGTON GROUP, INC., | : | Civil Action No. |
| Plaintiff, | : | 1:07-cv-1892(RBW) |
| v. | : | |
| HARRY SPORIDIS, | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Alan D. Strasser (Bar No. 967885)
Kathryn S. Zecca (Bar No. 457244)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW
Suite 411
Washington, DC 20006
Phone: (202) 775-4500
Fax: (202) 775-4510

*Attorneys for Defendant Harry Sporidis*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT..............................................................................1

STATEMENT OF FACTS ......................................................................................2

ARGUMENT ...........................................................................................................6

I.     TWG WILL NOT SUFFER IRREPARABLE INJURY IF AN
INJUNCTION IS NOT GRANTED...................................................................7

     A.    At The Direction Of TWG's CEO And CFO, Mr. Sporidis'
Clients Have Already Terminated Their Relationship With
TWG ..........................................................................................................7

     B.    Because Any Potential Injury to TWG Can Be
Compensable By Damages, Injunctive Relief Is Not
Appropriate ..............................................................................................9

II.    THERE IS NOT A SUBSTANTIAL LIKELIHOOD THAT TWG
WILL SUCCEED ON THE MERITS ...............................................................10

     A.    There Is Substantial Doubt That A Contract Containing A
Non-Solicitation Clause Was Ever Formed.............................................11

          1.    The Washington Group Has Not Proven It Has A
Contract With Mr. Sporidis.........................................................11

          2.    Mr. Sporidis Did Not Intend To Agree To A
Restrictive Covenant....................................................................15

     B.    The Restrictive Covenants Are Not Enforceable .....................................16

     C.    Even If There Were A Valid, Enforceable Non-Solicitation
Covenant, TWG Has Waived Any Right To Enforce It............................20

III.   THE ISSUANCE OF AN INJUNCTION WILL
SUBSTANTIALLY HARM OTHER INTERESTED PARTIES........................21

IV.   THE PUBLIC INTEREST WILL NOT BE FURTHERED BY
THE GRANT OF AN INJUNCTION ...............................................................22

CONCLUSION........................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Fed Nat. Mort. Assoc.*, 209 F.3d 740 (D.C. Cir. 2000)........................ 12, 15, 16

*Bancoult v. McNamara*, 227 F. Supp. 2d 144 (D.D.C. 2002) .........................................11

*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382 (1999) ........................................................18

*Boston Laser, Inc. v. Qinxin Zu*, No. 3:07-cv-0791, 2007 WL 2973663
    (N.D.N.Y. Sept. 21, 2007) ..........................................................................................17

*Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546 (1st Cir.
    2005).............................................................................................................................15

*Davenport v. International Broth. of Teamsters, AFL-CIO*, 166 F.3d 356
    (D.C. Cir. 1999) ............................................................................................................9

*Davis v. Winfield*, 664 A.2d 836 (D.C. 1995).................................................................13

*Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007 (D.C. 2002) ....................................12

*Horne v. Radiological Health Servs., P.C.*, 371 N.Y.S.2d 948, 83 Misc.2d
    446 (N.Y. Sup. Ct. 1975)..............................................................................................21

*Ideal Elec. Sec. Co. v. International Fid. Ins. Co.*, 129 F.3d 143 (D.C. Cir.
    1997).............................................................................................................................12

*International Shared Services, Inc. v. McCoy*, 686 N.Y.S.2d 28, 259
    A.D.2d 668 (2d Dep't. 1999).......................................................................................21

*Investor Access Corp. v. Doremus*, 588 N.Y.S.2d 842, 186 A.D.2d 401
    (1st. Dep't. 1992) .........................................................................................................20

*Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547 (E.D.N.Y. 1995) .....................10, 21

*Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d
    502 (D.C. 1985)............................................................................................................12

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd.*, 77
    N.Y.S.2d 883, 8 Misc. 3d 412 (N.Y. Sup. Ct. 2005) .............................................16, 18

*Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941) .......................................12

*Mazurek v. Armstrong*, 520 U.S. 928 (1997)....................................................................7

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27
(D.D.C. 2002)...........................................................................................5, 10

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) ...........................22

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986).................................22

*Prudential Securities, Inc. v. Plunkett*, 8 F. Supp. 2d 514 (E.D. Va. 1998)...............10, 11

*RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp.
2d 70 (D.D.C. 2007)..........................................................................7, 9, 11

*Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303 (1976)..........................17, 18

*Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002)........................14

*Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191 (D.C.
Cir. 1999).................................................................................................12

*Tenacre Found. v. INS*, 892 F. Supp. 289 (D.D.C. 1995), aff'd 78 F.3d 693
(1996).........................................................................................................9

*Walter Karl, Inc. v. Wood*, 528 N.Y.S.2d 94, 137 A.D.2d 22 (2d Dep't.
1988)..........................................................................................................20

At no time did Harry Sporidis violate any duties owed to his former employer, The Washington Group ("TWG"). To the contrary, he acted pursuant to TWG's instructions at all times. Plaintiff's motion for a temporary restraining order and preliminary injunction should be denied.

## PRELIMINARY STATEMENT

When Harry Sporidis announced his resignation from TWG, TWG's CEO *and* CFO told Mr. Sporidis to have "his" clients send in their termination notices as soon as possible. Mr. Sporidis followed their instructions, and his two principal clients immediately chose to continue to use Mr. Sporidis' services at his new employer. Rather than make any legitimate effort to retain these clients, TWG instead engaged in a campaign to intimidate Mr. Sporidis into staying at the firm and, once that failed, postured for litigation. Finally, the Friday afternoon before Mr. Sporidis was scheduled to start his new employment – a date that TWG had known for weeks – TWG filed a motion for injunctive relief.

These are the basic facts, and they are hardly the stuff that injunctions are made of. TWG's complains that it has lost clients, but this a self-inflicted wound, and one that can in any event be healed by the award of monetary damages if any were owed. What is more, there is substantial doubt whether Mr. Sporidis ever entered into the contract containing the non-solicitation covenants, and it is even more doubtful that the restrictive covenants are enforceable. And, by directing Mr. Sporidis to have his clients terminate their relationship with TWG, TWG has waived any right it may have had to enforce the non-solicitation covenants. Mr. Sporidis has the right to start his new job on a fair playing field, and his clients have the right to be represented by the professional of their choice. Plaintiff's motion for a TRO and preliminary injunction should be denied.

### STATEMENT OF FACTS

On September 26, 2007, Harry Sporidis met with Hon. Susan Molinari, the CEO of TWG and announced his intention to leave the company. (Cplt. ¶ 14). Ms. Molinari said that she thought he "was making the right decision for [him] and [his family]." Declaration of Harry Sporidis ("Sporidis Dec.") ¶ 18. *She told Mr. Sporidis that he should ask his clients to submit their 30-day termination notices immediately*, in order to ensure compliance with accounting procedures and to avoid any overlap between TWG and Mr. Sporidis' new firm. *Ibid.*[1] She also asked that Mr. Sporidis speak with Paul Lobo, Senior Vice President and CFO of TWG, to let him know to exclude the revenue from Mr. Sporidis' clients from Mr. Lobo's budget estimate for 2008. *Id.* at ¶ 19.

Mr. Sporidis met with Mr. Lobo the morning of September 27, 2006. Mr. Lobo told him that Ms. Molinari wanted to ensure an easy transition, and that Mr. Sporidis' clients should e-mail termination notices right away. Sporidis Dec. ¶ 20. Mr. Lobo stated that it would be best if he received the termination notices as soon as possible so that "the clock can start ticking." *Ibid.*

It is hardly surprising that neither Ms. Molinari nor Mr. Lobo made any reference to a restrictive covenant in their conversations with Mr. Sporidis. When Mr. Sporidis was first hired by TWG in 2001, TWG's then-CEO John Rafaelli told Mr. Sporidis that TWG had no non-compete agreements and would not impose any non-compete agreements. Sporidis Dec. ¶ 2. This was a major factor in his decision to join TWG. *Ibid.* And Mr. Sporidis is not the only employee to have taken his clients with him when he left

---

[1] TWG contracts require clients to give TWG 30 days' notice if they wish to terminate TWG's provision of services. Sporidis Dec. ¶ 18.

TWG. Over the past two years, five former TWG employees have performed services for TWG clients shortly after leaving the company. *Id.* at ¶ 14.

Mr. Sporidis has no reason to expect that he had a non-compete agreement. Neither of the first two stock grants that Mr. Sporidis received contained a non-solicitation covenant. In 2002, Mr. Sporidis received a letter from Omnicom Group, the parent company of Ketchum (which, in turn, is the parent company of TWG) granting him Omnicom shares. See Sporidis Dec. 3 & Ex. 1. The letter awarded Mr. Sporidis 450 shares of stock, 20 percent of which vested each July over the succeeding five years. *Ibid.* The letter set certain restrictions on the acceptance of the stock, but, notably, *did not contain a restrictive covenant*. See *ibid.* Mr. Sporidis signed and dated his acknowledgement and acceptance of the terms of the agreement. *Ibid.* In 2003, Mr. Sporidis received an identical letter granting him another 352 shares of Omnicom stock. Sporidis Dec. ¶ 4 & Ex. 2. Again, Mr. Sporidis signed and dated his acknowledgement and acceptance of the terms of the Agreement. *Ibid.*

These agreements stand in stark contrast with what TWG describes as the 2005 stock award. Under the 2002 and 2003 stock grants, a certain number of Omnicom shares vested every July. Mr. Sporidis typically accepted the shares, net of taxes owed, and directed Fidelity to sell a portion of the vested shares so that it could withhold the appropriate income taxes prior to distributing the remaining shares to Mr. Sporidis. Sporidis Dec. ¶ 5. When he received a notice from Fidelity in July of 2005, he did not realize that the notice was a grant of *new* shares; he believed simply that the notice signified that previously-granted shares had vested. *Id.* at ¶ 41. Although TWG alleges that Mr. Sporidis received a letter from Omnicom a month or two earlier notifying him of

the stock grant (Cplt. ¶ 10), Mr. Sporidis does not recall receiving that letter (Sporidis Dec. ¶ 43) and, notably, TWG has not provided a copy of the letter that allegedly was addressed to Mr. Sporidis. Mr. Sporidis did not read a copy of the Restricted Stock Agreement (see Patrone Dec. Ex. I); indeed, he did not understand that he was receiving a new grant of stock, let alone that a non-compete covenant had been inserted into the middle of the multi-page agreement. Sporidis Dec. ¶ 41.

The first time that Mr. Sporidis heard about the non-solicitation covenant was two days after he announced his departure from TWG. On September 27, 2007, pursuant to the instructions he received from both Ms. Molinari and Mr. Lobo, Mr. Sporidis notified Mentor and ASCO that he was leaving TWG. He asked Mentor to e-mail notification that it intended to terminate its relationship with TWG. Mentor immediately did so (see Sporidis Dec. ¶ 21 & Ex. 3) and Mr. Sporidis forwarded the notice to Mr. Lobo. Sporidis Dec. ¶ 22 & Ex. 3. Because ASCO's contract with TWG had lapsed a month earlier, Mr. Sporidis did not request a termination notice from ASCO. *Id.* at ¶ 23. Additionally, consistent with Ms. Molinari's and Mr. Lobo's acknowledgment that Mr. Sporidis would continue to service these clients after leaving TWG, Mr. Sporidis informed a Powell Goldstein partner about the clients and provided information to help draft new representation agreements between Powell Goldstein and ASCO and Mentor. Patrone Dec. Exs. F & G. Contrary to TWG's unfounded assertions, Mr. Sporidis has *not* solicited business from either SHRM or Novo Nordisk and has no expectation of performing work for either of these clients at Powell Goldstein. Sporidis Dec. ¶¶ 26-28.[2]

---

[2] As a matter of professional courtesy, Mr. Sporidis has notified both clients that he has resigned from TWG. See Sporidis Dec. ¶¶ 26, 28; Ex. H. But providing such notification is not "solicitation" as contemplated by a non-solicitation covenant. See, *e.g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 34 (D.D.C. 2002) (enjoining certain defendants from soliciting clients of former

It was only after Mentor had terminated its relationship with TWG and after Mr. Sporidis had begun efforts to transition those clients to Powell Goldstein that Mr. Sporidis even heard of a non-compete covenant. On September 28, 2007, Mr. Lobo informed Mr. Sporidis that Craig Mirsky, Ketchum's General Counsel, had said that Mr. Sporidis had agreed to a non-compete when he accepted his 2005 stock award. Sporidis Dec. ¶ 29. Mr. Sporidis immediately told Mr. Lobo that he had never agreed to a non-compete. *Id.* at ¶¶ 29-30. Mr. Lobo told Mr. Sporidis that he did not have any more information and would look into the matter. *Id.* at ¶ 30. After learning that he had received a new grant of stock in 2005, and that TWG claimed this granted was conditioned on a non-compete agreement, Sporidis attempted to return the stock award. *Id.* at ¶ 41.

On October 2, Mr. Sporidis had lunch with Eugene Patrone, Senior Vice President and Chief Operating Officer of TWG. Mr. Patrone told Mr. Sporidis that Ketchum would make things difficult for Mr. Sporidis and his family if he maintained his decision to leave TWG. Sporidis Dec. ¶ 33. He told Mr. Sporidis that he was running a risk that his new firm would abandon Mr. Sporidis if litigation were threatened or undertaken, and he could become a "man without an island." *Ibid.* Mr. Sporidis wrote Mr. Patrone an e-mail the following morning noting that he had said that "Ketchum/TWG will hurt me if I choose to move on to a new firm" and that "I have to consider what is best for my family." *Id.* at ¶ 34 & Ex. 6. Mr. Patrone never denied Mr. Sporidis' description of what was said at their meeting. *Id.* at ¶ 34. Mr. Sporidis also forwarded his e-mail to Ms. Molinari (*Id.* at ¶ 36 & Ex. 6) who reacted by e-mailing Mr. Patrone and asking him

employer, but noting that the injunction "does not stop the defendants from informing their former clients of their new positions. . . .").

to tell Loraine Thelian (Ketchum Senior Partner) that he "put the fear of God into" Mr. Sporidis. Sporidis Dec. ¶ 37 & Ex. 7. In this same e-mail, Ms. Molinari expressed doubt that TWG could maintain ASCO as a client without Mr. Sporidis. *Ibid*.

Indeed, after Mr. Sporidis announced his resignation – and even *after* he forwarded Mentor's termination to Mr. Lobo – TWG made *no* effort to retain any of the business that Mr. Sporidis intended to transfer to Powell Goldstein. And TWG does not allege that it has taken any steps to contact these clients, nor does it allege that it has the ability to service these clients. To the contrary, its complaint emphasizes that it has only 15 professionals (Patrone Dec. ¶ 5), and Ms. Molinari herself expressed doubt that TWG could retain ASCO as a client. Mr. Sporidis is unaware of any actions that TWG has taken to retain these two clients.

Instead, all TWG has done is threaten Mr. Sporidis in an attempt to make him reverse his decision to resign. And, despite the "immediate" harm that TWG alleges, it waited more than three weeks after Mr. Sporidis announced his departure, until the Friday afternoon before the Monday he intended to start his new job, to file its complaint and motion for injunctive relief. This case is not about TWG keeping its clients, and it is not about enforcing contractual obligations that are of great significance to TWG. It is about punishing Mr. Sporidis for being disloyal. The Court should decline to join TWG's retaliatory campaign. Plaintiff's motion for preliminary relief should be denied.

## ARGUMENT

Injunctive relief is plainly inappropriate in this case. "The standard for issuance of the 'extraordinary and drastic' remedy of a temporary restraining order or a preliminary injunction is very high. . . ." *RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70, 72 (D.D.C. 2007) (*quoting Mazurek v. Armstrong*, 520 U.S. 928, 972

(1997)) (denying motion to enforce non-competition agreements). "The movant must demonstrate (1) a substantial likelihood of success on the merits of its claims; (2) that it will suffer irreparable harm if an injunction is not granted; (3) that the issuance of an injunction will not unduly or substantially harm other parties; and (4) that the public interest favors issuance of an injunction." *RCM Technologies*, 502 F. Supp. 2d at 73. TWG cannot establish any of these factors, and injunctive relief therefore must be denied.

## I.    TWG WILL NOT SUFFER IRREPARABLE INJURY IF AN INJUNCTION IS NOT GRANTED

Any injury TWG has suffered is self-inflicted. Although this key fact is *nowhere* in TWG's pleadings, Mr. Sporidis' superiors told him to have *his* clients terminate their relationships with the firm. In any event, if TWG has suffered any legally-recognized injury, it is compensable by money damages.

### A.    At The Direction Of TWG's CEO And CFO, Mr. Sporidis' Clients Have Already Terminated Their Relationship With TWG

From the moment Mr. Sporidis announced his resignation, the CEO of TWG assumed that Mr. Sporidis' clients would follow him to his new firm. Ms. Molinari told Mr. Sporidis to have his clients send in their notices of termination immediately. She also told him to inform Mr. Lobo of his departure so that Mr. Lobo could exclude Mr. Sporidis' clients from TWG's revenue projections for 2008. When Mr. Sporidis spoke with Mr. Lobo, Mr. Lobo did not contradict Ms. Molinari's instructions, but confirmed them, emphasizing that even a notice by e-mail would suffice. Mr. Sporidis was therefore acting at the instruction of and consistent with the intentions of his superiors. Accordingly, TWG is complaining about a self-inflicted wound.

Strikingly, TWG does not dispute this fact, and has not submitted a declaration from either Ms. Molinari or Mr. Lobo. This failure of evidence, however, is *not* because TWG will be surprised by Mr. Sporidis' recollection of events. Mr. Sporidis told Mr. Patrone on October 3, nearly three weeks ago, that Ms. Molinari had instructed him to inform his clients immediately of his departure. Sporidis Dec. ¶ 35. Additionally, he told Ketchum's General Counsel one day later about the same conversation. *Id*. at ¶ 39. Undersigned counsel also informed counsel for TWG of this conversation more than ten days ago. Nonetheless, TWG filed its complaint and motion for injunctive relief without any evidence to undermine the argument that TWG had caused the damage it alleges to have suffered.

TWG's submission is also wholly deficient of any evidence that it attempted to mitigate the harm allegedly suffered by Mr. Sporidis' actions. Mr. Sporidis notified the company that he was leaving and that he intended to continue to service his clients almost a month ago. TWG has offered no allegation, let alone evidence, that it has made any effort to contact these clients and persuade them that TWG is willing and able to service them even after Mr. Sporidis' departure. Certainly, there is nothing preventing TWG from contacting the clients it claims rightfully belong to the firm. Nor has TWG offered any evidence that it is capable of meeting these clients' needs now that Mr. Sporidis has left. To the contrary, TWG's pleadings emphasize that it has "only 15 professionals" (Patrone Dec. ¶ 5), and an e-mail from Ms. Molinari expresses doubt that TWG could keep ASCO without Mr. Sporidis.

Not only has TWG known since September that Mr. Sporidis intended to service his clients at his new firm, but it also delayed filing its motion for injunctive relief until

the Friday afternoon before the Monday that Mr. Sporidis was scheduled to start his new job. TWG's delay in filing, particularly when combined with its failure to attempt to maintain its relationships with its clients, demonstrates that there is no irreparable injury warranting injunctive relief. See, *e.g.*, *RCM Technologies*, 502 F. Supp. 2d at 74 (relying on plaintiff's delay in filing request for injunctive relief in concluding that plaintiff had failed to establish irreparable injury); *Tenacre Found. v. INS*, 892 F. Supp. 289, 294 n.5 (D.D.C. 1995), *aff'd* 78 F.3d 693 (1996) (same).

### B.    Because Any Potential Injury to TWG Can Be Compensable By Damages, Injunctive Relief Is Not Appropriate

It is well established that where potential losses can be quantified, a plaintiff can be compensated with monetary damages and there is no irreparable injury warranting injunctive relief. See *Davenport v. International Broth. of Teamsters, AFL-CIO*, 166 F.3d 356, 367 (D.C. Cir. 1999) ("[T]he injury plaintiffs urge is in any event not irreparable" because "this kind of injury can be remedied with money damages."). Because any harm suffered by TWG can easily be remedied by an award of damages, injunctive relief is not necessary.

Notwithstanding TWG's concern that Mr. Sporidis will attempt to steal "dozens" of clients (Pl. Memo. at 17), there are only two TWG clients – ASCO and Mentor – that intend to follow Mr. Sporidis to his new firm.[3] Mr. Sporidis has not solicited and does not intend to solicit any other clients, including SHRM and Novo Nordisk. Compare Pl. Memo. at 6-7, 9 and Sporidis Dec. ¶¶ 27, 28. The alleged losses from ASCO and Mentor

---

[3] Significantly, contrary to plaintiff's intimation in its brief (at 16), in transitioning ASCO and Mentor to Powell Goldstein, Mr. Sporidis did not use any proprietary TWG information – such as confidential customer lists – or take advantage of any goodwill that TWG had established with the clients. Sporidis Dec. ¶¶ 9, 21-24; see also Section II.B, *infra*. Compare, *e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Wertz*, 298 F. Supp. 2d 27, 30 (D.D.C. 2001) (defendants using client lists prepared by plaintiff former employer to solicit plaintiff's customers).

are easily calculated; indeed, TWG identifies the monthly fees paid by the clients in its pleadings. *See* Patrone Dec. ¶¶ 32, 35; *see also* Pl. Memo. at 17.[4] Accordingly, because "alleged losses can be quantified, and [plaintiff] can be substantially compensated for with monetary damages for those losses," TWG "has failed to show that it will suffer irreparable harm if a preliminary injunction is not entered." *Prudential Securities, Inc. v. Plunkett*, 8 F. Supp. 2d 514, 519 (E.D. Va. 1998) (denying motion to enforce non-solicitation agreement). *See also Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 566 (E.D.N.Y. 1995) (concluding that irreparable injury had not been established because plaintiff could "identify precisely which customers were lost" and damages could therefore be calculated).

## II.    THERE IS NOT A SUBSTANTIAL LIKELIHOOD THAT TWG WILL SUCCEED ON THE MERITS

In order to obtain injunctive relief, the plaintiff must make a "clear showing that it is likely to succeed" on the merits, and evidentiary disputes of key allegations can undermine such a showing. *RCM Technologies*, 502 F. Supp. 2d at 73. Thus, in *RCM Technologies*, the Court relied on defendants' denial of essential facts in affidavits, combined with the fact "that the record at this event does not *plainly* favor [plaintiff's] version of events," to conclude that plaintiff had not shown likelihood of success on the merits. *Ibid*. *See also Bancoult v. McNamara*, 227 F. Supp. 2d 144, 152 (D.D.C. 2002) (plaintiff's ability to establish substantial likelihood of success on merits impeded because "the parties hotly dispute certain basic points"); *Prudential Securities, Inc.*, 8. F.

---

[4] TWG also half-heartedly cites a request by the American Society of Plastic Surgeons ("ASPS") that Mr. Sporidis submit a proposal for services. Pl. Memo. at 8. To the extent that TWG could establish that it lost any revenues from ASPS, those revenues could be measured and compensated by a damages award. In any event, as explained below (Section II.B, *infra*), covenants restricting the performance of services for *prospective* clients are plainly unenforceable.

Supp. 2d at 516 ("When the facts are sharply disputed, a preliminary injunction will not be granted.") (internal citation omitted).

Here, there is substantial doubt as to whether Mr. Sporidis ever executed the contract that contains the non-solicitation covenant. What is more, there is a substantial question as to whether, given Mr. Sporidis' history with the particular clients at issue, the restrictive covenants are enforceable. Finally, even if there were a valid, enforceable contract, TWG has waived any right to enforce it.

### A.    There Is Substantial Doubt That A Contract Containing A Non-Solicitation Clause Was Ever Formed

TWG has offered surprisingly weak evidence that there is *any* contract between it and Mr. Sporidis, much less a contract that contains an enforceable non-solicitation clause. TWG has offered no document that actually bears Mr. Sporidis' signature. We assume that plaintiff contends that Mr. Sporidis must have affixed an electronic signature to the proffered Restricted Stock Agreement, but the evidence that he actually accepted any of the terms of that particular agreement is virtually non-existent.

### 1.    The Washington Group Has Not Proven It Has A Contract With Mr. Sporidis

"The party asserting the existence of a contract has the burden of proving its existence." *Bailey v. Fed Nat. Mort. Assoc.,* 209 F.3d 740, 726 (D.C. Cir. 2000) (citations omitted).[5] The Washington Group has simply asserted that it has a contract with

---

[5] As the complaint invokes the court's diversity jurisdiction, the court must apply the conflicts-of-law rules of the forum state. "When deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." *Ideal Elec. Sec. Co. v. International Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997) (citations omitted); *see also Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487 (1941). As plaintiff is headquartered in the District of Columbia, and Mr. Sporidis worked for them in the District of Columbia, the District of Columbia has the "most substantial interest" in the contract. District of Columbia's choice of law principles "direct courts to apply the law of that state which has the "more substantial interest" in the resolution of the pending dispute."

Mr. Sporidis, but it has produced no contract that contains all the material terms that is signed by both Mr. Sporidis and The Washington Group. We assume that The Washington Group will concede that there is no such document, as Mr. Patrone and Mr. Mirsky, the General Counsel of Ketchum, told Mr. Sporidis that none existed. Sporidis Dec. ¶ 38. Mr. Sporidis has never signed one. *Id.* ¶ 45.

TWG alleges, though, that Mr. Sporidis is bound by the 2005 Restricted Stock Agreement because he visited the Fidelity web site on July 27, 2005, and that he "reviewed and accepted the terms of conditions of the 2005 RSA." Cplt. ¶ 11. We acknowledge that a contract may be created without a signature literally on it, and may enter into a contract by acceding to its terms on a website (*Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007 (D.C. 2002)), but the party seeking to enforce bears the burden of proving the other party's assent to the terms by his conduct. *See, e.g., Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995). Here, plaintiff has offered no evidence of Mr. Sporidis' conduct at the time plaintiff claims that the contract was formed in July 2005—no evidence of the documents he saw, no evidence of the appearance of the computer screens, and no evidence that he saw any message that informed him that he had entered into a contract.

*First*, TWG has offered no evidence of the screens that Mr. Sporidis actually saw in 2005, instead offering only a description of the "current grant acceptance process." Azzopardi Dec. ¶ 7. That process is supposedly described in a "walk though demonstrating the process for accepting grants of stock through Fidelity's web site." Azzopardi Dec. ¶ 6 & Ex. B. An examination of the "walk through," though, shows no

---

*Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C. 1985) (tort law); *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191,194 (D.C. Cir. 1999) (contracts).

connection between it and Omnicom (which is not named in the "walk through"). Nor is there any evidence that the "walk through" was sent to any Omnicom employees, much less to Mr. Sporidis. Indeed, Mr. Sporidis first reviewed them as part of his review of Mr. Azzopardi's declaration submitted in this litigation. Sporidis Dec. ¶ 44.

Even these descriptions come not from an employee of Fidelity or from anyone who claims to know how the Fidelity system works. It comes from Steven Azzopardi, the Director of Finance for Omnicom, who does not even state that he has *talked to anyone at Fidelity* to learn how its web site works. Azzopardi Dec. ¶ 1. Indeed, his apparent lack of familiarity with the workings of the Fidelity website is shown by his complete lack of explanation of how the Fidelity record of stock acceptance, which is attached as Exhibit A to his declaration, is generated.[6]  Although the declaration casually asserts that the process has undergone "only minor changes," since 2005 (*ibid.*), there is no reason to think that it accurately describes the current process for Omnicom, and no reason to think that Mr. Azzopardi has any basis for stating that the screens are unchanged – "except for minor changes" – in the two years since then.

Plaintiff cannot meet its burden of proving that Mr. Sporidis saw a screen that communicated to him that his acceptance of stock would constitute agreement to a restrictive covenant. Plaintiff therefore essentially asks the court to speculate on the very facts that might create an enforceable contract. This case thus differs from *Forrest* (and other cases) in which the defendant could prove the actual computer screen that plaintiff saw. Furthermore, merely showing that the other party to a putative contract accessed a website, or downloaded something from it, does not show that he agreed to a contract.

---

[6] Mr. Azzopardi offers no explanation whatsoever of the second page of Exhibit A. It does not appear in the "walk through" at all. It is meaningless by itself.

"[Where the writing] does not appear to be a contract and the terms are not called to the attention of the recipient, . . . no contract is formed." *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir. 2002).

Plaintiff tries to draw support from its assertion that Omnicom circulated a general memo to certain employees describing the new Restricted Stock Agreement. Again, there is no evidence that Mr. Sporidis received any memo. Indeed, it is clear that Mr. Sporidis did not receive the memo that plaintiff cites (Retter Dec. Ex. B), because that memo is addressed to an employee of Ketchum rather than TWG and purports to award the employee only 30 shares of Omnicom stock, whereas Mr. Sporidis allegedly was awarded 180 shares. Retter Dec. Ex. A. Mr. Sporidis does not recall receiving such a memo. Sporidis Dec. ¶ 43.[7] And although Ms. Retter avers that each stock award recipient received an e-mail notifying them that the letter was on its way, (Retter Dec. ¶ 7), the e-mail attached to her declaration (as Ex. C) is not addressed to any of the potential recipients, but only to Ms. Retter. What is more, even if Mr. Sporidis had received this memo, receipt alone would not create an enforceable contract. See *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 557 (1st Cir. 2005), holding that an employee did *not* manifest his assent to a new dispute resolution policy when the policy was announced in a mass e-mail to employees, and the e-mail did not invite an affirmative response from the employee; *Bailey*, *supra*, 209 F.3d at 746 (mere distribution of new ADR policy does not bind employee to arbitration where employee does not show acceptance of it).

---

[7] Plaintiff does not even know when this memo was sent out. Ms. Retter tells us that it was June 29, 2005 (Retter Dec. ¶ 5) whereas Mr. Azzopardi believes it may have gone out in May. Azzopardi Dec. ¶ 4.

### 2.    Mr. Sporidis Did Not Intend To Agree To A Restrictive Covenant

Even assuming, though, that this confused mishmash of contradictory evidence somehow suggests that Mr. Sporidis clicked on some kind of web site on July 27, 2005, none of it shows that Mr. Sporidis intended to override his long-standing opposition to a restrictive covenant. He had made plain before he joined The Washington Group that he would not sign a restrictive covenant. Sporidis Dec. ¶ 2, 13. He refused to sign one when the company asked him to sign it during his tenure there. Sporidis Dec. ¶ 12. He had signed two previous Restrictive Stock Agreements that contained *no* non-compete or non-solicitation clauses. Sporidis Dec. ¶ 3-4 & Exs. 1 & 2. He did not know Ketchum claimed he had a non-compete until after he had announced his resignation. Sporidis Dec. ¶ 29.

The parties' intentions determine whether they have entered into a contract. "An enforceable contract does not exist unless there has been a 'meeting of the minds' as to all material terms. In other words, a contract is not formed unless the parties reach an accord on all material terms and indicate an intention to be bound." *Bailey*, *supra*, 209 F.3d at 746. The court added that "In evaluating contract formation, we also look closely at the parties' intention to be bound. In order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract." *Ibid.* Here, Mr. Sporidis had no intention to be bound to any non-compete clause. He would have foregone the stock award – indeed, he would have stopped working at The Washington Group – rather than accept this restriction on his employment. Sporidis Dec. ¶ 45. Nothing about Mr. Sporidis' actions surrounding the

grant of stock suggested that he was manifesting an intent to be bound by a non-compete clause.

**B.    The Restrictive Covenants Are Not Enforceable**

The Washington Group argues that the restrictive covenants contained in Omnicom's Restricted Stock Agreement are enforceable under New York law. But, TWG's assertion to the contrary, "[w]ith few exceptions, New York courts are generally reluctant to enforce restrictive covenants contained in employment agreements due to public policy considerations which militate against sanctioning the loss of a person's livelihood." *Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd.*, 77 N.Y.S.2d 883, at *2, 8 Misc. 3d 412, 416 (N.Y. Sup. Ct. 2005) (citing *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 271 (1963)). See also *Boston Laser, Inc. v. Qinxin Zu*, No. 3:07-cv-0791, 2007 WL 2973663 (N.D.N.Y. Sept. 21, 2007) (slip copy). And applying New York law here, TWG cannot demonstrate any likelihood of success on the merits – even if Mr. Sporidis had knowingly signed a restrictive covenant with TWG – because TWG cannot show a "legitimate interest" protected by Omnicom's Restricted Stock Agreement.

The seminal New York case is *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303 (1976), in which the New York Court of Appeals ruled on the enforceability of a restrictive covenant signed by the former vice-president of a consulting firm. The *Reed* court stated that a restrictive covenant could only be specifically enforced if it were "reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *Id*. at 307 (citations omitted).

The *Reed* court set forth a two-part test for determining whether a restrictive covenant serves the employer's "legitimate interest." Under the "legitimate interest" inquiry, the *Reed* court held that restrictive covenants will be enforceable only (1) "to the extent necessary to prevent the disclosure or use of trade secrets or confidential information," or (2) "where an employee's services are unique or extraordinary." *Id*. at 309.

Under the first prong of its test, the *Reed* court determined that the vice-president's alleged use of the consultancy's "customer-list" was not actionable because the names and contact information of current and potential customers were easily ascertainable from public sources. *Id*. at 308. Further, the court held that the defendant's intimate knowledge of plaintiff's business operation did not meet the "unique or extraordinary" standard. Rather, the court stated that where knowledge is not deemed a protectable trade secret and there has been no misappropriation, "we see no reason to inhibit the employee's ability to realize his potential both professionally and financially by availing himself of opportunity." *Id*. at 309.

The Court of Appeals discussed the "legitimate interest" standard in *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 392-93 (1999). The *Seidman* court held that an employer may in certain circumstances protect the "good will" which an employee develops with the employer's client in the course of employment and utilizing the employer's assets. Upon this premise, the Court of Appeals held that an employer may have a legitimate and protectable interest to support a restrictive covenant to the limited extent the covenant prevents the former employees from exploiting goodwill which was created and maintained at the employer's expense and effort. *Ibid*. Significantly, the

17

Seidman Court indicated that a restrictive covenant cannot be enforced to the extent that it seeks to protect client relationships that are not dependent upon the former employer's goodwill or were developed independent of considerable expense and effort by the former employer.

*Kanan, Corbin, Schupak & Aronow*, *supra*, illustrates the application of *Reed* and *Seidman* in a case with facts remarkably similar to those here. In that case the plaintiff ("KCSA"), a New York based investor public relations firm, sought a preliminary injunction against two former employees, Evan Smith and Erica Pettit. 797 N.Y.S.2d at *1, 8 Misc.3d at 413. Smith and Pettit had accepted employment at Financial Dynamics ("FD"), a competing financial public and investor relations firm. KCSA alleged that Smith and Pettit solicited and induced KCSA clients to terminate their agreements with KCSA and retain FD to perform those services, in breach of non-competition and non-solicitation covenants contained in defendants' respective employment agreements. *Ibid.* In holding that "it is evident the restrictive covenants contained in the Smith and Pettit agreements fail to meet the 'legitimate interest' standard" (797 N.Y.S.2d at *4, 8 Misc. 3d at 418) of *Reed* and *Seidman*, the KCSA court reasoned: (1) Smith and Pettit's recollection of the identity of their clients and of the details of their accounts does not amount to misappropriation within the context of Reed's first prong; (2) neither Smith nor Pettit's professional services could be termed either "unique" or "extraordinary; nor were their skills "of such a character as to make replacement impossible"; and (3) KCSA could not show that the client relationships which Smith enjoyed while employed by KCSA were due to its goodwill and therefore it did not represent a "legitimate interest" of KCSA. 797 N.Y.S.2d at *4-5, 8 Misc. 3d at 418-19. The court further noted that while

courts may protect goodwill created at the employer's "expense," whether client goodwill is developed as a result of the defendants' own efforts, rather than being generated and maintained primarily at the employer's expense, is a triable issue of fact which militates against the issuance of a preliminary injunction. 797 N.Y.S.2d at *5, 8 Misc. 3d. at 419.

Applying the foregoing here, it is clear that TWG cannot show that the restrictive covenants of the Restrictive Stock Agreement are supported by a "legitimate interest" within the meaning of *Reed* and *Seidman*. Mr. Sporidis did not use any confidential information or significant assets of TWG in attracting ASCO or Mentor as clients (nor will he use any proprietary information or confidential clients lists of TWG in continuing such representation). Sporidis Dec. ¶¶ 7, 9, 21-24. One client, ASCO, hired TWG for its governmental relations work as a result of Mr. Sporidis' response to a widespread request for solicitation (*id.* at ¶ 7), and the other, Mentor, was directly referred to Mr. Sporidis because of his prior staff work for a congressional committee. *Id.* at ¶ 9. What is more, both clients have informed Mr. Sporidis that their loyalty is to him personally, and have volunteered that, if he should ever leave TWG, they will follow him wherever he goes. *Id.* ¶¶ 8, 10. This hardly represents the protectable "goodwill" that the *Seidman* Court had in mind. See, *e.g.*, *Walter Karl, Inc. v. Wood*, 528 N.Y.S.2d 94, 137 A.D.2d 22, 28 (2d Dep't. 1988) (reversing grant of preliminary injunction to enforce restrictive covenant where defendant presented "direct evidence" that clients ceased doing business with plaintiff employer "based upon the defendant's personal familiarity with and knowledge of their needs as well as his outstanding ability in the field"); see also *Investor Access Corp. v. Doremus*, 588 N.Y.S.2d 842, 186 A.D.2d 401, 404 (1st. Dep't. 1992) (refusing to enforce restrictive covenant where major account followed defendant to a new firm

because defendant's recollection of information pertaining to particular clients is not confidential, and the client's decision to follow the defendant to his new employment was based on the defendant's familiarity of the client's needs and outstanding ability in the field). And, to the extent that the Restrictive Stock Agreement purports to bar Mr. Sporidis from performing services for prospective clients, such as ASPS, it is plainly invalid as an attempt to "baldly restrain competition". *Ivy Mar Co.*, *supra*, 907 F. Supp. at 560 (internal quotation and citation omitted). Moreover, there is nothing "unique" or "extraordinary" about the services Mr. Sporidis provides that would preclude TWG from seeking to continue to represent those clients or any other clients serviced by Mr. Sporidis. Accordingly, TWG cannon show that that restrictive covenants contained in the Omnicom Restrictive Stock Agreement will protect a "legitimate interest" of TWG.

### C.    Even If There Were A Valid, Enforceable Non-Solicitation Covenant, TWG Has Waived Any Right To Enforce It

Even assuming that the Restricted Stock Agreement is a valid contract, and that the restrictive covenants are enforceable, TWG has waived any right to enforce those covenants and is estopped from doing so. Both the CEO and CFO directed Mr. Sporidis to engage in conduct that violated the restrictive covenants by requesting that his clients send in their termination notices. Where an employer "knowingly aids" its employee in conduct that violates a restrictive covenant, the employer waives the right to enforce that covenant. *International Shared Services, Inc. v. McCoy*, 686 N.Y.S.2d 28, 259 A.D.2d 668, 669 (2d Dep't. 1999) (employer waived right to enforce restrictive covenant by assisting employee in finding a new job). See also *Horne v. Radiological Health Servs., P.C.*, 371 N.Y.S.2d 948, 83 Misc.2d 446, 454 (N.Y. Sup. Ct. 1975) (same).

What is more, Mr. Sporidis relied on the statements of Ms. Molinari and Mr. Lobo in requesting the termination notice from Mentor and in facilitating their transition to Powell Goldstein. Sporidis Dec. ¶¶ 18, 20, 21. Accordingly, TWG is also estopped from enforcing the non-solicitation covenants.

## III.  THE ISSUANCE OF AN INJUNCTION WILL SUBSTANTIALLY HARM OTHER INTERESTED PARTIES

The balance of harm prong (also known as the balance of equities) (see *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001) strongly militates against the grant of an injunction. As discussed in Section I, *supra*, TWG will suffer little harm – and no harm that cannot be monetarily compensated – if injunctive relief is not granted. Mr. Sporidis, on the other hand, is scheduled to start his new employment at Powell Goldstein on Monday, October 22 (a fact of which TWG has been aware for two weeks). Furthermore, having already terminated their relationship with TWG, his clients expect Mr. Sporidis to be available to provide services at his new firm.

What is more, TWG is hard-pressed to argue that equities weigh in its favor given its conduct towards Mr. Sporidis in early October. In its campaign to pressure Mr. Sporidis to change his mind and stay on at TWG, TWG threatened make things difficult for him and his family, to interfere with his relationship with his new employer, and to run up his legal bills. See Sporidis Dec. ¶¶ 33, 34 & Ex 6. It devoted its efforts to intimidating Mr. Sporidis and building a case to punish him for disloyalty (see *ibid*. & ¶ 40) rather than devoting any resources to re-building its relationships with Mr. Sporidis' clients. Such tactical behavior does not merit the award of injunctive relief.

**IV.    THE PUBLIC INTEREST WILL NOT BE FURTHERED BY THE GRANT OF AN INJUNCTION**

Mr. Sporidis' clients have a First Amendment right to petition the government for action on their behalf (see, *e.g.*, *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986)), and they use Mr. Sporidis' expertise and experience to exercise this right. TWG's request for an injunction interferes with their ability to use the professional they have identified as the best qualified to accomplish their goals. See Sporidis Dec. ¶¶ 7-1, 24. Accordingly, if this Court grants the request for injunctive relief, it will deprive Mr. Sporidis' clients of the legislative representation of their choice. Any injunction that prevented Mr. Sporidis from serving these clients would cause them harm without serving any legitimate need for TWG. Such a result would run contrary to the public interest.

**CONCLUSION**

TWG cannot establish any of the four factors necessary to obtain injunctive relief. Plaintiff's motion for a TRO and preliminary injunction must be denied.

Respectfully submitted,

/s/ *Alan D. Strasser*
Alan D. Strasser (Bar No. 967885)
Kathryn S. Zecca (Bar No. 457244)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW
Suite 411
Washington, DC 20006
Phone: (202) 775-4500
Fax: (202) 775-4510

*Attorneys for Defendant Harry Sporidis*

## CERTIFICATE OF SERVICE

The foregoing Memorandum Of Law In Opposition To Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction was served by e-mail on October 21, 2007, upon:

Elizabeth A. Lalik, Esq.
LITTLER MENDELSON, P.C.
1650 Tysons Blvd., Suite 700
McLean, Virginia 22102

David S. Greenberg
DAVIS & GILBERT LLP
1740 Broadway
New York, New York 10019

*Attorneys for Plaintiff The Washington Group*

_____
Alan D. Strasser

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE WASHINGTON GROUP, INC., | : Civil Action No. |
| Plaintiff, | : 1:07-cv-1892(RBW) |
| v. | : |
| HARRY SPORIDIS, | : |
| Defendant. | : |

## DECLARATION OF HARRY A. SPORIDIS

I, Harry A. Sporidis, under penalty of perjury, state as follows based on my personal knowledge:

1.  I grew up in the Washington area and went to college at Washington & Jefferson College, from which I graduated in 1991 with a BA in Political Science and concentration in Art history. In 1991, I started work as an intern to Congressman Shaw of Florida. I then worked as a legislative aide for Congressman Bilirakis of Florida, and finally for Congressman Greenwood of Pennsylvania, where I was a Senior Legislative Assistant. In 1998, I joined the lobbying firm of Kessler and Associates, where I worked until 2001. I focus my lobbying in the health care area and other issues that the House Energy & Commerce Committee covers.

2.  In 2001, I decided to leave Kessler and Associates and began to interview at other firms. I interviewed with John Raffaelli, who then was the chairman of The Washington Group, with a view toward joining that firm. I specifically asked Mr. Raffaelli whether The Washington Group would require me to sign a non-compete clause if I came to work there. Mr. Raffaelli told me that The

Washington Group had never required any lobbyist to sign a non-compete clause

and never would require it. Raffaelli assured me that The Washington Group

would not impose a non-compete clause despite the pending acquisition of The

Washington Group by Ketchum. Based on that assurance, I came to work at The

Washington Group. My initial salary included base pay and bonus and then later

as an added bonus a promise that I would receive restricted shares of stock in the

parent company of Ketchum.

3.     I received a letter from Omnicom dated July 1, 2002 informing me that I had been

awarded 450 shares, which vested at the rate of 20% a year on July 1 of each year.

That 2002 Agreement, which I signed, is attached as Exhibit 1. The agreement

contains no non-compete or non-solicitation clauses. Under that agreement, 90

shares vested on July 1, 2002; 90 shares vested on July 1, 2003; and so on, until

all 450 shares vested.

4.     I received another letter from Omnicom dated September 19, 2003 informing me

that I was awarded another 352 shares of Omnicom stock, which also would vest

20% a year on July 1 of each year, beginning with July 1, 2003. An unsigned

copy of that agreement is attached as Exhibit 2; I returned the signed copy to the

HR Department. That 2003 Agreement contains no non-compete or non-

solicitation clauses. Thus, under that agreement, 70.4 shares vested on July 1,

2004; 70.4 shares vested on July 1, 2005; and so on, until all 352 shares vested.

5.     Both the 2002 and the 2003 letters informed me that I was responsible for the

taxes on the award of shares. It became my practice to accept the shares soon after

they vested. I would instruct Fidelity to handle the transaction so that I would

have "net shares"—that is, Fidelity would sell a portion of the shares to pay the taxes on the shares, and put the balance of the shares—net of my tax obligation—into my account.

6.    I got access to the records of these shares through my account at Fidelity Investments. I access that account through the Fidelity web site, Fidelity.com.

**Relationships with Clients at The Washington Group**

7.    <u>ASCO</u>. During the time I worked at The Washington Group, I developed relationships with two clients in particular: Mentor Inc, and the American Society of Clinical Oncologists (ASCO). I began to work for ASCO when The Washington Group and Ketchum responded to a Request for Proposal (RFP) from ASCO for combined public affairs/ governmental relations work. The RFP was sent to several different firms and as far as I know did not come from any solicitation or marketing from Ketchum. I prepared the vast majority of the RFP response on behalf of The Washington Group, and someone else prepared the proposal on behalf of Ketchum. In preparing our response I do not recollect using any special knowledge other than that which I had gained from my experiences prior to joining The Washington Group. ASCO hired us to work for them. I have handled virtually all of the governmental relations work for ASCO during the three years that it has been a client of The Washington Group. I have brought my own expertise and experience to bear on the representation, but have not used any special services, training, or trade secrets of The Washington Group in serving this client. Nor have I used anything that could be considered confidential information or trade secrets of The Washington Group in that representation. Instead, I have relied simply on the skills I have developed in my profession.

8.   Deborah Kamin, Government Affairs Director at ASCO, has always told me that if I decide to leave TWG to give her plenty of lead time. I did discuss with Deborah a possibility of leaving the Washington Group early on, but nothing was definite. She told me that "should you leave TWG we will be following you out the door."

9.   <u>Mentor</u>. I began to work for Mentor because Mentor faced an issue before Congressman Greenwood's committee, and I had served as a legislative aide to Congressman Greenwood. No proprietary or confidential information of the Washington Group was used in either my being hired by Mentor or in my representation of that client. During the years I have performed governmental relations work for Mentor at The Washington Group, I have done virtually all the work on the account.

10.   In 2006, Josh Levine, CEO of Mentor, told me that should I ever leave the Washington Group, "just send me the new contract." When I spoke to Josh and told him that I was leaving the Washington Group, he told me that I was a big part of his team and they had no loyalty to The Washington Group.

**My Approach to Non-compete Clauses at The Washington Group**

11.   Ketchum made several efforts to get me to sign a non-compete clause. During one year, the company sent me an employment agreement that contained a non-compete clause. I struck out the non-compete clause and returned the agreement to the HR Department. I never heard anything more about that proposed agreement. I believe this happened in 2005, but I did not retain a copy of the proposed agreement.

12.    In 2006 The Washington Group sent Mentor a proposed contract for services that contained a clause prohibiting Mentor from hiring me as an in-house lobbyist, and prohibiting them from hiring me if I left The Washington Group and worked for another governmental relations firm. Mentor's representative at the time reviewed the proposed contract, struck out the proposed non-compete clause and returned the contract to The Washington Group. I saw the signed engagement letter with the non-compete clause removed. I forwarded the contract to Mr. Lobo. The Washington Group continued to work for Mentor without that clause in the retainer agreement.

13.    I have made plain my opposition to non-compete clauses since before the time I began to work at The Washington Group, and all the time I have been working there.

14.    I know that five other professionals have left The Washington Group in the last year. I know that The Washington Group has not enforced a non-compete clause against any of them, including Mr. Raffaelli. I know that Mr. Raffaelli had a non-compete clause in his contract from the buyout when Ketchum purchased the firm; however, I assumed that the other professionals that had left had no non-compete clauses to enforce, and I assumed that I also did not have one.

**My Departure from The Washington Group**

15.    I became increasingly unhappy with the working environment at The Washington Group during my time there. I decided in late 2006 to try to find a job at a different lobbying firm and began to interview with other firms. In late 2006 or early 2007, I began to talk with Powell Goldstein LLP, a law firm with offices in Washington, Atlanta and Dallas about joining their governmental relations

5

practice. Powell Goldstein has a substantial and well-respected health care practice that includes legal services and government relations. I thought my practice would fit well there.

16. Powell Goldstein offered me a job there on September 24, 2007, and I accepted their offer on the following day.

17. On September 26, 2007, I went to Susan Molinari's office to inform her of my decision. Ms. Molinari is a former Congresswoman, the Chairman & CEO of The Washington Group, President of Ketchum Public Affairs , and a Partner at Ketchum. She was my supervisor at The Washington Group. I told her that I would be leaving The Washington Group and joining the government relations practice of a law firm.

18. Congresswoman Molinari wished me luck in the new job and added that she thought I was making the right decision for me and my family. She reminded me that my clients' contracts with The Washington Group contained provisions entitling them to terminate the contracts on 30 days notice. She instructed me to ask the clients to give prompt notice of their intentions to terminate their contracts. She told me that it was important that I follow these procedures with my clients so that there would be minimal overlap between the work for my clients at The Washington Group and my work for them at my new firm. No one else was present for this conversation.

19. Congresswoman Molinari also told me that Paul Lobo, the CFO and senior Vice-President of The Washington Group, was preparing the annual budget for the coming year. She told me to talk to Mr. Lobo and inform him of my departure so

that he would know to exclude the expected revenue from my clients from the projected revenue for the following year.

20.    I spoke to Mr. Lobo on the morning of September 27, and told him that I would be leaving The Washington Group. He had already learned from Congresswoman Molinari that I would be leaving, and he told me that she wanted my transition to be easy. He told me that I should have "my clients" e-mail termination notices right away so that there would be no overlap. Paul told me that the sooner that I can do this the better so that the clock can start ticking. He and I discussed my sending an office-wide e-mail to notify everyone that I was leaving. He wished me luck in my new job. No one else was present for this conversation, and we did not discuss any non-compete clauses in this conversation.

21.    Based on the instructions from Congresswoman Molinari, I telephoned the CEO of Mentor Inc. on September 26, 2007 and told him I would be leaving The Washington Group. I asked him to send in a termination notice for Mentor. I asked him by e-mail on September 27, 2007 to submit his 30-day termination notice promptly. He responded by email within a few hours on September 27 with an email notice that Mentor was terminating its relationship with The Washington Group. That email exchange is attached as Exhibit 3 (and is Exhibit C to Patrone Declaration).

22.    When I received the termination notice from Mentor, I forwarded it within minutes to Mr. Lobo and to Tracy Gray, who is the office manager at The Washington Group and the person who maintains billing files, to inform them of the termination notice.

23.    Based on the instructions from Congresswoman Molinari, I also informed my contacts at ASCO by email on September 26, 2007 that I would be leaving The Washington Group and going to Powell Goldstein. One of those emails is attached to Mr. Patrone's Declaration as Exhibit E (and I have attached it as Exhibit 4). I knew that ASCO had not yet renewed its contract with Ketchum/The Washington Group when it expired in August 2007, and I therefore did not tell ASCO to submit a termination notice.

24.    I believe that ASCO and Mentor have continuing needs for governmental relations services that would be unmet if I could not continue to represent them. I am unaware of any steps that The Washington Group has taken to try to retain them as clients since the time that I gave notice of my departure. I do not know who at The Washington Group could provide the services that either client wants to receive. I have not been informed of any contact by anyone from The Washington Group with either client in the last month.

25.    I also notified my contact at the American Society of Plastic Surgeons that I would be leaving The Washington Group and going to Powell Goldstein. Although ASPS was not a client of The Washington Group, ASPS had sent me an RFP in early August, to which I responded. This RFP was sent to me due to the work that I had done with Mentor Corp. ASPS asked that I just resubmit the RFP from my new firm.

**SHRM and Novo Nordisk**

26.    Although I serviced SHRM during the time it was a client of The Washington Group, that client left The Washington Group for reasons that had nothing to do with me. In early August 2007, Mr. Mike Aitken, Director of Government Affairs

8

at SHRM informed me that SHRM was considering whether to terminate its contract with The Washington Group. I told Mr. Lobo and Mr. Patrone about Mr. Aitken's message to me. SHRM, in early August met with Mr. Gerry Kavanaugh, Principal of ISG which is now part of the Washington Group, to discuss work that Mr. Kavanaugh might perform for SHRM. It was after that meeting that Mike Aitken of SHRM informed me that SHRM might cut The Washington Group from its budget; again, I told Mr. Lobo and Mr. Patrone about Mr. Aitken's comments and urged them to have The Washington Group increase its efforts to retain SHRM as a client. Congresswoman Molinari was able to secure a meeting between the SHRM CEO and Senator Snowe. After that meeting was scheduled, though, SHRM terminated its contract with The Washington Group. Congresswoman Molinari cancelled the meeting with Senator Snowe soon after that termination. I notified my contacts at SHRM that the meeting had been cancelled. At the same time, I told them that I was leaving The Washington Group and going to work at Powell Goldstein.

27.    I have not spoken to anyone at SHRM since Congresswoman Molinari cancelled the Snowe meeting. I have no reason to think they will seek my services at Powell Goldstein, nor that anyone at Powell Goldstein has solicited them for governmental relations services. I had nothing to do with SHRM's termination of its contract with The Washington Group and did not inform SHRM of my departure until after it had terminated its contract with The Washington Group. I have not suggested that SHRM seek my services at Powell Goldstein.

28.    I have read the suggestion in Mr. Patrone's declaration that I was soliciting Novo

Nordisk while at The Washington Group; he is mistaken about that. I have read

the email, attached as Exhibit H to the declaration, that I exchanged with Lauren

Semeniuk. She has been a friend of mine for years, and the email states simply

that I had enjoyed having lunch with her, that I could not attend a breakfast she

was co-hosting the following week, and that I was leaving The Washington

Group. Nothing in the email solicits business. I have not solicited any business

from Novo Nordisk since I announced my departure from The Washington

Group, and I have no reason to think the company will seek my services at Powell

Goldstein.

**The Washington Group and Ketchum Start to Pressure Me to Stay**

29.    I first learned that Ketchum believed that I had a non-compete agreement on the

morning of September 28, 2007, which was after I had notified my clients and

ASPS that I was leaving and after Mentor had submitted its termination notice.

Mr. Lobo contacted me in the morning of Friday, September 28 and told me that

Craig Mirsky, the General Counsel of Ketchum, had informed him that I had a

non-compete which I had signed when I received 2005 stock awards, and that he

was trying to find it. I immediately told Mr. Lobo that I had never agreed to a

non-compete, and asked him what awards he was describing, as I did not think I

had received any 2005 stock awards.

30.    I emphasized to Mr. Lobo that I did not believe that I had a non-compete clause in

any agreement. I told him that I had been told by others in the office, including

Congresswoman Molinari, that I did not have a non-compete agreement.

Mr. Lobo said he did not have any more information and would look into the

matter. Later that morning I briefly discussed with Congresswoman Molinari what was going on and she told me that Ketchum was concerned about my taking ASCO and to start thinking about making a deal, perhaps a retainer split.

31. On October 1, 2007, Mr. Patrone emailed me a copy of the agreement that he said contained the non-compete agreement, and what he said was "the Fidelity generated record indicating acceptance of the stock on July 27, 2005 at 8:40." I have attached that email as Exhibit 5.

32. This was the first time I had seen this stock agreement, and the first time that I read the non-compete clause that The Washington Group says applies to me. That agreement is the same agreement that is attached to Mr. Patrone's declaration.

33. Eugene Patrone asked me to go to lunch with him the next day, October 2. At the lunch he told me that Ketchum would go after me and my family if I maintained my decision to leave The Washington Group. He told me that I was running a risk that my new firm would abandon me if litigation were threatened or undertaken, and I could become a "man without an island." He urged me again to stay. I was astonished and frightened that The Washington Group would threaten my family.

34. That evening, Mr. Patrone wrote me an email urging me to reconsider my decision to leave The Washington Group and asking me to discuss "what specific issues concern" me. I wrote him an email the following morning (October 3) noting that he had said that "Ketchum/TWG will hurt me if I choose to move on to a new firm" and that "I have to consider what is best for my family." (Mr. Patrone knows that I have three children under the age of three.) He warned me that Ketchum might write to my clients and tell them that they could not continue

to use me. Our email exchange is attached as Exhibit 6. I did not receive an email from Mr. Patrone contradicting anything I said in the email.

35.    I spoke with Mr. Patrone early in the afternoon of October 3, 2007. He told me that Ketchum wanted to know whether I would be staying with The Washington Group or leaving. I told him in that conversation that Congresswoman Molinari had told me to inform my clients immediately of my departure after I told her. Mr. Patrone seemed surprised to hear about her instructions to me, and I inferred that this was the first time he had heard it.

36.    After I spoke to Mr. Patrone, I sent a copy of our email exchange at about 3 pm on October 3 to Congresswoman Molinari. A copy of my email transmitting the exchange is attached as Exhibit 6. I spoke to her later that day and asked for her help in trying to fix the situation. She told me that she would speak to Lorraine Thelian, Ketchum Senior Partner who serves on the agency's 10-member Worldwide Executive Committee, about making a deal with Ketchum on ASCO.

37.    Several hours later I received an email on my Blackberry that apparently was sent from Congresswoman Molinari to Mr. Patrone. She asked him to tell "Lorraine" that she

>    Spoke with Harry today. Apparently Eugene put the fear of God into him. He realizes that Ketchum means biz. Basically he still really wants to leave and is wondering if there is anything he can do? Split ASCO for a year? Leave Asco? (not sure if we keep it but we could)

I do not know if I was intended to receive this email or not. I have attached a copy of it as Exhibit 7.

38.    I had pre-existing plans to take my family on a trip for the Columbus Day weekend and we drove to the beach on Thursday, October 4. On route to the

beach, I spoke by telephone with Mr. Patrone and Mr. Mirsky of Ketchum.

Mr. Mirsky told me that Ketchum intended to enforce the non-compete. I asked

them to provide me with a signed or executed copy of the Restricted Stock

Agreement, and they told me that they did not have one. Mr. Mirsky said they

knew I executed the agreement because Fidelity had a record showing that I had

received stock shares. I did not understand what he meant by that statement. I

received no documents from anyone at The Washington Group or anyone else

showing me how the Fidelity website looked in 2005 when I supposedly agreed to

the Restricted Stock Agreement.

39.     During that call, I told him that Congresswoman Molinari had told me to inform

my clients of my departure. Mr. Mirsky said that she lacked the authority to tell

me that. As I knew that she was my immediate supervisor, and the Chairman &

CEO of The Washington Group, President of Ketchum Public Affairs, and a

Partner at Ketchum, I thought Mr. Mirsky must be mistaken about whether she

could tell me to notify my clients of my departure.

40.     The next document I received was the letter from outside counsel to Ketchum

dated October 6, 2007 (attached as Exhibit I to Mr. Patrone's declaration)

threatening me with legal action.

**The Fidelity Documents and the 2005 Notification of Stock Award**

41.     Mr. Mirsky told me that The Washington Group believed that I had agreed to the

non-compete clause when I accepted the 2005 Stock Awards. I did not realize that

Omnicom was granting me the additional shares; I assumed I was receiving the

shares I had previously earned. Before I ended my employment with The

Washington Group, I telephoned Fidelity and instructed them to return the shares

to Omnicom. The Fidelity representative told me that she would note my request
and look into the question of how to do it.

42.    I had never seen the Fidelity documents attached to the Declaration of
Mr. Azzopardi until October 19, 2007, when counsel forwarded me a copy of his
declaration. I did see a document with the same information as page 1 of Exhibit
A to that declaration. The one I saw is attached as my Exhibit 8.

43.    I have reviewed the documents attached to the declaration of Cynthia Retter,
including the form notice that she says was sent to certain Ketchum employees,
including me through inter-office mail sometime in June 2005. I do not recall ever
seeing that notice before I saw it attached to Ms. Retter's declaration.

44.    I also have reviewed the welcome screens attached to Mr. Azzopardi's
declaration. I do not recall seeing those documents before either. Nor have I seen
the reprints of "screens" that are attached to his declaration as Exhibit B. Those
screens, which refer to option grants, do not seem familiar to me, and do not
appear to have anything to do with the award of restricted stock.

45.    I do not know whether I accessed my Fidelity account through fidelity.com in
July 2005, although I may very well have done so. I know that I received a notice
from Fidelity around that time that I should go to the web site and attend to a
matter concerning my restricted shares; I have not retained the notice. In response
to the notice from Fidelity, I went to the web site. I assumed that I was redeeming
shares that I had been granted under the restricted stock awards of 2002 and 2003,
since those awards vested in July of each year. I thought that I was instructing
Fidelity to obtain the usual net award of stocks—that is, move stocks into my

account net of the taxes required on them. I would not have read any notice or

agreement posted on the site as I did not believe that there was anything unusual

to read. I certainly did not think that I was entering into an agreement that

contained a non-compete clause. I would not have agreed to any such clause

under any conditions—I would have preferred to forego any stock rather than

agree to a non-compete clause. In fact, I would have left The Washington Group

rather than agree to a non-compete clause.

I declare under penalty of perjury under the laws of the United States that the foregoing is
true and correct.

Dated: _____10/21/07_____     _____
                                                    Harry A. Sporidis

# Omnicom Group Inc.

Barry J. Wagner
Secretary and
General Counsel

<u>CONFIDENTIAL</u>                                          July 1, 2002

Harry Sporidis
5604 MacArthur Boulevard, NW
Washington, DC 20016

Dear Harry:

You are hereby awarded **450** shares of the $.15 par value common stock of Omnicom Group Inc. ("Omnicom") on the terms and conditions set forth below.

   1.   You may accept this award by signing and returning to me, the attached copy of this letter.

   2.   If you accept this award, you will receive dividend equivalent payments on the shares awarded to you, commencing with the next dividend date. Dividend equivalents shall be paid to you until such time as the awarded shares vest in your possession.

   3.   One-fifth of the shares will vest on July 1, 2003, and each year, on July 1 an additional one-fifth will vest, through 2007.

   4.   If your employment with The Washington Group, or another company in the Omnicom Group ends before all shares are fully vested, any unvested shares will be forfeited.

   5.   You represent that the shares are acquired for your own account, and that you have no present intention to sell or otherwise dispose of the shares. Until shares vest, you may not transfer, sell, assign, bequeath, pledge, hypothecate or otherwise dispose of such shares.

EXHIBIT 1

Page 2
July 2, 2002

6.    Your acceptance of this offer does not obligate you to continue in the employ of The Washington Group, nor obligate The Washington Group to continue you in its employ.

Your signing this document at the place indicated below and returning it to me will constitute your acceptance of the offer to purchase the shares and your agreement with the foregoing terms and conditions.

Omnicom Group Inc.                    Accepted and Agreed:


By: _____          By: _____
    **Barry J. Wagner**                   **Harry Sporidis**

                                     Date: ___3\12\03___

# Omnicom Group Inc.

Barry J. Wagner
Secretary and General Counsel

CONFIDENTIAL                                      September 19, 2003

Harry Sporidis
5604 MacArthur Boulevard, NW
Washington, DC 20016

Dear Harry:

You are hereby awarded **352** shares of the $.15 par value common stock of
Omnicom Group Inc. ("Omnicom") on the terms and conditions set forth below:

> 1.    You may accept this award by signing and returning to me, the
> attached copy of this letter.

> 2.    If you accept this award, you will receive dividend equivalent
> payments on the shares awarded to you, commencing with the next
> dividend date.  Dividend equivalents shall be paid to you until such time
> as the awarded shares vest in your possession.

> 3.    One-fifth of the shares will vest on July 1, 2004, and each year, on
> July 1st an additional one-fifth will vest, through 2008.

> 4.    If your employment with The Washington Group, or another
> company in the Omnicom Group ends before all shares are fully vested,
> any unvested shares will be forfeited.

> 5.    You represent that the shares are acquired for your own account,
> and that you have no present intention to sell or otherwise dispose of the
> shares.  Until shares vest, you may not transfer, sell, assign, bequeath,
> pledge, hypothecate or otherwise dispose of such shares.

EXHIBIT 2

Page 2
September 19, 2003

      6.    Your acceptance of this offer does not obligate you to continue in the employ of The Washington Group, nor obligate The Washington Group to continue you in its employ.

Your signing this document at the place indicated below and returning it to me will constitute your acceptance of the offer to purchase the shares and your agreement with the foregoing terms and conditions.

Omnicom Group Inc.                          Accepted and Agreed:


By: _____             By:_____
    Barry J. Wagner                           Harry Sporidis

                                           Date: _____

**Greenberg, David**

| | |
|---|---|
| **From:** | Sporidis, Harry [hsporidis@thewashingtongroup.com] |
| **Sent:** | Thursday, September 27, 2007 7:36 PM |
| **To:** | Lobo, Paul; Gray, Tracey |
| **Subject:** | Fw: Termination Notice |

Josh's termination is below

-----Original Message-----
From: Levine, Josh <JHL1@mentorcorp.com>
To: Sporidis, Harry
Sent: Thu Sep 27 19:19:18 2007
Subject: Termination Notice

Harry,


This communication will serve as official notice that Mentor Corporation wishes to terminate it's agreement with The Washington Group.


This formally serves notice on the 30 day termination window.


Thank You,


Josh Levine

EXHIBIT 3

**Mersky, Craig**

| | |
|---|---|
| From: | Sporidis, Harry |
| Sent: | Wednesday, September 26, 2007 6 41 PM |
| To: | 'Kamind@asco org' |
| Subject: | Re Heads up |

It went great. I'll call you in the AM and give you the download

-----Original Message-----
From: Deborah Kamin <Kamind@asco.org>
To: Sporidis, Harry
Sent: Wed Sep 26 17:47:11 2007
Subject: Re: Heads up

Yes, I talked to Nina and she has said you should send an engagement letter from your new firm. How did it go with Susan?

>>> "Sporidis, Harry" <hsporidis@thewashingtongroup.com> 9/26/2007 3:30
PM >>>
Deborah,

I wanted to let you know that I had a conversation with Susan today about my departure from TWG.

I will be moving to my new firm on October 22nd. I wanted to discuss with you how we should proceed on the new agreement. Should I send a contract over to you that will pick up on October 22nd and we can move forward from there?

I know that you are about to get on a call so if you have time let's discuss this tomorrow.

Thanks

Harry Sporidis
The Washington Group
1401 K Street, NW
10th Floor
Washington, DC 20005
Phone:   202-789-2111
Fax:       202-789-4383
Mobile: 202-669-7399

www.thewashingtongroup.com <http://www.thewashingtongroup.com/>

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

------------------------------------------------------------------------
----------------------
Privacy Notice:
The contents of this electronic message, including any prior messages, files, or attachments transmitted with it, are CONFIDENTIAL and are intended solely for the use of the individual(s) to whom the message is addressed. This message may contain legally protected or privileged information. Do not read, copy, disclose or forward this message without authorization from the originator of this message. If you have received this message in error, please notify the sender immediately and delete all copies from your

1

EXHIBIT 4

OMNICOM GROUP INC.

RESTRICTED STOCK AGREEMENT

**RESTRICTED STOCK AGREEMENT**, dated as of _____ (this "**Agreement**"), by and between Omnicom Group Inc., a New York corporation, ("**Omnicom**"), and _____ (the "**Employee**").

**WHEREAS**, Omnicom has implemented the Omnicom Group Inc. Equity Incentive Plan, as amended, restated or otherwise modified from time to time (the "**Plan**"); and

**WHEREAS**, capitalized terms used and not otherwise defined herein or in the Plan shall have the meanings set forth in Section 4 hereof;

**NOW THEREFORE**, in consideration of the foregoing and of the mutual covenants and agreements contained herein, and as an inducement to the Employee to continue as an employee of the Company and to promote the success of the business of the Company, the parties hereto agree as follows:

1.      **Grant**.  Omnicom hereby grants to the Employee, and the Employee hereby accepts, an award of restricted stock, effective as of the date hereof (the "**Grant Date**"), of _____ shares of the common stock, par value $0.15 per share, of Omnicom (the "**Restricted Shares**"), subject to the conditions, limitations and restrictions set forth in the Plan and this Agreement. On the Grant Date, the Employee shall pay to Omnicom an amount equal to $0.15 multiplied by the number of Restricted Shares being granted hereunder (such amount being the aggregate par value of the Restricted Shares) (the "**Aggregate Par Value**").  Such payment shall either be (i) deducted by the administrator of Omnicom's Equity Incentive Plan ("**Omnicom's Agent**") from the Employee's brokerage account or participant trust maintained with Omnicom's Agent ("**Employee's Brokerage Account**"), (ii) if the entire Aggregate Par Value is not on deposit in Employee's Brokerage Account, deposited in cash by the Employee to Employee's Brokerage Account, or (iii) made as otherwise directed by Omnicom.  The Restricted Shares shall be deemed to include associated Stock Dividends (as defined below).

2.      **Ownership, Rights as a Shareholder and Custody**.  The Employee is the owner of the Restricted Shares and has all the rights of a shareholder with respect thereto, including the right to vote such Restricted Shares and to receive all dividends or other distributions paid with respect to such Restricted Shares; provided, that, dividends and distributions in shares of Omnicom common stock (the "**Stock Dividends**") shall be subject to restrictions and a risk of forfeiture to the same extent as the Restricted Shares with respect to which such Stock Dividends have been distributed.  Accordingly, the Employee shall only be entitled to receive such Stock Dividends when the Restricted Shares (with respect to which such Stock Dividends have been distributed) vest pursuant to Section 3 below.  Such ownership of Restricted Shares and Stock Dividends shall be evidenced by book entries on the records of Omnicom.  Promptly following the vesting of Restricted Shares pursuant to this Agreement, shares evidencing such Restricted Shares and Stock Dividends shall be transferred into Employee's Brokerage Account or, at

EXHIBIT 5

Omnicom's sole discretion, stock certificate(s) shall be issued and delivered to the Employee (or his/her permitted transferees) by Omnicom.

3.    **Vesting and Forfeiture.**

(a)    Provided that the Employee has remained in the continuous employ of Omnicom or an Omnicom Affiliate through the respective Vesting Date (as defined below), the Restricted Shares shall automatically vest and become transferable and nonforfeitable as to 20% of such Restricted Shares on (i) the first anniversary date of the Grant Date (the "**First Vesting Date**") and (ii) each of the next four anniversary dates of the First Vesting Date (each of such dates being referred to herein as a "**Vesting Date**").

(b)    In the event of a Termination of Employment prior to a Vesting Date by reason of the death of the Employee, all of the Restricted Shares not yet vested shall vest and become transferable and nonforfeitable on the Termination Date.

(c)    In the event of a Termination of Employment prior to a Vesting Date by reason of the Total Disability of the Employee, a portion of the then unvested Restricted Shares shall vest and become transferable and nonforfeitable on the Termination Date, such portion (rounded up to the nearest full Restricted Share) to be equal to the sum for each remaining Vesting Date of (i) the total number of Restricted Shares which would vest on such Vesting Date multiplied by (ii) a fraction, (A) the numerator of which shall be the number of full calendar months between the Grant Date and the Termination Date and (B) the denominator of which shall be the number of full calendar months between the Grant Date and such Vesting Date.

(d)    In the event of a Change of Control prior to a Vesting Date, all of the Restricted Shares not yet vested shall vest, and shall become transferable and nonforfeitable as of the effective time of such transaction or at such earlier time as may be fixed by the Compensation Committee of the Board (the "**Omnicom Compensation Committee**").

(e)    Any Restricted Shares not vested on the Termination Date shall be forfeited and Omnicom shall repurchase such Restricted Shares from the Employee or the Employee's legal representative at a price equal to the product of (i) the par value of such Restricted Shares multiplied by (ii) the number of Restricted Shares being repurchased. Omnicom shall pay or cause to be paid such amount to the Employee or the Employee's legal representative no later than 60 days following the Termination Date.

(f)    Notwithstanding anything contained herein to the contrary, the Employee shall make arrangements satisfactory to Omnicom for the satisfaction of any withholding tax obligations that arise in connection with his/her Restricted Shares, including, without limitation, by electing to have Omnicom's Agent withhold a portion of the vested Restricted Shares on the Vesting Date in payment of the relevant withholding taxes or maintaining sufficient cash in Employee's Brokerage Account for payment of the relevant withholding taxes.

2

4.    **Definitions**.  For purposes of this Agreement, the terms set forth below shall have the following meanings:

(a)    "**Affiliate**" of Omnicom or the Company, as the case may be, shall mean any person, firm, corporation or other form of entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with Omnicom or the Company, as the case may be.

(b)    "**Board**" means the Board of Directors of Omnicom.

(c)    "**Change of Control**" means and includes each of the following: (i) the acquisition, in one or more transactions, of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act) by any person or entity or any group of persons or entities who constitute a group (within the meaning of Section 13(d)(3) of the Exchange Act), other than a trustee or other fiduciary holding securities under an employee benefit plan of Omnicom or a Subsidiary, of any securities of Omnicom such that, as a result of such acquisition, such person, entity or group either (A) beneficially owns (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, more than 20% of Omnicom's outstanding voting securities entitled to vote on a regular basis for a majority of the members of the Board or (B) otherwise has the ability to elect, directly or indirectly, a majority of the members of the Board; (ii) a change in the composition of the Board such that a majority of the members of the Board are not Continuing Directors; or (iii) the consummation of a merger or consolidation of Omnicom with any other corporation which has been approved by the shareholders of Omnicom, other than a merger or consolidation which would result in the voting securities of Omnicom outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least 80% of the total voting power represented by the voting securities of Omnicom or such surviving entity outstanding immediately after such merger or consolidation, or the consummation of a plan of complete dissolution or liquidation of the Company or an agreement for the sale or disposition by Omnicom of (in one or more transactions) all or substantially all of Omnicom's assets which has been approved by the shareholders of Omnicom.

(d)    "**Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the Employment Period or (ii) had made a Pitch at any time during the Employment Period, or the six months immediately following, the Termination Date.

(e)    "**Company**" means the Omnicom Affiliate by whom the Employee is employed as of the date of this Agreement and each other Omnicom Affiliate by whom the Employee is employed at any time during the Employment Period.

(f)    "**Continuing Director**" means, as of any date of determination, any member of the Board who (i) was a member of such Board on the effective date of the Plan or (ii) was nominated for election or elected to such Board with the affirmative vote of a majority of the Continuing Directors who were members of such Board at the time of such nomination or election.

3

(g)   "**Employment Period**" means the period that the Employee is employed by any member of the Group.

(h)   "**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

(i)   "**Group**" means (i) if the Company operates within an Omnicom network, all of the companies, group of companies and divisions operating under a global or national brand of such Omnicom network, and (ii) if the Company operates as part of a division or separate company independent of an Omnicom network, all companies and divisions operating under such independent brand.

(j)   "**Pitch**" means a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch.

(k)   "**Restricted Client**" shall mean any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the one-year period prior to the Termination Date, or (ii) had made a Pitch at any time during the one-year period immediately preceding, or the six months immediately following, the Termination Date.

(l)   "**Subsidiary**" means any corporation that is a subsidiary of Omnicom within the meaning of Section 424(f) of the Internal Revenue Code of 1986, as amended from time to time, and any entity that is organized as a limited liability company in which Omnicom, directly or indirectly, possesses 50% or more of the voting power of all members of such limited liability company entitled to vote.

(m)   "**Termination Date**" means the date on which the Termination of Employment occurs.

(n)   "**Termination of Employment**" means the time when the Employee is no longer employed by any Omnicom Affiliate for any reason whatsoever.

(o)   "**Total Disability**" means the inability of the Employee to substantially perform the duties of his/her position as a result of illness or physical or mental incapacity or disability (from any cause or causes whatsoever). All determinations as to the disability of any Employee shall be made by the Omnicom Compensation Committee or the Board of Directors of the Omnicom Affiliate, as the case may be, who is then the Employee's employer, upon the basis of such evidence as such Omnicom Compensation Committee or Board of Directors deems necessary or desirable. In the event of a conflict between the determination made by the Omnicom Compensation Committee and the Board of Directors of the Omnicom Affiliate, the determination of the Omnicom Compensation Committee shall prevail.

5.   **Nontransferability**. Prior to the date upon which the Restricted Shares become vested pursuant to paragraph 3 hereof, the Restricted Shares may not be pledged, encumbered or hypothecated to, or in favor of, or subject to any lien, obligation or liability of the Employee to

any party, or assigned or transferred by the Employee otherwise than by will or the laws of descent and distribution; provided, however that such Restricted Shares may be transferred without consideration to immediate family members (*i.e.*, children, grandchildren or spouse), to trusts for the benefit of such immediate family members and to partnerships in which such family members are the only partners, provided that any such family member, trust and/or partnership shall be subject to all terms, conditions and restrictions of this Agreement by signing a joinder hereto.

6.    **Non-Solicitation/Non-Servicing and Protection of Confidential Information Agreement.**

(a)    In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group, the Employee will not, as an individual, employee, consultant, independent contractor, partner, shareholder, member or in association with any other person, firm, corporation or other form of entity, directly or indirectly, and regardless of the Employee continuing to be employed by a member of the Group or the reason for the Employee ceasing to be so employed by any member of the Group; provided, however, the restrictions set forth below in clauses (ii) and (iii) below shall only apply with respect to periods following the Termination Date if any Restricted Shares have vested under this Agreement:

(i) during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the same nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

(ii) for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expected to do with members of the Group; provided, *however*, that solely with respect to this Section 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; and

(iii) for a one-year period following the Termination Date, employ as an employee or retain as a consultant any person, firm, corporation or other form of entity who is then or at any time during the one-year period prior to the Termination Date was, an employee of or exclusive consultant to a member of the

5

Group, or persuade or attempt to persuade any employee of or exclusive consultant to a member of the Group to leave the employ of such member of the Group or to become employed as an employee or retained as a consultant by any other person, firm, corporation or other form of entity; provided, however, a solicitation pursuant to general recruitment advertising that is not directed at the employees or exclusive consultants of any member of the Group shall not be deemed to be a breach of this provision.

(b)     As a professional in a highly service-oriented and creative business, the Employee understands and agrees that his/her position with the Company requires and will continue to require services which are of a special character and which places him/her in a position of confidence and trust with the Clients and employees of members of the Group. The Employee further acknowledges that his/her services to the Clients necessarily require that the Employee have access to Confidential Information (as defined below) of members of the Group and their respective Clients and that, in the course of his/her employment with or rendering of services to the Company, the Employee will develop personal relationships with the Clients and knowledge of those Clients' affairs and requirements. Accordingly, the Employee acknowledges that the type and periods of restrictions imposed in this Agreement are fair and reasonable, are reasonably required in order to protect and maintain the proprietary interests of the members of the Group, other legitimate business interests of members of the Group, and the goodwill associated with the members of the Group. The Employee further understands and agrees that the Restricted Clients may be serviced from any location and accordingly it is reasonable that the covenants set forth herein are not limited by narrow geographic area but generally by the location of such Restricted Clients. In the event that any covenant contained in this Agreement shall be determined by any court or other tribunal of competent jurisdiction to be unenforceable by reason of its extending for too great a period of time or over too great a geographical area or by reason of its being too extensive in any other respect, (i) such covenant shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographical area as to which it may be enforceable and/or to the maximum extent in all other respects as to which it may be enforceable, all as determined by such court or other tribunal making such determination, and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made.

(c)     The Employee hereby acknowledges and agrees that for so long as the Employee has been employed by the Company (which term, as used in this Section 6(c) and Section 6(d) shall be deemed to include any Affiliate of the Company), the Employee has acquired and will continue to acquire and have access to confidential or proprietary information about the Company and/or its Clients, including but not limited to, trade secrets, methods, models, passwords, access to computer files, financial information and records, computer software programs, agreements and/or contracts between the Company and its Clients, Client contacts, creative policies and ideas, advertising campaigns, public relations campaigns, creative and media materials, graphic design, budgets, practices, concepts, strategies, methods of operation, financial or business projections of the Company, and information about or received from its Clients (collectively, **"Confidential Information"**). Accordingly, in consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this

6

Agreement, for so long as the Employee is employed by a member of the Group and thereafter, the Employee will retain in strictest confidence all Confidential Information and shall not disclose any such Confidential Information to anyone outside the members of the Group and Omnicom, except in the course of the Employee's duties for the Company or with Omnicom's express written consent. The Employee hereby acknowledges that he/she is aware that such Confidential Information is not readily available to the public, and agrees that he/she will not at any time utilize such Confidential Information for his/her own benefit or for the benefit of third parties.

(d)    The Employee hereby acknowledges and agrees that all materials created or modified by the Employee for so long as the Employee is employed by the Company, including, without limitation, all works of authorship, inventions, processes, ideas, methods, concepts and other tangible and intangible materials (collectively, "**Work Product**"), shall be "work for hire" and that the Company and/or Omnicom shall be the exclusive owner of the Work Product and all intellectual property rights associated with the Work Product, including all trademarks, patents or copyrights contained therein. To the extent any Work Product does not qualify as "work for hire", the Employee hereby assigns ownership of all such Work Product to the Company and/or Omnicom and agrees to take all reasonable measures, at the Company's expense, to perfect such rights in the Company and/or Omnicom. The Employee hereby appoints the Company and/or Omnicom as his/her attorney-in-fact with the limited power to execute assignments of such Work Product. If the Employee is an employee in the State of California, the parties hereto agree and acknowledge that the terms of this paragraph shall be subject to the terms of Section 2870 of the California Labor Code, a copy of which is annexed to this Agreement. The Employee hereby agrees to advise the Company and/or Omnicom promptly in writing of any inventions that he/she believes meet the criteria set forth in Section 2870.

(e)    Each of the covenants and agreements contained in this Section 6 (collectively, the "**Protective Covenants**") is separate, distinct and severable. All rights, remedies and benefits expressly provided for in this Section 6 are cumulative and are not exclusive of any rights, remedies or benefits provided for by law, in this Section 6 or otherwise, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived). The provisions of this Section 6 are not in lieu of, but are in addition to the continuing obligations of the Employee (which the Employee hereby acknowledges) to not use or disclose Confidential Information known to the Employee until any particular piece of Confidential Information becomes generally known to the public (through no action of the Employee), whereupon the restriction on use and disclosure shall cease as to that particular item. The existence of any claim, demand, action or cause of action that the Employee may have against Omnicom or any of its Affiliates, whether predicated pursuant to this Section 6 or otherwise, shall not constitute a defense to the enforcement of the provisions of this Section 6 or any other provision or provisions of this Agreement. The covenants contained in this Section 6 for the benefit of Omnicom and the members of the Group, shall survive any termination of this Agreement and may be waived in whole or in part by Omnicom without the consent of any other person, firm, corporation or other form of entity. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which the Employee is in violation of any of such Protective Covenants, and all such Protective Covenants shall automatically be extended by the period of

7

such violation. The Employee further acknowledges that he/she is a highly regarded executive who considered the terms and conditions upon which he/she is electing to be granted the Restricted Shares and that he/she has been advised and has had the opportunity to obtain counsel of his/her choice in connection with reviewing and executing this Agreement.

       (f)    By acceptance of the grant of Restricted Shares, the Employee agrees that if the Employee were, without authority, to use or disclose Confidential Information, or otherwise breach any of the Protective Covenants, or threaten to do so, in addition to all other available remedies (including without limitation seeking such damages as it can show it has sustained by reason of such breach), (i) Omnicom and/or any member of the Group shall be entitled to specific performance and injunctive and other appropriate relief (without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law) to prevent the Employee from doing so, and/or (ii) Omnicom (by action of the Chairman, Chief Executive Officer, President, Chief Financial Officer or General Counsel of Omnicom) may cause any or all of the following actions to occur: (x) the Restricted Shares granted hereunder shall become void, shall be forfeited and shall terminate effective the date on which the Employee entered into such activity, (y) any vested shares of Omnicom common stock acquired by the Employee pursuant to the grant hereunder shall be forfeited and returned to Omnicom, and (z) any gain realized by the Employee from the sale or transfer of shares of Omnicom common stock acquired through the grant hereunder, shall be returned by the Employee to Omnicom. The Employee acknowledges that the harm caused to Omnicom and/or members of the Group by the breach or anticipated breach of this Agreement is by its nature irreparable because, among other things, it is not readily susceptible of proof as to the monetary harm that would ensue. The Employee consents that any interim or final equitable relief entered by a court of competent jurisdiction shall, at the request of Omnicom and/or a member of the Group be entered on consent and enforced by any court having jurisdiction over the Employee, without prejudice to any rights either party may have to appeal from the proceedings that resulted in any grant of such relief.

       (g)    During the Employment Period and the one-year period after the Termination Date, prior to accepting employment with any subsequent employer, the Employee shall notify any prospective employer in writing of his/her obligations under this Agreement. In addition, immediately after accepting employment with a subsequent employer, the Employee shall provide Omnicom with a copy of the notice that was sent by him/her to such subsequent employer.

       7.    **Investment Representation and Compliance With Applicable Law**. The Employee hereby represents and covenants that (a) the Restricted Shares will be acquired for investment and not with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), unless such acquisition has been registered under the Securities Act and any applicable state securities law; and (b) any subsequent sale of any such Restricted Shares, unless their acquisition had been so registered, shall be made either pursuant to an effective registration statement under the Securities Act and any applicable state securities laws, or pursuant to an exemption from registration under the Securities Act and such state securities laws.

8.      **No Understandings as to Employment**. Nothing in the grant of the Restricted Shares or in this Agreement shall constitute or be evidence of any understanding, express or implied, on the part of Omnicom or any Omnicom Affiliate to employ the Employee for any period.

9.      **Plan Incorporated**. The Employee accepts the Restricted Shares herein subject to all of the provisions of the Plan, which are incorporated into this Agreement, including the provisions that authorize the Omnicom Compensation Committee to administer and interpret the Plan and which provide that the Omnicom Compensation Committee's decisions, determinations and interpretations with respect to the Plan are final and conclusive on all persons affected hereby. In the event of a conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan shall govern. Terms not otherwise defined in this Agreement shall have the meanings ascribed in the Plan.

10.     **Amendment**. This Agreement may be amended only by an instrument in writing executed and delivered by the Employee and Omnicom.

11.     **Assignment.** The parties hereto agree that the Omnicom shall have the right to assign this Agreement, and accordingly, this Agreement shall inure to the benefit of, and may be enforced by, any and all successors and assigns of Omnicom, including, without limitation, by asset assignment, stock sale, merger, consolidation or other corporate reorganization. Subject to Section 5, the Employee agrees that his/her obligations under this Agreement are personal to him/her, and the Employee shall not have the right to assign or otherwise transfer his/her obligations hereunder. Any purported assignment or transfer by the Employee shall be void and ineffective.

12.     **Governing Law**. The interpretation and construction of this Agreement, and all matters relating hereto (including, without limitation, the validity or enforcement of this Agreement), shall be governed by the laws of New York without regard to any conflicts or choice of laws provisions of the State of New York that would result in the application of the law of any other jurisdiction.

13.     **Notice**. Any notice to be given to Omnicom under the terms of this Agreement shall be addressed to the Office of the General Counsel of Omnicom at 437 Madison Avenue, New York, New York 10022, and any notice to be given to the Employee shall be addressed to the Employee at the address set forth beneath his or her signature hereto, or at such other address for a party as such party may hereafter designate in writing to the other. Any such notice shall be deemed to have been duly given if mailed, postage prepaid, addressed as aforesaid.

14.     **Headings**. All section titles and captions in this Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend or describe the scope or intent of any provisions of this Agreement.

15.     **Further Assurances**. The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be reasonably necessary or appropriate to achieve the purposes of this Agreement.

16.    **Entire Agreement**.  This Agreement, together with the Plan, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto. Notwithstanding the foregoing, any other confidentiality agreement, non-solicitation/non-servicing agreement or any other type of restrictive covenant agreement that the Employee has entered into prior to the date hereof or may enter into after the date hereof with Omnicom or one of its Affiliates shall remain in full force and effect.  No oral understandings, oral statements, oral promises or oral inducements between the parties hereto relating to this Agreement exist.  No representations, warranties, covenants or conditions, express or implied, whether by statute or otherwise, other than as set forth in this Agreement, have been made by the parties hereto.

17.    **Remedies**.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

18.    **Counterparts**.  This Agreement may be executed in two or more counterparts, or by facsimile transmission, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

19.    **Waiver**.  By signing and returning this Agreement, the Employee agrees that the Employee's rights in respect of the Restricted Shares (including upon Termination of Employment) shall be defined solely by the Plan and the provisions of this Agreement. Accordingly, the Employee waives all other claims he/she may have against Omnicom or any of its Affiliates, and their respective officers, directors, agents and employees for any losses or damages arising out of the forfeiture of any Restricted Shares as a result of such Termination of Employment, or otherwise in relation to the Plan with respect to such Restricted Shares.

20.    **Third Party Beneficiaries**.  Nothing in this Agreement is intended to confer upon any other person except the Employee, Omnicom and the Affiliates of Omnicom any rights or remedies hereunder or shall create any third party beneficiary rights in any person (other than Affiliates of Omnicom).

21.    **No Strict Construction**.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of law or contract interpretation that provides that in the case of ambiguity or uncertainty a provision should be construed against the draftsman will be applied against any party hereto.   The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted.

*[The remainder of this page is left blank intentionally]*

**IN WITNESS WHEREOF**, Omnicom, by its duly authorized officer, and the Employee, each has executed this Agreement as of the day and year first above written.

**OMNICOM GROUP INC.**

By: _____

Name: Michael J. O'Brien
Title: Senior Vice President,
General Counsel and
Secretary

**EMPLOYEE**

_____

Name:

11

**Annex I**
**to Restricted Stock Agreement**

## California Labor Code Section 2870

Employment agreements; assignment of rights

      (a)     Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his rights in an invention to his employer shall not apply to an invention that the employee developed entirely on his own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

      (i)     relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

      (ii)     result from any work performed by the employee for the employer.

      (b)     To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

12

From: "Sporidis, Harry" <hsporidis@thewashingtongroup.com>
Date: October 3, 2007 3:02:44 PM EDT
To: "Molinari, Susan" <smolinari@thewashingtongroup.com>
Subject: FW: Follow up

Susan, I wanted you to be aware of the e-mail exchange (below) that I had with Eugene earlier this morning.

I am looking forward to hearing how your conversation with Lorraine Theilan goes. You can reach me anytime by mobile.

Thanks


-----Original Message-----
From: Sporidis, Harry
Sent: Wed 10/3/2007 11:01 AM
To: Patrone, Eugene
Subject: RE: Follow up

Thank you for the lunch and your phone call today.

I appreciate your honesty and candor in laying out what actions Ketchum/TWG is intending to take. You laid out the case pretty well that Ketchum/TWG will hurt me if I choose to move on to a new firm. While I know that I am legally entitled to leave, as you said, I don't want to be burdened with legal fees and start at my new firm having to deal with threats and litigation no matter the lack of merit. As you said, I have to consider what is best for my family.

This is all so unfortunate. As we discussed, I have been told consistently, and in fact came to this firm, because there was a no non-compete policy. Further, no one ever informed me that I would have to enter into a non-compete to receive the promised stock rewards. In fact, I had no idea there was buried in the stock reward document the non-compete provisions until you raised it with me after my decision to leave TWG/Ketchum. So, I do think that TWG/Ketchum is wrong here and its response (and its intended actions as you described them) seems extremely harsh. But I have to take what you have said seriously and I am given your request for reconsideration a lot of thought.

I appreciate (as you said) that you don't want me to be a man without an island and you are concerned that the firm to which I am going will discard me if there is litigation. I am also taking seriously your statement that TWG/Ketchum is willing to write my clients that they cannot continue to use me

EXHIBIT 6

even though I can't imagine there is a legal basis for such a letter.

Although it is hard for me to think that I would really like working with Ketchum since they are willing to do the things you have indicated they would do, it may be that I may have to stay for the benefit of my family. Therefore, I am giving this all some serious thought and I will get back to you.

Thank you again.

Harry

-----Original Message-----
From: Patrone, Eugene
Sent: Tuesday, October 02, 2007 9:59 PM
To: Sporidis, Harry
Subject: Follow up

Harry,

I'm glad we spoke today and I remain hopeful that we can resolve the situation amicably. As I mentioned, I'd like you to reconsider leaving TWG. To that end, please think about what specific issues concern you and perhaps we can address them. With less than 2 weeks before you plan to leave TWG - including a 3 day weekend - I think we need to resolve these issues sooner rather than later. I would like to speak with you tomorrow afternoon and get your thoughts concerning our conversation today.

Eugene

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

------Original Message------
From: The Washington Group
To: Eugene Patrone
Sent: Oct 3, 2007 4:43 PM
Subject: Harry

Please pass onto Lorraine:

Spoke with Harry today. Apparently Eugene put the fear of God into him. He
realizes that Ketchun means biz. Basically he still really wants to leave
and is wondering if there is anything he can do ? Split ASCO for a year?
Leave ASCO? (Not sure if we keep it but we could)

This e-mail is intended only for the person or entity to which it is
addressed and may contain information that is privileged, confidential or
otherwise protected from disclosure. Dissemination, distribution or copying
of this e-mail or the information herein by anyone other than the intended

EXHIBIT 7

recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

------ End of Forwarded Message

-----Original Message-----
From: Patrone, Eugene
Sent: Mon 10/1/2007 3:13 PM
To: Sporidis, Harry
Cc: Paul Lobo (PLobo@TheWashingtongroup.com)
Subject: Stock documents

Harry,

10/21/2007                                                        EXHIBIT 8

As we discussed, attached is the Omnicom Restricted Stock Agreement and below is the Fidelity generated record indicating acceptance of the stock on July 27, 2005 at 8:40.


Please let me know if you have any questions.


Eugene


--------------------------------------------------------------------------------
----------------


Participant Name

Grant Date

Shares Granted

Grant Price A

Acp Dcln

Acp Dcln D

Acp Dcln Tm

Channel

SPORIDIS, HARRY

23-May-05

360.

0.15

Accepted

07/27/05

08:40 PM

Web

10/21/2007

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

10/21/2007