# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE WASHINGTON GROUP, INC.,

               Plaintiff,

     -against-

HARRY SPORIDIS,

               Defendant.

No.  1:07-cv-01892-RBW

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S APPLICATION FOR A PRELIMINARY INJUNCTION

Elizabeth A. Lalik (Bar No. 447052)
LITTLER MENDELSON, P.C.
1650 Tysons Blvd., Suite 700
McLean, Virginia  22102
Phone:  (703) 286-3131
Fax:  (703)842-8517

David S. Greenberg
DAVIS & GILBERT LLP
1740 Broadway
New York, NY 10019
Phone: (212) 468-4895
Fax: (212) 621-0940

*Attorneys for The Washington Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................iii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

ARGUMENT ...................................................................................................................... 11

I.      STANDARDS FOR INJUNCTIVE RELIEF............................................................ 11

II.     TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS
        AGAINST SPORIDIS. ....................................................................................... 12

        A.      TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS
                BREACH OF CONTRACT CLAIM AGAINST SPORIDIS......................... 12

                1.      *Sporidis Had Adequate Notice Of, and Therefore Accepted
                        the Terms Of, the 2005 RSA* .................................................... 12

                2.      *Sporidis Breached His Protective Covenants.*........................... 17

                3.      *The Protective Covenants Are Enforceable.* ............................ 19

                        a)      TWG Has A Legitimate Business Interest In Protecting Its
                                Goodwill And Its Client Relationships........................................ 19

                        b)      Sporidis' Restrictive Covenants Are Reasonable......................... 23

                        c)      Enforcement Of The Restrictive Covenants Is Not Unduly
                                Burdensome Or Harmful To The Public ..................................... 25

                4.      *TWG Has Not Waived Enforcement of the Protective
                        Covenants* ............................................................................... 25

                        a)      Molinari's Statements to Sporidis Do Not Constitute Waiver...... 25

                        b)      TWG's Enforcement History Does Not Constitute Waiver ......... 27

                5.      *TWG is not Estopped from Enforcing its Rights Under the
                        Agreements* .............................................................................. 29

III.    TWG HAS SUFFERED, AND WILL CONTINUE TO SUFFER,
        IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF..................................... 30

IV.     THE INJUNCTION TWG REQUESTS WILL NOT
        SUBSTANTIALLY INJURE SPORIDIS ................................................................ 34

V.    THE PUBLIC INTEREST WILL BE FURTHERED BY THE ISSUANCE OF TWG'S REQUESTED INJUNCTION ............................................ 35

CONCLUSION………………………………………………………………………..35

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*,
    682 F.2d 382 (2d Cir. 1982) .................................................................................. 30

*Bar-Ayal v. Time Warner Cable Inc.*,
    03   2006 U.S. Dist. LEXIS 75972
    (S.D.N.Y. Oct. 16, 2006) ............................................................................... 12, 13

*Davenport v. Int'l Bhd. of Teamsters*,
    166 F.3d 356 (D.C. Cir. 1999) ........................................................................ 30, 31

*Ecolab, Inc. v. Paolo*,
    753 F. Supp. 1100 (E.D.N.Y. 1991) ....................................................................... 30

*Ellis v. James V. Hurson Assocs., Inc.*,
    565 A.2d 615 (D.C. 1989) ................................................................................... 19

*Feldman v. Google, Inc.*,
    No. 06-2540, 2007 U.S. Dist. LEXIS 22996
    (E.D. Pa. Mar. 29, 2007) .................................................................................. 13

*Forrest v. Verizon Commc'ns, Inc.*,
    805 A.2d 1007 (D.C. 2002) ......................................................................... 12, 13, 15

*Ivy Mar Co. v. C.R. Seasons Ltd.*,
    907 F. Supp. 547 (E.D.N.Y. 1995) ........................................................................ 31

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004) .............................................................. 21, 23, 32

*Lutz Appellate Printers, Inc. v. Busby*,
    No. 89-2870-OG, 1989 U.S. Dist. LEXIS 13633
    (D.D.C. Nov. 14, 1989) ..................................................................................... 30

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*,
    298 F. Supp. 2d 27 (D.D.C. 2002) ............................................................... 11, 30, 34

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) ........................................................... 11, 19, 30, 34

*Mova Pharm. Corp. v. Shalala*,

140 F.3d 1060 (D.C. Cir. 1998) .......................................................................... 11

*Prudential Sec. Inc. v. Plunkett*,
     8 F. Supp. 2d 514 (E.D. Va. 1998) ........................................................................ 31

*Register.com, Inc. v. Verio, Inc.*,
     356 F.3d 393 (2d Cir. 2004) ................................................................................. 12

*Rescuecom Corp. v. Mathews*,
     No. 5:05-CV-1330 (FJS/GJD),
     2006 U.S. Dist. LEXIS 41042
     (N.D.N.Y. June 20, 2006) ............................................................................. 30, 32

*Silipos, Inc. v. Bickel*,
     No. 1:06-cv-02205-RCC-DFE,
     2006 U.S. Dist. LEXIS 54946 (S.D.N.Y. Aug. 8, 2006) ..................................... 21

*Specht v. Netscape Commc'ns. Corp.*,
     306 F.3d 17 (2d Cir. 2002) ........................................................................ 12, 13, 14

*Ticor Title Ins. Co. v Cohen*,
     173 F.3d 63 (2d Cir. 1999) ................................................................................... 30

*Treiber & Straub, Inc. v. United Parcel Serv., Inc.*,
     474 F.3d 379 (7th Cir. 2007) ................................................................................ 15

## STATE CASES

*BDO Seidman v. Hirshberg*,
     93 N.Y.2d 382 (1999) .................................................................. 19, 20, 22, 23, 24

*Chernoff Diamond & Co. v. Fitzmaurice, Inc.*,
     234 A.D.2d 200 (1st Dep't 1996) ........................................................................ 30

*Cicero Indus. Dev. Corp. v. Roberts*,
     63 Misc. 2d 565 (N.Y. Sup. Ct. Onondga Cty. 1970) ................................... 26, 29

*Contempo Commc'ns, Inc. v. MJM Creative Servs., Inc.*,
     182 A.D.2d 351 (1st Dep't 1992) ............................................................ 24, 25, 30

*Healthworld Corp. v. Gottlieb*,
     12 A.D.3d 278 (1st Dep't 2004) ............................................................ 23, 24, 25, 30

*Horne v. Radiological Health Services, P.C.*,

83 Misc. 2d 446 (N.Y. Sup. Ct. Suffolk Cty. 1975) ................................. 25, 27, 28

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*,
    797 N.Y.S.2d 883 (Sup. Ct. N.Y. Cnty. 2005) ...................................................... 22

*Mallory Factor, Inc. v. Schwartz,*
    146 A.D.2d 465 (1st Dep't 1989) .................................................................. 24, 30

*Reed, Roberts Assocs., Inc. v. Strauman*,
    40 N.Y.2d 303 (1976) ......................................................................................... 20

*Uniform Rental Div., Inc. v. Moreno*,
    83 A.D.2d 629 (2d Dep't 1981) .......................................................................... 24

## FEDERAL STATUTES

Fed. R. Civ. P. 65 ............................................................................................ 1, 11, 35

Plaintiff The Washington Group, Inc. ("TWG" or the "Company") submits this brief in support of its application, pursuant to Fed. R. Civ. P. 65, for an order preliminarily enjoining its former employee, defendant Harry Sporidis ("Sporidis" or "Defendant") from breaching protective covenants contained in an agreement that he signed while employed by TWG.

## PRELIMINARY STATEMENT

This case arises out of defendant Sporidis' breaches of his duty of loyalty while employed by TWG, and his violations of protective covenants contained in an agreement he signed while employed by TWG.  TWG commenced this lawsuit upon learning about Sporidis' breaches of the protective covenants, and after Sporidis made it clear that he did not intend to abide by those protective covenants.  The evidence uncovered thus far demonstrates that Sporidis breached not only his protective covenants, but his fiduciary duties and duty of loyalty as well.

As demonstrated by the declarations of James Meyer and Gregory Speck – obtained only after the Court's consideration of TWG's application for a temporary restraining order – in exchange for an award of stock in 2005, Sporidis, a Senior Vice President at TWG, signed an agreement containing covenants that he would not solicit or render competing services to certain limited TWG clients (with whom Sporidis had substantial involvement) for one year following his departure from TWG.  Regardless of that agreement, while still employed as a Senior Vice-President at TWG, Sporidis began speaking with a prospective new employer and competitor of TWG's, Powell Goldstein LLP, about the possibility of leaving TWG and joining Powell Goldstein.  In connection with this move, and in breach of his protective covenants and his duties as TWG's employee, Sporidis has solicited at least two of TWG's clients to terminate their relationships with TWG, so that he could bring those clients with him to Powell Goldstein.

Sporidis is currently exploiting client relationships and goodwill developed at great expense by TWG to divert business to his new employer, Powell Goldstein LLP. TWG has suffered and will continue to suffer irreparable harm: Sporidis continues to service TWG's former clients, and there is a risk that Sporidis will improperly solicit additional significant business away from TWG and to Powell Goldstein, resulting in further incalculable losses of income and goodwill by TWG. Accordingly, TWG should be granted an order enforcing the terms of the protective covenants to which Sporidis agreed, and enjoining Sporidis from further breaches of his common law duties.

## STATEMENT OF FACTS

### The Parties

TWG is a well-respected and established bipartisan government relations and strategic consulting firm, serving a mix of clients, including healthcare, technology, telecommunications, environmental, defense, trade, real estate and transportation entities, in virtually all areas of legislative and regulatory activity. (Patrone Dec., ¶ 4.)[1] TWG is a subsidiary of Ketchum, Inc., one of the world's largest and most respected public relations firms, and a member of the Omnicom Group, Inc. ("Omnicom") network of companies. (*Id.*) TWG advises its clients on political positioning, provides them with lobbying strategies and programs, tracks and analyzes pending legislation, assists with congressional testimony preparation and crisis management, writes legislative and regulatory language, and drafts position papers. (*Id.*) TWG spends significant resources developing and maintaining its client relationships, many of which have lasted for years. (*Id.*) Despite its success and reputation, TWG employs only 15 professionals, along with five administrative support personnel. (*Id.*, ¶ 5.) As a result, although

2

TWG entrusts certain of its professionals (including Sporidis) with handling the day to day, primary relationships with certain TWG clients, TWG relies on all members of its staff to service the needs of all of TWG's clients. (*Id.*; Lobo Tr. 12:10-17; 13:18-14:17.)[2]

Sporidis joined TWG as a Vice President on June 6, 2001, and later became a Senior Vice President, servicing many of TWG's clients. (Patrone Dec., ¶ 6.) Sporidis was well-compensated for his services, earning annual pay of $230,000 at the time he resigned, and receiving $40,000 in cash bonuses over the past two years alone. (*Id.*) During his over six and a half years working with TWG, Sporidis, at TWG's expense, developed and maintained relationships with some of TWG's most significant clients, including but not limited to Mentor Corporation ("Mentor"), a leading supplier of breast implants and other medical products for the global aesthetic medicine market, the American Society of Clinical Oncology ("ASCO"), a non-profit organization, dedicated to improving cancer care and prevention, and the Society for Human Resource Management ("SHRM"), a professional association devoted to serving the needs of HR professionals. (*Id.* ¶ 7.) Sporidis was TWG's chief contact for these clients. (*Id.*)

**Sporidis' Protective Covenants**

Selected employees of TWG (and of other Omnicom affiliates) periodically receive performance bonuses from TWG and Omnicom, in the form of grants of restricted Omnicom stock. (Patrone Dec., ¶ 8; Azzopardi Dec., ¶ 2.)[3] In exchange for receiving these

---

*(continued . . . )*

[1]    As used herein, "Patrone Dec." refers to the Declaration of Eugene Patrone, dated October 18, 2007, submitted along with plaintiff's application for a temporary restraining order.

[2]    As used herein, "Lobo Tr." refers to the Transcript of the Deposition of Paul Lobo (and the exhibits thereto), attached hereto as Exhibit 1.

[3]    As used herein, "Azzopardi Dec." refers to the Declaration of Steven Azzopardi, dated October 18, 2007, submitted along with plaintiff's application for a temporary restraining order.

awards of stock, the employees are required to agree to the terms and conditions of Omnicom's Restricted Stock Agreement, which are updated periodically. (Patrone Dec., ¶ 8; Azzopardi Dec., ¶ 2.) In or about June 2005, Sporidis was notified by letter (the "Notification Letter") that he had received such an award of Omnicom stock (the "2005 Award"), and that he could visit a website maintained by Fidelity Investments ("Fidelity"), the administrator of Omnicom's Restricted Stock Plan, to accept the 2005 Award. (Patrone Dec., ¶ 9; Retter Dec., ¶ 7.)[4]

The Notification Letter instructed Sporidis that he had to log onto the "NetBenefits" website operated by Fidelity, where he could view the 2005 Award and accept or decline it. (Retter Dec., ¶ 6.) The Notification Letter further specifically informed Sporidis that in order to accept the 2005 Award, he would be required to accept the terms and conditions of Omnicom's 2005 Restricted Stock Agreement (the "2005 RSA"), which would be available at the NetBenefits site for review. (*Id.*) The Notification Letter also specifically informed Sporidis that he would not be receiving a manually-signed copy of the 2005 RSA (as recipients had in the past), although he could print a copy at the NetBenefits website. (*Id.*) Finally, the Notification Letter also **specifically notified Sporidis that the terms and conditions of the 2005 RSA included provisions protecting Omnicom's and its affiliates' intellectual property and confidential information, and restricting employees from soliciting or servicing clients or soliciting or hiring certain employees**. (*Id.*) The Notification Letter asked Sporidis to review these provisions carefully upon logging in to accept his stock award. (*Id.*)

---

[4]    As used herein, "Retter Dec." refers to the Declaration of Cynthia Retter, dated October 18, 2007, submitted along with plaintiff's application for a temporary restraining order.

Sporidis logged onto the NetBenefits site on or about July 27, 2005, and accepted the 2005 Award. (Patrone Dec., ¶ 11; Meyer Dec., ¶¶ 6, 7 and Exs. B, C.)[5]  In the process of accepting the 2005 Award, Sporidis was again notified that he had to review and accept the terms and conditions of the 2005 RSA, and Sporidis **was further required to represent that he had done so in order to receive the 2005 Award**.  (Meyer Dec., ¶¶ 3-6 and Ex. A.)

The 2005 RSA that Sporidis accepted provides, *inter alia*,

 In consideration for and in order to be eligible to receive the voluntary grant of the Restricted Shares provided in this Agreement, except on behalf of a member of the Group the Employee will not…

i)  during the Employment Period, the Employee shall not, directly or indirectly, solicit business on behalf of, render any services to, engage in, or have any ownership interests or other affiliation in, any business or other endeavor, which is engaged in the business of the nature as or competitive with any member of the Group; provided, however, that nothing contained in this clause (i) shall be deemed to prevent the undersigned from owning less than ¼ of 1% of the shares of any publicly held corporation engaged in any such business;

ii)  for a one-year period following the Termination Date, solicit, render services to or for, or accept from, any Restricted Client, any business of the type performed by any member of the Group for such Restricted Client or persuade or attempt in any manner to persuade any Restricted Client to cease to do business or to reduce the amount of business which any such Restricted Client has customarily done or is reasonably expect to do with members of the Group; provided, *however*, that solely with respect to this 6(a)(ii), the definition of Restricted Client shall be limited to the particular product, brand or service of such Restricted Client in respect of which at any time during the one-year period prior to the Termination Date, the Employee had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a participation, supervisory responsibility or other involvement in a Pitch; . . .

---

[5]    As used herein, "Meyer Dec." refers to the Declaration of James Meyer, dated October 23, 2007, submitted along with plaintiff's motion for reconsideration of its application for a temporary restraining order.

> By acceptance of the grant of Restricted Shares, the Employee agrees that of the Employee were… to breach any of the Protective Covenants, or threatened to do so, in addition to all other available remedies… Omnicom and/or any member of the Group shall be entitled to specific performance and injunctive and other appropriate relief (without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law to prevent the Employee from doing so… The Employee acknowledges that the harm caused to Omnicom and/or members of the Group by the breach or anticipated breach of this Agreement is by its nature irreparable because, among other things, it is not readily susceptible of proof as to the monetary harm that would ensue.

(Patrone Dec., ¶ 12; Azzopardi Dec., Ex. C, § 6(a), (f); Speck Dec., ¶¶ 4-5.)[6] Sporidis continues to hold these shares to date; as of Wednesday, October 17, 2007, these shares were worth $52.35 each, or $18,846.00 in total.  (Patrone Dec., ¶ 9.)

**Sporidis Gives Notice at TWG**

Following his acceptance of the 2005 Award, Sporidis continued working for TWG.  (Patrone Dec., ¶ 13.)  On or about September 26, 2007, however, Sporidis approached Susan Molinari, TWG's Chairman and Chief Executive Officer, and notified her that he would be leaving TWG in mid-October.  (*Id.*)  Sporidis made reference to his compensation at TWG, stating that he had "left a lot of money on the table over the past few years."  (*Id.*)  Sporidis further told Ms. Molinari that he planned to continue his government relations and strategic consulting practice at a small law firm, and that he intended to take two of TWG's clients with him.  (*Id.* ¶ 14)  The following morning, September 27, Sporidis spoke with Paul Lobo, TWG's Chief Financial Officer, to notify Mr. Lobo of his decision to leave TWG.  (Lobo Tr. 28:5-

---

[6] As used herein, "Speck Dec." refers to the Declaration of Gregory Speck, dated October 25, 2007, submitted along with plaintiff's motion for reconsideration of its application for a temporary restraining order.

29:16.)  Mr. Lobo inquired of Mr. Sporidis as to whether he was subject to protective covenants, reminding Sporidis that certain recipients of Omnicom Restricted Stock were subject to such covenants, but Sporidis denied that he was.  (Lobo Tr. 32:10-35:17.)

Later on September 27, Sporidis circulated an e-mail to the members of TWG notifying them that he would be leaving TWG.  (Patrone Dec., ¶ 15 and Ex. A.)  Shortly thereafter, TWG learned that Sporidis was planning on working for a Washington, D.C. law office named Powell Goldstein LLP.  (*Id.* ¶ 15.)  On September 28, Lobo spoke with Sporidis again and notified him that Ketchum believed Sporidis was subject to protective covenants, but Sporidis continued to deny that he was subject to any such covenants.  (Lobo Tr. 46:22-47:13; 48:16-49:1.)

**Sporidis' Breach of the 2005 RSA's Protective Covenants**

On September 19 and 21, **a week before Sporidis notified anyone at TWG that he intended to leave**, Sporidis sent e-mails to Powell Goldstein making clear that he had already spoken with TWG's clients about his departure:

\*        In a September 19 e-mail to Alan Parver, Esq., Sporidis reported, "**Also, I have 3:30 call scheduled with Josh [Levine of Mentor] tomorrow to tell him what's going on.**"

\*        In a September 21 e-mail also to Mr. Parver, Sproridis noted, "**I am just hoping my clients don't leak since they both now know what's going on**".

(Berry Tr., 68:18-69:2 and Ex. 12, 13;   Sporidis Tr. 189:1-190:11, and Ex. 13.)(emphasis added).[7]

---

[7]        As used herein, "Berry Tr." refers to the transcript of the deposition of Cynthia Berry (and the exhibits thereto), attached hereto as Exhibit 2.  "Sporidis Tr." refers to the transcript of the deposition of Harry Sporidis (and the exhibits thereto), attached hereto as Exhibit 3.

Then, on September 26, Sporidis e-mailed Deborah Kamin, a member of ASCO's Government Relations Council, to inform her that he would be "moving to [his] new firm on October 22nd," and to ask her how he should proceed with respect to a new engagement agreement for ASCO. (Patrone Dec., ¶ 22 and Ex. E.) The next day, Sporidis e-mailed Shelagh Foster, another member of ASCO's Government Relations Council, seeking information regarding what terms ASCO wished to have included in its prospective agreement with Powell Goldstein. (Patrone Dec. ¶ 23 and Ex. F.)

On September 27, 2007, Joshua Levine, Mentor's President and Chief Executive Officer e-mailed Sporidis and confirmed with him that Mentor was terminating its agreement with TWG. (Patrone Dec., ¶ 20 and Ex. C.) Sporidis had e-mailed Mr. Levine and specifically asked him to send that e-mail terminating Mentor's contract with TWG. (*Id.* ¶ 21 and Ex. D.)

Shortly before his resignation, Sporidis also communicated with Powell Goldstein about the details of moving Mentor's and ASCO's business to Powell Goldstein, and he discussed diverting potential clients away from TWG to Powell Goldstein. (Patrone Dec., ¶ 24.) For example, on September 27, 2007, Sporidis e-mailed Cynthia Berry, a partner at Powell Goldstein, and forwarded her a copy of Mentor's agreement with TWG. In that e-mail, Sporidis discussed arrangements for Powell Goldstein to send to both Mentor and ASCO contracts containing terms similar to their arrangements with TWG. (*Id.* ¶ 25 and Exs. F, G.) Berry later e-mailed Sporidis to notify him that she had sent a draft of the requested Mentor contract (which had been prepared prior to Mentor's termination notice) to Sporidis' other e-mail address for review, and that she would sign the contract and send it to Mentor upon Sporidis' approval. (*Id.*; Sporidis Tr. 212:13-213:14.)

Also on September 27, 2007, Sporidis e-mailed Joshua Levine at Mentor and notified him that Sporidis had been asked by the American Society of Plastic Surgeons ("ASPS") to submit a proposal to service ASPS's government relations needs. (Patrone Dec. ¶ 26 and Ex. D.) Sporidis had, in fact, submitted a proposal to ASPS on behalf of TWG earlier, but it appears from Sporidis' e-mails that while still employed by TWG, Sporidis also pursued this opportunity on behalf of Powell Goldstein. This is clear from Sporidis' September 27 e-mail exchange with Levine, in which he described the ASPS request as an opportunity to "coordinate ASPS' efforts along with ours" going forward – after having already notified TWG and Mentor that he was resigning from TWG. (*Id.*)[8] Moreover, despite his testimony to the contrary, it is clear that **Sporidis sent Powell Goldstein a copy of the ASPS proposal he had submitted on behalf of TWG and while being paid by TWG, to enable Powell Goldstein to submit a similar proposal**. (*Compare* Sporidis Tr. 75:13-77:2; 207:14-209:7 and Ex. 19 *with* Berry Tr. 88:17-90:16; 94:5-95:1 and Ex. 14.)

On October 6, 2007, TWG's counsel, Davis & Gilbert LLP ("D&G") wrote to Sporidis, copying his counsel, demanding that Sporidis cease all conduct in breach of the 2005 RSA's protective covenants, provide a list of any TWG clients that he had solicited, and certifying that he would comply with the protective covenants if he indeed left TWG. (Patrone Dec., ¶ 28 and Ex. I.) The October 6, 2007 letter further advised Sporidis that TWG would commence legal action if he continued to breach his obligations under the 2005 RSA. (*Id.*) Nevertheless, Sporidis and his counsel have refused to acknowledge Sporidis' obligations under

---

[8]     As set forth in TWG's application for a temporary restraining order, there has been some evidence to suggest that Sporidis may have also solicited another client of TWG, SHRM. (*See* Patrone Dec., ¶ 16-18 and Ex. B.) The limited discovery period did not afford TWG sufficient time to adequately explore this possibility further, beyond deposing Mr. Sporidis himself, who, not surprisingly, denied such solicitation.

the 2005 RSA to service clients for whom he provided services while at TWG, including Mentor and ASCO, and have refused to provide the information and certification requested in the October 6 letter. (*Id.* ¶ 29.)

**Since leaving TWG, Sporidis has been servicing Mentor and ASCO on behalf of his new employer, Powell Goldstein.** (Sporidis Tr. 294:2-10.) Mentor had been a major client of TWG for over five years, and for at least the past three years had been paying TWG monthly retainers of $25,000. (Patrone Dec. ¶ 32.) Prior to Sporidis' improper solicitation, there was no indication from Mentor, nor any reason for TWG to believe, that Mentor would be terminating or reducing its business with TWG. (*Id.*) Similarly, ASCO had been a client of TWG for over three years, and for at least the past three years had been paying TWG monthly retainers of $20,000. (*Id.* ¶ 33.) Until Sporidis' solicitation, there was no indication from ASCO, nor any reason for TWG to believe, that ASCO would be terminating or reducing its business with TWG. (*Id.*)

Sporidis began working with Mentor and ASCO while employed by TWG, which enabled him to develop relationships with them. (*Id.* ¶¶ 31, 35.) Before he started working for TWG, Sporidis had no business relationship with those clients. (*Id.*; Sporidis Tr. 49:9-50:17; Kamin Tr. 15:15-16:6; 18:1-7.)[9] TWG spent significant amounts of money to develop and maintain its relationship with these clients and TWG provided the necessary support for Sporidis to develop relationships with them, placing Sporidis in a position of close, regular contact with

---

[9]     As used herein, "Kamin Tr." refers to the transcript of the deposition of Deborah Kamin (and the exhibits thereto), attached hereto as Exhibit 4.

those clients.  (Patrone Dec. ¶ 31, 35.; Sporidis Tr. 52:15-55:20; 57:4-58:11; 59:3-62:11; 63:14-66:8; Thelian Tr. 10:12-12:16. 79:17-81:1; Lobo Tr. 13:18-14:4; 14:22-15:7.)[10]

## ARGUMENT

## I.    STANDARDS FOR INJUNCTIVE RELIEF.

In order to obtain injunctive relief pursuant to Fed. R. Civ. P. 65, TWG must demonstrate: "1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (internal quotations and citation omitted); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wertz*, 298 F. Supp. 2d 27, 30-31 (D.D.C. 2002) (enforcing covenants not to solicit, and enjoining former employees from soliciting, clients of former employer).   In deciding such a motion, the four factors are not considered in isolation of each other, and "a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors." *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).  Regardless, as set forth below, TWG can demonstrate each of the four factors, and TWG is therefore entitled to a preliminary injunction under this standard.

---

[10]    As used herein, "Thelian Tr." refers to the transcript of the deposition of Lorraine Thelian (and the exhibits thereto), attached hereto as Exhibit 5.

II.    **TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS AGAINST SPORIDIS.**

  A.    **TWG IS LIKELY TO SUCCEED ON THE MERITS OF ITS BREACH OF CONTRACT CLAIM AGAINST SPORIDIS.**

    1.    *Sporidis Had Adequate Notice Of, and Therefore Accepted the Terms Of, the 2005 RSA*

As Sporidis himself concedes, a contract may be created by acceding to its terms on a website.  *See* TRO Opp. Br. at 12, (*citing Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007 (D.C. 2002)).  Indeed, a "contract is no less a contract simply because it is entered into via a computer," *Forrest*, 805 A.2d at 1010-1011 (referring to agreement formed by clicking an "accept" button after reading agreement in scroll box); *see also Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 402-404 (2d Cir. 2004) (finding valid online contract formed where defendant was shown contract terms online and accepted contract benefits, *even without clicking* to indicate agreement); *Bar-Ayal v. Time Warner Cable Inc.,* 03 CV 9905, 2006 U.S. Dist. LEXIS 75972, at *11-12, 17-18, 42  (S.D.N.Y. Oct. 16, 2006) (finding agreement valid where individual was required to click to accept it).  Sporidis should be held to the terms of the contract of which he was clearly notified, to which he agreed, and of which he accepted the benefits.

Sporidis has cited *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17 (2d Cir. 2002), in support of his assertion that no contract was formed upon his acceptance of his 2005 Award.  *See* TRO Opp. Br. at 14.  *Specht* actually involved two types of electronic agreements, a "click-wrap" agreement (like the agreement in this case) and a "browse-wrap" agreement, involved in the process of installing internet browsing software.  The "click-wrap" agreement automatically presented its terms to the user during the installation process,

12

and the user could not continue installing the software product at issue without clicking "Yes" to indicate acceptance of those terms. The "browse-wrap" agreement, by contrast, merely notified the user, via a notice buried within large amounts of text and not initially visible on screen, that terms and conditions were posted on another location of the website (actually several clicks away), without calling those terms to the attention of the site's users and without actually requiring review of those terms, or an affirmative click for acceptance, prior to completion of installation. *Id.* at 21-25. The *Specht* court found the "browse-wrap" agreement unenforceable, but took for granted the enforceability of the "click-wrap" agreement. *See id.* at 22 n.4, 35.

Other courts have confirmed that such "click-wrap" agreements – like the RSA here -- are enforceable. In *Feldman v. Google, Inc.*, No. 06-2540, 2007 U.S. Dist. LEXIS 22996, at *15-24 (E.D. Pa. Mar. 29, 2007), the court held a click-wrap agreement for online advertising services enforceable because the website presented the user with reasonable notice of terms and conditions. Notably, the *Feldman* court explicitly based its holding on a declaration submitted by the defendant describing the *online process* for opening an account, despite the plaintiff's claim that he had never signed nor seen the agreement at issue. *See Feldman*, 2007 U.S. Dist Lexis 22996, at *6-9.. *See also Forrest*, 805 A.2d at 1010-11 (holding sufficient notice of terms provided via scroll box on user's screen during installation process for DSL service); *Bar-Ayal*, 2006 U.S. Dist. LEXIS 75972, at *16-18 (enforcing agreement based on Defendants' supporting declarations, despite plaintiffs' claims that they never saw agreements in question, and despite absence of actual signed agreement in evidence).

13

As described in the Meyer and Speck Declarations, 2005 RSA (as presented by Fidelity's NetBenefits website) was most certainly a valid and enforceable "click-wrap" agreement, not a "browse-wrap" agreement. Consistent with the *Specht* court's discussion of the enforceability of online agreements, the Fidelity NetBenefits acceptance process "presents the user with a message on his or her computer screen, requiring that the user manifest his or her assent to the terms of the…agreement by clicking on an icon. The product cannot be obtained…unless and until the icon is clicked." *Specht*, 306 F.3d at 22 (internal quotation and citation omitted). In other words, the Fidelity site provides clear notice of the 2005 RSA. In fact, the Fidelity process requires *more* than the simple click described by the *Specht* court; it requires that a checkbox be filled, representing the recipient's affirmative acknowledgement that he or she has read and accepted the terms of the 2005 RSA, and *then* an additional click of an icon to complete the acceptance process. (*See* Meyer Decl., ¶¶ 4-6 and Ex. A.) Unlike the "browse-wrap" agreement in *Specht*, the 2005 RSA itself was available by a prominent hyperlink visible on the same screen as (and immediately below) the notice that the recipient must read and accept the grant agreement, but above the checkbox indicating that the user has indeed done so. (Meyer Dec., Ex. A; Speck Dec. ¶¶ 4-5; Azzopardi Dec., Ex. C.) **Without checking the box, recipients (including Sporidis) were unable to successfully click the "Accept" button – located directly below the notice and checkbox – and therefore were unable to receive their award of stock**. (Meyer Dec. ¶ 5.) Upon clicking the hyperlink, the 2005 RSA – filled with information specific to the recipient (such as name, date, number of shares awarded, and par

value) – opened on the recipient's screen and could be saved and printed by the recipient. (Meyer Dec., ¶ 4 and Ex. A.)

Sporidis himself has admitted that he received the 2005 Award, by claiming that he has attempted to return it. (*See* Sporidis Dec. ¶ 41.) Moreover, Fidelity's records preclude him from denying that he received it. (*See* Meyer Dec., Exs. B, C.) And as discussed above and in the Speck and Meyer Declarations, Sporidis had to have agreed to the 2005 RSA, including the protective covenants contained in Section 6, in order to receive the stock Award. Rather than denying that he received and accepted the 2005 Award, Sporidis declares that he "assumed" he was simply redeeming shares from previous years and that he "would not have read any notice or agreement posted on the site" and "did not think [he] was entering into an agreement that contained a non-compete clause." (Sporidis Dec. ¶ 45.) He thus admits that he did not carefully read what was presented to him at the time.[11] His own failure to read the 2005 RSA, despite being presented with notice of it and an opportunity to do so, cannot be held against TWG. It is black-letter law that "one who signs a contract is bound by a contract which he has an opportunity to read whether he does so or not." *Forrest*, 805 A.2d at 1011 (internal quotations and citation omitted). *See also Treiber & Straub, Inc. v. United Parcel Serv., Inc.*, 474 F.3d 379, 382, 385 (7th Cir. 2007) (finding that plaintiff had notice of terms where he signified agreement by clicking on a box and that plaintiff could not renege based on his own failure to read them). Moreover, Sporidis' claims that he did not understand that he was granted new stock in 2005 (Sporidis Dec. ¶ 45; Sporidis Tr. 109:12-

---

[11]    Sporidis did testify, though, that he understands what an internet hyperlink is, and he has had experience with such hyperlinks. (Sporidis Tr. 121:4-19.) Thus, he cannot credibly claim that he would not have known how to review the 2005 RSA.

110:16; 113:22-114:3) or that he was entering into an agreement concerning that stock (Sporidis Dec. ¶ 45) are somewhat incredible.

It is clear that neither Omnicom nor Ketchum attempted to bury the protective covenants or trick recipients into accepting them. To the contrary, on or about June 29, 2005, Ketchum notified all of its 2005 stock award recipients – including Sporidis – by e-mail that they would be receiving a letter regarding a grant of Omnicom restricted stock, and that they should "read the letters carefully" because they required action. (Retter Dec., Ex. C.) Following the email, Ketchum sent notification letters to Recipients, including Sporidis, informing them how to redeem their 2005 stock awards. (Retter Dec., ¶ 7 and Ex. B.) These letters specifically explained that there were changes to the 2005 RSA from previous stock agreements, and **called the Recipient's attention to the protective covenants in Section 6 of the 2005 RSA**. (Retter Dec. ¶ 6 and Ex. B.) Finally, the 2005 RSA itself was clearly and ineluctably presented to Sporidis as part of the grant agreement process, and the 2005 RSA itself contained clear notice of the protective covenants – Section 6 takes up four pages of a ten-page agreement and is titled, in bold and underlined text "Non-Solicitation/Non-Servicing and Protection of Confidential Information Agreement." (Azzopardi Dec., Exhibit C.)

Sporidis does not actually deny having logged in to the Fidelity site and having accepted the 2005 Award; he claims he just does not recall whether he did so. (Sporidis Tr. 108:3-13; 137:2-138:4.) Further, Sporidis cannot credibly deny having received Ketchum's June 29 e-mail or the Notification Letter addressed to him. As to the June 29 e-mail, all he can do is claim that he does not *recall* seeing the e-mail. (Sporidis

16

Dec. ¶ 43; Sporidis Tr. 98:14-21.)   As to the Notification Letter, he likewise claims not to *recall* seeing it (Sporidis Dec. ¶ 43) and *claims* it impossible that he received it in 2005, because "I generally keep all paper that I have, so I -- no."  (Sporidis Tr. 100:3-13.)  Yet in attempting to explain just how it is that he happened to visit Fidelity's website in July 2005 to accept the 2005 Award (if not due to the Notification Letter), Sporidis could only speculate that he might have received a notice from Fidelity informing him to log on and attend to a matter concerning vesting shares from a *previous* award – which notice from Fidelity he did *not* retain, despite his assertion that he "generally keep[s] all paper that [he has.]"  (Sporidis Tr. 112:19-114:8.)

In light of the foregoing, it is clear that Sporidis' acceptance of the 2005 Award resulted in the formation of an enforceable contract – the 2005 RSA.

### 2.    *Sporidis Breached His Protective Covenants.*

There is no dispute over the fact that Sporidis breached the protective covenants in the 2005 RSA.  *While still employed* as a Senior Vice President of TWG, Sporidis e-mailed Mentor's Chairman and C.E.O., and asked him to terminate Mentor's contract with TWG, in order to enable Sporidis to bring Mentor with him to Powell Goldstein, his new employer. (Patrone Dec., ¶ 21 and Ex. D)  Further, *also while still employed* by TWG, Sporidis e-mailed ASCO personnel to inform them that he would be joining Powell Goldstein on October 22, and to discuss with them what terms ASCO wished to have in a contract with Powell Goldstein. (Patrone Dec. ¶¶ 22-23 and Exs. E, F.)  These e-mails make it clear that Sporidis had discussed his departure with ASCO before notifying TWG.  (*Id.*)

Sporidis claims that he behaved in this manner pursuant to specific instructions from Susan Molinari, given during a conversation on September 26, 2007.  (Sporidis Dec. ¶ 21.)

However, regardless of what Ms. Molinari actually told him, **other e-mails indicate that he had been discussing his departure from TWG with those clients well before he spoke with Ms. Molinari on September 26**:

       \*      On September 18, 2007, Sporidis e-mailed ASCO to tell them that he had "No non-compete" and that Powell Goldstein represented "[n]o tobacco companies and they have no pharma companies." (Sporidis Tr. 189:1-190:11, and Ex. 13.)

       \*      On September 19, Sporidis e-mailed Powell Goldstein and stated that he "had a 3:30 call scheduled with Josh [Levine, of Mentor] tomorrow to tell him what is going on." (Berry Tr. Ex. 13.)

       \*      On September 21, in an e-mail exchange with Powell Goldstein – which Sporidis did not disclose during expedited discovery and which TWG received from Powell Goldstein after Sporidis' deposition – Sporidis stated that he was "hoping my clients don't leak since they both now know what's going on." (Berry Tr., 68:18-69:2, and Ex. 12.)

       Further still, *again while still employed* by TWG, Sporidis e-mailed Powell Goldstein to make arrangements for contracts to be sent to Mentor and ASCO, and provided Powell Goldstein with those clients' current arrangements with TWG. (Sporidis Tr. 202:2-206:7 and Ex. 17.) Contrary to his sworn testimony – which now appears to be false - Sporidis also provided Powell Goldstein with a copy of a presentation he made to ASPS on TWG's behalf (and while being paid by TWG), after which time Powell Goldstein submitted its own presentation to ASPS. (*Compare* Sporidis Tr. 75:13-77:2; 207:14-209:7 and Ex. 19 *with* Berry Tr. 88:17-90:16; 94:5-95:1 and Ex. 14.) And Sporidis admits that he is currently servicing Mentor and ASCO on behalf of Powell Goldstein. (Sporidis Tr. 294:2-10.) Sporidis has therefore breached the protective covenants in the 2005 RSA by soliciting TWG's clients to do

business with Powell Goldstein rather than TWG, and by servicing those clients for Powell Goldstein, and it is undisputed that he will continue to do so absent injunctive relief.

### 3.  *The Protective Covenants Are Enforceable.*

Under New York law,[12] a restrictive covenant is enforceable against a former employee if it is (a) necessary to protect the employer's legitimate interests, (b) reasonable in terms of duration and geographic area, and (c) not harmful to the general public and not unreasonably burdensome to the employee. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389 (1999) (New York applies a standard of *reasonableness* to determine the validity of a restrictive covenant).

### a)  *TWG Has A Legitimate Business Interest In Protecting Its Goodwill And Its Client Relationships.*

New York courts have consistently recognized that protecting an employer's goodwill, client relationships and confidential information constitutes a legitimate business interest that justifies injunctive relief. As the New York Court of Appeals explained in *BDO Seidman*, an "employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment." *Id.* at 392. In that case, the employer was entitled to enforce a restrictive covenant to protect against the "use of client relationships which [the employer] enabled [the former employee] to acquire through his performance of accounting services for the firm's clientele during the course of his employment." *Id.* (internal citation omitted).

---

[12]     Under the explicit terms of the 2005 RSA, New York law governs this dispute. (Azzopardi Dec., Ex. C, at § 12.) In any event, however, the results would be the same under District of Columbia law.

19

In opposing TWG's application for a temporary restraining order, Spordis essentially sought to "turn back the clock" on New York law construing what is a "legitimate interest," citing *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303 (1976) and attempting to limit the enforceability of restrictive covenants to the prevention of disclosure of the employer's trade secrets or confidential information, or situations involving an employee whose services are unique or extraordinary. *See* TRO Opp. Br. at 17.

Yet, in the wake of *BDO Seidman*, "it is now **clear that under New York law an employer also has a legitimate interest in protecting client relationships developed by an employee at the employer's expense**." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 534 (S.D.N.Y. 2004)(emphasis added). *BDO Seidman* involved a national accounting firm that sought to enforce a restrictive covenant against one of its accountant employees, Hirschberg. Hirschberg resigned from Seidman and began servicing Seidman's clients on his own, despite his agreement not to do so in a contract he signed when he was promoted to management several years prior to his resignation. While applying limitations to its enforcement of the covenants in question (largely because those covenants sought restraints on Hirschberg's servicing Seidman's *entire* client base), the *Seidman* court held that an employer indeed has a legitimate interest in "protection against defendant's competitive use of client relationships which BDO enabled him to acquire through his performance of accounting services for the firm's clientele during the course of his employment." *BDO Seidman*, 93 N.Y.2d at 392. Following this rationale, the *Seidman* court

_____

*(continued . . . )*

*See, e.g.,*; *Morgan Stanley DW Inc.*, 150 F. Supp. 2d at 74-75; *Ellis v. James V. Hurson Assocs., Inc.*, 565 A.2d 615, 617 (D.C. 1989)

declared the restrictive covenants at issue in the case enforceable as applied to those Seidman clients with whom Hirschberg "acquired a relationship through the direct provision of substantive accounting services during his employment." *Id.* at 393.

Since *Seidman*, courts have continued to find similar covenants enforceable based on the employer's legitimate interest in protecting client relationships and goodwill developed by the employee at the employer's expense. For example, in *Johnson Controls*, the Federal District Court for the Southern District of New York preliminarily enjoined the defendants from servicing former clients of the plaintiff that they had serviced while employed by the plaintiff, based on that court's finding that the defendants "were placed in unique positions vis-à-vis [plaintiff's] critical systems clients and that they developed significant relationships with these clients." 323 F. Supp. 2d at 535. The defendants argued that many of the clients in question should have been regarded as the *personal* clients of Moon, one of the defendants, inasmuch as Moon's relationships with those clients were developed by Moon himself. *Id.* The court rejected that argument, however, because (just as in the case at bar) the evidence showed that the relationships Moon formed, and any of Moon's own recruitment efforts, were financed and supported by the plaintiff employer, "which paid [defendant's] salary and the salary of the other engineers that worked under him," and thus were not the result of the defendant's own independent efforts. *Id.* at 535-36.

Similarly, in *Silipos, Inc. v. Bickel*, the court enjoined the defendant from soliciting certain of the plaintiff's customers whom the defendant had brought to the plaintiff, for whom the defendant had been the primary contact on behalf of the plaintiff, or with whom the defendant "had a substantial degree of long-term involvement." No. 1:06-cv-

21

02205-RCC-DFE, 2006 U.S. Dist. LEXIS 54946, at *23-28. (S.D.N.Y. Aug. 8, 2006). The court recognized that protection of the employer's customer relationships was a legitimate interest, and that the defendant "had extensive, regular communications with many of [plaintiff's] customers… nurtured these relationships… brought [some of] these customers to [plaintiff]… [and] was [the] sole or primary contact with the customers." *Id.* at *17. Critically, plaintiff "shouldered all of the monetary expenses of these interactions." *Id.* On that basis, the court found that the plaintiff had a legitimate interest in protecting the relationships. *Id.*[13]

As set forth in detail above, Sporidis has used client relationships that he developed at TWG to solicit and now service TWG clients on behalf of his new employer, Powell Goldstein. Neither Mentor nor ASCO was a personal client of Sporidis "who came to [TWG] solely to avail themselves of his services *and* only as a result of his own independent recruitment efforts, which [TWG] neither subsidized nor otherwise financially supported." *BDO Seidman,* 93 N.Y.2d at 393 (emphasis added). ASCO became a client of both Ketchum and TWG as the result of a joint business pitch made by those entities while Sporidis was employed by TWG, and Sporidis had no connection to them prior to joining TWG. (Sporidis Tr. 57:4-

---

[13]       In opposing TWG's application for a temporary restraining order, Sporidis cited *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.*, 797 N.Y.S.2d 883, (Sup. Ct. N.Y. Cnty. 2005) in support of his assertion that TWG cannot demonstrate a legitimate interest. But *Kanan, Corbin* is distinguishable. First, the covenants at issue in *Kanan, Corbin* were preconditions to the individual defendants' employment, the first factor which that court held militated against enforcement under *BDO Seidman*. *See Kanan, Corbin*, 797 N.Y.S.2d at 888-89. By contrast, the protective covenants in the 2005 RSA had no effect on Sporidis' continued employment with TWG – they were merely conditions on Sporidis' acceptance of an award of Stock. (*See generally* Azzopardi Dec., Ex. C.) Second, while acknowledging that the existence of a triable fact will not defeat a motion for a preliminary injunction, the court in *Kanan, Corbin* stated summarily that the plaintiff there had failed to make a minimal showing that the goodwill misappropriated in that case was created at KCSA's expense. While the summary nature of that pronouncement makes it difficult to compare, in the instant case TWG has certainly made such a showing, as discussed *infra*.

58:11; 59:3-62:11; Thelian Tr. 10:12-12:16.)  Sporidis' own participation in pitching ASCO was done at TWG's and Ketchum's request, and while he was being paid by TWG.  (Sporidis Tr. 61:7-62:8; Patrone Dec. ¶ 31.)  Indeed, while ASCO liked Sporidis, their decision to engage Ketchum and TWG resulted from their impression of the overall "package" presented by Ketchum and TWG.  (Kamin Tr. 15:15-16:6; 18:1-7.)  Similarly, while Sporidis seems to assert that Mentor came to TWG solely because of him, in fact, he himself did not independently recruit them; rather Mentor sought out TWG through John O'Hanlon, one of TWG's founders and currently TWG's Managing Director.  (Sporidis Tr. 49:9-50:17.)  Any effort on Sporidis' part was carried out within the context of his employment with TWG.  TWG placed Sporidis in a position of close contact with Mentor and ASCO, and entrusted Sporidis with the job of servicing Mentor's and ASCO's accounts largely on his own.  (*See* Sporidis Tr. 52:15-55:20; 63:14-66:8; Lobo Tr. 13:18-14:4; 14:22-15:7; Thelian Tr. 79:17-81:1.)  *See Johnson Controls*, 323 F. Supp. 2d at 535-36.  Accordingly, TWG has a legitimate business interest in preventing Sporidis' competitive use of client relationships and goodwill he developed at TWG's expense.

### b)    *Sporidis' Restrictive Covenants Are Reasonable.*

The duration and scope of Sporidis' protective covenants are reasonable in scope, as they seek only to prevent Sporidis from soliciting business or providing services "of the type provided by" TWG and other Omnicom affiliates, and only with respect to "the particular product, brand or service of such Restricted Client[14] in respect of which… [Sporidis himself] had either (A) a servicing relationship, supervisory responsibility or other involvement, or (B) a

---

[14]    As relevant to this provision The 2005 RSA defines "Restricted Client" as "any person, firm, corporation or other form of entity to whom any member of the Group (i) rendered services at any time during the one-year period prior to the Termination Date, or (ii) had made a Pitch at any time during the one-year period immediately preceding… the Termination Date."  (Azzopardi Dec., Ex. C, § 4 (k).)

participation, supervisory responsibility or other involvement in a Pitch[15]... ." (Azzopardi Dec., Ex. C, at § 6(a)(ii).)  Those restrictions fall squarely within the scope of restrictions deemed reasonable by courts in New York.  *See BDO Seidman*, 93 N.Y.2d at 389; *Healthworld Corp. v. Gottlieb*, 12 A.D.3d 278, 279 (1st Dep't 2004); *Mallory Factor, Inc. v. Schwartz*, 146 A.D.2d 465, 466-68 (1st Dep't 1989).

The duration of the protective covenants is also reasonable, as they only last for one year.  In *BDO Seidman*, the court held that eighteen months represented a "reasonably brief interlude to enable the [former employer] to replace the client relationship and goodwill [the former employee] was permitted to acquire with some of its clients."  93 N.Y.2d at 393.  Courts also regularly enforce restrictions of one to two years. *See Healthworld Corp.*, 12 A.D.3d at 278-79, (one-year restriction against soliciting and accepting business was reasonable); *Contempo Commc'ns, Inc. v. MJM Creative Servs., Inc.*, 182 A.D.2d 351, 353-54, (1st Dep't 1992) (two-year covenant barring former employees from working for customers was reasonable); *Uniform Rental Div., Inc.  v. Moreno*, 83 A.D.2d 629 (2d Dep't 1981) (two-year covenant barring solicitation of certain customers was reasonable).

In addition, even if the Court deemed the scope of the restrictive covenants overbroad in some respect, the Court should enforce the covenant to the extent that it deems reasonable.  In *BDO Seidman*, the lower courts refused to enforce a covenant that imposed restraints on the defendant-employee's ability to work for *any* of the plaintiff-employer's clients. 93 N.Y.2d at 394-95.  The Court of Appeals held that the lower courts erred by failing to "rewrite" the covenant, and should have enforced the restriction with respect to clients that the

---

[15]    The 2005 RSA defines "Pitch" as "a new business presentation or similar offering of services; provided, however, a general mailing or an incidental contact shall not be deemed a Pitch." (Azzopardi Dec., Ex. C, § 4 (j).)

employee had served while employed by the plaintiff. *Id.* In so holding, the Court of Appeals explained that, when partially enforcing restrictive covenants, courts are not limited to crossing out portions that can be "mechanically severed." *Id.* Accordingly, even if Sporidis' protective covenants were overbroad in some respects (which, as discussed, they are not), they should be enforced in a limited form that the Court deems reasonable.

### c)    Enforcement Of The Restrictive Covenants Is Not Unduly Burdensome Or Harmful To The Public

Sporidis will not be unduly burdened by the enforcement of the 2005 RSA's protective covenants. He is free to pursue his livelihood in any geographic location, and can directly compete with TWG. TWG merely seeks to prevent Sporidis from soliciting and servicing those clients that he himself serviced or pitched during the year before he left TWG. Meanwhile, Sporidis is free to compete with TWG with respect to every other company he did not service or pitch in the one-year period prior to his resignation. Courts have regularly granted preliminary injunctions under similar circumstances. *See, e.g., Healthworld Corp.*, 12 A.D.3d at 278-79 (enjoining former employee from accepting business from former employer's clients which whom she had previously had contact); *Contempo Commc's,* 182 A.D.2d at 353-54 (enjoining former employees from working for former employer's clients that they had previously serviced).

### 4.    TWG Has Not Waived Enforcement of the Protective Covenants

### a)    Molinari's Statements to Sporidis Do Not Constitute Waiver

Sporidis claims that TWG has waived its rights to enforce the protective covenants, based on statements made by Ms. Molinari. Ms. Molinari's statements to Sporidis during their September 26th discussion about Sporidis' resignation, however, do

nothing to change the enforceability of Sporidis' post-employment restrictions, because Molinari lacked the requisite intent to relinquish TWG's rights. A waiver involves the "intentional relinquishment of a known right." *Horne v. Radiological Health Services, P.C.*, 83 Misc. 2d 446, 455 (N.Y. Sup. Ct. Suffolk Cty. 1975) (emphasis added). The intention to waive must be ". . . clearly established and cannot be inferred from doubtful or equivocal acts or language." *Cicero Indus. Dev. Corp. v. Roberts*, 63 Misc.2d 565, 571 (N.Y. Sup. Ct. Onondga Cty. 1970).

Upon learning of Sporidis' resignation from TWG, Ms. Molinari reminded Sporidis of the need to abide by the 30-day opt-out clauses provided in TWG's client contracts. (Molinari Tr. 64:4-66:16.)[16] Ms. Molinari made this statement completely unaware of Sporidis' protective covenants. (*Id.*) Ms. Molinari's statement could not possibly have been an "intentional relinquishment of a known right" when she remained unaware that TWG *had* an enforceable right against Sporidis. Ms. Molinari certainly never made any unequivocal statement to Sporidis that TWG waived its right to enforce the non-solicitation and non-service agreements.

No evidence has been presented indicating that Ms. Molinari knew about the agreements. Sporidis' protective covenants were not a condition of his employment, and were not included in an employment contract or other document with which Ms. Molianri would likely have been aware. Rather, as discussed above, the protective covenants were contained in the 2005 RSA, into which Sporidis entered online in the course of accepting the 2005 Award. (*See* Patrone Dec. ¶ 4; Speck Dec. ¶¶ 3-5; Azzopardi Dec., Ex. C.) Molinari

---

[16]     As used herein, "Molinari Tr." refers to the transcript of the deposition of Susan Molinari (and the exhibits thereto), attached hereto as Exhibit 6.

had no reason to know whether Sporidis received stock or accepted the 2005 RSA – particularly since the program was administered by Fidelity, not TWG, and since the notifications sent to Harry about the 2005 Award were handled by Ketchum's Pittsburgh office, not by TWG.  (Retter Dec., ¶¶ 3-7; Meyer Dec. ¶ 2.)  Molinari did not learn of Sporidis' acceptance of the 2005 Award from Sporidis, as he did not discuss the 2005 Award with anyone.  (Sporidis Tr. 110:8-16.)

Without knowledge that Sporidis received the 2005 Award and accepted the 2005 RSA, Molinari lacked the required intent to form a waiver, and her off-handed statement did nothing to alter Sporidis' obligations to TWG.[17]

### b)    *TWG's Enforcement History Does Not Constitute Waiver*

Sporidis has also suggested that TWG's past conduct regarding departing employees who have breached protective covenants bears on its ability to enforce the 2005 RSA against Sporidis.  But TWG's business decisions about whether to pursue or not to pursue litigation against previous employees represent valid exercises of TWG's business judgment, and, as a matter of law, do not constitute waivers of its rights to enforce the agreements against Sporidis or in response to any other future breach.  As the court in *Horne* stated:

> Integral to the concept of enforcement of covenants not to compete is the balancing of the interest of employer, employee and public welfare in each case and the right to enforce a negative covenant must be determined on an *ad hoc* basis. . . .  Since enforcement of

---

[17]    In addition, the 2005 RSA states that any modifications may only occur by a signed writing.  The 2005 RSA provides: "This Agreement may be amended only by an instrument in writing executed and delivered by the Employee and Omnicom." Azzopardi Dec., Ex. C., at § 10.) Molinari's verbal statements therefore fail to effectively modify the Agreement for this reason as well.

> negative covenants is permitted solely when stated tests are met,
> the failure to enjoin all violators is not *ipso facto* a waiver of the
> right to enjoin the violators whose competition is offensive.

83 Misc. 2d at 455 (citations omitted).

TWG chose to negotiate deals with two former TWG employees who breached their agreements, instead of bringing lawsuits against them, an option also initially presented to Sporidis. (Molinari Tr., 25:1-26:5; 47:21-48:22.)

The New York Court's decision in *Horne v. Radiological Health Servs., P.C.*, demonstrates that TWG's decisions here do not do not affect the enforceability of Sporidis' agreement. In that case, the Court found that a professional corporation's decision to sue only one of several employees who violated a covenant not to compete did not constitute a waiver of the corporation's right to enforce the agreements against future breaches. *Id.*at 455. The court noted:

> Each case of nonenforcement of the covenant resulted from a
> business judgment that either there would be no competition or that
> on balance it would not be offensive. In sum, each case can be
> justified as being of benefit to the corporation.

*Id.* Similarly, TWG's decision and ability to negotiate deals in some cases reflect its business judgment that a deal would be more beneficial to it than litigation in those instances, and the business reality that in some situations a resolution is viable while in others it is not. The deposition testimony confirms that TWG did not simply ignore the other violations, but rather made the business decision, given the particular circumstances and available alternatives, that was most beneficial to the organization. In accordance with the case law, TWG's decision not to pursue litigation over all violations of its non-solicitation and non-service agreements does not constitute a waiver of any rights against Sporidis.

28

5.    **TWG is not Estopped from Enforcing its Rights Under the Agreements**

Sporidis previously argued that TWG is somehow estopped from enforcing the protective covenants against him based on Ms. Molinari's (or Mr. Lobo's) statements. (*see* TRO Opp. Br. at 21). His estoppel argument fails, however, because Sporidis did not rely on TWG's representations to his detriment. To support a defense of estoppel Sporidis must prove that he relied on Ms. Molinari's (and/or Mr. Lobo's) statements to his detriment. *Cicero*, 63 Misc. 2d at 571. This he cannot do.

Before Sporidis even informed Molinari (or Lobo) of his intent to leave TWG, he was already preparing to bring TWG's clients to Powell Goldstein. Berry testified that on September 10th, Sporidis submitted a business plan to Powell Goldstein listing his TWG clients, information regarding client portability, and collections totals for the clients. (Berry Tr. 30:17-37:17). Sporidis also sent two emails to Berry's partner, Alan Parver, indicating that Sporidis had already solicited TWG's clients. As noted above, in a September 19 email Sporidis wrote, "Also, I have 3:30 call scheduled with Josh [Levine] tomorrow to tell him what's going on." (Berry Tr., Ex. 13). In a second September 21 email Sporidis wrote, "I am just hoping my clients don't leak since they both now know what's going on." (Berry Tr., Ex. 12). Sporidis did not inform Ms. Molinari that he was leaving TWG until September 26th (and did not speak with Lobo until September 27th). (Sporidis Tr. 164:9-18; 170:2-8.) Sporidis intended to and did solicit and service TWG clients well before he spoke to Molinari (or Lobo). Thus, Sporidis cannot show that he solicited clients in reliance on Molinari's or Lobo's statements.

### III.    TWG HAS SUFFERED, AND WILL CONTINUE TO SUFFER, IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

TWG has already suffered irreparable harm in the loss of its client relationships with Mentor and ASCO.  If an injunction is not granted, TWG is threatened with continued irreparable harm to its goodwill and client relationships.  With respect to client relationships and goodwill, courts have readily held that a "plaintiff would suffer irreparable harm should its clients terminate their relationships with it in order to use defendant's services."  *Chernoff Diamond & Co. v. Fitzmaurice, Inc.*, 234 A.D.2d 200, 203 (1st Dep't 1996); *see Lutz Appellate Printers, Inc. v. Busby*, No. 89-2870-OG, 1989 U.S. Dist. LEXIS 13633, at *3 (D.D.C. Nov. 14, 1989).  Courts have similarly recognized that harm to goodwill and client relationships constitutes irreparable harm, and that "**it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come**."  *Ticor Title Ins. Co. v Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)(emphasis added); *see Morgan Stanley*, 150 F. Supp. 2d at 77; *Merrill Lynch*, 298 F. Supp. 2d at 34; *Rescuecom Corp. v. Mathews*, No. 5:05-CV-1330 (FJS/GJD), 2006 U.S. Dist. LEXIS 41042, at *6-8 (N.D.N.Y. June 20, 2006); *see also Healthworld Corp.*, 12 A.D.3d at 278-79 (affirming preliminary injunction against use of client relationships and goodwill); *Contempo Commc'ns, Inc.*, 182 A.D.2d at 354 (enforcing restrictive covenant to protect "special relationship" with clients); *Mallory Factor, Inc.*, 146 A.D.2d at 468 (non-solicitation agreement enforced where necessary to protect misappropriation of former employer's goodwill); *Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 388 (2d Cir. 1982) ("New York courts have upheld covenants prohibiting employees from soliciting former customers to the extent necessary to protect the good will of the employer"); *Ecolab, Inc. v.*

30

*Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages").

In opposition to TWG's application for a temporary restraining order, Sporidis cited *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 367 (D.C. Cir. 1999), for the proposition that "where potential losses can be quantified, a plaintiff can be compensated with monetary damages and there is no irreparable injury warranting injunctive relief." TRO Opp. Br. at 9. *Davenport*, however, is completely distinguishable, and while that statement of law may be accurate, it has no application here. *Davenport* involved a union's application for an injunction preventing the implementation of a temporary collective bargaining agreement. The irreparable harm urged by the plaintiffs consisted of an increase in the flight time required of flight attendants, accompanied by the elimination of those flight attendants' per diem pay and hotel allowances. *Davenport*, 166 F.3d at 367. The court held that this injury was not irreparable because the damages would be calculable if the plaintiffs ultimately succeeded, particularly because the implementation of the agreement in question was to last for only a limited duration. *Id.* The instant case, however, involves the likely permanent loss of at least two TWG client relationships, along with the fees those clients would have paid to TWG for an indeterminate amount of time in the future.[18]

TWG has already suffered irreparable harm in Sporidis' solicitation of Mentor and ASCO. Sporidis used his client relationships, obtained while at TWG and at TWG's expense, to divert business from TWG, and to reduce the amount of business clients do with

---

[18]    Sporidis cited two other cases regarding the standard for irreparable injury. But in *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp 547 (E.D.N.Y. 1995), the plaintiff testified that it could quantify the damages if it knew what customers had been lost due to the defendants' conduct. *Id.* at 566. There has been no such testimony herein. As for *Prudential Sec. Inc. v. Plunkett*, 8 F. Supp. 2d 514 (E.D. Va. 1998), that case is obviously not binding on this Court, and it seemingly contradicts substantial other authority on this issue, including the D.C. and New York cases cited in this section.

TWG. (*See* Patrone Dec., ¶¶ 3, 14, 16-27.)  As discussed above, it was through TWG that Sporidis formed his relationships with Mentor and ASCO, and got the opportunity to work closely with them, and TWG paid Sporidis to develop and maintain relationships with its contacts at Mentor and ASCO. (*Id.* ¶ 31; Sporidis Tr. 57:4-58:11; 59:3-62:11; Thelian Tr. 10:12-12:16)  TWG also provided the office, staff, and other resources necessary to provide the services that those clients demanded. (Patrone Dec. ¶ 31; Sporidis Tr. 52:15-66:8.)  Because of Sporidis' violation of his protective covenants, TWG's goodwill and customer relationships with Mentor and ASCO have been damaged, and TWG has lost an indeterminate amount of future business from those clients. (*See* Patrone Dec. ¶¶ 31-36.)

Further, it would be impracticable, if not impossible, to quantify the harm to TWG if Sporidis is allowed to continue misappropriating TWG's client relationships and goodwill. (Patrone Dec., ¶ 36.)  Aside from Mentor and ASCO, there are many other clients with whom Sporidis developed relationships while at TWG. (*Id.*)  While Sporidis claims he is not currently servicing other TWG clients (Sporidis Tr. 294:11-17), absent an injunction there is no way to know that he will indeed not do so.

Sporidis suggests that TWG cannot claim irreparable harm because he believes that TWG has made no efforts to persuade Mentor and ASCO to remain with TWG. (*See* TRO Opp. Br. at 8; Sporidis Dec. ¶ 24.)  Because of the manner in which Sporidis solicited those clients from TWG, however – notifying them of his departure and arranging for their engagement of Powell Goldstein before he even notified TWG he was leaving – TWG was denied any meaningful opportunity to offer those clients alternatives to continue their relationships with TWG. (Sporidis Tr. 189:1-190:11, and Ex. 13; 202:2-206:7 and Ex. 17; Berry Tr., 68:18-69:2, and Exs. 12, 13.)  *See Johnson Controls*, 323 F. Supp. 2d at 532 (finding

32

irreparable harm where, in addition to indeterminate lost future billings, plaintiff was denied opportunity to transfer client relationships to replacement employees); *Rescuecom Corp.*, 2006 U.S. Dist. LEXIS 41042, at *7-8 (finding irreparable harm where client relationships lost and defendant's actions prevented plaintiff from transferring clients to new franchisee). In any event, Ketchum has reached out to ASCO in an effort to retain ASCO's business. (Thelian Tr. 50:18-51:6.)

Sporidis also suggests that TWG cannot offer Mentor and ASCO the services those clients desire. (Sporidis Dec. ¶ 24.) Yet at his deposition, Sporidis retreated from that assertion (Sporidis Tr. 217:10-222:20), and other testimony makes it clear that TWG has personnel with the relevant expertise and experience to service those accounts. (Thelian Tr. 52:6-53:21.) In any case, it is clear that the longer Sporidis is allowed to continue servicing those clients, the smaller the chance that TWG or Ketchum can successfully convince those clients to return to TWG. Moreover, as evidenced by Sporidis' own e-mails, his continued servicing of these clients may impact TWG's ability to win and service other clients. (*See* Patrone Dec., Ex. D (noting opportunity presented by ASPS RFP to coordinate efforts with Mentor).)

Finally, by executing the 2005 RSA, Sporidis himself acknowledged that his breach of the protective covenants would result in irreparable harm, and he further agreed that TWG would be entitled to enforce the protective covenants by means of the requested injunction for that reason. (*See* Azzopardi Dec., Ex. C, at § 6 (f).)

IV.    **THE INJUNCTION TWG REQUESTS WILL NOT SUBSTANTIALLY INJURE SPORIDIS**

The injunction TWG seeks will not substantially injure Sporidis.  If Sporidis is allowed to exploit the client relationships and goodwill that he developed at TWG expense, contrary to the obligations to which he agreed in the 2005 RSA, he will doubtlessly continue serving Mentor and ASCO to TWG's detriment, and he may divert other longstanding TWG clients, as well potential clients that he pitched while still being paid by TWG.  In contrast, TWG does not seek to prevent Sporidis from pursuing his career, nor from competing with TWG generally.  Sporidis is free to compete with TWG so long as he does not use client relationships and goodwill that he developed while serving as Senior Vice President of TWG.  In other words, an injunction will simply allow TWG to protect its goodwill, business reputation, and contractual rights, while it will not prevent Sporidis from earning a living.

Under circumstances like this, this Court has found that the "balance of the equities" favors the former employer seeking the injunction.  *See Morgan Stanley*, 150 F. Supp. 2d at 78.  The Court has further found in similar circumstances that a former employee will not be harmed by being enjoined from engaging in activity he specifically agreed to avoid in signing a previous agreement.  *Merrill Lynch*, 298 F. Supp. 2d at 34.  As to the clients themselves, even Sporidis admitted that there are other lobbyists, both at TWG and at other firms, that are qualified to service Mentor and ASCO.   (Sporidis Tr. 218:21-222:20.)  Accordingly, Sporidis should be enjoined from soliciting and servicing TWG clients who he serviced during the one year preceding his resignation from TWG.

V.    **THE PUBLIC INTEREST WILL BE FURTHERED BY THE ISSUANCE OF TWG'S REQUESTED INJUNCTION**

Finally, the issuance of the injunction requested by TWG will further the public interest. This Court has held on numerous occasions that the public interest is served by the prevention of a former employee from engaging in unfair competition, and by the enforcement of reasonable contractual provisions to protect an employer's goodwill and client relationships. *See Morgan Stanley*, 150 F. Supp. 2d at 79; *Merrill Lynch*, 298 F. Supp. 2d at 34-35. Again, the injunction TWG seeks will not prevent Sporidis from pursuing his livelihood, nor will it even restrict TWG's clients from engaging the firm of their choice to service their governmental relations needs; it will merely protect TWG's goodwill and investments of time and resources in developing its client relationships by preventing Sporidis himself, for a limited period, from soliciting and servicing those same clients he serviced on behalf of TWG in the year prior to his resignation. *See Morgan Stanley*, 150 F. Supp. at 79.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant TWG's application pursuant to Fed. R. Civ. P. 65, and issue an order enforcing the terms of the 2005 RSA and enjoining Sporidis from further breaches of his protective covenants in the 2005 RSA and of his common law duties, and granting such other relief as the Court deems just and proper.

Dated: November 6, 2007

Respectfully submitted,


By:_____/s/_____

Elizabeth A. Lalik (Bar No. 447052)
LITTLER MENDELSON, P.C.
1650 Tysons Blvd., Suite 700
McLean, Virginia  22102
(703) 286-3131  (Direct Dial)
(703)842-8517 (Fax)

*Attorneys for The Washington Group, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


THE WASHINGTON GROUP, INC.,


Plaintiff


v.                              Civil Action
No. 1:07-cv-1892(RBW)


HARRY SPORIDIS,


Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

PAUL ALAN LOBO

October 31, 2007
2:25 p.m.

Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP
1801 K Street, NW, Suite 411
Washington, DC

Tracy E. Barksdale, Certified Shorthand Reporter
and Notary Public in and for the District of Columbia

Paul Alan Lobo                                                                October 31, 2007

---

Page 10

1    that legislative professionals have the right
2    resources?
3        A.    It's really ensuring that they have
4    an opportunity to ask other people for
5    assistance, and at times when they are not
6    getting the assistance or, you know, prodding
7    other folks along.
8        Q.    So if one of the legislative
9    professionals at The Washington Group wanted
10   to develop contact with a client or pitch the
11   client for new business, part of your
12   responsibility would be to see to it that
13   that professional had assistance from other
14   professionals if he felt he needed it?
15       A.    I would act as a catalyst in
16   making sure that, yeah, that those
17   responsibilities were available, and it's more
18   of a communication function, I would describe
19   it.
20       Q.    I think I don't understand what
21   you mean. You're communicating between who?
22       A.    It may be just between members of
23   the firm or could be our parent company
24   Ketchum, as well.
25       Q.    How many legislative professionals

Page 11

1    are there right now with The Washington
2    Group?
3        A.    You'd like an exact number?
4        Q.    Yes, please.
5        A.    15.
6        Q.    When you say 15, are you including
7    the people who work for ISG?
8        A.    I am including people -- I'm not
9    including all the people that work for ISG.
10   I'm including some of them.
11       Q.    You're including the legislative
12   professionals at ISG, and they total 15?
13       A.    The registered lobbyists of the
14   ISG.
15       Q.    How many registered lobbyist are
16   there at ISG?
17       A.    There are two registered lobbyists
18   at ISG.
19       Q.    So I take it that there must be
20   13 legislative professionals, then, at The
21   Washington Group who are not at ISG?
22       A.    I believe -- I believe that is the
23   number, that's correct.
24       Q.    If you could just name them for
25   me, please.

Page 12

1        A.    Okay. That would be Susan
2    Molinari, Rita Lewis, Eugene Patrone, Brett
3    Shogren, Marissa Mitrovich, Kim Farmer, Missy
4    Edwards, Jim Noone, Carlos Bonilla, Paul Lobo,
5    Fowler West, Tanya Saunders, John O'Hanlon,
6    and Kevin Allen.
7        Q.    Mr. O'Hanlon's not at ISG?
8        A.    He's an employee of The Washington
9    Group.
10       Q.    Did you keep track of which
11   professionals worked for which clients?
12       A.    All the clients are clients of the
13   firm. Certain clients are given -- certain
14   lobbyists are entrusted with the day-to-day
15   responsibilities of the client, and yes, we
16   do track who is the lead contact for the
17   client.
18       Q.    Is there somebody overseeing the
19   work of the lobbyists for the individual
20   clients?
21       A.    Yes. There's a -- Susan Molinari
22   is the CEO, myself as the CFO, and Eugene
23   Patrone is actually the chief operating
24   officer.
25       Q.    Yes. But what I was -- you said

Page 13

1    that the lobbyists, that there's some
2    lobbyists who are entrusted with the daily
3    responsibilities for the clients.
4        A.    Uh-huh.
5        Q.    What I'm asking you is whether
6    you're distinguishing the daily
7    responsibilities for some other -- from some
8    other kinds of responsibilities for the
9    client.
10       A.    I'm sorry. I'm not --
11       Q.    Not understanding my question?
12       A.    Yeah. Please rephrase.
13       Q.    Let me ask it a different way.
14            I thought you said there were
15   certain lobbyists that are entrusted for
16   particular clients?
17       A.    That's correct.
18       Q.    Now, is there somebody overseeing
19   that daily work that the lobbyists do for the
20   clients?
21       A.    We entrust the clients to a
22   specific lobbyist, and that person works in
23   conjunction with the other lobbyists to meet
24   the client's needs. It's more of a matrix
25   organization, if you think about organizational

Paul Alan Lobo

October 31, 2007

---

**Page 14**

1  structure.  So we have -- there is a -- my
2  role is making sure that things are being
3  done for the client, if that's what you're
4  asking.
5      Q.    Well, I think that is what I'm
6  asking.
7          You're saying it's your
8  responsibility to make sure that things are
9  done for the client?
10     A.    It is -- the professionals at The
11 Washington Group are given responsibility for
12 the client, the day-to-day operation, and
13 entrusted to ensure that the delivery of
14 services to that client is complete.  Heir can
15 rely on the resources of the entire
16 organization, and we work together as a team
17 to do that.
18     Q.    Who supervises the lobbyists and
19 their work?
20     A.    I would say Susan Molinari as the
21 CEO.
22     Q.    Now, were there any clients for
23 whom, as you put it, Mr. Sporidis was
24 entrusted with the daily responsibilities?
25     A.    Yes.  Mr. Sporidis was entrusted

---

**Page 15**

1  with specific clients.
2      Q.    Which were those?
3      A.    It was ASCO and Mentor Corporation.
4  Those were two.  Additionally in this year he
5  worked with ALTA, American Land Title
6  Association, and SHRM, Society of Human
7  Resource Management.
8      Q.    Did someone in the management of
9  The Washington Group decide that Mr. Sporidis
10 would be the lobbyist who worked for SHRM?
11     A.    I do not recall.
12     Q.    How about for ALTA?  Did someone
13 in the management of Washington Group decide
14 that Mr. Sporidis would be the lobbyist who
15 worked for ALTA?
16     A.    ALTA was -- is a client of The
17 Washington Group that Mr. Sporidis introduced
18 us to.
19     Q.    That's nice, but that's not what I
20 asked you.
21     A.    Please restate the question.
22         MR. STRASSER:  Would you read back
23 my question
24         (Thereafter the requested material
25 was read by the court reporter.)

---

**Page 16**

1      BY MR. STRASSER:
2      Q.    Did someone in the management of
3  The Washington Group decide that Mr. Sporidis
4  would be the lobbyist who worked for ALTA?
5      A.    I don't recall.
6      Q.    Did someone in the management of
7  The Washington Group decide that it would be
8  Mr. Sporidis would be the lobbyist who worked
9  for ASCO?
10     A.    I don't know.
11     Q.    How about for Mentor?  Did someone
12 in management at The Washington Group decide
13 it would be Mr. Sporidis who would be the
14 lobbyist to work for Mentor?
15     A.    I don't know.
16     Q.    So you're saying you didn't decide
17 that for any of those clients, correct?
18     A.    I joined The Washington Group after
19 June 2005.
20     Q.    I take it your answer is that
21 they, all four of those, were already clients
22 when you joined The Washington Group?
23     A.    No.
24     Q.    I'm sorry?
25     A.    No.

---

**Page 17**

1      Q.    Okay.  So which of them became a
2  client after you joined The Washington Group?
3      A.    ALTA and SHRM.
4      Q.    Okay.  Did you decide that Mr.
5  Sporidis should be the lobbyist who worked
6  for ALTA?
7      A.    No.
8      Q.    And did you decide that Mr.
9  Sporidis should be the lobbyist who worked
10 for SHRM?
11     A.    No.
12     Q.    And you don't know who decided
13 that it would be Mr. Sporidis who was working
14 for ASCO, correct?
15     A.    I do not know, correct.
16     Q.    And you don't know who decided
17 that Mr. Sporidis would work for Mentor?
18     A.    Correct.
19     Q.    Correct?  For all you know, it was
20 Mr. Sporidis' decision?
21     A.    I don't know.
22     Q.    Do you know how Mentor became a
23 client of The Washington Group?
24     A.    I don't know.
25     Q.    How about ASCO?  Do you know how

---

Paul Alan Lobo                                                    October 31, 2007

| Page 26 | | Page 28 | |
|---|---|---|---|

**Page 26**

1    Q.    What was odd about that?
2    A.    It's not something that people in
3    our firm say. There is a standard way of
4    communicating when you're with a client.
5    That's a rote way of saying, you can reach
6    me by phone or Blackberry. I'm with client
7    X. And to break from that is, just seemed
8    unusual.
9    Q.    Because he didn't identify the
10   client?
11   A.    Correct.
12   Q.    But you're saying that you realized
13   that only in retrospect?
14   A.    Yeah. You have clarity in
15   retrospect.
16   Q.    Well, at the time you saw the
17   e-mail, did you have some conversation with
18   Ms. Molinari about it?
19   A.    I don't recall.
20   Q.    Or how about with Mr. Patrone or
21   perhaps with both of them about what an odd
22   e-mail it was?
23   A.    Yeah. We did discuss the oddity
24   of the e-mail, that's correct.
25   Q.    What was odd about it? Did it

**Page 27**

1    suggest to you that Mr. Sporidis was doing
2    something other than spending the whole day
3    with a client?
4    A.    It did, yes.
5    Q.    Did you speculate about what that
6    might be?
7    A.    There was speculation.
8    Q.    Was part of that speculation about
9    whether he was looking for another job?
10   A.    Yes.
11   Q.    Let's mark this as 12, please.
12        (Thereafter Exhibit-12 was marked
13   for identification.)
14   BY MR. STRASSER:
15   Q.    I've just handed you Exhibit 12.
16   Is this the e-mail that you were thinking of?
17   A.    I believe so.
18   Q.    And this is an e-mail sent on
19   September 12th?
20   A.    Yes. This e-mail was sent on
21   September 12th.
22   Q.    Did you receive it that day?
23   A.    Yes, I did.
24   Q.    This doesn't identify the client,
25   right, and it doesn't contain a cell phone

**Page 28**

1    number, so this is the kind of e-mail you
2    were talking about which is unusual?
3    A.    Right. I believe this is the
4    e-mail that we were discussing.
5    Q.    All right. So did Mr. Sporidis
6    come talk to you on the day after your
7    conversation with Ms. Molinari?
8    A.    Yes, he did.
9    Q.    And are you able now to recall
10   that as September the 27th?
11   A.    I don't recall the exact date.
12   Q.    Was it in the morning?
13   A.    It was in the morning.
14   Q.    Were you in the office at the
15   time?
16   A.    Yes.
17   Q.    And Mr. Sporidis came to your
18   office?
19   A.    That's correct.
20   Q.    And he told you -- what did he
21   say when he first came?
22   A.    I don't recall exactly what he
23   first said.
24   Q.    Did he tell you he wanted to talk
25   to you about something?

**Page 29**

1    A.    I assume so, yes.
2    Q.    Did he tell you that he wanted to
3    talk to you about his departure from The
4    Washington Group?
5    A.    Yes.
6    Q.    And did you tell him that you
7    already knew about it?
8    A.    Yes.
9    Q.    And did you tell him how you knew
10   about it?
11   A.    Yes.
12   Q.    What did you say?
13   A.    I said, Susan told me last night.
14   Q.    Okay. And did he tell you, then,
15   I'm going to be leaving?
16   A.    Yes.
17   Q.    And did you tell him that Susan
18   wanted his transition to be as easy as
19   possible?
20   A.    I don't recall.
21   Q.    Had Susan said that to you, that
22   she wanted his transition to be as easy as
23   possible?
24   A.    I don't recall.
25   Q.    Did you tell him that he ought to

Paul Alan Lobo                                          October 31, 2007

|  | Page 30 |
|---|---|
| 1 | get his clients to terminate their contracts |
| 2 | by sending in their 30-day notices? |
| 3 | A.   No. |
| 4 | Q.   Did you say anything about his |
| 5 | clients to him? |
| 6 | A.   We discussed his clients; the two |
| 7 | clients that we discussed were Mentor |
| 8 | Corporation and ASCO Corporation. |
| 9 | Q.   What did you say about Mentor |
| 10 | Corporation to him? |
| 11 | A.   I asked him what the contract |
| 12 | status was with Mentor. |
| 13 | Q.   What did you mean by that? |
| 14 | A.   I believe I meant, what are the |
| 15 | conditions of the contract with Mentor |
| 16 | Corporation? |
| 17 | Q.   What did he tell you? |
| 18 | A.   He said that they had a 30-day |
| 19 | notification period. |
| 20 | Q.   Mr. Sporidis said that? |
| 21 | A.   Yes. |
| 22 | Q.   Okay.  What did you say then? |
| 23 | A.   I don't recall. |
| 24 | Q.   Now, you asked Mr. Sporidis about |
| 25 | the contract status with Mentor, because you |

|  | Page 31 |
|---|---|
| 1 | couldn't -- you didn't know it yourself? |
| 2 | A.   I had not researched it myself. |
| 3 | Q.   You didn't know it off the top of |
| 4 | your head? |
| 5 | A.   Correct. |
| 6 | Q.   And some of the client contracts |
| 7 | at The Washington Group have a 30-day |
| 8 | termination provision in them, right? |
| 9 | A.   Yes. |
| 10 | Q.   And some do not? |
| 11 | A.   That's correct. |
| 12 | Q.   And you obviously couldn't know |
| 13 | which kind this was, without looking at the |
| 14 | contract? |
| 15 | A.   That's correct. |
| 16 | Q.   And you assumed Mr. Sporidis would |
| 17 | know what the contract said? |
| 18 | A.   That's correct. |
| 19 | Q.   So when he said they had a 30-day |
| 20 | notice provision, did you say anything about |
| 21 | what he should do about that? |
| 22 | A.   I don't recall. |
| 23 | Q.   Now, what did you say to him about |
| 24 | the ASCO contract? |
| 25 | A.   I asked him about the status of |

|  | Page 32 |
|---|---|
| 1 | the ASCO contract. |
| 2 | Q.   What did he tell you? |
| 3 | A.   He informed me that they did not |
| 4 | have a contract in place. |
| 5 | Q.   What did you say? |
| 6 | A.   I said -- I don't recall. |
| 7 | Q.   You didn't say, I don't recall; |
| 8 | you don't recall what you said? |
| 9 | A.   I don't recall what I said. |
| 10 | Q.   Did you discuss anything else with |
| 11 | Mr. Sporidis in that conversation? |
| 12 | A.   I did. |
| 13 | Q.   What's that? |
| 14 | A.   I asked Harry if he had any type |
| 15 | of noncompete. |
| 16 | Q.   You asked him in that conversation? |
| 17 | A.   In that conversation. |
| 18 | Q.   Why did you ask that? |
| 19 | A.   Because some employees of The |
| 20 | Washington Group have noncompetes, and some |
| 21 | people don't. |
| 22 | Q.   And you didn't know whether Mr. |
| 23 | Sporidis did or didn't? |
| 24 | A.   I did not know. |
| 25 | Q.   Why did you ask him if he had |

|  | Page 33 |
|---|---|
| 1 | one? |
| 2 | A.   Because it would make a difference |
| 3 | on how we proceeded from this point forward. |
| 4 | Q.   Okay.  And what difference would |
| 5 | it make? |
| 6 | A.   A difference on how we proceeded |
| 7 | with current clients. |
| 8 | Q.   Okay.  Well, what would that |
| 9 | difference be? |
| 10 | A.   I guess how we arranged for his |
| 11 | departure from the firm. |
| 12 | Q.   Trying to understand what |
| 13 | difference there is, whether he has a |
| 14 | noncompete or not. |
| 15 | A.   If he had a noncompete, he would |
| 16 | not be in a place to move the clients that |
| 17 | he worked with at The Washington Group to his |
| 18 | new employer. |
| 19 | Q.   Why is that? |
| 20 | A.   Without knowing at the time what |
| 21 | the noncompete was, I just wanted to -- I |
| 22 | don't know what the specifics were, but I |
| 23 | knew that there would probably be some |
| 24 | ramifications that he would need to be aware |
| 25 | of. |

9  (Pages 30 to 33)

Paul Alan Lobo                                                    October 31, 2007

| Page 34 |
|---|

1      Q.    So you were asking him about the
2   noncompete out of your concern for him?
3      A.    Yes.
4      Q.    Not for -- out of your concern for
5   The Washington Group?
6      A.    I would say, yeah -- I would say
7   out of my concern for both The Washington
8   Group and for Harry.
9      Q.    Now, when you asked him if he had
10  a noncompete, what did he tell you?
11     A.    He said emphatically, no.
12     Q.    He said he'd never had a
13  noncompete?
14     A.    Yes.
15     Q.    And he said he was told when he
16  joined the firm that he would not have to
17  sign a noncompete?
18     A.    I do not know.
19     Q.    He didn't say that to you, or you
20  don't remember him saying that to you?
21     A.    Restate your question.
22     Q.    Okay.  What I'm asking is, did he
23  say to you then in this meeting that you're
24  recounting now, that he had been told he
25  would never have to sign a noncompete while

| Page 35 |
|---|

1   he was at The Washington Group?
2      A.    I don't recall if he said that in
3   that conversation, but it's -- in that
4   conversation or in a subsequent conversation
5   he did say that to me, yes.
6      Q.    Okay.  Would you describe his
7   reaction.  You didn't tell him he didn't have
8   a noncompete, you were just asking him
9   whether he had?
10     A.    At the conversation I asked him if
11  he had a noncompete.  He said no.  I asked
12  him if he had received stock, and he said
13  yes.  I said, some of the stock agreements
14  granting of stock have noncompetes in them,
15  and he said he had never agreed or signed
16  anything that was a noncompete.
17     Q.    Okay.  Anything else you said?
18     A.    I don't recall.
19     Q.    Now, did you have a discussion in
20  that initial meeting that day about how Mr.
21  Sporidis would notify other people in The
22  Washington Group about his departure?
23     A.    Yes.
24     Q.    And what was that discussion that
25  you had?

| Page 36 |
|---|

1      A.    Harry said -- we had a discussion
2   about how to notify other people in the firm,
3   and I think Harry suggested that an e-mail
4   from him would be the best way to do it, and
5   we initially discussed he would do an e-mail
6   the next day.
7      Q.    Did he draft an e-mail to send
8   out?
9      A.    He did.
10     Q.    Did he show it to you?
11     A.    I believe so, yes.
12     Q.    And did you think it was okay the
13  way it was stated?
14     A.    Yes.
15     Q.    You told him, go ahead and send it
16  out?
17     A.    I suggested that he hold off till
18  the next day to send it out.
19     Q.    Why?
20     A.    Mainly, I was hoping that we could
21  find a way to try to keep him, and I needed
22  to reach people to do that.
23     Q.    Who did you need to reach to try
24  to do that?
25     A.    Lorraine Thelian, Craig Mersky.

| Page 37 |
|---|

1      Q.    Now, why did you feel the need to
2   talk to Ms. Thelian?
3      A.    Given Harry's salary range, in
4   order to make an adjustment at that range, I
5   don't have authority to do that.
6      Q.    About what was his salary range
7   there?
8      A.    Base salary is 230,000.
9      Q.    Did he usually get a bonus?
10     A.    Yes.
11     Q.    What had been his bonus the
12  previous year?
13     A.    I don't recall.
14     Q.    Around 40,000?
15     A.    I don't recall.
16     Q.    And the firm paid for other things
17  for him as well, right?
18     A.    Correct.
19     Q.    Paid for health benefits for him?
20     A.    Yes.
21     Q.    Some kind of 401(k) contribution
22  for him?
23     A.    Yes.
24     Q.    Other kinds of benefits for him?
25     A.    Other benefits as well, yes.

Paul Alan Lobo                                          October 31, 2007

Page 46

1     Q.   Did you discuss with her on this
2  day how much more money you might pay him?
3     A.   No.
4     Q.   Did you discuss with Ms. Thelian
5  on that day how you might structure the
6  payment to Mr. Sporidis to increase his
7  compensation?
8     A.   I don't recall.
9     Q.   Did you talk with her about giving
10 him more stock?
11    A.   No.
12    Q.   So as you conceived increasing Mr.
13 Sporidis' compensation, you conceived it as an
14 increase in his cash compensation?
15    A.   Correct.
16    Q.   Did you have another conversation
17 with Ms. Thelian -- did you have only one
18 conversation with her on the 27th?
19    A.   I don't recall.
20    Q.   Did you talk with her on the 28th?
21    A.   I don't recall.
22    Q.   Did you talk with Harry on the
23 28th?
24    A.   Yes, I did.
25    Q.   Did you tell him that Ketchum was

Page 47

1  saying that he had a noncompete agreement?
2     A.   Yes, I did.
3     Q.   And what did he say to that?
4     A.   He said he never signed a
5  noncompete agreement.
6     Q.   Was he angry?
7     A.   Yes.
8     Q.   He actually spoke angrily to you,
9  didn't he?
10    A.   Yes.
11    Q.   He later sent you an e-mail
12 apologizing for his outburst, didn't he?
13    A.   I don't recall.
14    Q.   Did he ask you to show him the
15 agreement?
16    A.   Yes.
17    Q.   What did you say to him?
18    A.   I said, I don't have a copy.
19    Q.   Did you say Ketchum didn't have a
20 copy either?
21    A.   I don't recall.
22    Q.   Did you say someone was looking
23 for the copy?
24    A.   Yes.
25    Q.   Who did you tell him was looking

Page 48

1  for the copy?
2     A.   I don't recall.
3     Q.   Did you say it was someone at
4  Ketchum?
5     A.   I don't recall.
6     Q.   Did you tell him Ms. Thelian was
7  looking for a copy?
8     A.   No.
9     Q.   Did you tell him Mr. Mersky was
10 looking for a copy?
11    A.   I don't recall.
12    Q.   Who did you think was looking for
13 a copy?
14    A.   Could have been Mr. Mersky, could
15 have been someone in HR.
16    Q.   Now, did you call him again on the
17 28th and talk with him to say that Ketchum
18 insisted that he had a noncompete?
19    A.   I did.
20    Q.   What did you say to him?
21    A.   We spoke, and I conveyed the
22 message that Ketchum believed that he had a
23 noncompete and intended to hold him to it.
24    Q.   What was his reaction to that?
25    A.   I think disbelief.  And, I need to

Page 49

1  see it, is what he asked, specifically.
2     Q.   Did you offer to get it for him?
3     A.   I said as soon as I had it, he
4  would have a copy of it.
5     Q.   Did you send him a copy of it?
6     A.   I never directly sent him a copy.
7     Q.   Did you indirectly send him a
8  copy?
9     A.   No.
10    Q.   You never sent him a copy, period?
11    A.   I never provided Harry with a
12 copy.
13    Q.   Mr. Patrone actually sent him a
14 copy, right?
15    A.   I believe so, yes.
16    Q.   Mr. Patrone told you he sent him a
17 copy?
18    A.   I don't recall.
19    Q.   Let me tell you that the 28th is
20 a Friday.
21    A.   Okay.
22    Q.   Did Mr. Patrone tell you the
23 following Monday that he'd given a copy to
24 Mr. Sporidis of this supposed noncompete
25 agreement?

13  (Pages 46 to 49)

Paul Alan Lobo                                                    October 31, 2007

---

Page 102

1          Q.    Have you had the follow-up meeting
2    with the staff about the noncompetes?
3          A.    No, we have not.
4                MR. STRASSER:  All right.  That's
5    all the questions I have.
6                (Whereupon the deposition concluded
7    at 4:56 p.m.)
8                  .
9                  .
10                 .
11                 .
12                 .
13                 .
14                 .
15                 .
16                 .
17                 .
18                 .
19                 .
20                 .
21                 .
22                 .
23                 .
24                 .
25                 .

---

Page 103

1          DESCRIPTION OF DEFENDANT'S EXHIBITS
2    EXHIBIT DESCRIPTION
3     12    E-mail dated September 12, 2007, from
4           Harry Sporidis to TWG-Email
5     13    E-mail chain; top e-mail dated
6           September 27, 2007, from Paul Lobo to
7           Lorraine Thelian
8     14    E-mail chain; top e-mail dated
9           September 28, 2007, from Paul Lobo to
10          Susan Molinari
11    15    E-mail chain; top e-mail dated
12          October 3, 2007, from Eugene Patrone
13          to Susan Molinari, Lorraine Thelian,
14          Paul Lobo, and Craig Mersky
15    16    E-mail chain; top e-mail dated
16          October 12, 2007, from Paul Lobo to
17          Tom Rector and Jeremy Mills
18    17    E-mail chain; top e-mail dated
19          October 4, 2007, from Eugene Patrone
20          to Harry Sporidis, Susan Molinari,
21          Paul Lobo, Lorraine Thelian, and
22          Craig Mersky
23                 .
24                 .
25                 .

---

Page 104

1          DESCRIPTION OF DEFENDANT'S EXHIBITS (CONT.)
2    EXHIBIT DESCRIPTION
3     18    E-mail dated October 4, 2007, from
4           Eugene Patrone to Harry Sporidis,
5           Susan Molinari, Lorraine Thelian,
6           Craig Mersky, and Paul Lobo
7     19    E-mail dated October 5, 2007, from
8           Harry Sporidis to Eugene Parone,
9           Susan Molinari, Lorraine Thelian,
10          Craig Mersky, and Paul Lobo
11    20    Handwritten note
12    21    E-mail chain; top e-mail dated
13          October 9, 2007, from Lorraine Thelian
14          to Eugene Patrone, Craig Mersky, and
15          Paul Lobo
16    22    Handwritten note
17    23    E-mail chain; top e-mail dated
18          October 10, 2007, from Kelley Leach
19          to Eugene Patrone and Paul Lobo
20                 .
21    (Exhibits 12 through 23 were attached by
22    counsel.)
23                 .
24                 .
25                 .

---

Page 105

1          CERTIFICATE OF COURT REPORTER
2          I, TRACY E. BARKSDALE, the court
3    reporter before whom the foregoing deposition
4    was taken, do hereby certify that the witness
5    whose testimony appears in the foregoing
6    deposition was duly sworn by a Notary Public;
7    that the foregoing testimony is a complete,
8    true, and correct transcription of the
9    stenographic notes as taken by me in said
10   manner on said date; that I am neither
11   counsel for, related to, nor employed by any
12   of the parties to the action in which this
13   deposition was taken; and, further, that I am
14   not a relative or employee of any counsel or
15   attorney employed by the parties hereto, nor
16   financially or otherwise interested in the
17   outcome of this action.
18          DATED:  _____
19                 .
20          _____
21          TRACY E. BARKSDALE, RPR
22          Notary Public for the
23          District of Columbia
24          My commission expires
25          November 14, 2011

---

27 (Pages 102 to 105)

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA


---------------------- X

THE WASHINGTON            )

GROUP, INC.,              )   Civil Action No.

      Plaintiff,    )   1:07-cv-1892 (RBW)

  -against-              )

HARRY SPORIDIS,           )

      Defendant.    )

---------------------- X


Deposition of Harry Sporidis

Tuesday, October 30, 2007

Washington, D.C.


Pages 1 - 306

Job No. 183948

Reported by:  Deborah Larson Hommer, RPR

Harry Sporidis

Page 46

1    Susan Molinari for Mentor.
2        Q.  Okay.  But those instances you've
3    just listed to me, those are the only times
4    you can recall --
5        A.  Those are the only times I can
6    recall.  It is very rare that anybody helped
7    me with Mentor.  Actually, it's extremely rare
8    that anybody helped me with Mentor.
9        Q.  Okay.  Was there ever a time that
10   you were out of the office, say, for an
11   extended period, vacation or family leave or
12   something to that effect?
13       A.  Yes.
14       Q.  And who was servicing those clients
15   while you were out?
16       A.  When I was out -- there was one
17   time I was in Greece for two weeks, and I had
18   asked Eugene Patrone to service the clients
19   while I was out.  But unfortunately the client
20   was calling me in Greece to have them [sic]
21   help them.  So that really didn't work out
22   that well for me.

Page 47

1        Q.  I can relate to that.  Believe me.
2    Any other occasions?  When was that, by the
3    way?
4        A.  I think it's 2003, but I'm not
5    sure.
6        Q.  Were you out any other extended
7    period?
8        A.  Yes, I have been.
9        Q.  When was that?
10       A.  I have been out for a week when I
11   got married, which was 2005.  But again, I
12   was -- I was in the U.S., so I didn't really
13   need anybody to keep an eye on my clients for
14   me.  It was only a week while Congress was out
15   of session.
16       Two weeks in August, this past
17   August.  Again, Congress was out of session,
18   so no real need for anybody to, you know,
19   maintain -- and I was here domestic, so I
20   could keep an eye on things.
21       Q.  Do you know what the billing
22   arrangement was between Mentor and The

Page 48

1    Washington Group?
2        A.  It was a monthly retainer.
3        Q.  What was that?
4        A.  $25,000 a month.
5        Q.  And who sent those bills?
6        A.  Tracey Gray, I believe, of The
7    Washington Group.
8        Q.  On behalf of The Washington Group?
9        A.  Correct.
10       Q.  They didn't come directly from you?
11       A.  No.  I did review the invoices,
12   though.
13       Q.  You reviewed the invoices?
14       A.  Correct.
15       Q.  Do you know how long they had been
16   paying -- I think you said it was -- how much
17   was it again?
18       A.  25,000 a month.
19       Q.  How long had they been paying
20   25,000 a month?
21       A.  Since the beginning, since they
22   were there.

Page 49

1        Q.  We talked a few minutes ago about
2    how Mentor came to seek out the services of
3    The Washington Group.  I was hoping you could
4    elaborate on that process a little bit more
5    for me.  You said that it was a contact -- it
6    was a contact based on Jim Greenwood; is that
7    correct?
8        A.  Correct.
9        Q.  And they came to The Washington
10   Group or The Washington Group pitched them?
11       A.  No.  The Washington Group did not
12   pitch Mentor.  Kathryn Gleason, an attorney
13   here in town, knew that I had worked for Jim
14   Greenwood on a client that we had worked on
15   together and put in a call.
16       Q.  She put in a call to you?
17       A.  No.  She put in a call, actually,
18   to John O'Hanlon, and then John O'Hanlon
19   quickly got me into his office, and there you
20   have it.
21       Q.  I appreciate that.  Can you --
22   "there I have it" -- can you elaborate a

13  (Pages 46 to 49)

Harry Sporidis

Page 50

1    little bit more on what you and John O'Hanlon
2    discussed?
3        A.  Well, she knew -- as I said, she
4    had known that I had worked for Congressman
5    Greenwood.  There was an inquiry pending.  And
6    within two days they were a client of The
7    Washington Group.
8        Q.  I'm sorry to be -- maybe I'm not
9    asking specific enough questions.  I am trying
10   to learn what happened between that initial
11   call and them joining -- and them becoming a
12   client of The Washington Group.
13       A.  They called -- Clarke Scherff
14   called, and we -- both John O'Hanlon and I
15   were on the phone.  And we said, okay, we can
16   do this for you, 25,000 a month.  And he said,
17   okay.  And that was it.
18       Q.  What exactly were you doing for
19   them?  What you were going to be doing for
20   them?
21       A.  I was doing advocacy work for them.
22       Q.  Can you elaborate on that, advocacy

Page 51

1    work?
2        A.  Again, it was -- it was to work on
3    a specific inquiry that Congressman Jim
4    Greenwood had with the FDA.
5        Q.  Okay.  And in the context of that
6    inquiry -- you have to forgive me.  I'm a
7    lawyer from New York.  I'm not a member of the
8    Washington, D.C., political scene.  So when
9    you say you were working on inquiry, I don't
10   understand exactly what that means.
11       A.  I had answered that question prior.
12   You had already asked me that question.
13       Q.  Okay.
14       A.  So I have already answered the
15   question.
16       Q.  You have already answered the
17   question --
18       A.  I have.
19       Q.  Wait for a question.
20           You have already answered the
21   question of what the inquiry was?
22       A.  Again, the inquiry was Congressman

Page 52

1    Greenwood had a letter into the FDA inquiring
2    about an OCI investigation.
3        Q.  What is OCI investigation?
4        A.  Office of Criminal Investigation --
5        Q.  Okay.
6        A.  -- on Mentor.  I had answered that
7    question.
8        Q.  Okay.  The investigation was on --
9    okay.
10       A.  Correct.
11       Q.  The disconnect was I didn't
12   understand what the investigation was, and
13   that it was specifically involving them.  I
14   appreciate your clarifying that.
15           In the course of your servicing
16   Mentor's account, did you use resources that
17   were provided to you by The Washington Group?
18       A.  I believe so.
19       Q.  And what were those?
20       A.  Computer, telephone, office.
21       Q.  And did you take advantage of
22   connections that others in The Washington

Page 53

1    Group had in servicing Mentor's account?
2        A.  Again, not many people stepped up
3    to the plate for me on Mentor.
4        Q.  When you say not many people
5    stepped up to the plate, I understand you
6    testified earlier that you sometimes requested
7    assistance with [sic] them, and that you don't
8    feel that that was provided.
9        A.  Correct.
10       Q.  Can you give me an example of a
11   specific connection that you sought out that
12   was either provided or not provided?
13       A.  I had asked David Crane, who was at
14   The Washington Group, to secure me a meeting
15   with -- at that time I believe his name was
16   David Ventimiglia.  He was the staff director
17   of the Senate Health Committee.  Never came
18   through.  Just did not happen.
19           I had asked for meetings with
20   Democratic Senators that did not happen.  I
21   had asked once for Susan Molinari to put in a
22   specific phone call to Olympia Snowe directly

14  (Pages 50 to 53)

Harry Sporidis

---

Page 54

1  which I don't believe ever happened.
2       So there had been on more than one
3  occasion that I had been left in the lurch.
4       Q.  So you can't recall any instances
5  where you sought out assistance like that and
6  it was actually provided to you?
7       A.  Well, no.  I named you --
8       Q.  You mentioned one earlier.
9       A.  I named you about three, but that's
10  about it.
11      Q.  Okay.  You testified that, as we
12  have been discussing, you were the primary
13  and, in your opinion, the only person really
14  servicing Mentor on behalf of The Washington
15  Group?
16      A.  Correct.
17      Q.  Is it fair to say, then, that The
18  Washington Group entrusted you with managing
19  that relationship on your own?
20      A.  I don't know if it was they
21  entrusted me or if nobody really cared enough
22  to do anything for the client.

---

Page 55

1       Q.  Well, is it your testimony you
2  don't think that they cared about the client?
3       A.  I think they cared about the
4  revenue that was coming in from the client,
5  but I don't -- I wasn't getting a lot of
6  assistance from people for the client.
7       Q.  And would that be because they were
8  leaving you to service Mentor on their behalf?
9       A.  I'm not sure I understand the
10  question.  I'm not sure I understand where
11  you're going.
12      Q.  I am asking if it's fair to say
13  that The Washington Group left the servicing
14  of Mentor Corporation, one of its clients, to
15  you?
16      A.  I was the only one that was
17  servicing the company.
18      Q.  So then is the answer yes?
19      A.  I don't think anybody left it to
20  me.  I was the only one servicing the company.
21      Q.  Another client you mentioned
22  earlier was ASCO.

---

Page 56

1       A.  Uh-huh.
2       Q.  And what does ASCO stand for?
3       A.  The American Society of Clinical
4  Oncology.
5       Q.  And that was another client that
6  you yourself serviced at The Washington Group?
7       A.  I did, primarily.
8       Q.  Primarily, you say.  Who else
9  serviced them there?
10      A.  Tanya Saunders helped me once.
11      Q.  And what were the
12  circumstances?
13      A.  It was recently, actually.  I
14  needed to get in quickly to see Ed Towns.  I
15  had already had things moving in Ed Towns'
16  office, but I just needed that extra push, and
17  Tanya assisted me in getting the extra push.
18      Q.  Okay.  Any other occasions?
19      A.  No.
20      Q.  In the entire time that you were
21  servicing ASCO?
22      A.  There were a few times that -- you

---

Page 57

1  know, Susan would come to a couple of dinners.
2  She came to a couple of meetings.  But by and
3  large, no.
4       Q.  Okay.  Who was your primary contact
5  at ASCO?
6       A.  Deborah Kamin and Shelagh Foster
7  and Joseph Bailes.
8       Q.  Let's go one at a time with those.
9  Who is Deborah Kamin?
10      A.  Deborah Kamin -- I don't know her
11  exact title.  I apologize.  But she is
12  basically the head of government affairs.
13      Q.  And Shelagh Foster?
14      A.  She is -- I believe her title is
15  director of government affairs.
16      Q.  And who is the third person?
17      A.  Joseph Bailes.  Policy czar.  He is
18  a doctor.  He's a doctor of oncology.
19      Q.  How did you become introduced to
20  Deborah Kamin?
21      A.  When we pitched Mentor I became --
22  I got to know her.

---

ESQUIRE DEPOSITION SERVICES

Harry Sporidis

---

Page 58

1    Q.  Shelagh Foster?
2    A.  The same thing.
3    Q.  And Joseph Bailes?
4    A.  Joseph Bailes was a little bit
5    further down the road I met Joseph Bailes.
6    But I don't believe he was at the initial
7    pitch.
8    Q.  You didn't know any of those
9    individuals, though, prior to ASCO becoming a
10   client?
11   A.  No, I did not.
12   Q.  Okay.  And what kind of services
13   did you provide to ASCO?
14   A.  Government strategic -- advocacy.
15   Q.  The same as the kind of services
16   you generally provided?
17   A.  Correct.
18   Q.  And those you provided to Mentor?
19   A.  Correct.
20   Q.  Who would you say was your primary
21   contact there?
22   A.  Well, the three that I gave you.

---

Page 59

1    Q.  All of them?
2    A.  All three, yes.
3    Q.  Okay.  Do you know how long ASCO
4    was a client of The Washington Group?
5    A.  I'm guessing three years, but I'm
6    not quite sure.
7    Q.  But you participated in the initial
8    pitch of business?
9    A.  I did.
10   Q.  What kind of business exactly were
11   you pitching?
12   A.  Public affairs and government
13   relations.
14   Q.  Was it in the context of a specific
15   task that they needed or was it a general --
16   A.  It was a specific task that they
17   needed.  They needed serious communications
18   and government affairs help at that point.
19   Q.  But there wasn't -- for example,
20   with Mentor, that originated as part of a
21   specific inquiry that was being made about
22   Mentor by the Office of the Criminal

---

Page 60

1    Investigation.
2    A.  No.  There was a specific need.
3    They were having some -- they were having some
4    serious image problem on the Hill, and they
5    needed to reshape their image.
6    Q.  Can you elaborate on that at all?
7    A.  There was -- it was an ugly debate
8    in the Medicare Modernization Act with the
9    oncologists, and they soured a lot of
10   relationships with members of Congress.  So it
11   was my task to rebuild their relationships
12   with House Energy and Commerce Committee
13   members and House Ways and Means Committee
14   members.
15   Q.  I see.  And do you know if they
16   were -- they were soliciting bids, let's say,
17   from other agencies?
18   A.  I believe so.
19   Q.  Do you know who else was bidding
20   for them?
21   A.  I don't.  I don't -- I don't
22   recall.

---

Page 61

1    Q.  But you believe that there were
2    others besides Ketchum and The Washington
3    Group?
4    A.  I believe so because I believe we
5    were one of three that made it to the final
6    round, so yes.
7    Q.  And what was your role in preparing
8    that bid?
9    A.  I assisted in putting the actual
10   proposal together for The Washington Group,
11   for The Washington Group's portion, and was
12   one of the presenters at the actual pitch.
13   Q.  Who else presented?
14   A.  David Crane, Susan Molinari, Noam
15   Gelfond, and I believe it was Steve Erickson,
16   but I'm not sure on that one.
17   Q.  And who else assisted you in
18   preparing the documentation that you
19   submitted?
20   A.  Nobody.
21   Q.  You did that on your own?
22   A.  Correct.

---

16  (Pages 58 to 61)

Harry Sporidis

Page 62

1    Q.  Was that pursuant to a specific
2  request from somebody specific?
3    A.  It was pursuant to a specific
4  request from Noam Gelfond at Ketchum.
5    Q.  Noam Gelfond spoke directly with
6  you about this?
7    A.  Yes, and he asked me if I could get
8  this done, and I got it done for him.
9    Q.  Had they previously been a Ketchum
10  client?
11    A.  Not that I -- not that I -- no.
12    Q.  And are you familiar with the
13  billing arrangement between The Washington
14  Group and ASCO?
15    A.  Somewhat.  It's a little strange
16  the way it was set up.  Basically, the billing
17  arrangement was that ASCO would give a lump
18  sum, cut a check to Ketchum and then Ketchum
19  distribute The Washington Group's portion to
20  The Washington Group.  So it was kind of a
21  roundabout way --
22    Q.  Okay.

Page 63

1    A.  -- of how it worked.
2    Q.  But the bills originated with
3  Ketchum?
4    A.  Correct.
5    Q.  And you didn't send those out
6  yourself?
7    A.  No, I did not.
8    Q.  And you said that, for Mentor, you
9  reviewed invoices.  Did you do the same thing
10  for ASCO?
11    A.  No, I did --
12    Q.  You never saw those?
13    A.  No, I did not.
14    Q.  And like we discussed for Mentor,
15  is it fair to say you used resources of The
16  Washington Group in servicing ASCO's account?
17    A.  Again, telephone, computer, office
18  space, yes.
19    Q.  And I know you mentioned earlier
20  one specific occasion, but in terms of taking
21  advantage of connections of others at the
22  group, were there instances where you were

Page 64

1  able to take advantage of others' connections
2  in order to service them?
3    A.  David, I tried.  I tried, actually,
4  to integrate other people into the account,
5  and unfortunately it just didn't work.
6        I tried to integrate Missy Edwards
7  into the account.  It didn't work.  It didn't
8  happen.  At the time, Tripp Funderburke who
9  was at The Washington Group -- no longer
10  there -- I tried to integrate him into the
11  account.  Just somewhat of a disconnect.
12        So I made a point to try to
13  integrate other people in, but it just didn't
14  happen.
15    Q.  What was the context of you trying
16  to get Missy Edwards involved?
17    A.  I brought her to the first few
18  meetings that we had out at ASCO.  The context
19  was to get her involved in terms of Senate
20  Republicans.
21    Q.  And you say it didn't work.  She
22  didn't -- she never maintained interest in the

Page 65

1  account?  She still works at The Washington --
2    A.  She still works at The Washington
3  Group, and there wasn't a lot of interest in
4  the account, no.
5    Q.  And Chip Under --
6    A.  Tripp.  Tripp Funderburke.
7    Q.  Tripp?
8    A.  Yes.
9    Q.  My apologies.
10    A.  He is no longer at The Washington
11  Group.
12    Q.  And how did you try and get him
13  involved?
14    A.  I brought Tripp to the first
15  meetings, too.  He worked for an
16  Appropriations Committee member.  So, you
17  know, it would have been a good fit.  But,
18  unfortunately, there was no interest.
19    Q.  There was no interest on Tripp's
20  part --
21    A.  Correct.
22    Q.  -- and Missy's part?

17 (Pages 62 to 65)

Harry Sporidis

Page 66

1    A.  Correct.
2    Q.  Did any of the other senior
3  personnel at The Washington Group have contact
4  with ASCO or people at ASCO?
5    A.  Not that I know of.
6    Q.  So they pretty much left ASCO to be
7  serviced by you?
8    A.  Correct.
9    Q.  Another one of the clients you
10  mentioned earlier was SHRM?
11    A.  Society of Human Resource
12  Management.
13    Q.  And they were one of the clients
14  that you serviced for The Washington Group?
15    A.  Yes.
16    Q.  And what kind of service did you
17  provide them?
18    A.  Government affairs advocacy,
19  strategic counseling.
20    Q.  The same as we have been
21  discussing?
22    A.  Correct.

Page 67

1    Q.  How did you become introduced to
2  SHRM?
3    A.  Through Ketchum.
4    Q.  Through Ketchum?  Do you recall
5  when that was?
6    A.  I want to say it was in the spring
7  of 2006.  I'm not sure what month it was, but
8  I want to say it was the spring of -- early
9  spring 2006.
10    Q.  Do you recall the circumstances?
11    A.  Yes.  They were having their annual
12  fly-in.  They wanted to make sure that it all
13  went off without a hitch.  Ketchum Public
14  Affairs was supposed to do all the media, and
15  we were supposed to, on The Washington Group
16  side, get all the rooms together, get all
17  the -- get members of Congress to the
18  reception, you know, and get everything done
19  in that regard.
20    Q.  Can you explain what a fly-in is?
21    A.  A fly-in is when they have members
22  of their organization -- SHRM is about 250,000

Page 68

1  members.  They have members of their
2  organizations fly here to D.C. to do an
3  advocacy day on Capitol Hill.
4    Q.  And that consists of meeting with
5  members of Congress --
6    A.  Correct.
7    Q.  -- and their staff?
8    A.  Correct.
9    Q.  And I guess pressing their agenda?
10    A.  Correct.
11    Q.  I see.  Who was your primary
12  contact at SHRM?
13    A.  Nancy Hammer and Michael Aitken.
14    Q.  And did others at The Washington
15  Group service SHRM's account?
16    A.  Yes.  Rita Lewis helped out with
17  SHRM.  She got them a few meetings with
18  Senators.  Tanya Saunders helped out with SHRM
19  as well.
20    Q.  And she also helped by arranging
21  meetings; is that it?
22    A.  Yes, she did.

Page 69

1    Q.  Do you know what SHRM's billing
2  arrangement was with The Washington Group?
3    A.  Well, it was $20,000 a month, I
4  believe, for the first three months, and then
5  it went to $12,000 a month.
6    Q.  How long were they a client?
7    A.  Early spring of '06 to September.
8  They discontinued in early September, I
9  believe.
10    Q.  September of this year?
11    A.  Yes.
12    Q.  Do you know how SHRM became a
13  client?
14    A.  Again, yes, it was through Ketchum.
15    Q.  It was all directly through
16  Ketchum?
17    A.  Yes.
18    Q.  We have discussed Mentor.  We have
19  discussed ASCO.  We just discussed SHRM.  At
20  the time you left The Washington Group, what
21  were the other significant clients that you
22  were servicing for The Washington Group?

18  (Pages 66 to 69)

Harry Sporidis

Page 74

1   this a pitch that originated with the group or
2   was it in response to a request for proposals?
3       A.  It was a favor.  I asked Dolly
4   Judge if she would made with us.
5       Q.  Dolly Judge is at Pfizer?
6       A.  Yes.
7       Q.  How about Merck?
8       A.  Again, it was a favor.  I asked if
9   they would meet with us.
10      Q.  Biotech?  Bio -- yes, Biotech.
11      A.  I asked if they would meet with us.
12      Q.  And ASPS?
13      A.  They sent me the request for
14  proposal.
15      Q.  Did we, by the way, say what ASPS
16  stands for?
17      A.  American Society of Plastic
18  Surgeons.
19      Q.  I know that, but I'm not sure if it
20  was on the record.
21          I apologize if you just answered
22  this, but the proposal to ASPS, was that for a

Page 75

1   specific task or was that general public
2   affairs?
3       A.  No.  It was general lobbying.  It
4   was government relations.
5       Q.  General government -- I'm sorry.
6   Government relations?
7       A.  Correct.  And I believe that the
8   RFP went out to -- I think it was told 12
9   firms, maybe more.
10      Q.  Do you know who any of the other
11  firms were?
12      A.  I don't.
13      Q.  And did -- all you did was -- all
14  The Washington Group submitted was an initial
15  proposal?
16      A.  All I submitted was an initial
17  proposal.
18      Q.  And that was on behalf of whom?
19      A.  The Washington Group.
20      Q.  No one ever heard back from ASPS on
21  that?
22      A.  Not while I was at The Washington

Page 76

1   Group.
2       Q.  So they never either said, let's
3   talk further, or, we're not interested?
4       A.  Not while I was at The Washington
5   Group.
6       Q.  Subsequently, did you hear anything
7   about that?
8       A.  Yes.
9       Q.  About their communication with The
10  Washington Group or you had further
11  communications yourself with them?
12      A.  Well, I had communication -- I had
13  told them that I was leaving The Washington
14  Group.
15      Q.  Okay.  When was that?
16      A.  It was after September 26, so it
17  had to have been September 27th or 28th.
18      Q.  And what are you referencing to
19  recall those dates?
20      A.  I am referencing the day I talked
21  to Susan Molinari.
22      Q.  So this was within a day or two

Page 77

1   after that?
2       A.  Correct.
3          (Recess.)
4       BY MR. GREENBERG:
5       Q.  Earlier we discussed your -- well,
6   briefly we discussed your salary with The
7   Washington Group.  Did you receive bonuses as
8   well?
9       A.  I did.
10      Q.  And -- let's see.  You were there
11  from 2001 on.  Can you recall for me what your
12  bonuses were, annually, generally?
13      A.  It varied year to year.  They were
14  generally pretty good bonuses, though.  I
15  mean, the first year I believe it was 25,000.
16  There was one year it was a $60,000 bonus,
17  $40,000 bonus.  So they were -- at that time,
18  it was -- it was good bonuses.
19      Q.  Was that tied to anything, such as
20  performance or --
21      A.  Honestly, I have no idea.
22      Q.  You just received a bonus --

20  (Pages 74 to 77)

Harry Sporidis

Page 98

1  identity. If he would like, I can give him
2  back the exhibit. But I want to know -- do
3  you want me to give him back the exhibit?
4         MR. STRASSER: Well, I think --
5         MR. GREENBERG: I don't need him to
6  do a side-by-side comparison.
7         MR. STRASSER: Well, I think you
8  can look at them and tell they're different.
9  But are you asking him to testify to that?
10        MR. GREENBERG: No. I don't need
11 him -- I don't need him to -- strike the
12 question. Strike the question.
13        BY MR. GREENBERG:
14    Q. My question for you -- your
15 attorney is correct in this instance. I don't
16 need you to testify about that in comparison.
17 My question for you is simple: Do you recall
18 ever receiving this message --
19    A. No.
20    Q. -- in June of 2005?
21    A. No.
22    Q. Okay. Now, if you will turn to

Page 99

1  Exhibit B --
2    A. Okay.
3    Q. -- do you recognize this letter at
4  all?
5    A. Can I -- can I go through it?
6    Q. Please. Please take your time.
7    A. Okay, David.
8    Q. Do you recognize this letter at
9  all?
10   A. I do not.
11   Q. Have you ever seen it before
12 sitting here with me today?
13   A. I have seen it in the declarations,
14 but I have never seen it before --
15   Q. So the first time you have ever
16 seen this was after this lawsuit had been
17 filed?
18   A. Correct.
19   Q. Have you ever seen a letter like
20 this addressed specifically to you?
21   A. No.
22   Q. So you don't recall receiving a

Page 100

1  letter like this in or about June of 2005?
2    A. I do not.
3    Q. Are you certain you never received
4  this?
5    A. I have never received this letter.
6    Q. You're certain?
7    A. I have never received this letter.
8    Q. It's not possible that you received
9  it and don't recall?
10   A. No.
11   Q. Why is that not possible?
12   A. Because I generally keep all paper
13 that I have, so I -- no.
14   Q. Is there some reason you're aware
15 of that if a document like this were sent to
16 you via inter-office mail at The Washington
17 Group you wouldn't have received it?
18   A. I have no idea.
19   Q. Do you generally read all of your
20 inter-office mail?
21   A. I do.
22   Q. If you had received a letter like

Page 101

1  this one addressed to you, would you have read
2  it?
3    A. I would have.
4    Q. As you sit here today, having read
5  the letter, what do you understand the purpose
6  of it to be?
7    A. A letter notifying employees that
8  they're receiving Omnicom restricted stock.
9    Q. If you had received this letter in
10 2005, what would you have done?
11        MR. STRASSER: You want him to --
12        THE WITNESS: I can't answer a
13 hypothetical.
14        MR. GREENBERG: What's your
15 answer -- what's your objection?
16        MR. STRASSER: You're asking him to
17 speculate about what he would have done. Is
18 that the question you're asking?
19        MR. GREENBERG: I am. I am asking
20 him to speculate.
21        MR. STRASSER: Go ahead. If you
22 could reconstruct -- I think he is asking

26 (Pages 98 to 101)

Harry Sporidis

Page 106

1    A.  Yes.
2    Q.  Including The Washington Group?
3    A.  Yes.
4    Q.  And you testified that you've used
5  that website on occasion in the past to manage
6  your account?
7    A.  I have, yes.
8    Q.  Other than logging in, as you said,
9  to elect on how to cover the taxable costs of
10  your stock, have you used the Fidelity website
11  for other purposes?
12    A.  No.
13    Q.  So you've only logged into the
14  Fidelity website in the context of stock
15  awards from --
16    A.  Stock awards, and maybe once or
17  twice to take a look at my 401(k).
18    Q.  Okay.  The 401(k) is also
19  administered by Fidelity?
20    A.  Yes.
21    Q.  How many times a year would you say
22  you log into Fidelity's website?

Page 107

1    A.  Not many.  I can't tell you how
2  many times, but not many.
3    Q.  Is it once a month?
4    A.  Perhaps.
5    Q.  More than that?
6    A.  I don't know.
7    Q.  Do you know when the first time was
8  that you logged into Fidelity's website?
9    A.  The first time I was asked to go on
10  there for the net shares.
11    Q.  Okay.  So that would be in -- would
12  that be in 2002?
13    A.  I believe so.
14    Q.  Do you know when the last time was
15  that you logged onto Fidelity's site?
16    A.  A few days ago.
17    Q.  And what was the purpose of that
18  visit?
19    A.  Just to take a look at what might
20  have transpired because I just didn't know.
21    Q.  Might have transpired when?
22    A.  In 2005.

Page 108

1    Q.  With respect to what?
2    A.  The stock in question.
3    Q.  I see.  Do you recall logging into
4  Fidelity's website in July of 2005 to accept a
5  grant of stock?
6    A.  I don't.
7    Q.  Do you have some reason to believe
8  that you did not log in to accept a grant of
9  stock in --
10    A.  I don't recall.
11    Q.  Do you have any specific reason to
12  believe you would not have done that?
13    A.  David, I don't know.
14       (Deposition Exhibit No. 5 was
15  marked for identification.)
16       BY MR. GREENBERG:
17    Q.  Mr. Sporidis, you have just been
18  handed Plaintiff's Exhibit 5, what appears to
19  be your declaration submitted in response to
20  this lawsuit.
21    A.  Uh-huh.
22    Q.  If you would like to take a moment

Page 109

1  to review it, you can.  It's rather lengthy
2  and we are only going to be focusing for right
3  now on a couple of paragraphs, but --
4    A.  Okay.
5    Q.  -- I wouldn't want to be unfair,
6  so...
7    A.  I think I'm familiar with it.
8    Q.  Okay.  If you will turn to page 14,
9  paragraph 43.  Would you take a moment to
10  review paragraphs 43 through 45?
11    A.  Okay.
12    Q.  Mr. Sporidis, was it your testimony
13  in this document that you did not understand
14  you were receiving an additional award of
15  stock in 2005?
16    A.  I did not.
17    Q.  What did you believe you were --
18  what did you believe in 2005, according to
19  this testimony?
20    A.  That I was just going onto
21  net shares, which is probably what I did.
22    Q.  You were just --

28 (Pages 106 to 109)

Harry Sporidis

Page 110

1    A.  Probably what I did.
2    Q.  I'm sorry, but you were just going
3  on --
4    A.  That I was just doing net shares.
5    Q.  Meaning to manage the taxable
6  income issue?
7    A.  Correct.
8    Q.  So is it your testimony that you
9  did not understand in 2005 -- not just based
10  on the website, but in any context, you did
11  not understand that you were receiving an
12  award of Omnicom restricted stock?
13    A.  Correct.
14    Q.  You never discussed that with
15  anybody?
16    A.  No.
17    Q.  Would you say these awards of stock
18  are akin to bonuses?
19    A.  I don't know how they're
20  distributed.
21    Q.  Well, how do -- how would you
22  construe -- strike that.  Strike that.

Page 111

1         When you received your award in
2  2002, which you testified to earlier which you
3  discussed with John Raffaelli, was it your
4  understanding that you were receiving that
5  award as a form of bonus?
6    A.  I don't know.  I don't know how
7  they were presenting it to me, David.  I
8  don't -- I don't know how the process worked.
9    Q.  Okay.  But what was your perception
10  of why you were receiving that stock?
11    A.  Incentive to stay.
12    Q.  Incentive to stay?
13    A.  Yes.
14    Q.  Same for 2003 when you received
15  that second letter?
16    A.  I would -- I would imagine.
17    Q.  Did you view it as something that
18  you were entitled to as an employee of The
19  Washington Group?
20    A.  No, not necessarily.
21    Q.  Can you explain what you mean "not
22  necessarily"?

Page 112

1    A.  I don't view it as something that I
2  was entitled to.
3    Q.  So this was -- would you say that
4  this was, in effect, a form of bonus
5  compensation?
6    A.  David, again, I don't -- I don't
7  know what my superiors had in mind in
8  providing this.
9    Q.  I know, but I am asking you, from
10  your perspective.  I know you can't read their
11  minds, and I wouldn't ask you to do that --
12    A.  Okay.
13    Q.  -- but from your perspective, did
14  you say, hey, I got an award of 450 shares of
15  Omnicom; good job?
16    A.  Possibly.
17    Q.  You don't recall?
18    A.  I don't recall.
19    Q.  If you look at paragraph 45 --
20    A.  Okay.
21    Q.  -- of Exhibit 5, you say that you
22  know you received a notice from Fidelity

Page 113

1  around that time that you should go to their
2  website and attend to a matter concerning your
3  restricted shares.
4    A.  Yes.
5    Q.  How do you know that you received
6  that notice?
7    A.  I believe that at that time I did
8  receive a notice.  I -- I'm just -- you know,
9  unfortunately, I'm speculating.  I am trying
10  to remember the best I can, but, you know, I
11  would receive these notices periodically, and
12  it would be in July because that's when all
13  the shares would vest.
14    Q.  You received these notices once a
15  year in July?
16    A.  Around that time.
17    Q.  Okay.  You don't recall what it
18  said with specificity?
19    A.  No, I don't.
20    Q.  And you didn't retain it?
21    A.  I did not.
22    Q.  You say you assumed that you were

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376      MD 1-800-539-6398      VA 1-800-752-8979

Harry Sporidis

Page 118

1    screens out there that are similar to this,
2    David.
3        Q.   My question to you --
4            MR. STRASSER:  Let him finish --
5            MR. GREENBERG:  You can let him
6    finish his answer.
7            MR. STRASSER:  I think he did.  I
8    think -- I told him to wait for a question
9    from you.
10           BY MR. GREENBERG:
11       Q.   But my question to you is, I
12   understand that there are a lot of screens out
13   there that are similar to this, would you
14   agree with me that if you went to Amazon.com
15   to purchase a novel or a video or a CD, this
16   is not what you would see?
17       A.   I don't know.
18       Q.   Have you ever visited Amazon.com?
19       A.   I have.
20       Q.   Have you ever purchased anything?
21       A.   I haven't been through the entire
22   website, though.  It's a huge website.

Page 119

1        Q.   Okay.  When you initially log into
2    Amazon's website, have you ever seen screens
3    that look like this?
4        A.   I suppose not.
5        Q.   Why don't you describe for me, as
6    best you can, what you recall seeing the last
7    time you logged into Fidelity's website.
8        A.   Just recently?
9        Q.   Just recently.
10       A.   My account.  That's it.
11       Q.   When you say your account, what
12   were you viewing?  A list of your stock
13   options?
14       A.   The stock options and my 401(k) and
15   then that's it.  Then I logged out.
16       Q.   Okay.  Was there anything on the
17   screen to indicate that it was -- that you
18   were viewing information regarding an Omnicom
19   plan?
20       A.   No.
21       Q.   No?  Omnicom's name -- to your
22   recollection, Omnicom's name didn't appear

Page 120

1    anywhere on the screens?
2        A.   I -- I will have to look at it
3    again.  I'm just not sure.
4        Q.   Okay.  I'm sorry.  How long ago was
5    that that you logged in?
6        A.   Just a few days ago.
7        Q.   Unfortunately, these pages are not
8    numbered.  If you will turn to the fourth
9    page.
10       A.   Which page?  Can you show me?
11       Q.   At the top, it says, "Accepting."
12           Do you see there is a box in the
13   center of the screen that says, "Plan
14   document"?
15       A.   I do.
16       Q.   And it says, "You must certify that
17   you have read your plan document to continue."
18           And then there's some text below
19   that that's underlined in blue.  "Plan
20   document."
21       A.   I see that.
22           MR. GREENBERG:  Alan, I apologize,

Page 121

1    you don't have a color copy.
2            MR. STRASSER:  Right.
3            BY MR. GREENBERG:
4        Q.   Do you understand what that blue
5    underlined language is?
6        A.   Is it hypertext?
7        Q.   Is that what you understand it to
8    be?
9        A.   I suppose.
10       Q.   And do you understand that clicking
11   on that leads you somewhere else?
12       A.   I would imagine.
13       Q.   Or perhaps opens another screen?
14       A.   Perhaps.
15       Q.   You have had experience with
16   clicking on hyperlinks in your --
17       A.   I have.
18       Q.   In your web surfing lifetime?
19       A.   I have.
20       Q.   Okay.  If you were viewing this
21   screen today on your computer -- and I hear
22   Alan getting ready to object that I am asking

31 (Pages 118 to 121)

Harry Sporidis

Page 134

1    Q. And are you currently rendering
2  services to Mentor and ASCO?
3    A. I am.
4    Q. I think we will get into this a
5  little bit later.
6        Although you haven't told me what
7  your understanding is of section 6(a)(ii), do
8  you have any reason to believe that your
9  understanding would have been different in
10  2005 had you seen this document?
11        MR. STRASSER: Different than what?
12        THE WITNESS: Yes, different than
13  what?
14        BY MR. GREENBERG:
15    Q. Different than what it is now.
16    A. I'm not sure I understand that.
17    Q. Well, you said you have an
18  understanding of section 6(a)(ii), right?
19  Although your attorney instructed you not to
20  tell me what that is.
21    A. I have an understanding of it.
22    Q. Okay. Do you have any reason to

Page 135

1  believe your understanding would have been
2  different two years ago had you read this
3  document?
4    A. I don't think so.
5        (Recess.)

Page 136

1        AFTERNOON SESSION
2            (1:16 p.m.)
3  Whereupon,
4        HARRY SPORIDIS,
5  was recalled as a witness and, having been
6  previously duly sworn, was examined and
7  testified further as follows:
8  EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9        BY MR. GREENBERG:
10    Q. Mr. Sporidis, as you sit here
11  today, is it your understanding now that you,
12  in fact, received an award of stock and
13  accepted it on July 27, 2005?
14    A. That's what I have been told.
15    Q. And do you have any reason to doubt
16  that that's accurate?
17    A. At this point, I mean, that's --
18  again, that's what I have been told.
19    Q. But do you doubt that that's, in
20  fact, the case?
21    A. Apparently there's 300 shares of
22  stock that -- or what is it? I don't even

Page 137

1  know how many shares of stock vested, so...
2    Q. Can you say with certainty that you
3  never accepted a grant of stock via Fidelity's
4  website?
5    A. I've accepted stock via Fidelity
6  website using net shares.
7    Q. I guess my question to you is, as
8  opposed to instructing Fidelity as to how to
9  pay the costs of vesting shares as those
10  shares vested, are you able to say that you
11  have never accepted a new grant of stock via
12  the website?
13    A. The only thing I have ever done on
14  the Fidelity website, David, is do net shares.
15  I have gone on and I have selected net shares
16  in terms of taking out my taxable income.
17  That's what I've done on the Fidelity website.
18    Q. Okay. So you're saying that you're
19  able to say with certainty that you never
20  accepted a new grant of stock?
21    A. I don't recall ever accepting a new
22  grant of stock.

35 (Pages 134 to 137)

Harry Sporidis

Page 138

1    Q.  You don't recall or you're sure you
2  did not?
3    A.  I don't recall ever accepting a new
4  grant of stock.
5    Q.  When did you begin looking to leave
6  The Washington Group?
7    A.  Well, it's an interesting question.
8  My options --
9    Q.  Thank you.
10    A.  -- have always been open, so -- I
11  was toying with the idea maybe about a year
12  ago.
13    Q.  Why was that?
14    A.  Well, I have two-year-old daughter.
15  I have two six-month-old baby boys.  I have a
16  wife that doesn't work.  So, yes, I have a lot
17  of things to think about.
18    Q.  So you're telling me that it was a
19  financial consideration?
20    A.  Yes, it is.
21    Q.  Any other reason?
22    A.  There were some other reasons.

Page 139

1  I'm -- you know, I'm not -- I wasn't overly
2  enthused in the direction that was firm was
3  going.
4    Q.  Where was that?  Where was the firm
5  going?
6    A.  A lot of people were leaving the
7  firm, David, and very little communication to
8  back up why these people were leaving the
9  firm.  About one person every three months, it
10  seems like, on average.
11    Q.  When you say very little
12  communication, you mean from upper management?
13    A.  Correct.
14    Q.  So there was -- one of the reasons
15  you wanted to leave was people were leaving
16  and nobody was explaining to the remaining
17  staff why?
18    A.  Correct.
19    Q.  And did you speak with any of those
20  people who left?
21    A.  I tried -- oh, with people who
22  left?

Page 140

1    Q.  People who left.
2    A.  I have spoken to some people who
3  have left.
4    Q.  Who have you spoken to about their
5  departure?
6    A.  I haven't spoken to them
7  specifically about their departure, but I have
8  spoken to people who have left.  I have spoken
9  to Richard Sullivan.
10    Q.  And did you discuss with Richard
11  his reasons for leaving?
12    A.  No, I did not.
13    Q.  So if I understand what you just
14  said correctly, you haven't actually talked
15  with any of the people who left about the
16  specific reasons why --
17    A.  No.  No, I have not.  No.
18    Q.  So financial considerations were a
19  part of your calculation and many people were
20  leaving without learning why.  Any other
21  reasons why you were looking to leave?
22    A.  That's about it.

Page 141

1    Q.  How did you go about looking for a
2  new job?
3    A.  I spoke to some friends about what
4  possibilities or what opportunities might be
5  available and went from there.
6    Q.  Who did you speak to?
7    A.  You know, David, I have a lot of
8  friends in this town, so I -- you know, I
9  don't know if I can really distill it down.  I
10  mean, I talked to a few different people.
11  Spoke to Jeff McKinnon.
12    Q.  Who is he?
13    A.  He is another lobbyist here in
14  town.
15    Q.  Is he with a firm?
16    A.  Yes, he is.
17    Q.  Which firm is he with?
18    A.  You know, I don't know the name
19  right off the top of my head.  It's Ryan,
20  Utrecht and McKinnon, I think.  I'm not -- I
21  don't remember it right off the top of my
22  head.  I apologize.  And spoke to some other

36 (Pages 138 to 141)

Harry Sporidis

Page 162

1  office --
2      A.  Yes.
3      Q.  -- of Powell, Goldstein?
4      A.  Yes.
5      Q.  And can you describe for me the
6  context of that conversation with Alan Parver?
7      A.  He asked me if I had a noncompete,
8  and I told him I did not have a noncompete.
9      Q.  What were you there for?
10     A.  We were discussing, you know,
11  possible -- my possibly joining Powell,
12  Goldstein.
13     Q.  Did he specifically say noncompete?
14     A.  I don't remember what he
15  specifically said.
16     Q.  Do you remember what you
17  specifically said?
18     A.  I said I don't -- I have no --
19  there are no noncompetes at The Washington
20  Group.
21     Q.  And did you specify -- did you make
22  a distinction between a noncompete or

Page 163

1  nonsolicitation agreement, nonservice
2  agreement?
3      A.  No.
4      Q.  You just said noncompete?
5      A.  Noncompete.
6      Q.  Okay.  And what did he say after
7  you told him that?
8      A.  It was the end of the conversation.
9  Nothing else was said.
10     Q.  Nothing else was said.  You just --
11  you left after that?
12     A.  That was it.
13     Q.  I am noticing Exhibit 9 is dated
14  October 17, 2007.  Is that the date -- when
15  did you receive Exhibit 9?
16     A.  October 17, 2007.
17     Q.  Okay.  Was there a formal offer
18  letter sent to you prior to this one?
19     A.  This is it.
20     Q.  Okay.  So when did you learn that
21  you were getting an offer from Powell,
22  Goldstein?

Page 164

1      A.  September 24.
2      Q.  And how was that communicated to
3  you?
4      A.  Verbally.
5      Q.  Okay.  And the first written
6  communication you had about that was this
7  letter?
8      A.  Correct.
9      Q.  Okay.  Did there come a time when
10  you notified The Washington Group that you
11  were leaving?
12     A.  September 26.
13     Q.  Who did you notify?
14     A.  Susan Molinari.
15     Q.  And was that like in the morning?
16  In the evening?
17     A.  I believe it was late morning,
18  early afternoon.
19     Q.  Describe that for me, if you would.
20     A.  Well, I went into Susan's office.
21  I was -- I went into Susan's office and I sat
22  down with her.  I told her I needed to speak

Page 165

1  with her.  We sat down together and we chatted
2  for a while.  And I told her -- I said that I
3  had two options that I was seriously
4  considering, one partnering up with a friend
5  of mine and the other going with a law firm.
6  And I had decided that I would probably go
7  with option B of going with the law firm.  And
8  she was very happy to hear about the decision
9  that I made.
10         She said that if -- she thought it
11  was the right decision for me and my family.
12  She said that she supports me in the decision.
13  And she told me at that point, you know, I
14  want this transition to be easy for you.  Let
15  your clients know to put -- submit their
16  termination notices in.  Rob Lorfink is a
17  stickler on the 30-day -- Rob Lorfink is the
18  CFO of Ketchum.  He is a stickler on the
19  30-day termination, so, you know, make sure
20  that they -- you know, you get the 30-day
21  termination notices in, and also make sure to
22  let Paul Lobo know about what you're doing and

42 (Pages 162 to 165)

Harry Sporidis

Page 170

1    too.
2        Q.  Okay.  And I believe you testified
3    she told you to speak to Paul Lobo?
4        A.  She did.
5        Q.  Okay.  And did you do that?
6        A.  I did that the next day.
7        Q.  And that was the 27th?
8        A.  Correct.
9        Q.  Tell me about that conversation.
10       A.  I walked into the office.  It was
11   the first thing I did.  I walked in and I went
12   into Paul's office and I said, I have
13   something to talk to you about.  And he looked
14   at me, and I knew as soon as he looked at me
15   that he already knew what I had to talk to him
16   about.
17           And I said, Susan talked to you,
18   didn't she?  And he said, yes, she did.
19           And I said, well -- I said, I am
20   going to be leaving the firm.  He said, I
21   know.  He said, Susan wants your transition to
22   be as easy as possible.  He said, Harry, just

Page 171

1    get your clients to terminate the contracts.
2    An e-mail would suffice, he said to me.  Just
3    have them e-mail a termination.  That's all we
4    need, but have that done sooner rather than
5    later so the clock can start ticking.
6        Q.  He told you that at this first
7    meeting with him after he spoke to Susan?
8        A.  Yes.
9           MR. GREENBERG:  Can you read back
10   that answer -- the one before that?
11          (The reporter read the record as
12   requested.)
13          BY MR. GREENBERG:
14       Q.  Did Paul mention with you in that
15   conversation the possibility that you might be
16   subject to restrictive covenants?
17       A.  No.
18       Q.  At no time during that
19   conversation?
20       A.  No.
21       Q.  Did you and Paul discuss the
22   possibility that you had restrictive covenants

Page 172

1    anytime that day?
2        A.  No.
3        Q.  Did you discuss sending a message
4    to the other people at The Washington Group?
5        A.  We did.
6        Q.  And what did you discuss about
7    that?
8        A.  He asked how he would like us to
9    communicate this with the rest of the firm.  I
10   had suggested that maybe it would be better if
11   I send out an e-mail, office-wide e-mail so
12   nobody feels slighted that I didn't go to them
13   directly.  And he thought that was a good
14   idea.  And prior to sending that e-mail out, I
15   had him review it first.
16       Q.  And did he -- when did you have him
17   review that?
18       A.  That was later in the afternoon,
19   shortly before I had sent it -- you probably
20   have the e-mail, so --
21       Q.  We will take a look at it in a
22   minute.

Page 173

1        A.  Yes, take a look at the time there.
2        Q.  And what did he say upon reviewing
3    the e-mail?
4        A.  He said, it's fine.
5        Q.  Did he tell you to send it?
6        A.  Uh-huh.
7        Q.  And he didn't tell you to hold off
8    on sending it?
9        A.  No, he did not.
10       Q.  Did you discuss the potential that
11   you were subject to restrictive covenants with
12   anybody at The Washington Group that day?
13       A.  No.
14       Q.  When was the first time you spoke
15   with someone at The Washington Group about the
16   potential -- about the possibility that you
17   were subject to restrictive covenants?
18       A.  Friday the 28th, in the morning.
19       Q.  So the following day in the
20   morning.  Who did you speak with then?
21       A.  Paul Lobo came in and talked to me.
22          (Deposition Exhibit No. 10 was

44 (Pages 170 to 173)

Harry Sporidis

Page 186

1    Q.  What was the context of that
2  discussion?
3    A.  He just brought it up, unsolicited.
4    Q.  Out of nowhere?
5    A.  Out of nowhere.
6    Q.  And this was about --
7    A.  This was a couple of years ago.  He
8  was here in town and I was taking him around
9  to Hill meetings.
10    Q.  Okay.  Did there come a time that
11  you notified ASCO that you were leaving The
12  Washington Group?
13    A.  There came a time that I notified
14  ASCO that I was considering leaving The
15  Washington Group, yes.
16    Q.  When was that?
17    A.  This was -- I don't remember
18  exactly when it was, but Deborah Kamin had
19  asked me -- at one time the conversation --
20  Deborah Kamin had said to me, if you are ever
21  thinking of leaving The Washington Group, I
22  want you to let me know; I want you to give me

Page 187

1  plenty of lead time so we can follow you out
2  the door.
3    So I let Deborah know that nothing
4  was in stone, but there was a possibility of
5  my leaving The Washington Group.
6    Q.  And you don't recall when that was?
7    A.  I don't recall.
8    Q.  Was it six months before you left?
9    A.  I don't -- I don't recall.
10    Q.  You can't recall with any
11  generality?
12    A.  I don't recall.
13    Q.  And did you discuss that issue with
14  them after that conversation?
15    A.  Yes.  As we came closer to -- after
16  the September 12 meeting down in Atlanta, I
17  had spent a day with Shelagh Foster and
18  Dr. Alan Lichter, the president and CEO of
19  ASCO.  We were on the Hill all day doing our
20  round of Hill meetings.  And at the end of the
21  day I told Shelagh that the possibility might
22  actually happen.  But nothing was in stone, I

Page 188

1  told her.
2    Q.  This was after you went to Atlanta?
3    A.  Yes.  This was on September 18.
4  But, again, I told her nothing was in stone.
5    Q.  What did -- I'm sorry.  You were
6  speaking with Shelagh Foster and Deborah Kamin
7  at that time?
8    A.  No.  It was just Shelagh.
9    Q.  Just Shelagh?  What did Shelagh say
10  in response?
11    A.  She sounded very happy for me.
12    Q.  Did she say anything specific?
13    A.  She said, that's great.  It's a
14  great firm.
15    Q.  Any discussions with anyone else
16  around that time?
17    A.  No.
18    Q.  I meant at ASCO, of course.
19    A.  No.  Not at that point, no.
20    (Deposition Exhibit No. 13 was
21  marked for identification.)
22    BY MR. GREENBERG:

Page 189

1    Q.  Do you recognize this document?
2    A.  I do.
3    Q.  Can you identify it, please?
4    A.  It's an e-mail that was sent -- I
5  believe it started from Shelagh to me and then
6  I responded.
7    Q.  What are you basing that on?
8    A.  Well, because this is a response.
9    Q.  What is?  The second message is a
10  response?
11    A.  Yes, the second message I believe
12  is a response, but I'm not -- I am pretty sure
13  the second message is a response.
14    Q.  So you believe there is another
15  message somewhere from Shelagh Foster?
16    A.  Yes, I'm not sure.  Or she might
17  have called me, actually.
18    Q.  She might have called you?
19    A.  She might have called me and left
20  me a voice mail message.
21    Q.  And what did you -- what was the
22  message?  Do you recall the message?

48 (Pages 186 to 189)

Harry Sporidis

Page 190

1    A.  The message -- the voice mail
2  message was, do you have a noncompete and do
3  they represent any big pharma or tobacco
4  clients?  And I responded by saying, no
5  noncompete and no tobacco or pharma companies.
6    Q.  When you say "they" have no tobacco
7  companies --
8    A.  Powell, Goldstein.
9    Q.  -- you're referring to Powell,
10  Goldstein?
11    A.  Correct.
12    Q.  And did you inquire at that time as
13  to whether you had a noncompete, or you just
14  took it as knowledge that you had none?
15    A.  I had been consistently told at The
16  Washington Group that I have no noncompete or
17  any restrictive covenant.
18    Q.  Was this the first conversation you
19  had with Shelagh Foster after telling her that
20  you were considering leaving to go to Powell,
21  Goldstein?
22    A.  I don't know.

Page 191

1    Q.  Do you remember if you spoke on
2  more than one occasion after going to Atlanta
3  with Shelagh Foster?
4    A.  I don't know.
5    Q.  Did you suggest to Shelagh Foster
6  that ASCO should follow you to Powell,
7  Goldstein?
8    A.  No, I did not suggest that ASCO
9  should follow me to Powell, Goldstein.
10    Q.  Did you discuss that issue
11  specifically with her?
12    A.  I did not discuss that issue
13  specifically with her.
14    Q.  Did you discuss that with Deborah
15  Kamin around this time?
16    A.  No, I did not discuss it with
17  Deborah Kamin around this time.
18    Q.  And you never suggested to Deborah
19  that ASCO should follow you to --
20    A.  I did not.
21    Q.  Did you ever suggest that to
22  anybody at ASCO?

Page 192

1    A.  Not that I know of, no.
2    Q.  And was this message the first
3  communication you had with the possibility
4  that you had a noncompete -- strike that.
5  That's a bad question.
6      Was this message the first
7  communication you had with ASCO about whether
8  or not you were subject to a noncompete?
9    A.  Correct.
10    Q.  It was?
11    A.  This was the -- yes, this was the
12  first message.  They asked me.
13    Q.  Yes, this was the first -- the
14  message to which you were responding was the
15  first time they had asked about that?
16    A.  Correct.
17    Q.  Do you have an understanding why
18  they were asking about tobacco companies?
19    A.  Well, it's the American Society of
20  Clinical Oncology so, I mean, there would be a
21  bit of conflict there.
22    Q.  Conflict of interest?

Page 193

1    A.  Yes.
2    Q.  And pharmaceutical companies?
3    A.  Well, again, it's the American
4  Society of Clinical Oncology; they dispense a
5  lot of pharmaceuticals, so.
6    Q.  Did you have an understanding as to
7  why they were asking you as to whether you had
8  a noncompete?
9    A.  No.
10    Q.  Did you ask them why they were
11  asking?
12    A.  No.
13    Q.  Subsequent to this message, did you
14  discuss the issue of noncompetes with them
15  again?
16    A.  No.
17      (Deposition Exhibit No. 14 was
18  marked for identification.)
19      BY MR. GREENBERG:
20    Q.  Do you recognize Exhibit 14?
21    A.  I do.
22    Q.  Can you identify it?

49 (Pages 190 to 193)

Page 202

1          BY MR. GREENBERG:
2          Q.  Can you identify Exhibit 17?
3          A.  These are e-mails from me to Cindi
4    Berry and responses, and then an e-mail to
5    Shelagh Foster.
6          Q.  Take a look at the earliest message
7    in the chain, which is --
8          A.  "Again my apologies"?
9          Q.  Yes.
10         A.  Okay.
11         Q.  Had you been having previous
12    discussions with Cindi Berry about Mentor and
13    ASCO?
14         A.  I had, I believe, earlier that
15    morning.
16         Q.  And what did you discuss?
17         A.  I don't remember.
18         Q.  Did you discuss talking with Mentor
19    and ASCO about coming to Powell, Goldstein?
20         A.  I believe I had, yes.
21         Q.  And can you recall any of the
22    details of that conversation?

Page 203

1          A.  I can't, no.
2          Q.  And can you recall, in relation to
3    your conversation with Sue Molinari when was
4    the first time you discussed with Cindi Berry
5    moving Mentor and ASCO to Powell, Goldstein?
6          A.  It was after I spoke with Susan.
7          Q.  After you spoke with Susan was the
8    first time you spoke with Cindi about --
9          A.  We actually started getting the
10    ball rolling, yes.
11         Q.  Tell me about that conversation.
12    Was it on the phone?
13         A.  I believe it might have been on the
14    phone.  And I, you know, told her it was a
15    great conversation.  I had a great -- had a
16    great meeting with Susan, and I told her what
17    Susan said.
18         Q.  Cindi you're talking about?
19         A.  Yes.
20         Q.  And what did Cindi say in response?
21         A.  She said, that's fantastic.  I
22    said, yes, it's fantastic.

Page 204

1          Q.  What's fantastic?
2          A.  What a great conversation I had
3    with Susan.
4          Q.  Okay.  And what did you discuss
5    with her about Mentor and ASCO?
6          A.  About getting new letters of
7    engagements.
8          Q.  What did you say?
9          A.  That we should probably send those
10    out sooner rather than later.
11         Q.  And was that you -- did you
12    volunteer that or did Cindi ask you about it?
13         A.  No, I volunteered that.
14         Q.  What did she say?
15         A.  She said, okay.
16         Q.  Okay.  And then I gather
17    subsequently she asked you to provide --
18    strike that.
19              Did she ask you to provide copies
20    of their current contracts?
21         A.  No, she did not.
22         Q.  That was your idea?

Page 205

1          A.  That was my idea.
2          Q.  Take a look at the earliest message
3    again --
4          A.  Uh-huh.
5          Q.  -- where it says, "Attached is the
6    agreement" --
7          A.  Okay.
8          Q.  Do you see that?  You say in the
9    e-mail, "Attached is the agreement I have had
10    with Mentor Corporation."
11         A.  Uh-huh.
12         Q.  Was the agreement that you sent
13    her, in fact, the agreement between Mentor and
14    The Washington Group?
15         A.  It was the agreement that I had
16    drafted for Mentor and The Washington Group,
17    yes.
18         Q.  Okay.  So The Washington Group was
19    the party in the contract with Mentor, not
20    you?
21         A.  It was the agreement that I had
22    drafted for The Washington Group and Mentor,

52 (Pages 202 to 205)

Harry Sporidis

Page 206

1    yes.
2        Q.   Okay.  But what I am asking you is
3    the parties to the contract were Mentor and
4    The Washington Group, correct?
5        A.   Okay.
6        Q.   Is that correct?
7        A.   Correct.
8            (Deposition Exhibit No. 18 was
9    marked for identification.)
10           BY MR. GREENBERG:
11       Q.   Do you recognize Exhibit 18?
12       A.   I do.
13       Q.   Can you identify it, please?
14       A.   It's an e-mail chain between me and
15   Josh Levine, CEO of Mentor Corporation.
16       Q.   And taking a look at the earliest
17   message --
18       A.   Yes.
19       Q.   -- what's the topic of that
20   message?
21       A.   That is regarding the American
22   Society of Plastic Surgeons' proposal and

Page 207

1    asking Josh if he would like to see a copy.
2        Q.   And was it the same proposal you
3    had submitted on behalf of The Washington
4    Group?
5        A.   Yes, earlier in August.  Yes.
6        Q.   It looks like Levine asked you to
7    please see a copy of the proposal.
8        A.   Yes.
9        Q.   Did you send it to him?
10       A.   I did, after it was completed.
11           (Deposition Exhibit No. 19 was
12   marked for identification.)
13           BY MR. GREENBERG:
14       Q.   What is Exhibit 19?
15       A.   I believe this is an e-mail from me
16   to Bill Seward and Khatereh at the American --
17   and Dr. Scot Glasberg at the American Society
18   of Plastic Surgeons.
19       Q.   And what's attached to this e-mail?
20       A.   That would be the proposal that was
21   prepared by Powell, Goldstein.
22       Q.   And did you prepare this?

Page 208

1        A.   I did not.
2        Q.   Who prepared this?
3        A.   I believe Julius Hobson prepared
4    this.
5        Q.   Did you assist in preparing this?
6        A.   I did not.
7        Q.   Did you prepare a document to be
8    submitted --
9        A.   I did not.
10       Q.   You didn't?
11       A.   I prepared a document for The
12   Washington Group to be submitted.  This is not
13   the same document that was submitted from The
14   Washington Group.
15       Q.   It's not?
16       A.   No, it's not.
17       Q.   Okay.  Did you provide The
18   Washington Group's proposal to Powell,
19   Goldstein?
20       A.   I did not.  I provided maybe one
21   page of the proposal to Powell, Goldstein, but
22   that was about it.

Page 209

1        Q.   Okay.  What was the purpose of
2    that?
3        A.   Just to show one bulleted section
4    in terms of government relations.
5        Q.   But then, after that, you didn't
6    participate in preparing that?
7        A.   I did not.
8        Q.   Back to Exhibit 18, I'm looking at
9    Josh Levine's message back to you after your
10   initial message.
11       A.   Uh-huh.
12       Q.   It says he "would like to see a
13   copy of the proposal," as we discussed.  "Can
14   you identify the name of the firm you're
15   moving to?"
16       A.   Right.
17       Q.   Okay.
18       A.   On September 27.
19       Q.   Right.
20       A.   Right.
21       Q.   Did you have any conversations with
22   him outside of this e-mail chain prior to

53 (Pages 206 to 209)

Harry Sporidis

Page 210

1  responding?
2      A.  No, I did not.
3      Q.  Did he tell you at this time that
4  he wanted to follow you to Powell, Goldstein?
5      A.  No, he had told me that on
6  the 26th.
7      Q.  On the 26th?
8      A.  Yes.
9      Q.  And that was after you --
10     A.  That was after I spoke to Susan
11  Molinari.
12     Q.  Then you spoke to him?
13     A.  Correct.
14         (Deposition Exhibit No. 20 was
15  marked for identification.)
16         BY MR. GREENBERG:
17     Q.  Do you recognize Exhibit 20?
18     A.  Yes.
19     Q.  Identify it, please.
20     A.  It's an e-mail from Cindi Berry to
21  me asking if I could take a look at the
22  engagement letter to Josh Levine at Mentor

Page 211

1  Corp.
2      Q.  And then attached to it?
3      A.  Is the -- is the letter of
4  engagement.
5      Q.  And who drafted the letter of
6  engagement?
7      A.  I believe it was Cindi Berry.
8      Q.  And do you know if she based it on
9  the information you had provided?
10     A.  I don't think she did.  I think
11  they already have boilerplate language.
12     Q.  And what was your response to this?
13     A.  I thought it looked good.
14     Q.  Do you know if she, in fact, sent
15  them?
16     A.  I believe she did.
17     Q.  Do you know when she did that?
18     A.  I don't know.
19         (Deposition Exhibit No. 21 was
20  marked for identification.)
21         BY MR. GREENBERG:
22     Q.  Do you recognize this?

Page 212

1      A.  I do.
2      Q.  And what is 21?
3      A.  This is my forwarding Josh Levine's
4  termination message to Cindi Berry.
5      Q.  And the initial message, that's
6  from Josh Levine to you?
7      A.  Correct.
8      Q.  And that was in response to your
9  request that he sent you a notice of
10  termination?
11     A.  Correct, at the behest of Susan
12  Molinari and Paul Lobo.
13     Q.  And then you forwarded that initial
14  termination to Cindi Berry, correct?
15     A.  Correct.
16     Q.  And is it your recollection that
17  that took place after she had sent you the
18  draft letter for Mentor?
19     A.  That I don't -- let me take a look
20  here.
21         No.  She sent me the draft letter
22  from Mentor, it looks like, a little bit

Page 213

1  before.
2      Q.  She sent the draft letter before
3  the notice of termination?
4      A.  Well, what time is the notice of
5  termination?  What is 1919?  What would that
6  be?  Military time.
7      Q.  That's 7 --
8         MR. STRASSER:  7:19.
9         BY MR. GREENBERG:
10     Q.  7:19.
11        MR. STRASSER:  P.M.
12        THE WITNESS:  Okay.  So she had the
13  engagement letter drafted before the
14  termination notice came out.
15        BY MR. GREENBERG:
16     Q.  And had you discussed Mentor's
17  termination with her before sending her this
18  message?
19     A.  I probably did.
20     Q.  Do you remember what you discussed?
21     A.  No, I don't.
22     Q.  Do you remember when it was that

54 (Pages 210 to 213)

Harry Sporidis

Page 214

1    you discussed it?
2        A.  It was after I spoke to Susan
3    Molinari.
4        Q.  And why were you asking if you
5    should come over tomorrow just to visit with
6    Cindi?
7        A.  You know, I don't remember why I
8    wanted to go over there.  I think it was just
9    the excitement of a new employer.
10       Q.  You say in the e-mail -- that's
11   Exhibit 21 -- "I was hoping we could Fed-Ex a
12   new agreement to Josh sometime tomorrow."
13           Were you referring to the
14   attachment to Exhibit 20?
15       A.  Possibly.  Yes, probably.
16       Q.  Do you know if that was, in fact,
17   sent out by Fed-Ex?
18       A.  I don't know if it was sent out by
19   Fed-Ex on that day.  I have no idea.
20           (Recess.)
21           (Deposition Exhibit No. 22 was
22   marked for identification.)

Page 215

1        BY MR. GREENBERG:
2        Q.  Do you recognize Exhibit 22?
3        A.  I do.
4        Q.  Can you identify it, please?
5        A.  I believe this is part of the same
6    e-mail chain that you had just showed me.
7    Included on top is an e-mail from Cindi Berry
8    to me, and then my e-mail in response to her.
9        Q.  And does this indicate that she
10   sent the contracts as you requested, or that
11   she planned to do so?
12       A.  No, it doesn't.  It says that she
13   has e-mailed me a draft letter and contract
14   terms, and to review and let me know if I have
15   any -- let her know if there's any changes.
16   And then she says, "Once you approve the
17   content, I will sign it and Fed-Ex it."
18           And then she says of course I'm
19   always welcome to come over.
20       Q.  Okay.
21       A.  And then I say, "Thanks.  You're
22   the best."

Page 216

1        Q.  Okay.  She mentions that she made
2    the agreement effective as of October 24 even
3    though it's not 30 days from that date.  Do
4    you see that?
5        A.  I do see that.
6        Q.  Do you know why --
7        A.  I don't know why.
8        Q.  Well, my question was going to be,
9    do you know why she made it effective on
10   October 24?
11       A.  I don't know why.
12       Q.  Okay.
13       A.  I don't know why.
14       Q.  Did you answer [sic] her about
15   that?
16       A.  No.  I didn't even notice that, to
17   be honest with you.
18       Q.  Do you recall reviewing the draft
19   letter?
20       A.  I reviewed it.  I browsed it very
21   quickly.
22       Q.  And then did you get in touch with

Page 217

1    her again?
2        A.  I told her I thought it was okay.
3        Q.  Let's take a look back at
4    Exhibit --
5        A.  I have up to 15 here.
6        Q.  -- 5.  This is it here.
7        A.  I don't have 5 -- yes.
8        Q.  If you turn to paragraph 24.
9        A.  Okay.
10       Q.  Is it your testimony that ASCO and
11   Mentor have continuing needs that will be
12   unmet if you don't continue to represent them?
13       A.  I believe so.
14       Q.  Can you explain the basis for that
15   belief?
16       A.  I have been the sole person working
17   on those two clients since they have come to
18   the group.  I have the institutional knowledge
19   that these clients need to move forward.
20       Q.  Is it your testimony that you don't
21   believe The Washington Group could provide the
22   services that those clients want to receive?

55 (Pages 214 to 217)

Harry Sporidis

Page 218

1     A.  In the past when I tried to
2  integrate other people from The Washington
3  Group into these clients, I wasn't getting the
4  assistance or the interest.  So judging from
5  my past experience, I don't think so.
6     Q.  You don't think that The Washington
7  Group can provide the services --
8     A.  I don't.
9     Q.  -- that they need?
10     A.  I don't.
11     Q.  What services does ASCO want that
12  The Washington Group can't provide, in your
13  estimation?
14     A.  Continued strategic thinking.
15     Q.  And you're the only one that was at
16  The Washington Group that could provide that?
17     A.  I mean, I'm sure there's other
18  people at The Washington Group that could
19  provide it if they had shown some interest in
20  it.
21     Q.  So then you do believe that there
22  are other people qualified to service --

Page 219

1     A.  Not necessarily --
2     Q.  -- those clients?
3     A.  -- no, I don't.
4     Q.  Well, you say that there are other
5  people there that are qualified, but at the
6  same time you're saying --
7     A.  There might be some other people
8  there that are qualified, but they're
9  completely overtaxed at the moment and would
10  not be able to handle these two clients, no.
11     Q.  So it's a matter of workload, not
12  of ability?
13     A.  I suppose.
14     Q.  So then it's not a matter of
15  qualifications?
16     A.  I don't know qualifications.
17  Explain.
18     Q.  Meaning -- what I just heard you
19  testify, unless I've misheard what you said,
20  is that you believe there are other qualified
21  individuals there, but you don't believe that
22  they have the time to devote to the clients

Page 220

1  that you did?
2     A.  I think there are some people there
3  that, if they had the time to devote to these
4  clients, might be successful.  But I'm not
5  certain of that, no.
6     Q.  Okay.  Do you believe that there
7  are no -- outside of The Washington Group, do
8  you believe that there is nobody else in the
9  industry that's qualified to service these
10  clients?
11     A.  I can't say that.
12     Q.  What I am getting at is,
13  Mr. Sporidis, is there something unique about
14  your qualifications that you believe these
15  clients can't get from anyone else?
16     A.  Well, I provide my clients, David,
17  with constant and continued information,
18  nonstop.
19     Q.  And are you the only one that does
20  so at The Washington Group?
21     A.  Honestly, David, I don't know
22  who -- you know, other than maybe Rita Lewis,

Page 221

1  I don't know anybody else that does.
2     Q.  So do you believe that that's a
3  qualification that's unique to you?
4     A.  To some degree.
5     Q.  Anything else that makes you
6  uniquely suited to serve these two clients --
7     A.  Again --
8     Q.  -- other than your dedication to
9  the --
10     A.  -- the institutional knowledge that
11  I have for both of these clients.  I have done
12  all of the work for both of these clients,
13  Mentor for the past four or five years and
14  ASCO for the past three years.  Nobody else
15  there has done any of the work on these
16  clients, David.
17     Q.  Flesh out for me institutional
18  knowledge.  What do you mean by that?
19     A.  Everything that has transpired with
20  that client.
21     Q.  You're the only one with that
22  knowledge?

56 (Pages 218 to 221)

Harry Sporidis

Page 222

1    A.  Yes.
2    Q.  What about on the client's end?
3    A.  Well, the client obviously has that
4  knowledge.
5    Q.  If you were to cease practicing
6  government relations, do you believe that
7  their needs would be unmet?
8    A.  At The Washington Group, yes.
9    Q.  Anywhere?
10   A.  No.  I'm sure they could find
11 somebody else.
12   Q.  And the reason those needs would be
13 unmet at The Washington Group is solely
14 because of the amount of time you devoted to
15 them?
16   A.  The amount of time, but also the
17 lack of interest that people showed in
18 servicing those clients.
19   Q.  Anything else?
20   A.  That's it.
21   Q.  Did you inform other Washington
22 Group clients that you were leaving --

Page 223

1    A.  No.
2    Q.  -- or had left?
3    A.  No.
4    Q.  Just Mentor and ASCO were the
5  only --
6    A.  Correct.
7    Q.  -- two?
8       I'm sorry.  I have to ask you to
9  let me finish the question.
10   A.  I apologize.  The American Land
11 Title Association knows that I have left, but
12 there is no intention of the American Land
13 Title Association coming with me.
14   Q.  Okay.  But they're a client of The
15 Washington Group?
16   A.  They were a client of Ketchum and
17 The Washington Group, yes.
18   Q.  Okay.  So you notified them?
19   A.  Ed Miller is a very good friend of
20 mine.
21   Q.  Okay.
22   A.  We have a long-standing personal

Page 224

1  relationship.
2    Q.  Right.  Right.
3    A.  Yes.
4    Q.  When did they -- when were they
5  notified that you left?
6    A.  After I had received my -- after I
7  had talked to Susan.
8    Q.  So you had a conversation with them
9  to let them know --
10   A.  Right.
11   Q.  -- that you were leaving?
12   A.  No.  Ed called me that night at
13 home to talk to me about motorcycles because
14 we both ride Harleys.
15   Q.  All right.
16   A.  So he was going to pick me up a new
17 battery, which my wife doesn't want me to
18 have, but anyway -- that's not part of the
19 story.
20       MR. STRASSER:  But it was endlessly
21 fascinating.
22       THE WITNESS:  Yes, I know.

Page 225

1       BY MR. GREENBERG:
2    Q.  Can't blame her, really.
3    A.  Right.
4    Q.  Well, you do have young children.
5    A.  Exactly.
6    Q.  In the context of that phone call
7  about the motorcycles, you let him know, hey,
8  by the way, I'm leaving?
9    A.  Yes.
10   Q.  And what did he say?
11   A.  Good luck to you.  Good for you.
12   Q.  Anything else?
13   A.  That's it.
14   Q.  Any other clients that you can
15 think of?
16   A.  I only notified the Society of
17 Human Resource Management that I was leaving
18 the firm when Susan Molinari canceled the
19 Olympia Snowe meeting on October 31.
20   Q.  When did she cancel that?
21   A.  It's in the e-mails.  I can't
22 remember the day that she decided to cancel

57 (Pages 222 to 225)

Page 294

1    A.  No.
2    Q.  Are you currently servicing Mentor
3  Corporation --
4    A.  I am.
5    Q.  -- in your capacity as an employee
6  of Powell, Goldstein?
7    A.  I am.
8    Q.  Are you currently servicing ASCO as
9  an employee of Powell, Goldstein?
10    A.  I am.
11    Q.  Are you servicing any other
12  clients -- any other former clients of The
13  Washington Group?
14    A.  No, I am not.
15    Q.  Are you servicing any other current
16  clients of The Washington Group?
17    A.  No, I am not.
18    MR. GREENBERG:  I think we're
19  finished.  I would like to take one more short
20  break just to go back through and make sure I
21  haven't omitted anything, and then probably
22  we're going to come back and I am going to say

Page 295

1  we're done.
2    (Recess.)
3    BY MR. GREENBERG:
4    Q.  Mr. Sporidis, have you spoken with
5  any former employees of The Washington Group
6  about this lawsuit?
7    A.  I have spoken to a former employee
8  about the threat of a lawsuit, but not now
9  that the lawsuit has happened.
10    Q.  Who did you speak to?
11    A.  I spoke to Bill Burke.
12    Q.  What did you discuss with Bill
13  Burke?
14    A.  I just -- you know, he called me to
15  congratulate me for my move.  And I said, it
16  would be -- yes, I said, it would be a great
17  move if I didn't have a threat of a lawsuit
18  hanging over my head.
19    Q.  And what did he say?
20    A.  He couldn't believe it.  He said, I
21  can't believe that.  I said, well, it is what
22  it is.

Page 296

1    Q.  Did he elaborate on why he couldn't
2  believe it?
3    A.  No.
4    Q.  Did he say anything else?
5    A.  That was it.  And that's all I
6  discussed with Bill.
7    Q.  Did you say anything else on that
8  call?
9    A.  No.  No.
10    Q.  And he didn't say anything else
11  either?
12    A.  No.  He actually wanted to get
13  together for lunch.
14    Q.  Did you?
15    A.  No, I have not.  I have not.
16    And I have also discussed it -- I
17  have also talked to Richard Sullivan.  Richard
18  used to be a roommate of mine.  We lived
19  together for some time.  Told him -- calling
20  him to tell him I was leaving The Washington
21  Group, and I told him there might be a threat
22  of litigation, but I wasn't sure at that

Page 297

1  point.
2    Q.  What did he say?
3    A.  He said he couldn't believe that
4  there would be a threat of litigation.  I
5  said, well, it is what it is.
6    Q.  Did he tell you why he couldn't
7  believe it?
8    A.  Because things like this just don't
9  happen in this town, David.  They just don't.
10    Q.  He told you that?
11    A.  No, but that's -- I know that's
12  what he meant.
13    Q.  Did he tell you anything about what
14  he meant by "I can't believe it"?
15    A.  No.
16    Q.  Okay.  Did he say anything else on
17  that call?
18    A.  No.
19    Q.  Did you say anything else to him on
20  that call?
21    A.  No.
22    Q.  Did you speak to other employees of

75 (Pages 294 to 297)

Page 302

1    part of his team, and that they had no loyalty
2    to the Washington Group.
3        Q.  Right.  And that second sentence,
4    is that referring to a conversation you had
5    with him after your conversation with Susan
6    Molinari?
7        A.  This is after the conversation I
8    had with Susan Molinari, correct.
9        Q.  And there was no other conversation
10   in which you told him you were leaving The
11   Washington Group?
12       A.  No, no.  My conversation with Josh
13   was...
14       Q.  I see.
15       MR. GREENBERG:  That's all I have.
16
17       (Whereupon, signature not having
18   been waived, the taking of the deposition
19   concluded at 4:51 p.m.)
20
21
22

Page 303

1                * * *
2
3        ACKNOWLEDGMENT OF DEPONENT
4
5        I, Harry Sporidis, do hereby acknowledge I
6    have read and examined the foregoing pages of
7    testimony, and the same is a true, correct and
8    complete transcription of the testimony given
9    by me, and any changes and/or corrections, if
10   any, appear in the attached errata sheet
11   signed by me.
12
13
14   Date            Signature
15
16
17
18
19
20
21
22

Page 304

1        CERTIFICATE OF NOTARY PUBLIC
2        I, Deborah Larson Hommer, RPR, the officer
3    before whom the foregoing deposition was
4    taken, do hereby certify that the witness
5    whose testimony appears in the foregoing
6    deposition was duly sworn by me; that the
7    testimony of said witness was taken by me in
8    stenotype and thereafter reduced to
9    typewriting under my direction; that said
10   deposition is a true record of the testimony
11   given by said witness; that I am neither
12   counsel for, related to, nor employed by any
13   of the parties to the action in which this
14   deposition was taken; and, further, that I am
15   not a relative or employee of any attorney or
16   counsel employed by the parties hereto, nor
17   financially or otherwise interested in the
18   outcome of the action.
19
         _____
         Notary Public in and for
20       the District of Columbia
     My Commission Expires:
21   October 14, 2008
22

Page 305

1
2    November 5, 2007
3    Alan D. Strasser, Esquire
4    Robbins, Russell, Englert, Orseck, Untereiner
     & Sauber, LLP
     1801 K Street, N.W.
5    Suite 411 L
     Washington, D.C.  20006
6
7    Re: The Washington Group v. Sporidis
         Deposition of Harry Sporidis
8
     Dear Mr. Strasser:
9
       Enclosed for review is your copy of the
10   above-referenced deposition.  Please have the
     deponent read the copy of the transcript and
11   sign the enclosed certificate of deponent.
     Also enclosed is an errata sheet which the
12   deponent should use to note corrections and
     the reasons for such corrections.  This and
13   any additional errata sheets should be signed
     and dated by the deponent.
14
       The deponent has thirty days in which to
15   read and sign the transcript.  After the
     deponent has reviewed the copy of the
16   transcript, please return the certificate of
     deponent and any errata sheets to 1020 19th
17   Street, Northwest, Suite 620, Washington, D.C.
     20036.
18
     Sincerely,
19
20
21   Deborah Larson Hommer, RPR
22

77 (Pages 302 to 305)

**Mersky, Craig**

| | |
|---|---|
| **From:** | Sporidis, Harry |
| **Sent:** | Tuesday, September 18, 2007 6:40 PM |
| **To:** | 'fosters@asco.org' |
| **Subject:** | Re: No non-compete |

No tobacco companies and they have no pharma companies

-----Original Message-----
From: Sporidis, Harry
To: 'fosters@asco.org' <fosters@asco.org>
Sent: Tue Sep 18 18:39:44 2007
Subject: No non-compete

1



PLAINTIFF'S
EXHIBIT
13
10-30-07

## Mersky, Craig

**From:**  Sporidis, Harry
**Sent:**  Thursday, September 27, 2007 2:22 PM
**To:**  'Shelagh Foster'
**Subject:** FW:

Shelagh,

Since I don't have a copy of the Ketchum contract, would you assist me on this?  Just let me know what you would like the scope of the agreement to be.

---

**From:** Berry, Cynthia [mailto:CBerry@pogolaw.com]
**Sent:** Thursday, September 27, 2007 2:14 PM
**To:** Sporidis, Harry
**Subject:** RE:

Can you tell me the specific issues and other pertinent info to be included in the ASCO contract?

Cynthia E. Berry, Esq.
Powell Goldstein LLP
901 New York Ave., NW
3rd Floor
Washington, DC 20001
(202) 624-3976
(202) 624-7222 (fax)

> -----Original Message-----
> **From:** Sporidis, Harry [mailto:hsporidis@thewashingtongroup.com]
> **Sent:** Thursday, September 27, 2007 1:39 PM
> **To:** Berry, Cynthia
> **Subject:**

Cindi,

Again, my apologies on not having you on the e-mails.

Attached is the agreement that I have had with Mentor Corp.

ASCO has also asked that we send out the agreement letter ASAP.  The Agreement should begin on October 24th for both ASCO and Mentor.

ASCO is $20k a month and Mentor is $25k a month.

The person that we need to send the letter to at ASCO is:

Deborah Kamin
Senior Director Cancer Policy and Clinical Affairs
1900 Duke Street
Suite 200
Alexandria, VA 22314



PLAINTIFF'S
EXHIBIT
17
6 3001

I am also forwarding you the e-mail that I sent to Josh Levine at Mentor.

**Harry Sporidis**
*The Washington Group*
*1401 K Street, NW*
*10th Floor*
*Washington, DC 20005*
*Phone: 202-789-2111*
*Fax:    202-789-4883*
*Mobile: 202-669-7399*

*www.thewashingtongroup.com*

This e-mail is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential or otherwise protected from disclosure. Dissemination, distribution or copying of this e-mail or the information herein by anyone other than the intended recipient, or an employee or agent responsible for delivering the message to the intended recipient, is prohibited. If you have received this e-mail by mistake, please delete it from your system immediately and notify helpdesk@thewashingtongroup.com.

NOTICE: This communication may contain privileged or other confidential information. If you are not the intended recipient, or believe that you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use the information. Also, please indicate to the sender that you have received this communication in error, and delete the copy you received.

IRS CIRCULAR 230 Disclosure: Under U.S. Treasury regulations, we are required to inform you that any tax advice contained in this e-mail or any attachment hereto is not intended to be used, and cannot be used, to avoid penalties imposed under the Internal Revenue Code.

Thank you.

# Material Redacted

**From:** scotbg@juno.com
**Date:** October 3, 2007 3:31:41 PM EDT
**To:** Harry Sporidis <sporidis@mac.com>
**Subject: Re: proposal**
**Reply-To:** scotbg@juno.com

Did you get this in yet?
------Original Message------
From: Harry Sporidis
To: Mr. William F. Seward
To: Khatereh Calleja
Cc: Dr. Scot Glasberg, M.D.
Sent: Oct 2, 2007 4:55 PM
Subject: proposal

You all should be receiving the updated proposals tomorrow.  Thank you for the extension due to my current circumstances.

Sent via BlackBerry by AT&T



**Prepared for:**
**AMERICAN SOCIETY OF**
**PLASTIC SURGEONS**

October 3, 2007

HS_000217

HS_000218



# Powell Goldstein LLP Proposal
# to the American Society of Plastic Surgeons
# for Government Relations Services

Powell Goldstein LLP is pleased to submit this proposal to the American Society of Plastic Surgeons ("ASPS") for federal government relations services. We have the qualifications, experience, vision, and desire to successfully position ASPS so that it can achieve its federal policy objectives, including those pertaining to Medicare (payments to ambulatory surgical centers and physician reimbursement), medical liability, appropriations, graduate medical education, and other health policy matters.

## Executive Summary

Powell Goldstein is comprised of a group of professionals with bipartisan political credentials, a reputation for integrity, a proven track record of success, and unparalleled knowledge of health care policy, particularly as it impacts physicians and their patients. We have helped shape laws affecting the Medicare and Medicaid programs, as well as laws that impact virtually all sectors of the health care sector.

We do not devise cookie-cutter strategies for our clients. Instead, we develop and implement strategies that match the client's specific needs with the political and policy interests of key lawmakers and Administration officials. We pride ourselves on our in-depth knowledge of the backgrounds, sensitivities, philosophies, and policy objectives of lawmakers. We have an insider's view of the political process. We know how to tailor arguments so that they are persuasive to particular audiences. This experience has enabled us to forge relationships on Capitol Hill and in the Administration that are built on trust and respect. These relationships have ensured that we are "in the room" when important policy decisions are made.

ASPS' primary point of contact will be Harry Sporidis. However, the Powell Goldstein/ASPS team also will include Cindi Berry, Chair of our Advocacy and Government Relations Practice, Julius Hobson, Jr., Senior Policy Advisor, Steven Stranne, MD, Partner, Tim Perrin, Legislative Analyst, and Alan Parver, Chair of our Washington Health Care Practice.

Our work plan for ASPS will include legislative and regulatory monitoring, intelligence gathering, and ongoing communications with ASPS executives and staff. It will involve the development and implementation of a targeted lobbying strategy, which will incorporate the time and talents of senior ASPS officials and board members where appropriate. We will assist the Executive Vice President in forging key Congressional relationships on both sides of the aisle. Among the tasks to be performed will be: preparation of advocacy materials; meetings with legislators, staff, and agency officials; and strengthening relationships with Members of Congress serving on committees with jurisdiction over issues of importance to ASPS.

1

## The Powell Goldstein/ASPS Team

Below you will find brief descriptions of the Powell Goldstein/ASPS team. Detailed bios of each member are attached. In addition to the individuals mentioned below, every attorney and professional with health care and advocacy expertise will be available to ASPS as needed.

- **Harry Sporidis, Senior Policy Advisor:** Harry will be joining Powell Goldstein on October 22, 2007. He currently is a senior vice president with The Washington Group, where he specializes in legislative and regulatory issues. He previously worked for former Reps. Jim Greenwood [R-PA], Mike Bilirakis [R-FL], and Clay Shaw [R-FL]. Harry brings many years of experience with Members of Congress and has issue expertise in health care, the environment, transportation, trade, energy and banking.

- **Cynthia Berry, Esq., Partner:** Cindi chairs the firm's Advocacy and Government Relations Practice and is co-chair of the Powell Goldstein PAC. Cindi previously worked for Senator Jon Kyl [R-AZ] and spearheaded his medical liability reform efforts in the U.S. House of Representatives. She served as Washington Counsel to the American Medical Association and was chair of the Health Care Liability Alliance's Legislative Drafting Committee. She was appointed as a member of the U.S. Department of Health and Human Services' Advisory Committee on Genetic Testing and the Secretary's Advisory Committee on Genetics, Health and Society. She was appointed by Governor James Gilmore (R-VA) to the board of directors of the Virginia Birth-Related Neurological Injury Compensation Program for two terms and served as Vice Chair of the Board.

- **Julius Hobson, Jr., Senior Policy Advisor:** Julius has over 35 years of experience both inside and outside of government. Prior to joining Powell Goldstein, he was the American Medical Association's top Congressional lobbyist, where he came to know the entire House and Senate Republican and Democratic Leadership, as well as the Chairs and Ranking Members of the key committees with responsibility for health care policy. He previously worked in the House for then-Rep. Walter Fauntroy [D-DC] and in the Senate for Senator Charles Robb [D-VA]. He was chief lobbyist for the District of Columbia government and Howard University. Julius also served as member, vice chair, and chair of the previous D.C. Health and Hospitals Public Benefit Corporation, the governing board for the public hospital and clinics.

- **Steven Stranne, MD, Esq., Partner:** As a physician and attorney, Steve has an in-depth understanding of how federal policies affect the practice of medicine. He has experience in developing and implementing regulatory, legislative and strategic initiatives for providers, health care manufacturers, associations, and patient groups, as well as conducting health care policy research.

- **Alan Parver, Esq., Partner:** Alan is chair of the Washington Health Care Practice Group. He focuses his practice on counseling physicians, long-term care entities, infusion pharmacies, and home care clients on third-party reimbursement and coverage. He has particular expertise in Medicare coverage and reimbursement for medical equipment and technology.

- **Tim Perrin, Legislative Analyst:** Prior to joining Powell Goldstein, Tim was a Government Affairs Representative at the American Association for Geriatric Psychiatry, a national advocacy

HS_000220

organization representing physicians and older adults. At Powell Goldstein, Tim is responsible for monitoring Congressional and Administrative activities, conducting legislative research, and developing and implementing lobbying strategies for a variety of clients.

## Issue Expertise

### Health Care

Powell Goldstein has an established track record in representing with distinction virtually every segment of the health care industry. Because of this work, we have close ties to Members of Congress and staff of all the committees of jurisdiction over health care: the Senate Finance and Health, Education, Labor and Pensions Committees; the House Ways and Means, Energy and Commerce, and Education and Labor Committees; and House and Senate Appropriations Committees. Our clients have included physicians, hospitals, nursing homes, home health agencies, pharmaceutical manufacturers, diagnostic and biotechnology companies, infusion therapy manufacturers and pharmacies, medical device manufacturers, medical equipment and service suppliers, telemedicine companies, managed care companies, preferred provider organizations, Medicare carriers, physician practice management companies, outpatient care providers, as well as trade associations representing many of the above entities. We work to shape federal legislation and regulations that affect the ability to bring health care services and products to patients and to secure coverage and appropriate reimbursement by various payers.

Our health care group includes professionals with clinical backgrounds. This affords us the ability to understand complex medical issues involved in a client's business, fashion cogent arguments based on clinical literature and practice, and translate those arguments into public policy recommendations. Several of our professionals have served in Congressional offices and in the Executive Branch. All have extensive policy and political experience that informs our strategic counsel. Our health care attorneys are thoroughly familiar with current laws and legislative history and are adept at legal analysis and legislative drafting. Our work in advising clients on health care operations matters is an enormous benefit in federal advocacy, as we are able to convey to policymakers the practical impact of proposed federal policies on the health care delivery system.

### Medicare

We have particular expertise in the area of Medicare policy. We have been involved in virtually all major Medicare legislative and regulatory initiatives, including the Medicare Prescription Drug, Improvement and Modernization Act (MMA). We drafted legislative language and provided input to the Centers for Medicare and Medicaid Services (CMS) to ensure coverage and fair reimbursement for infusion therapy services. Working within a broad coalition of pharmaceutical companies and patient and consumer advocacy groups, we devised and implemented a comprehensive legislative strategy to gain Medicare coverage of certain self-injectable drugs. We helped develop the chronic care improvement program and the new prevention benefits. We worked to secure higher payment rates and additional incentives for Medicare+Choice/Medicare Advantage Plans. We were responsible for a provision establishing special payment for brachytherapy. Since the early 1990s, we have been enmeshed in the many policy and logistical issues surrounding Medicare Part B competitive bidding. Currently, we are in regular communication with the responsible CMS officials regarding how competitive bidding might affect our clients and their patients. Because of our expertise, CMS has reached out to us on a number of

HS_000221

competitive bidding and related issues. For example, CMS asked that we prepare draft quality standards for two product areas that were released for public comment.

Our lawyers and legislative analysts routinely monitor legislative and regulatory developments in Medicare. Given the depth of our health care group, we are able to provide our clients with intelligence on the latest developments, and counsel on the best course of action in each circumstance.

## Health Insurance Coverage and Regulation

The growing ranks of the uninsured continues to be of interest and concern to voters and policymakers in Washington. We are very familiar with: the State Children's Health Insurance Program and proposed funding and eligibility expansions; the numerous health care tax credit proposals introduced in both the House and Senate, as well as the President's tax credit concept; the President's initiatives to enhance coverage through community health centers, broaden the availability of Health Savings Accounts, and ensure transparency in pricing and quality reporting; and proposals to move away from the employer-based model and toward an individual mandate for health insurance. We are able to analyze these proposals in detail for our clients and are able to help shape the debate.

We routinely advise clients on HIPAA compliance, including portability and privacy requirements. We have experience regarding issues and proposals pertaining to genetic non-discrimination.

## Reimbursement and Claims Processing

We assist our clients in resolving claims processing and reimbursement disputes. This "hands on" experience helps inform our federal and state advocacy efforts by allowing us to identify real life examples of problems with the implementation and interpretation of coverage, reimbursement and coding rules. Our reimbursement appellate team includes attorneys familiar with Medicare Part A and Part B appeals, as well as Medicaid reimbursement; a physician and a nurse capable of dealing with clinical issues; and attorneys with years of experience advising hospitals, pharmacies, drug manufacturers, nursing homes, medical equipment suppliers, clinics and home health agencies, physicians, laboratories and infusion therapy providers on coverage and reimbursement issues.

## Medicaid

For over two decades, Powell Goldstein attorneys have been actively engaged in Medicaid issues. For example, we assisted Congressional staff in developing the concept of "disproportionate share hospital" (DSH) adjustments under both Medicaid and Medicare in the early 1980s and helped to write the original legislation. Since that time, Medicaid and Medicare DSH have become irreplaceable sources of financial support for the mission of safety net hospitals. Powell Goldstein attorneys have been "at the table" in virtually every legislative and regulatory modification of the Medicaid program since the mid-1970's, right through the most recent amendments enacted in the Deficit Reduction Act of 2005. We worked with Senator Jon Kyl [R-AZ] to create an additional payment mechanism for hospitals providing emergency services to undocumented immigrants. We also secured in the MMA increased Medicaid disproportionate share hospital allotments.

4

HS_000222

Powell Goldstein has been at the forefront of both federal policymaking and state-based implementation. Our unique combination of federal legislative and regulatory experience in the evolution of Medicaid reimbursement policy and our technical involvement in the development of reimbursement programs at the state level have positioned us to successfully identify and implement federal legislative and regulatory opportunities that may be available to manufacturers and providers.

**HS_000223**

## Government Relations Expertise

We provide clients with the full spectrum of government relations services. These include:

- assisting clients in defining federal legislative and/or regulatory objectives;
- developing and implementing comprehensive legislative and regulatory strategies to achieve the client's objectives;
- gathering and analyzing intelligence;
- monitoring policy developments and analyzing their potential impact on the client;
- identifying and cultivating Congressional and Administration champions;
- direct lobbying of Administration officials, Members of Congress, and staff;
- drafting testimony, public comments, legislative language, and advocacy materials;
- witness preparation;
- establishing broad-based coalitions; and
- coordinating public relations strategies.

We also have a political and election law component to our government relations practice – a valuable asset to clients attempting to navigate the ever-changing landscape surrounding political contributions. Our firm has an active political action committee. Many of our clients do not or are not able to have a PAC, but they benefit from ours. We incorporate lawmakers who are important to our clients in our PAC budget. We certainly would factor ASPS' interests and wishes into our PAC efforts.

Our value rests in our ability to deliver on the four essential pillars of effective advocacy:

### 1.) Access

Our government relations practice is well known for solid relationships with national policymakers and a proven track record in utilizing those relationships to produce results. We have access not only because of our political involvement but because we are viewed by lawmakers and staff on both sides of the aisle as honest and knowledgeable advocates. Our Washington office enjoys excellent working relationships with the majority of Republican and Democratic Members of Congress, including the Leadership. Over the years, we have worked closely with virtually every committee and subcommittee chairman and ranking member. We also have strong relationships with officials in key federal agencies, as well as with principal advisors at the White House.

### 2.) Strategic Counsel

Our professionals have worked in Congress and in the Executive Branch and consequently, possess an insider's knowledge of the legislative and regulatory processes. This understanding informs the strategic counsel we provide to our clients and ensures that resources and actions are appropriately targeted. We are known for our creative thinking and ability to forge alliances between diverse groups of lawmakers and organizations to achieve common goals. We understand the political process and are able to develop and implement strategies that persuade policymakers to embrace particular causes by weaving political considerations and Member parochial interests into discussions of the merits.

6

### 3.) Policy Expertise

Opening doors will not achieve results unless you know what to say once you are inside. The success of our government relations practice can be attributed in large part to our in-depth policy expertise on a wide range of issues, including health care, tax, trade, homeland security, education, government contracting, intellectual property, financial services, information technology, and antitrust. This level of knowledge has made us trusted advisors not only to our clients but to lawmakers and staff who rely on us for policy guidance. Our guidance is effective because of our unique ability to translate complex matters into easily comprehensible terms and to make the most persuasive case.

### 4.) Legal Counsel

Implementing a government relations strategy without regard to potential legal implications is a dangerous course of action. As attorneys, we are thoroughly familiar with current laws and legislative history and are adept at legal analysis and legislative drafting. If clients are facing legal issues, we can seamlessly coordinate legislative, regulatory, and legal strategies to minimize exposure and maximize the potential for a positive outcome in all arenas.

### 5.) Political Counsel

Powell Goldstein can assist ASPS in identifying the candidates to whom the Society's political action committee should contribute to gain the most political capital and further ASPS legislative goals and objectives. We can help put together a PAC budget (which prioritizes candidates and suggests contribution amounts), determine whether and for whom ASPS should host fundraisers, engage in joint ASPS/Powell Goldstein fundraising activities, attend fundraisers and other political events with ASPS staff or on behalf of ASPS, and advise the Society PAC leadership on strategic use of the PAC. Powell Goldstein can develop strategies for growing the PAC and provide guidance on day-to-day reporting and operations issues.

## ASPS Work Plan

### A.) Monitoring of Legislative and Regulatory Developments

Because of our network of contacts throughout the government, we have the ability to gather information that is not readily available through traditional research tools. When combined with our access to decision-makers, we can provide ASPS with the type of timely and accurate information needed to react swiftly and strategically to legislative and regulatory developments.

We believe that the ultimate success of any government relations effort is dependent upon an entity's ability to proactively identify potential issues and develop and implement strategies to address these issues on a long-term basis. The passive, reactive approach which often involves waiting until after damage is done and playing "catch-up" rarely is effective.

HS_000225

We can assist ASPS in identifying and staying on top of all relevant issues. We can help you establish and refine the association's government relations objectives and tactics based on legislative and regulatory developments. We can provide advice on what is "doable," what requires immediate attention, which opportunities are available (based on Congressional and Administration priorities and the legislative calendar), and what must be done to place ASPS in the most favorable position to achieve its goals.

We will monitor the activities of Committees of jurisdiction over ASPS issues. We will be in constant communication with Members of Congress and staff as a means of protecting ASPS. Powell Goldstein will provide analysis to ASPS on the nature of Congressional action on key bills and suggest appropriate strategies to influence the legislative outcome.

## B.) Strategic Counsel and Lobbying

Powell Goldstein will assist ASPS in its lobbying efforts in support of the "Children's Access to Reconstructive Evaluation and Surgery Act of 2007 (CARES)", H.R. 1655 and S. 1588. We also will assist ASPS with the "Ambulatory Surgical Center Medicare Payment Modernization Act of 2007" (H.R. 1823). We will assist in lobbying efforts with regard to Medicare physician reimbursement, reauthorization and appropriations for Trauma Systems Planning and Development, breast-implant legislation, Health Information Technology (HIT), and medical liability reform.

After consulting with ASPS government relations professionals and other association executives, we will develop a strategic plan designed to meet ASPS lobbying goals. The plan will outline specific tactics for achieving ASPS' objectives. Components of the strategy will include:

- *Preparation of advocacy materials* (depending on the objective and the circumstances, these could include: position papers tailored to the relevant audience; Congressional and agency correspondence; opinion-editorials; legislative language; regulatory comments; Congressional testimony). To the extent that ASPS seeks to pursue federal funding in FY09, we can begin laying the groundwork for an appropriations effort. This would involve gathering the information typically required for completing appropriations committee worksheets and framing the request in the most compelling terms in order to demonstrate the need for and wisdom of the ASPS request.

- *Meetings with legislators, staff, and agency officials* (these meetings could occur both with and without ASPS executives and board members. If the latter, we would provide individuals with complete briefings so that they have all they need to know about the people with whom they will meet, as well as talking points to help guide the meetings).

- *Develop and nurture working relationships with Members of Congress and staff*
  Key Members of Congress who serve on the Appropriations Committees or on committees with jurisdiction over health care will be important targets.

- *Develop and nurture working relationships with relevant agency officials*
  We would utilize our ties to the Executive Office of the President and other agencies on behalf of ASPS. We would assist ASPS in identifying opportunities with the Administration to promote ASPS' objectives. Specifically, Powell Goldstein will work closely with the Centers for

8

Medicare and Medicaid Services (CMS); the Department of Health and Human Services (HHS); and the U.S. Food & Drug Administration (FDA) to promote and identify regulatory opportunities that will benefit the plastic surgeon community. We would advise ASPS on when meetings with Administration officials would be appropriate and helpful and when staff-level contacts would produce better results. We would schedule such meetings, prepare leave-behind materials, and conduct oral and written briefings for ASPS participants in advance of each meeting.

- *Assist with ally development*
  Our work with health care providers, patient organizations, trade associations, labor unions, and business organizations has resulted in excellent relationships with all of these groups. Powell Goldstein would assist ASPS in building coalition support with the patient advocate community. We would reach out to patient advocacy organizations to build momentum and support for the plastic surgery community. We would be pleased to facilitate meetings for ASPS so that it can build similarly strong relationships with such organizations with a view toward mobilizing a coalition in support of ASPS' legislative objectives. Powell Goldstein would assist ASPS in building a "Plastic Surgery" or "Reconstructive Surgery" Caucus in the U.S. House of Representatives and in the U.S. Senate.

- *Coordinate with media/public relations efforts*
  It is essential that public relations and advocacy activities are closely linked and complement one another. We would work with ASPS communications professionals to ensure coordination and to leverage media in support of ASPS advocacy objectives. When ASPS communications professionals generate positive news stories, we would undertake to disseminate them to relevant Congressional offices and other outlets when appropriate.

## C.) Development of a Grasstops Program

We can develop a "grasstops" program for board members and influential allies that complements and expands upon ASPS' political clout activities. We would conduct this work only after laying sufficient groundwork to give members and executives a high degree of comfort that their efforts will be worthwhile and successful. Tasks, which would be performed in conjunction with ASPS government relations professionals, would include: training the board on advocacy techniques in preparation for presentations to individual Members of Congress; developing talking points, white papers, speeches, Congressional testimony, media events, and opinion-editorials; scheduling meetings with federal officials; and preparing briefing materials. Briefing materials would include a complete schedule of meetings, talking points for each meeting, and biographical sketches of each official. We would be available to conduct briefing sessions for ASPS officials. We would accompany them on the meetings and ensure appropriate follow-up (i.e., draft thank-you letters, provide staff with requested information).

## D.) Ongoing Communications and Involvement of ASPS Staff

We believe that regular updates to clients are essential to ensuring that they are well-informed and have the tools they need to make the most appropriate business and strategic decisions. We routinely summarize complicated and technical issues in ways that are both informative to individuals who are following the issues closely and readily understandable to their colleagues who are less involved but who are interested in understanding the implications, level of risk or uncertainty, and timing.

HS_000227

We will prepare written reports and provide oral summaries as requested by ASPS. If desired, we would be pleased to participate in regular conference calls to share intelligence, explain in detail procedural and substantive developments, and assist ASPS in making informed advocacy decisions. We always will be "on call" to answer any questions and provide advice. We are very comfortable briefing staff, senior executives, and board members via any means ASPS prefers – whether by phone, video conference, or formal, in-person presentations.

## Fees

We propose a monthly fee of $17,000, plus expenses.

10

## References

Mr. Gary Marchand
CEO
Memorial Hospital at Gulfport
P.O. Box 1810
4500 13th Street
Gulfport, MS 39502-1810
(228) 865-3071

Mr. Kevin Burke
Director
Government Relations
American Academy of Family Physicians
2021 Massachusetts Avenue, N.W.
Washington, D.C. 20036
(202) 232-9033

Mr. Don Smithburg
Former CEO
LSU Health Care Services Division
(512) 517-2032

Ms. Chris Burch
Executive Director
National Association of Public Hospitals and Health Systems
1301 Pennsylvania Avenue, NW
Suite 950
Washington, DC 20004
(202) 585-0110

11

**HS_000229**

## Other Information

## Firm Background

Founded in 1909 in Atlanta, Georgia, the firm of Powell, Goldstein LLP is comprised of over 300 attorneys in over twenty-five specialized practice areas. Our Washington, D.C. office is staffed by more than 90 lawyers, policy professionals, and advisors and constitutes a prominent force in federal policymaking. Many of the firm's long line of distinguished attorneys have served in Congress, the Executive Branch, state legislatures, the judiciary, and as general counsels for major corporations. Some of our professionals also have experience at the local government level, bringing to the firm and its clients an understanding of the challenges faced by states, counties, and municipalities. Our client base includes Fortune 500 corporations, charitable organizations, hospitals and hospital systems, national and international trade associations, governmental entities, and organizations with operations throughout the world.

## Selected Case Studies

- We worked closely with the U.S. Department of Health and Human Services to develop a demonstration grant program designed to assist safety net providers caring for the uninsured. Seizing on one paragraph of general language in the President's budget, we developed what became known as the Healthy Communities Access Program (HCAP). We formed a "safety net coalition" of national advocacy groups to lobby for appropriations for a demonstration program to fund the idea. In a very tight fiscal environment, we obtained $25 million in appropriations in the first year. We successfully increased funding to $125 million in the second year.

- On behalf of the LSU Health Care Services Division and Memorial Hospital in Gulfport, Mississippi, we worked with the Louisiana and Mississippi Congressional delegations and the chairmen of the Appropriations Committees to ensure that hundreds of millions of dollars in Katrina relief funds would be available to assist in rebuilding health care infrastructure, medical staff retention efforts, and providing essential health care services to hurricane evacuees.

- We assisted a regional medical center in enhancing its federal reimbursement. When action by the Centers for Medicare and Medicaid Services threatened to derail these efforts by prohibiting the center's proposed financing mechanism, we implemented a multi-pronged administrative and legislative strategy in response. We pursued an administrative resolution through meetings with the CMS Administrator. We supplemented this strategy with a legislative component and successfully obtained a targeted amendment in the Medicare prescription drug legislation that exempts the medical center from any CMS determinations with regard to the proposed financing mechanism.

- We have advised the infusion therapy community over the past 15 years in its effort to protect access and reimbursement under Medicare and private sector programs for home infusion drug and nutritional therapies.

HS_000230

- We led a coalition of providers in securing Congressional repeal of Medicare's consolidated billing requirements under Part B in skilled nursing homes.

- Working with the Federation of American Societies for Experimental Biology, we were an integral part of the effort to double the funding for the National Institutes of Health over five years. The effort began in 1999 with an increase of $2.7 billion (15%) and continued successfully for the next five years until the goal was reached.

- We were retained by the U.S. Department of Health and Human Services Office for Civil Rights to prepare two guidance documents designed to help institutional and small health care providers navigate the challenges of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule. The documents are published on OCR's HIPAA guidance website.

HS_000231



**Harry A. Sporidis**
Senior Policy Advisor - Washington

202.347.0066
hsporidis@pogolaw.com

**Practices**

- Advocacy & Government Relations

**Education**

- B.A., Washington and Jefferson College, 1991

Mr. Sporidis brings many years of experience with Members of Congress and has worked on several issue areas including environment, health, transportation, trade, energy, and banking.

Mr. Sporidis was Legislative Director to Congressman Jim Greenwood, Chairman of the House Energy and Commerce Subcommittee on Oversight, from June of 1995 to April of 1998. Mr. Sporidis assisted the Congressman in managing his legislative staff as well as providing the Congressman with institutional knowledge of Congress and the federal legislative process.

From 1991 to 1995, Mr. Sporidis was Legislative Assistant to Congressman Mike Bilirakis, the Chairman of the House Energy and Commerce Subcommittee on Health. Mr. Sporidis developed much of his early legislative expertise while working for Congressman Bilirakis.

Mr. Sporidis began his career in the office of Congressman E. Clay Shaw, Chairman of the House Ways and Means Subcommittee on Social Security.



## POWELL GOLDSTEIN LLP

**Cynthia E. Berry**

Partner - Washington

202.624.3976
cberry@pogolaw.com



### Practices

- Advocacy & Government Relations
- Climate Strategies Insights
- Government
- Health Care

### Education

- J.D., Vanderbilt University, 1987
- B.A., Echols Scholar, University of Virginia, 1984

### Bar & Court Admissions

- District of Columbia, 1989
- Tennessee, 1987
- U.S. Supreme Court

### Languages

- French

Cindi Berry is Chair of our Advocacy and Government Relations practice and Co-Chair of the Powell Goldstein Political Action Committee. Widely regarded as one of Washington's top lobbyists, she is a respected advocate before Congress and the Administration on a range of issues, including health care; appropriations; education reform; aviation; telecommunications; and international matters. She routinely advises clients on lobbying disclosure requirements, Foreign Agents Registration Act compliance, election law issues, and government ethics. She represents the interests of Fortune 500 corporations, professional associations, and non-profit organizations.

Ms. Berry was appointed by Health and Human Services Secretary Tommy Thompson to the Secretary's Advisory Committee on Genetic Testing and to the Secretary's Advisory Committee on Genetics, Health and Society. She served on the 2005 Presidential Rank Award Review Board, assisting the President of the United States in determining which of the federal government's career Senior Executive Service Members merit the rank of Distinguished Executive. She was appointed by former Governor James Gilmore to the board of directors of the Virginia Birth-Related Neurological Injury Compensation Program for two terms and served as Vice Chair of the Board. Ms. Berry is a frequent featured speaker at association conferences, has been published in *The Washington Times*, and has appeared on television as a Republican analyst. Ms. Berry served as a speechwriter

*continued*

HS_000233

at both the 2000 and 2004 Republican National Conventions, penning speeches for Senate Majority Leader Bill Frist (R-TN), George P. Bush, family members of 9/11 heroes and NFL Hall of Fame Star Lynn Swann, among others. Notwithstanding her Republican credentials, she has long-standing relationships on both sides of the political aisle and excels in forging alliances between diverse groups and political constituencies.

Before joining Powell Goldstein, Ms. Berry was General Counsel and Managing Director at a prominent government affairs firm. She also served as Washington Counsel to the American Medical Association and as Legislative Assistant to Senator Jon Kyl (R-AZ) during his tenure in the U.S. House of Representatives.

Ms. Berry practiced law in Nashville, Tennessee, before moving to Washington, specializing in commercial litigation, health care law and medical malpractice defense.



**Julius W. Hobson, Jr.**

Senior Policy Advisor - Washington

202.624.7303
jhobson@pogolaw.com



## Practices

- Advocacy & Government Relations
- Climate Strategies Insights

## Education

- M.A., Legislative Affairs, The George Washington University
- B.A., History, Howard University

## Memberships

- National Multiple Sclerosis Society, Member & Vice Chair, Board of Trustees, 2004-present
- IONA Senior Services 30th Anniversary Gala Dinner, Co-Chair

## Publications

- "Lobbying for the Crusader Artillery System," *Routledge Handbook of Political Management*, edited by Dennis Johnson, forthcoming
- "The Mayor's Race: This Isn't A Personality Contest," Op-Ed, "Outlook Section," *The Washington Post, p. B8, August 25, 2002*
- *"The Mayor's Muddled Plan for D.C. General," Op-Ed, "Outlook Section," The Washington Post, p. B8, April 8, 2001*

Julius W. Hobson, Jr. is Senior Policy Advisor at Powell Goldstein LLP, where he advises and lobbies on a number of issues including health care, appropriations, banking and financial services, budget, defense, foreign relations, energy and taxes. Prior to assuming his current role, he was Director, Division of Congressional Affairs, American Medical Association, where he managed the AMA's interaction with the U.S. Congress. Previously, Mr. Hobson was Assistant Director in the Division. While at the AMA, he lobbied the House and Senate Republican Leadership, the House Committees on Energy & Commerce and Ways & Means, and the House and Senate Appropriations, Armed Services, and Budget Committees.

Prior to joining the AMA, Mr. Hobson served on the staff of former Senator Charles Robb [VA], where he was responsible for financial and economic issues, with particular emphasis on the budget resolution and appropriations bills. He previously served in the Executive Office of the Mayor, District of Columbia Government, where he was responsible for coordinating the city's relations with the Congress and the Federal Executive Branch, and for advocating for the annual District of Columbia Appropriations Bill. Mr. Hobson served in the U.S. House of Representatives as a subcommittee Staff Director and as Chief of Staff to a Member of the House. He also handled Congressional Affairs for Howard University, including advocating for

*continued*

the University's annual appropriation before the Congress. Mr. Hobson served a four-year term as an elected member of the D.C. Board of Education, during which he served a term as Vice President; and, his responsibilities included testifying before the House and Senate Appropriations Committees on behalf of the school system's budget.

In addition to his full time position, Mr. Hobson is Adjunct Associate Professor of Political Management, Graduate School of Political Management, George Washington University, where he teaches courses on "Lobbying". He has lectured on budgets and appropriations at American University, University of the District of Columbia, Bowie State University, and the University of Texas, Austin. Mr. Hobson is Vice Chair, Board of Trustees, National Multiple Sclerosis Society, National Capital Chapter. Mr. Hobson previously served as Chair, Vice Chair, and Member, Board of Directors, D.C. Health and Hospital Public Benefit Corporation, which was the governing board for the city's public hospital and clinics. He previously served as Chair, D.C. Health and Hospital Public Benefit Foundation.

A Washington, D.C. native, Mr. Hobson is a graduate of Howard University (B.A., History) and George Washington University (M.A., Legislative Affairs). He is married to Diane C. Lewis, Executive Vice President, ALTA Consulting Group, Inc., and is the father of two daughters and has one granddaughter. Mr. Hobson's family is profiled in *The Washington Century: Three Families and the Shaping of the Nation's Capital*, by Burt Solomon (2004). He is one of several lobbyists profiled in *Lobbying in Washington, London, and Brussels: The Persuasive Communication of Political Issues* , by Conor McGrath (2005).

**HS_000236**



## POWELL GOLDSTEIN LLP

**Steven Stranne**

Partner - Washington

202.624.7301
sstranne@pogolaw.com



### Practices

- Advocacy & Government Relations
- Biotechnology & Life Sciences
- Health Care
- Higher Education Institutions & Research Parks
- Intellectual Property

### Education

- J.D., Harvard Law School, 1994
- M.D., Duke University School of Medicine, 1990
- B.S.M.E., Duke University School of Engineering, 1986

### Bar & Court Admissions

- District of Columbia, 1996

### Memberships

- National Health Lawyers Association

### Publications

- *Recommendations for the Establishment of Stroke Systems of Care: Recommendations from the American Stroke Association's Task Force on the Development of Stroke Systems.* Stroke. 2005;36:690-703.

Dr. Steven Stranne is a partner in the Washington DC office of the law firm Powell Goldstein LLP, and he is also an active member of an affiliated health policy research group, *HealthPolicy R&D*. He focuses his practice on developing and implementing regulatory, legislative and strategic initiatives for health care manufacturers, associations, providers and patient groups, as well as conducting health care policy research.

Dr. Stranne has experience in the following areas: the coverage and reimbursement of pharmaceuticals, medical devices and related services; regulatory compliance; chronic care and disease management; home infusion drug therapy and nutrition therapy; health information technology; medication adherence; measuring quality of care; and the establishment of appropriate coding for medical services and products (including HCPCS codes).

Dr. Stranne's practice includes the representation of clients before the Centers for Medicare and Medicaid Services (CMS), the U.S. Congress, Medicare carriers, the Durable Medical Equipment Regional Carriers (DMERCs) and the Statistical Analysis Durable Medical Equipment Regional Carriers (SADMERC).

*continued*

HS_000237

- *Improving Quality of Care Through Disease Management Principles and Recommendations from the American Heart Association's Expert Panel on Disease Management.* Circulation. 2004;109:2651-2654.

- The Negative Impact of APCs on Hospital Outpatient Cancer Care: Update 2001. Oncology Issues. 2001;16:22-26.

**Speaking Engagements**

- *A Physicians' Guide to Medicare's New Prescription Drug Benefit and Related Program Changes.* A Presentation to Blair Medical Associates, April 5, 2005, Altoona, Pennsylvania.

- *Changes to Medicare Part B: Drugs, DME and Interaction with Part D.* A Presentation to the National Association of Chain Drug Stores Foundation, Medicare Prescription Drugs and Reform Conference — Part II, March 4, 2005, Baltimore, Maryland.

- *Impact of Medicare Changes on Part B Suppliers: Drugs and DME.* A Presentation to the National Association of Chain Drug Stores Foundation, 2004 Pharmacy and Technology Conference, August 31, 2004, San Diego, California.

HS_000238



**Alan K. Parver**

Partner - Washington

202.624.7225
aparver@pogolaw.com



**Practices**

- Health Care
- Advocacy & Government Relations

**Education**

- J.D., Cornell Law School, 1976
- B.A., American University, 1973

**Bar & Court Admissions**

- District of Columbia, 1978
- New York, 1977

**Memberships**

- American Association of Homes for the Aging, former Legislative Counsel
- District of Columbia Bar Association, Health Section
- New York Bar Association

Alan Parver chairs our Washington Health Care practice and focuses his practice in the area of health care law with particular emphasis on counseling long-term care, physicians and home care clients on third-party reimbursement and coverage. A significant portion of his practice concerns Medicare coverage and reimbursement for medical equipment and technology.

Clients of Mr. Parver include high-tech health care manufacturers and providers, as well as several start-up ventures in health care. He currently serves as counsel to the National Alliance for Infusion Therapy, an organization of national providers and manufacturers of infusion therapy supplies, equipment and services.

Mr. Parver has played an active role in the passage of legislation to establish Medicare reimbursement for certain high-tech services and equipment.

A frequent lecturer on Medicare policies and issues, Mr. Parver is also the author of several articles on such topics as nutrition support and the potential liability exposure of high-tech equipment suppliers.

HS_000239



**Tim Perrin**

Legislative Analyst - Washington

202.624.3956
tperrin@pogolaw.com



### Practices

- Advocacy & Government Relations
- Health Care

### Education

- M.A., Legislative Affairs, George Washington University, 2006
- B.A., University of South Carolina, Honors College, 1997

### Memberships

- American League of Lobbyists

Tim Perrin serves as a legislative analyst in our Government Relations practice. Mr. Perrin is responsible for monitoring Congressional and Administrative activities, conducting legislative research and developing lobbying strategies for a variety of clients. Mr. Perrin also lobbies on behalf of clients before Congress and federal agencies.

Prior to joining Powell Goldstein, Mr. Perrin was a Government Affairs Representative at the American Association for Geriatric Psychiatry, a national advocacy organization representing physicians and older adults. During his tenure, Mr. Perrin advocated for federal funding for health care programs serving seniors before the Appropriations Committees in both the U.S. Senate and House of Representatives. He also managed the association's nationwide grassroots advocacy program.

Mr. Perrin also served on the staff of U.S. Representative Floyd Spence (South Carolina) as a University of South Carolina Washington Fellow.

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

----------------------------x

THE WASHINGTON GROUP, INC.,    :

    Plaintiff,    :

    -vs-    : Civil Action

HARRY SPORIDIS,    : No. 1:07-cv-1892 (RBW)

    Defendant.    : PAGES 1 - 138

----------------------------x

Videotape Deposition of Cynthia E. Berry

Washington, D.C.

Thursday, November 1, 2007

Reported by:  Tammy S. Newton

JOB NO. 183964

# Cynthia Berry

|  | Page 30 |
|---|---|
| 1 | whether this issue was discussed during the specific |
| 2 | meetings. But I -- I'm wondering now as a general |
| 3 | matter, in the middle part of September, had you and |
| 4 | Mr. Sporidis discussed whether those clients that you |
| 5 | just listed would likely follow him to Powell |
| 6 | Goldstein, if he made the move? |
| 7 | A    I don't remember the timing of it, but it |
| 8 | would have come up in the context of conversations |
| 9 | with regard to his business plan. |
| 10 | Q    Now, I mentioned I had this e-mail about |
| 11 | his business plan. Again, I don't have a copy of it. |
| 12 | Alan, this is Powell Goldstein No. 17, but I think we |
| 13 | should go ahead and mark it as an exhibit. |
| 14 | (Deposition Exhibit No. 3 was marked for |
| 15 | identification and retained by counsel.) |
| 16 | BY MS. LALIK: |
| 17 | Q    Is that an e-mail that you sent to Harry |
| 18 | Sporidis concerning his submission of a business plan |
| 19 | to Powell Goldstein? |
| 20 | A    Yes. |
| 21 | Q    Did he at some point thereafter submit a |
| 22 | business plan? |

|  | Page 31 |
|---|---|
| 1 | A    He did. |
| 2 | Q    Do you know when that occurred? |
| 3 | A    It would have occurred prior to our trip to |
| 4 | Atlanta. |
| 5 | Q    So sometime between September 10th, Monday, |
| 6 | and Wednesday, September 12th -- |
| 7 | A    Yes. |
| 8 | Q    -- is your recollection of when he |
| 9 | submitted the business plan? |
| 10 | A    Yes. |
| 11 | Q    Do you happen to know whether the business |
| 12 | plan was incorporated in the documents that you all |
| 13 | brought with you today? |
| 14 | MR. CRENSHAW: I believe it is, but I want |
| 15 | to look through them and double-check. I'm not sure |
| 16 | whether they are in the first group or the second |
| 17 | group that's still coming. |
| 18 | MS. LALIK: We'll keep looking. |
| 19 | BY MS. LALIK: |
| 20 | Q    So I'm asking you these questions in a |
| 21 | vacuum. So pardon my ignorance in not being able to |
| 22 | point necessarily in a specific direction. What did |

|  | Page 32 |
|---|---|
| 1 | the business plan entail? |
| 2 | A    I did not prepare it, but I saw it. And my |
| 3 | recollection is that it was a description of Harry, |
| 4 | his experience, background information so that our |
| 5 | partners would know a little bit more about him. And |
| 6 | then it would have gone into a discussion of work that |
| 7 | he is engaged in, what he thinks he might be able to |
| 8 | bring to the firm and targets, business opportunities |
| 9 | that he would like to focus on if he were to come to |
| 10 | the firm. |
| 11 | Q    Did that business plan -- well, strike |
| 12 | that. |
| 13 | You said you didn't prepare it. Who did? |
| 14 | A    Alan Parver. And he prepared it in |
| 15 | coordination with Harry. |
| 16 | Q    Did you have conversations with Mr. Parver |
| 17 | and Mr. Sporidis as they were coordinating to prepare |
| 18 | the business plan? |
| 19 | MR. CRENSHAW: Are you saying conversations |
| 20 | about the business plan or just conversations at that |
| 21 | period of time? |
| 22 | MS. LALIK: Good question. Conversations |

|  | Page 33 |
|---|---|
| 1 | about the business plan. |
| 2 | THE WITNESS: Independently, I had |
| 3 | conversations with Alan Parver and separate |
| 4 | conversations with Harry, I suspect, not with the two |
| 5 | of them together. |
| 6 | BY MS. LALIK: |
| 7 | Q    Did the business plan list the clients that |
| 8 | Harry was then working with in his capacity at The |
| 9 | Washington Group? |
| 10 | A    I believe it listed some of them. |
| 11 | Q    Did the plan include dollar amounts that |
| 12 | Harry expected the clients might bring to Powell |
| 13 | Goldstein if he and the clients made the move? |
| 14 | A    I believe it did. |
| 15 | Q    And here is the business plan we have |
| 16 | found. This, Mr. Strasser, for your information, is |
| 17 | Powell Goldstein 0201 through 0203. I apologize for |
| 18 | sort of taking a moment. I hope you understand I'm |
| 19 | seeing these documents for the first time as well |
| 20 | here. |
| 21 | Let's go ahead and mark this as Exhibit 4, |
| 22 | and I may have to ask you to sort of give it back to |

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

## Cynthia Berry

### Page 34

1   me periodically since we're sharing the document.

2      A   Sure.

3      (Deposition Exhibit No. 4 was marked for

4   identification and retained by counsel.)

5   BY MS. LALIK:

6      Q   Go ahead and take a look through it and let

7   me know when you're ready for me to ask you a question

8   or two.

9      A   Okay.

10     Q   And we've actually located apparently

11   another copy of a plan, and we're not sure whether

12   this is a different version or the same version.  So

13   let's mark this as No. 5.  You can compare them, and

14   we'll determine whether it's the same version or not.

15     (Deposition Exhibit No. 5 was marked for

16   identification and retained by counsel.)

17   BY MS. LALIK:

18     Q   Do those two documents appear to be the

19   same document?

20     A   They do.

21     Q   Let me take Exhibit 5 from you so I can ask

22   you questions a little bit more easily about it.

### Page 35

1   Before I delve into the document, are you aware of any

2   other versions of this business plan for Mr. Sporidis,

3   besides the version you have in front of you as

4   Exhibit 4?

5     A   No, not -- there were -- it's a work -- it

6   was a work in progress.

7     Q   Sure.

8     A   There might have been drafts and changes to

9   that.  But this would have been the final -- it

10   appears to be the final business plan submitted.

11     Q   On Page 2 of the plan, I'd like to focus

12   your attention on the section that starts, Harry's

13   primary current clients are the following, and there's

14   a list of four clients.  Do you see that?

15     A   Yes.

16     Q   And then some information there about the

17   clients being portable?

18     A   Yes.

19     Q   And amounting to approximately 850,000 in

20   collections.  Do you see that?

21     A   Yes.

22     Q   Where did that information come from?

### Page 36

1     A   That was a result of conversations between

2   Harry and Alan Parver.

3     Q   And the next sentence, if you'll take a

4   look at that, where it says, Harry also has several

5   potential clients that he is close to bringing in, and

6   it lists four clients.  Do you see that?

7     A   Yes.

8     Q   Where did that information come from?

9     A   Again, it would have been as a result of

10   conversations between Alan Parver and Harry.

11     Q   And then the next sentence as well where it

12   lists Mentor and ASCO as being his largest clients and

13   their, I guess, revenues per month, do you see that?

14     A   Yes.

15     Q   Where did that information come from?

16     A   Also in conversations between Alan Parver

17   and Harry.

18     Q   And do you see how everything I've asked

19   you about is in different text than the rest of this

20   document?

21     MR. CRENSHAW:  Different font?

22   BY MS. LALIK:

### Page 37

1     Q   I'm sorry, different font.

2     A   Yes.

3     Q   Does that mean anything to you or suggest

4   anything to you?

5     A   No.

6     Q   Does it lead you to think that maybe this

7   was taken out of another e-mail and plopped into

8   this --

9     A   I would be speculating.

10     MR. CRENSHAW:  Objection to form.

11   BY MS. LALIK:

12     Q   And I think it was your testimony that this

13   document, you believe, was created sometime between

14   September 10th and September 12th before Mr. Sporidis'

15   trip to Atlanta?

16     A   It might have been started before September

17   10th but finalized before the trip to Atlanta.

18     Q   Okay.  In that paragraph that lists the

19   potential clients Mr. Sporidis was close to bringing

20   in, there's a reference to BIO, B-I-O, and BIO

21   members.  Do you see that?

22     A   Yes.

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

## Cynthia Berry

|  | Page 66 |
|---|---|
| 1 | A   Yes. |
| 2 | Q   -- the e-mail which he forwards on to you |
| 3 | the communication that he had with Mr. Levine -- |
| 4 | A   Yes. |
| 5 | Q   -- did you reach any conclusion in your own |
| 6 | mind or any -- did you have any thoughts in your own |
| 7 | mind that Mr. Sporidis may have talked with Mr. Levine |
| 8 | about leaving The Washington Group before he told |
| 9 | anybody at The Washington Group that he was resigning? |
| 10 | A   I never gave it a second thought. |
| 11 | Q   Okay.  So I take it, you have no idea |
| 12 | whether Mr. Sporidis talked to anyone at Mentor about |
| 13 | leaving The Washington Group in the August or |
| 14 | September time frame of 2007 before he announced his |
| 15 | resignation to the folks at The Washington Group? |
| 16 | A   I don't know. |
| 17 | Q   And you have no idea whether Mr. Sporidis |
| 18 | encouraged any of the clients that he was working for |
| 19 | in his employment at The Washington Group to follow |
| 20 | him to new employment before he talked to The |
| 21 | Washington Group about his resignation? |
| 22 | A   I have no idea. |

Page 67

1    MS. LALIK:  Let's mark this as Exhibit 12,
2    please.
3        (Deposition Exhibit No. 12 was marked for
4    identification and retained by counsel.)
5        MS. LALIK:  Mr. Strasser, did you catch the
6    Bates?
7        MR. STRASSER:  I didn't.  It's PG 339.
8        MS. LALIK:  If I can look at it for one
9    moment, please.
10       MR. STRASSER:  Sure.
11   BY MS. LALIK:
12   Q   Ms. Berry, if you would take a look at
13   Exhibit 12.
14       MR. CRENSHAW:  The document number should
15   have a B at the end.  It should be PG 0339B.
16       MS. LALIK:  In case Mr. Strasser was
17   looking at a different 339.
18       MR. STRASSER:  I was.  That was confusing.
19       MR. CRENSHAW:  Off the record.  I give you
20   one job.  I give you one job.
21       MS. AUGUSTIN:  I have to do them first.
22       MR. STRASSER:  Please.  To fix --

Page 68

1        MR. CRENSHAW:  I understand.  I'm just
2    teasing.
3        MR. STRASSER:  To fix someone else's
4    mistake.
5        MR. CRENSHAW:  My mistake.
6        MS. LALIK:  I'll give Mr. Strasser a
7    minute.  Would you like a minute to look at it?
8        MR. STRASSER:  I was looking at -- okay.
9        MS. AUGUSTIN:  Sorry.
10       MS. LALIK:  Let me know when you're all
11   set.  Are you all set, Alan?
12       MR. STRASSER:  Yes.
13   BY MS. LALIK:
14   Q   Ms. Berry, the document that's been marked
15   as Exhibit 12, have you ever seen that document
16   before?
17   A   No.
18   Q   At the very top of the document, and I
19   guess if I may, I apologize for taking it from you,
20   it's an e-mail from Mr. Sporidis to Mr. Parver and
21   says something about Mr. Sporidis hoping his clients
22   don't leak since they both now know what's going on.

Page 69

1    Do you see that?
2    A   I do.
3    Q   Did you have conversations with Mr.
4    Sporidis, around the time of September 21st, about his
5    clients knowing what was going on with Powell
6    Goldstein?
7    A   No.
8    Q   Did you have conversations with Mr. Parver
9    about Mr. Sporidis' clients knowing what was going
10   on --
11   A   No.
12   Q   -- about Powell Goldstein?
13   A   No.
14   Q   Did you hear from anyone that Mr. Sporidis'
15   clients might know what was going on between Mr.
16   Sporidis and Powell Goldstein?
17   A   No.
18       MS. LALIK:  Let's mark this as Exhibit 13,
19   please, and Mr. Strasser, this is Bates --
20       MR. STRASSER:  346B.
21       MS. LALIK:  Thank you.
22       (Deposition Exhibit No. 13 was marked for

18  (Pages 66 to 69)

## Cynthia Berry

| Page 86 | Page 88 |
|---|---|
| 1      MR. STRASSER: I object to the relevance of | 1   BY MS. LALIK: |
| 2   this. | 2     Q   Before I ask you questions specifically |
| 3      MS. LALIK: Okay. | 3   about No. 14, Ms. Berry, if you'll tell me what, if |
| 4      MR. CRENSHAW: It's just a yes/no question | 4   any, communications did you have with Mr. Sporidis |
| 5   for now. | 5   about The Washington Group's presentation or any |
| 6   BY MS. LALIK: | 6   presentation that The Washington Group made to ASPS in |
| 7     Q   Have you had any -- | 7   response to their request for proposal? |
| 8     A   I sat next to someone from AstraZeneca this | 8     A   I am not aware that The Washington Group |
| 9   morning at a briefing -- at a breakfast. We talked. | 9   actually made a presentation to ASPS. |
| 10   But nothing about Harry or Powell Goldstein | 10     Q   You don't know one way or the other? |
| 11   representing them. I have a lot of friends in the | 11     A   I don't think they did. If they did, I'm |
| 12   biotech community, and I see them pretty frequently. | 12   not aware of it. |
| 13     Q   Okay. I am obviously asking other than | 13     Q   What is your belief that they may not have |
| 14   general friendly conversations. So your answers are | 14   based on? |
| 15   the same -- | 15     A   When you say presentation, what do you mean |
| 16     A   Right. | 16   exactly? |
| 17     Q   -- based on that? You referenced a | 17     Q   Actually, let me sort of start again, if |
| 18   presentation that you gave to ASPS, I believe. | 18   we're confused about presentation. May I see No. 14, |
| 19     A   Yes. | 19   please. |
| 20     Q   Had ASPS put out some sort of request for | 20      Do you have any understanding about whether |
| 21   proposal? | 21   The Washington Group submitted a proposal to ASPS in |
| 22     A   It was my understanding they did. | 22   response to their request for proposals? |

| Page 87 | Page 89 |
|---|---|
| 1     Q   How did you get that understanding? | 1     A   At first, it wasn't clear whether they had |
| 2     A   Harry sent it to us. | 2   actually submitted it or not. And then Harry |
| 3     Q   The request for proposal? | 3   clarified that, I guess, it had been submitted, a |
| 4     A   Yes. | 4   written proposal. |
| 5     Q   When did he send it to you? | 5     Q   And do you know whether The Washington |
| 6     A   I don't recall the specific date. | 6   Group ever presented physically in person its proposal |
| 7     Q   Do you recall -- I understand you may not | 7   to ASPS? |
| 8   recall the specific date. Do you recall what month it | 8     A   I don't think they did. |
| 9   took place in or any general information about the | 9     Q   Is that -- is your belief that they may not |
| 10   time frame? | 10   have based on information you received from Mr. |
| 11     A   It might have been the very end of | 11   Sporidis? |
| 12   September. | 12     A   Yes. |
| 13     Q   Let's mark this as Exhibit 13 -- 14. I'm | 13     Q   Is Exhibit 14 an e-mail that you received |
| 14   sorry. And is this a B? | 14   from Mr. Sporidis around September 26th of this year? |
| 15      MS. AUGUSTIN: No, if it's got the letter | 15     A   It appears to be, yes. |
| 16   up top. | 16     Q   And what's attached to that e-mail that he |
| 17      MS. LALIK: No, because it's 0021. That's | 17   sent you? |
| 18   not in the B category. So Alan, this is 0021 through | 18     A   This -- it is a Washington Group proposal |
| 19   0046. | 19   to ASPS. |
| 20      (Deposition Exhibit No. 14 was marked for | 20     Q   Do you know whether or not that's the |
| 21   identification and retained by counsel.) | 21   proposal that The Washington Group submitted to ASPS |
| 22      THE WITNESS: Okay. | 22   in response to their request for proposals? |

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

# Cynthia Berry

Page 90

1    A    It looks like it from what Harry said in
2  the e-mail, but there was some question in my mind,
3  because when I read it, and I didn't know if it was
4  based on problems in transmission from his Mac to me.
5  There seemed like there were font changes and typos
6  and things like that.  So I remember asking him, is
7  this the final?  Is this what -- was this actually
8  submitted?
9    Q    And what was his response?
10    A    He said it was submitted.
11    Q    So your understanding is that Mr. Sporidis
12  forwarded by e-mail to you a copy of the final
13  proposal that The Washington Group had submitted to
14  ASPS in response to its request for production --
15  proposals?
16    A    Yes.
17    Q    When you received that e-mail with the
18  attachment, did you -- did it strike you one way or
19  another in your mind about whether it was
20  appropriate or not for him to be sending that to you?
21    MR. CRENSHAW:  Objection.
22    MS. LALIK:  You can object.

Page 91

1    MR. STRASSER:  I object.
2    MS. LALIK:  You can object, and I'm --
3    MR. STRASSER:  I object on the same basis
4  as before, that the question is meaningless without a
5  definition of appropriate.
6    MR. CRENSHAW:  Just to clarify, you're not
7  asking for a legal opinion?
8    MS. LALIK:  I am not asking for a legal
9  opinion.  Go ahead and answer.
10    THE WITNESS:  I didn't know what the
11  arrangement was or whether Harry found out about this
12  RFP and had some conversation with ASPS or not.  I
13  really didn't know.  He was asking if he could submit
14  a proposal from Powell Goldstein, and I don't think
15  there was ever any -- certainly not on my part, any
16  thought that The Washington Group couldn't submit
17  their own proposal.  We submitted our own proposal,
18  and The Washington Group was at liberty to submit
19  whatever they wanted.
20  BY MS. LALIK:
21    Q    I take it you submit proposals to potential
22  clients on a regular basis?

Page 92

1    A    Yes.
2    Q    Do you feel that those proposals are public
3  information or private information?
4    A    The request for proposal or the proposal
5  itself?
6    Q    The proposal itself.
7    A    I don't think it's necessarily proprietary
8  information.  In fact, when you submit proposals to
9  public entities, such as transit organizations or
10  county governments, they're all public anyway.
11    Q    That's a good point.  When you submit a
12  proposal to a private entity?
13    A    But I don't -- I don't have an expectation
14  that anything that we submit to any perspective client
15  is held in confidence.  You just have to know that it
16  potentially could be released to the public.
17    Q    This is going to be a hypothetical
18  question.  So your counsel can object.
19    But if you had one of your employees take
20  one of the proposals that you had submitted to a
21  private organization in response to a request for
22  proposal and sent it along to a competitor, would you

Page 93

1  have taken any steps to address it?
2    MR. CRENSHAW:  Object to the form, grounds
3  it asks for hypothetical, asking for a legal
4  conclusion.
5    MS. LALIK:  You can go ahead and answer.
6    MR. CRENSHAW:  If you can.
7    MR. STRASSER:  I'll join that objection.
8    THE WITNESS:  Would I have taken steps to
9  address that?
10  BY MS. LALIK:
11    Q    Uh-huh.
12    A    If I had known about it, I suppose I would
13  have talked to the employee.
14    Q    Why would you have talked to the employee?
15    MR. CRENSHAW:  Same objection.
16    THE WITNESS:  Just find out what they were
17  doing and why.
18  BY MS. LALIK:
19    Q    Would it surprise you that they would be
20  forwarding a Powell Goldstein proposal to a
21  competitor?
22    MR. CRENSHAW:  Same objection.

24  (Pages 90 to 93)

## Cynthia Berry

Page 94

1    THE WITNESS: I would wonder about it and
2  ask about it, and there could be potentially a good
3  explanation, maybe not. But I would ask about it.
4  BY MS. LALIK:
5    Q    Okay. You said that Powell Goldstein
6  sometimes submitted its own proposal to ASPS?
7    A    Yes.
8    Q    Did Powell Goldstein do that after receipt
9  from Mr. Sporidis of The Washington Group's proposal?
10   A    Yes.
11   Q    Were you involved in the creation of the
12  Powell Goldstein proposal to ASPS?
13   A    Yes.
14   Q    In creating the Powell Goldstein proposal,
15  did you use The Washington Group proposal that Mr.
16  Sporidis passed on to you?
17   A    Not much of it.
18   Q    Did you use any of it?
19   A    There might have been one concept that we
20  used, which I did not put in the original proposal,
21  because I actually didn't think their proposal was any
22  good, and I wanted to submit a Powell Goldstein

Page 95

1  proposal in the way that we like to do proposals.
2    Q    Do you know who wrote The Washington Group
3  proposal?
4    A    I have no idea.
5    Q    Did Mr. Sporidis tell you he wrote it?
6    A    We didn't talk about it.
7    Q    If we can mark this as an exhibit, please.
8    MR. CRENSHAW: 15?
9    MS. LALIK: It will be No. 15, yes.
10   (Deposition Exhibit No. 15 was marked for
11  identification and retained by counsel.)
12  BY MS. LALIK:
13   Q    I'm not going to ask you necessarily
14  detailed questions, but I wanted to give you an
15  opportunity to look at the exhibit. Let me know when
16  you're ready.
17   A    Sure.
18   Q    Ms. Berry, is Exhibit 15 an e-mail that you
19  sent to Mr. Sporidis dated September 28th, 2007?
20   A    Yes.
21   Q    And attached to it is at least a draft of
22  the Powell Goldstein proposal to ASPS; is that

Page 96

1  correct?
2    A    Yes.
3    Q    In your e-mail to Mr. Sporidis, you
4  indicate that, quote, we rewrote the proposal to
5  include all the PoGo info. Do you see that?
6    A    Yes.
7    Q    Does that change your testimony at all
8  about how much of The Washington Group proposal you
9  used when you drafted a version of the Powell
10  Goldstein proposal to ASPS?
11   A    No. It was a polite way of saying we
12  basically didn't use The Washington Group proposal.
13  We did our own.
14   Q    Did anything in The Washington Group
15  proposal that you saw from Mr. Sporidis help you draft
16  Powell Goldstein's proposal from a competitive
17  standpoint?
18   A    No. We started from scratch.
19   Q    And I'm asking a slightly different
20  question. Did it help you in drafting the Powell
21  Goldstein proposal to know what The Washington Group
22  had already proposed to ASPS?

Page 97

1    A    Really, it didn't.
2    Q    Why is that?
3    A    I relied on how we put together proposals
4  and in conversations I had with Harry as to what he
5  thought their issues are and what they care most
6  about. Also, I spoke and worked with Julius Hobson
7  from our firm. He and I have experience representing
8  physicians. So we relied on that more than anything
9  else.
10   Q    May I take a look at the, I guess, Exhibit
11  14, please. You may be able to point me to it even
12  faster than I can find it, since I'm just seeing this
13  now.
14   But in The Washington Group proposal, was
15  there a reference to a monthly fee proposal; do you
16  know?
17   A    As I recall, what Harry had sent me -- I
18  don't know what's in this one, if this is a final.
19  What he had sent me, I didn't see any reference to it.
20  And I asked Harry what fee do you want to charge,
21  because I didn't see it in the version that was
22  e-mailed to me. As I said, I think or he thought at

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

## Cynthia Berry

### Page 134

1  Sporidis regarding a client or company called Novo
2  Nordisk?
3      A   No.
4      MR. STRASSER:  I object on relevance
5  grounds to this.
6  BY MS. LALIK:
7      Q   Okay.  No?
8      A   No.
9      Q   Do you have any expectation of Novo Nordisk
10  becoming a client of --
11      MR. STRASSER:  Same objection.
12      MS. LALIK:  Okay, but let me ask the
13  question.
14  BY MS. LALIK:
15      Q   Do you have any expectation of Novo Nordisk
16  becoming a client of Powell Goldstein?
17      A   No.
18      MS. LALIK:  I don't have anything further.
19      MR. STRASSER:  I don't have any questions.
20      MR. CRENSHAW:  No questions.
21      MS. LALIK:  Thank you very much for your
22  time.  We appreciate it.

### Page 135

1      MR. CRENSHAW:  We'd like to read.
2      VIDEOTAPE OPERATOR:  This concludes today's
3  proceedings, the deposition of Cynthia Berry.  The
4  total number of videotapes is two.  We are going off
5  the record.  The time is 6:51:22.
6      (Whereupon, the signature not having been waived, the
7  deposition concluded at 6:51 p.m.)
8              * * *
9          ACKNOWLEDGMENT OF DEPONENT
10
11  I, Cynthia E. Berry, do hereby acknowledge I have read
12  and examined the foregoing pages of testimony, and the
13  same is a true, correct and complete transcription of
14  the testimony given by me, and any changes and/or
15  corrections, if any, appear in the attached errata
16  sheet signed by me.
17
18
19  _____   _____
20  Date       Cynthia E. Berry
21
22

### Page 136

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Tammy S. Newton, the officer before whom
3  the foregoing proceedings was taken, do hereby certify
4  that the foregoing transcript is a true and correct
5  record of the proceedings; that said proceedings were
6  taken by me stenographically and thereafter reduced to
7  typewriting under my supervision; and that I am
8  neither counsel for, related to, nor employed by any
9  of the parties to this case and have no interest,
10  financial or otherwise, in its outcome.
11      IN WITNESS WHEREOF, I have hereunto set my
12  hand and affixed my notarial seal this 1st day of
13  November, 2007.
14  My commission expires:
15  8/01/2012
16
17  _____
18  Notary Public in and for the
19  District of Columbia
20
21
22

### Page 137

1  Elizabeth Anne Lalik, Esquire
   Littler Mendelson
2  1650 Tysons Boulevard, Suite 700
   McLean, Virginia 22102
3
4
5  Re:  The Washington Group V. Sporidis
6  Dear Ms. Lalik:
7  Enclosed please find your copy of the deposition of
   Cynthia E. Berry along with the original signature
8  page.  As agreed, you will be responsible for
   contacting the witness regarding reading and signing
   the transcript.
9
10  Within 30 days of receipt, please forward the errata
    sheet and original signature page signed to opposing
11  counsel.
12  If you would like to change this procedure or if you
    have any questions, please do not hesitate to call.
13
14  Thank you.
15  Sincerely,
16
17
18  Tammy Newton
    Reporter/Notary
19
20
21
22

35  (Pages 134 to 137)

**Parver, Alan**

| | |
|---|---|
| **From:** | Harry Sporidis [sporidis@mac.com] |
| **Sent:** | Friday, September 21, 2007 3:16 PM |
| **To:** | Parver, Alan |
| **Subject:** | Re: Contact |

OK, no worries on waiting until Tuesday.    I am just hoping my clients don't leak since they both now know what's going on.

I will wait until Tuesday to let my folks know what is going on.  In the meantime, after the Tuesday vote would it be possible to have a formal letter from your end making the offer?  Just let me know.

And thanks about the news on Ellen.  I will let her know what is going on after the vote.

Thanks Alan, have a good weekend.


On Sep 21, 2007, at 2:14 PM, Parver, Alan wrote:

> Harry, it looks like the vote has to be on Tuesday. Couldn't round
> folks
> up.  There will be leak on this end, I can assure you.
>
> -----Original Message-----
> From: Harry Sporidis [mailto:sporidis@mac.com]
> Sent: Friday, September 21, 2007 2:07 PM
> To: Parver, Alan
> Subject: Contact
>
>
> Alan,
>
> I sent you an e-mail yesterday regarding Ellen Newcomb, she is
> currently
> at $10.00 an hour.
>
> Please feel free to contact me over the weekend if there are any
> updates
> on the Exec vote.  My mobile is 202-669-7399.
>
> Thanks Alan, looking forward to hearing from you.
>
> Harry
>
>
> NOTICE: This communication may contain privileged or other
> confidential information. If you are not the intended recipient, or
> believe that you have received this communication in error, please
> do not print, copy, retransmit, disseminate, or otherwise use the
> information. Also, please indicate to the sender that you have
> received this communication in error, and delete the copy you
> received.
>
> IRS CIRCULAR 230 Disclosure:  Under U.S. Treasury regulations, we
> are required to inform you that any tax advice contained in this e-
> mail or any attachment hereto is not intended to be used, and
> cannot be used, to avoid penalties imposed under the Internal
> Revenue Code.
>
> Thank you.
>

1



EXHIBIT

Berry #12
11/1/07

PG0339 B

**Parver, Alan**

| | |
|---|---|
| **From:** | Harry Sporidis [sporidis@mac.com] |
| **Sent:** | Wednesday, September 19, 2007 5:34 PM |
| **To:** | Parver, Alan |
| **Subject:** | Question |

Alan,

I forgot to mention Ellen Newcomb.  She is currently studying for her LSAT's and is looking for a full time job on Cap HIll.  In the meantime she is Mentor's GC's daughter and Josh Levine, the CEO personally asked that I take her in.

Would this be a problem?  We do pay her and she is terrific.  Also, I would like to tell Josh that Ellen will be taken care of.  Let me know your thoughts.

Also, I have a 3:30 call scheduled with Josh tomorrow to tell him what's going on.

Harry



EXHIBIT

Berry #13

11/1/07

PG0346

**Berry, Cynthia**

| | |
|---|---|
| **From:** | Harry Sporidis [sporidis@mac.com] |
| **Sent:** | Wednesday, September 26, 2007 8:36 PM |
| **To:** | Berry, Cynthia; Parver, Alan; Stranne, Steven |
| **Subject:** | ASPS Proposal |



ASPS PROPOSAL
DRAFT 8 14 07.do... I have attached a copy of the proposal that I have already submitted
to the American Society of Plastic Surgeons (ASPS).

I have an e-mail out to Bill Seward of ASPS asking if I can update
the proposal and attach the new team members.  I am waiting on a
reply.  In the meantime I wanted to pass the proposal along to the
two of you and ask if revisions could be made?  Basically we remove
all references to the Washington Group and put in PoGo.  Also, since
I am not as familiar with the team I was hoping you all would be able
to provide that info.

Thanks, and I hope that they will allow a revision at this late a date.


Harry



EXHIBIT

Berry #14
11/1/07

PG0021



**1401 K STREET, NW, SUITE 1000**
**WASHINGTON, DC 20005**
**PHONE: (202) 789-2111**
**FAX: (202) 789-4883**
www.thewashingtongroup.com

AUGUST 16, 2007

# PROPOSAL TO



## TABLE OF CONTENTS

I.  FIRM PROFILE

II.  EXECUTIVE SUMMARY

III.  PROPOSAL
    a.  STRATEGY – A NEW MESSAGE
       i.  CONGRESSIONAL AFFAIRS/LOBBYING
      ii.  MONITORING, ANALYSIS AND STRATEGY
     iii.  REGULATORY AFFAIRS
     iv.  INTER-ORGANIZATIONAL LIAISON AND
           COALITION BUILDING
    b.  ACTION PLAN – KEY CONGRESSIONAL TARGETS
    c.  TWG PROFILES
    d.  POTENTIAL CONFLICTS
    e.  PERFORMANCE MEASUREMENTS

IV.  APPENDIX
    a.  DETAILED BIOGRAPHIES
    b.  CLIENT LIST



PG0023

2

FIRM PROFILE

The Washington Group (TWG) is a bipartisan, government relations and strategic consulting firm based in Washington, DC. At TWG, we believe that the crucial elements of a successful advocacy effort combine timely information gathering and the ability to persuade Members of Congress and Administration officials to support our clients' position.

TWG has positioned itself to execute a course of action that puts its clients' issues at the forefront of the Congressional agenda. Our approach is directed to leaders of both political parties, in both Houses of Congress. This approach utilizes all our resources to achieve an optimum result for our clients.

The nearly two-dozen members of TWG have legislative and political experience at the most senior levels of government. Led by former New York Republican Congresswoman Susan Molinari, and her colleagues at TWG will develop a unique, comprehensive and individually tailored strategy to meet your needs. TWG knows how to analyze a situation, define the problem and design the most effective solution.

TWG is constantly anticipating our clients' future needs to put them in the most advantageous position. By utilizing our network on the Hill and in the Administration, we are able to provide our clients with timely and accurate information. Information is power and we come to work every day to ensure that our clients have the advantage that information brings.

## CAPABILITIES AND SERVICES

TWG serves clients in virtually all areas of legislative and regulatory activity. Whether the concern is a narrow, company-specific issue, an issue involving a broad, industry-wide policy debate or a desire to develop a credible and effective Washington presence, TWG excels at providing the unique insights, the strategic specializations and the proven practices to meet a client's mission objectives.

TWG offers this comprehensive range of services:

1. Creating lobbying strategies and programs
2. Providing ongoing support for existing government relations programs
3. Advising on political positioning
4. Developing and leading crisis management plans
5. Building, managing and participating in coalitions
6. Conducting legislative tracking and analysis
7. Preparing congressional testimony
8. Writing legislative and regulatory documents
9. Organizing Washington conferences
10. Drafting position papers
11. Conducting media tracking and analysis



**PG0024**

3

## II.          Executive Summary

The Washington Group (TWG) will provide the American Society of Plastic Surgeons (ASPS) a strong voice in Washington DC to ensure that policy makers know that plastic surgery is more then just elective surgery.  TWG will quickly, along with ASPS, identify key Members of Congress as well as senior officials in the Administration to communicate with and begin to implement our strategy to ensure that ASPS be a significant part of the debate when health care related issues are considered.

TWG, a bipartisan firm, will be able to reach out to both Democrats and Republicans on Capitol Hill and identify "champions" on our issues. TWG will also utilize its relationships with the House and Senate Leadership (both Democrats and Republicans), which create the legislative agenda in Congress, to ensure that these Members know ASPS' legislative priorities.  TWG will also be able to introduce ASPS to key Congressional caucus' such as the Congressional Black Caucus (CBC) and the Blue Dogs (moderate to conservative Democrats) just to name a few.

TWG will assist ASPS in building coalitions with-in Congress and outside of Congress.  TWG would strongly recommend that we begin to build a Congressional "Plastic Surgery" or "Reconstructive Surgery" Caucus.  This type of caucus will enable us to identify our supporters quickly, as well as giving ASPS members a reason to contact their Congressional Representative to request that they add their name as a member of this type of caucus.

In addition, TWG will assist ASPS in reaching out to the patient advocacy community to begin to build support for reconstructive surgery issues.

TWG will also use its expertise to efficiently monitor the legislative agenda for issues that could potentially affect ASPS.  TWG will be able to take quick and effective action in these kinds of situations to promote the interests of ASPS and ensure that ASPS' position is heard and action is taken.

Finally, TWG's experience with administrative agencies will also enable ASPS to have a significant voice should regulatory issues arise.



PG0025

4

### III. a.  SRATEGY:  A NEW MESSAGE

On Capitol Hill and generally, plastic surgery is viewed by and large as being "elective" surgery. Therefore, when Congress debates key pieces of legislation (i.e., Medicare, SGR/Pay for Performance, Health Information Technology (HIT), etc.) that effect the medical community, plastic surgeons are not typically at the forefront of the Congressional mindset.

TWG will work closely with ASPS to create a new and "fresh" message to be used with policy makers and the media to highlight the benefits of plastic surgery and the necessity of these medical procedures (i.e., burn victims, traumatic injuries, and congenital deformities that can now be corrected – Children's Access to Reconstructive Evaluation and Surgery (CARES)). Further, our message must stress that these types of procedures be done only by a board certified plastic surgeon.

TWG will also work with ASPS to create a seamless flow of information, realizing that our efforts and resources may need to be shifted as the legislative landscape changes.

In addition, through constant dialogue with ASPS, TWG will set realistic goals in moving our message and legislative agenda forward with key policy makers and those in the media.  We will identify and contact key Members of Congress in both parties, particularly within the Leadership (House and Senate as well as Committee leadership), to create a foundation for our efforts on behalf of the plastic surgery community.  Further, TWG will aggressively initiate meetings with Members of Congress for ASPS leadership and staff so that these Members can get to know the plastic surgery community and the important role that plastic surgeons play in the medical community.

i.    **Congressional Affairs'/Lobbying**

1.  Continue to educate key Members of Congress and Administration officials on the importance of plastic surgery.

2.  Expand the reach of ASPS by aggressively and "pro-actively" scheduling face-to-face meetings with Members of Congress and other key policy makers.

3.  Identify key Congressional allies on appropriate committees of jurisdiction in both the House and the Senate.
    a.  Determine potential vulnerabilities on committees of jurisdiction (i.e., identify Members of Congress on the Committees that have been anti-breast implant).
    b.  Possibly, and only after a full assessment of the situation, engage Members of Congress that have been opposed to ASPS issues in order to shore up any vulnerability and to educate the Member.



    c. Aggressively begin the process of setting up meetings for ASPS with all the Members of Congress and staff that sit on relevant Committees of jurisdiction. It is imperative that we establish a rapport with all of these Members and have a personal contact.

4. TWG will ensure that should Members of Congress, staff and key policy makers have questions regarding plastic surgery issues that they will contact ASPS first.

5. Work closely with the physician and the patient community to ensure that these organizations are using the same message points when discussing plastic surgery issues.

6. Begin the process with ASPS of building a "Plastic Surgery Caucus or Reconstructive Surgery Caucus" on Capitol Hill. This type of caucus will be helpful in allowing ASPS to distribute its "positive" message on Capitol Hill and will give our physicians a platform of support in Congress that will be helpful in moving ASPS' legislative agenda.

ii. **Monitoring, Analysis, and Strategy**

1. Monitor the legislative progress and the Committees of jurisdiction. In addition, TWG will also be prepared and ready to engage Members of Congress and their staffs should any "anti-plastic surgery" provision or initiative move through the legislative process (i.e., anti-breast implant legislation, plastic surgery tax issues, etc.).

2. TWG will always be in constant communication with Member of Congress offices so that we may be alerted to any such negative or positive legislative effort that may affect ASPS.

3. TWG will provide strategic analysis to ASPS on how to best affect a potentially negative situation and how to best exploit a positive situation.

4. TWG will provide and work with ASPS in developing reports or an electronic newsletter to communicate the on-going activity on Capitol Hill to ASPS members.

iii. **Regulatory Affairs**

1. TWG will assist ASPS in identifying opportunities with the Administration to promote ASPS' objectives.

2. TWG will work closely with the Center for Medicare and Medicaid Services (CMS); the Department of Health and Human Services (HHS); and, the United States Food & Drug Administration (FDA) to promote and identify regulatory opportunities that will benefit the plastic surgeon community.



iv.   **Inter-organizational liaison and coalition building**

1. TWG will assist ASPS in building coalition support with the patient advocate community.
   a. We will reach out (as we have already done in the past) to patient advocacy organizations like Y-Me, the National Coalition for Cancer Survivorship (NCCS) and other members of the Cancer Leadership Council (CLC) to build momentum and support for the plastic surgery community.
   b. Assist ASPS (as mentioned earlier) in building a "Plastic Surgery or Reconstructive Surgery" Caucus in the House of Representatives and in the U.S. Senate.

## III. b. ACTION PLAN - KEY CONGRESSIONAL TARGETS

### HOUSE

**Leadership:**
Nancy Pelosi (D-CA) **Speaker**
Steny Hoyer (D-MD) **Majority Leader**
James Clyburn (D-SC) **Majority Whip**
John Boehner (R-OH) **Minority Leader**
Roy Blunt (R-MO) **Minority Whip**

**Ways & Means Committee:**

The Ways & Means Committee has jurisdiction over Medicare issues and performs some oversight on the Center for Medicare and Medicaid Services (CMS).

Charles Rangel (D-NY) Chairman
- Pete Stark (D-CA) Chairman, Subcommittee on Health
Jim McCrery (R-LA) Ranking Member
- Dave Camp (R-MI) Ranking Member, Health Subcommittee

**Energy & Commerce Committee:**

This Committee has jurisdiction over: Medicare; Medicaid; CMS; and the Food & Drug Administration (FDA).

John Dingell (D-MI, Chairman)
- Robert Pallone (D-NJ) Chairman, Subcommittee on Health
- Robert Stupak (D-MI) Chairman, Subcommittee on Oversight & Investigations

Joe Barton (R-TX) Ranking Member
- Rep. Nathan Deal (R-GA) Ranking Member, Subcommittee on Health



- Rep. Ed Whitfield (R-KY) Ranking Member, Subcommittee on Oversight & Investigation

**Appropriations Committee:**

The Appropriations Committee's jurisdiction is over all spending that takes place in the United States. This Committee appropriates monies for all health related programs.

David Obey (D-MI), Chairman
- David Obey (D-MI) Chairman, Subcommittee on Labor, Health and Human Services, Education and Related Agencies
- Rosa DeLauro (D-CT) Chairwoman, Subcommittee on Agriculture, Rural Development, Food and Drug Administration and Related Agencies

Jerry Lewis (R-CA) Ranking Member
- James Walsh (R-NY) Ranking Member, Subcommittee on Labor, Health and Human Services, Education and Related Agencies
- Jack Kingston (R-GA) Ranking Member, Subcommittee on Agriculture, Rural Development, Food and Drug Administration and Related Agencies

**Congressional Black Caucus (CBC)**
TWG would recommend strongly that ASPS meet with as many Members in the CBC as possible. The CBC is an extremely influential body of Members among the Democratic leadership and can assist us greatly in moving our agenda. TWG has very strong contacts with the CBC and will proactively initiate contact with these Members of Congress.

**New Members**
TWG recommends, if it has not already been done, a letter of welcome and introduction to all newly elected Representatives in Congress. TWG will assist ASPS in drafting this correspondence. While they are not the number one priority, it is important to get ASPS' position in front of them, before these Members give away any commitments to any of ASPS' detractors. In the same letter, a meeting request can be made.

**Blue Dogs**
The Blue Dog Caucus, a group of 44 conservative to moderate Democrats has the potential to be a key ally for ASPS.
- We should reach out to Members of the Blue Dog Coalition and introduce ASPS and their issues to the group.
- Secure as many Member meetings with the Blue Dog Caucus as possible.



<u>SENATE</u>

**Leadership**
Harry Reid, (D-NV) **Majority Leader**
Dick Durbin (D-IL) **Majority Whip**
Byron Dorgan (D-ND) **Democratic Policy Committee Chair**
Harry Reid (D-NV) **Democratic Conference Chair**
Mitch McConnell (R-KY) **Minority Leader**
Trent Lott (R-MS) **Minority Whip**
Kay Bailey Hutchison (R-TX) **Republican Policy Committee Chair**
Jon Kyl (R-AZ) **Republican Conference Chair**

**Finance Committee**

Like its counter-part in the House of Representatives (House Ways & Means) this committee has jurisdiction over Medicare issues.

Max Baucus (D-MT) Chairman
- John Rockefeller (D-WV) Chairman, Subcommittee on Health Care
Charles Grassley (R-IA) Ranking Member
- Orrin Hatch (R-UT) Ranking Member, Subcommittee on Health Care

**Health, Education, Labor & Pensions (HELP) Committee**

Like its counterpart in the House of Representatives this committee has jurisdiction over: Medicare; Medicaid; CMS; and, FDA.

Edward Kennedy (D-MA) Chairman
Mike Enzi (R-WY) Ranking Member

**Appropriations Committee:**

Like its counterpart in the House of Representatives, this committee has jurisdiction over all spending.

Robert Byrd (D-WV) Chairman
- Tom Harkin (D-IA) Chairman, Subcommittee Health and Human Services, Education and Related Agencies
- Herbert Kohl (D-WI) Chairman, Agriculture, Rural Development, Food and Drug Administration, and Related Agencies
Thad Cochran (R-MS) Ranking Member
- Arlen Specter (R-PA) Ranking Member, Subcommittee Health and Human Services, Education and Related Agencies
- Robert Bennett (R-UT) Ranking Member, Subcommittee Agriculture, Rural Development, Food and Drug Administration, and Related Agencies



**PG0030**

While the House of Representatives has been a strong hold for ASPS' cause, there is a need to begin to wade into the Senate. Clearly, our immediate targets will be those who serve on the Senate Finance Committee and the HELP Committee due to its jurisdiction over health related issues.

TWG will quickly schedule staff-level meetings, beginning with the staff of Senate Democrats on Senate Finance and Senate HELP Committees and moving onto the Republican staff of both Committees. For any upcoming visit of ASPS leadership, TWG will request to meet with the Chairs and Ranking Members of Finance (Senators Baucus and Chuck Grassley); with their Health subcommittee counterparts (John Rockefeller and the Ranking Republican Member Orrin Hatch) and Senate HELP (Senators Edward Kennedy and Mike Enzi. For all Committees and Subcommittees, TWG will schedule a briefing for committee staff to get them up to speed on ASPS issues.

As in the House, we recommend that a letter of welcome and introduction be sent to all newly elected Senators.

## ADMINISTRATION

TWG will, as needed, gather intelligence as well as schedule high-level meetings between ASPS and high-ranking officials at Administrative agencies.

### III. c.  TWG PROFILES

Below are brief biographical profiles of TWG leadership who will be dedicated to the ASPS Account. Detailed biographies are included in Appendix a.

- **The Hon. Susan Molinari** – Former Member of Congress and Member of the House Republican Leadership

- **Rita Lewis** – Formerly Top Aid to former Democratic Leader Senator Tom Daschle and has been recognized as one the top lobbyists in Washington

- **John O'Hanlon** – Served as key Aid to Democratic House Leader Richard Gephardt, worked at the Democratic Congressional Campaign Committee and has served as an advisor to many House Democratic Members

- **Harry Sporidis** – Served as Legislative Director to Congressman Jim Greenwood (R-PA); Senior Legislative Assistant to Congressman Mike Bilirakis (R-FL); and Aide to Congressman E. Clay Shaw (R-FL)



- **Carlos Bonilla** – Former Special Assistant to the President for Economic Policy at the White House (Present Bush Administration) and was the economist for the House Budget Committee under then-chairman John Kasich

- **Missy Edwards** – Former Director of Development for the National Republican Senatorial Committee under Senator Mitch McConnell and former Policy Advisor for Senator Thad Cochran

- **Gerry Kavanaugh** – Former Chief of Staff for Senator Edward Kennedy and worked as a key advisor on the Edwards Presidential Campaign

- **Moses Boyd** – Served as Chief Counsel to the U.S. Senate Commerce, Science and Transportation Committee and possesses considerable expertise in legislative analyses

- **Paul Lobo** – Served as Washington representative for Mayor Bloomberg and Chief of Staff for Congresswoman Molinari

- **Tonya Saunders** – Former legislative assistant to Senator Rockefeller and works closely with the Congressional Black Caucus

- **Brett Shogren** – Served as Policy Director and National Security Advisor to the House Republican Leadership

## III. f.  POTENTIAL CONFLICTS

TWG foresees no potential conflicts of interest between it current clients and ASPS.  A complete client list is provided in Appendix b.

## III. g.  PERFORMANCE MEASUREMENTS

To ensure performance and maintain quality assurance for the project, TWG will assign Paul Lobo as Performance & Quality Assurance Manager.  He will work with the team to develop and maintain a Plan of Action and Milestones (POAM), monitor completion of the taskings according to target completion dates and report to Mr. Sporidis on any emerging quality assurance problems.  Mr. Lobo has performed these same functions for TWG for other clients. Mr. Lobo has an MBA from Cornell University and was formerly an executive with American Express.  He has also served as Chief of Staff to TWG Chairman & CEO Susan Molinari when she was a Member of Congress and as one of New York Mayor Michael Bloomberg's key Washington representatives.



APPENDIX
Biographies
Client List



**APPENDIX - DETAILED BIOGRAPHIES**

## THE HONORABLE SUSAN MOLINARI

Ms. Molinari is the Chairman and CEO of The Washington Group and President of Ketchum Public Affairs.

A Member of Congress from 1990 to 1997, Ms. Molinari quickly became "one of the most distinctive Members of the House" and "one of the most visible voices for her party" according to the authoritative Almanac of American Politics. As a result, after just four years in Washington, and just weeks after the election of the first GOP House majority in 40 years, Ms. Molinari was elected by her colleagues to the eight person Republican Majority Leadership, making her the highest ranking woman in the Congress.

Unanimously re-elected to the House Leadership in 1996, Ms. Molinari also enjoyed another distinction that year as she was selected by GOP Presidential candidate Senator Robert Dole as Keynote Speaker at the Republican National Convention in San Diego.

Ms. Molinari was an effective leader in the fight for crime victims, passing sweeping judicial reforms to toughen laws on repeat rapists and child molesters and to increase funding for the Violence Against Women Act. She also won passage of measures to enhance adoption, and promote breast cancer awareness and research funding.

As a member of the House Budget Committee, she was at the forefront of producing Congress' first balanced budget in 29 years. Ms. Molinari chaired the Transportation and Infrastructure Committee's Railroad Subcommittee, which passed legislation to overhaul the nation's Amtrak passenger rail service. As chair, she also implemented the transition of the Interstate Commerce Commission, to the Surface Transportation Board, and played a key role in fashioning the historic, five year, multi-billion dollar transportation-funding bill (TEA-21) adopted in 1997.

Prior to Congress, Ms. Molinari was twice elected to the New York City Council, where she was Minority Leader. In 1997, she left Congress to co-anchor CBS News Saturday Morning.

In addition to her broadcast experience, Ms. Molinari has addressed hundreds of audiences on politics, government and the media in nearly every state. She is represented by the Harry Walker Agency of New York City as a lecturer before business and trade organizations, universities and civic groups from coast-to-coast and was selected as one of the Top Five Speakers of 1998 by the members of Toastmasters International.
*(cont.)*

She is the co-author of the book Representative Mom: Balancing Budgets, Bill and Baby in the U.S. Congress (Doubleday, 1998). Ms. Molinari has also authored scores of articles published by national magazines and daily newspapers on a wide variety of subjects, ranging from the role of women in politics to national fiscal policy.

Ms. Molinari was selected as a Visiting Fellow at the prestigious Institute of Politics/ Kennedy School of Government at Harvard University in 1998. She was chosen as Glamour Magazine's

13

Woman of the year in 1996 and by Time Magazine as one of forty of the nation's most influential people under age forty in the nation in 1994. In 2003 Susan was recognized for her efforts to develop a framework to address the national housing crisis. As co-Chair of Millennial Housing Commission, the National Housing Conference named her "Housing Person of the Year." She also served as a member of the Bush-Cheney Transition Advisory Committee

Ms. Molinari chairs the Century Council, a national, not-for-profit organization committed to reducing drunk driving and underage drinking. Ms. Molinari is a member of several boards including the Toyota North America Diversity Advisory Board, and the March of Dimes Advisory Board. She also served on the bi-partisan Commission on Federal Election Reform. The Commission, co-chaired by former President Jimmy Carter and former Secretary of State James Baker III, studied the adequacy of the Help America Vote Act (HAVA) of 2002.

Born and raised on Staten Island, Ms. Molinari is a third generation public servant. Her grandfather was the first Italian-American immigrant elected to the New York State Assembly and she was elected to Congress succeeding her father, Guy V. Molinari, who became the Borough President of Staten Island.

## RITA M. LEWIS

Former Principal and now serving as Vice Chairman, Rita Lewis has been with The Washington Group since 1998. With more than twenty years of political and legislative experience working for Democratic Leader Tom Daschle and other Democratic Members of the U.S. Senate, Ms. Lewis has worked both in the political and legislative arena and has been recognized as one of the top political strategists in Washington by *Roll Call*. Additionally, Ms. Lewis is highlighted as one of the top "hired guns" in the 2007 annual listing of top lobbyists by *The Hill* newspaper.

Prior to joining The Washington Group, Ms. Lewis served for three years as Deputy Executive Director and Political Director for the Democratic Senatorial Campaign Committee. In this capacity, she served as a chief political advisor to Democratic Senators and their staff as well as candidates for the U.S. Senate. She also led a record-breaking fundraising operation for the committee.

From 1993 to 1995, Ms. Lewis served as Director of Congressional Affairs at the U.S. Department of Education. As a key legislative aide at the department, Ms. Lewis worked with Secretary Richard Riley to successfully pass three major education initiatives.

In 1985, Ms. Lewis joined the staff of then Congressman Tom Daschle and worked in two major capacities: National Finance Director of his political campaigns and Economic Development Director in his Senate office. As Economic Development Director, she served as a liaison between the Senator and South Dakota business and local elected officials working on legislative issues ranging from tax issues to the environment to international trade. In that capacity, Ms. Lewis arranged trade missions for the Senator and the South Dakota Governor to Japan, Taiwan and Korea, and she also hosted trade missions from those countries to South Dakota.

Ms. Lewis received a B.S. degree cum laude in Business Administration and Mathematics from Winona State University. While in college, she was appointed by Governor Rudy Perpich to the Minnesota State University Board.

# G. JOHN O'HANLON

G. John O'Hanlon, is a co-founder of The Washington Group, and now serves as managing director. Mr. O'Hanlon has more than 25 years of lobbying, political and business experience, including specific expertise with appropriations, education, environmental, health care, tax, trade and technology.

He has played leadership roles in numerous political and philanthropic causes including; Finance Chairman for the Democratic National Committee's (DNC) Presidential Gala in 2003, Democratic Finance Chairman for the bi-partisan March of Dimes Gourmet Gala, Board member of the DNC's Jefferson Trust, Trustee for the Kerry/DNC for President Campaign, Democratic Congressional Campaign Committee's Speaker's Cabinet and has been involved in numerous local and national campaigns. Mr. O'Hanlon was named a Year 2000 Steward of the Everglades by national environmental organizations for his efforts to save the Florida Everglades.

Mr. O'Hanlon is an honors graduate of Northeastern University in Boston where he graduated in 1981 with a concentration in human resource management. In 1991, he received his J.D. from Georgetown University Law Center.

## CARLOS E. BONILLA

Carlos E. Bonilla joined The Washington Group as senior vice president in March 2003. Prior to joining The Washington Group, Mr. Bonilla served as a Special Assistant to the President for Economic Policy at The White House. There he was part of the tax policy team and held the labor and aviation portfolios at the National Economic Council. Mr. Bonilla came into the George W. Bush Administration in January 2001 and served for the first two years of the Administration. During his tenure at The White House, he worked extensively on the first two tax bills, aviation issues (including global alliances, the post 9/11 Air Transportation Stabilization Act, and the creation of two Presidential Emergency Boards), and pension issues (including the post-Enron reforms to 401(k) plans with significant work on issues affecting defined benefit plans). In the aftermath of 9/11, he was responsible for ensuring that trade flows across the borders and through the ports were maintained in light of enhanced security concerns. Other responsibilities included the inter-agency working group on West Coast ports during the 2003 labor dispute, leading up to a Taft-Hartley injunction.

Prior to joining the Administration, Mr. Bonilla was a Washington-based advisor to the Bush campaign and assisted the campaign with the formulation and refinement of the Economic Growth and Tax Relief Reconciliation Act.

Before joining The White House, he was the economist for the House Budget Committee under then-chairman John Kasich. Prior to that, he was chief economist for the Employment Policies Institute working on health care and employment issues. He was chief economist for the National Chamber Foundation at the US Chamber of Commerce and at the Institute for Research on the Economics of Taxation (IRET). In addition, he spent a year as a senior fellow at The Heritage Foundation. All told, he has over 20 years experience in public policy matters.

Mr. Bonilla has an undergraduate degree from The American University and a Masters in Economics from Georgetown University.

## MOSES BOYD

Moses Boyd currently serves as a principal for Integrated Solutions Group. Mr. Boyd began his legal career in private practice in Greenville, South Carolina in 1987. Later that year he was appointed to the South Carolina Legislative Council as a legislative drafting attorney.

In November 1989, he joined the United States Senate Committee on Commerce, Science, and Transportation, as Counsel to the Consumer Subcommittee. Mr. Boyd became Senior Counsel to the Consumer Subcommittee in 1992, and Democratic Chief Counsel to the full Committee in 1999.

Throughout his thirteen-year tenure with the Commerce Committee, Mr. Boyd played an active role on a number of major issues and policies. These included the liability of airlines and cities for the September 11, 2001 terrorist attacks, antitrust review procedures for communications and technology industry mergers, Enron oversight, corporate average fuel economy standards (CAFÉ), 2000 Digital Signatures Act, authorizing contractual agreements over the Internet through the use of digital signatures, 1998 Tobacco Settlement, federal insurance oversight and a host of product and commercial liability bills.

In 2003, he served as a Public Policy Scholar at the Woodrow Wilson International Center for Scholars in Washington, D.C., and conducted a seminar at the University of South Carolina on how INTEREST GROUPS ACQUIRE AND EFFECTUATE POLITICAL POWER.

Mr. Boyd received his BA in 1983 and JD in 1986 from the University of South Carolina. He also conducted graduate studies at the University of South Carolina in the areas of Public Policy and Public Administration and at American University in Washington, D.C. on Race and Civil Rights (1999). During the summer of 2000, he completed Harvard University's John F. Kennedy School of Government's Senior Executive Management Program for Public Managers.

## MELISSA M. EDWARDS

Missy Edwards joined The Washington Group as senior vice president in the beginning of 2001. Ms. Edwards brings to The Washington Group more than ten years of legislative and political experience with Republican Leaders of the United States Senate.

Prior to joining The Washington Group, Ms. Edwards served as the Director of Development for the National Republican Senatorial Committee for the 1999 – 2000 election cycle. In this role, Ms. Edwards was responsible for the NRSC's high-tech and business community outreach across the United States. Ms. Edwards worked directly with the members of the Senate Republican leadership, Committee Chairmen and Members to identify, contact and liaison with individuals and organizations throughout the country to discuss various policy initiatives.

Beginning in 1990, Ms. Edwards worked on the staff of Senator Thad Cochran (R-MS) as a policy advisor in the areas of Health Care, Energy, Defense and Product Liability Reform. Ms. Edwards continued in her role as an advisor to Senator Cochran through 1995 representing the Senator on matters of jurisdiction to his committee assignments on the Senate Labor and Human Resources Committee and the Senate Appropriations Committee.

In 1997, Ms. Edwards was recruited by the American Medical Association to serve as their chief Senate GOP lobbyist. In this role, Ms. Edwards provided strategic input for policy initiatives and played a key role in the implementation of their legislative agenda. Ms. Edwards was largely responsible for AMA's advocacy efforts directed to Republican Members of the Senate.

Her experience as a senior staff member in the United States Senate and a political operative for Republican Senate members combined with her issue advocacy background provide Ms. Edwards with all of the credentials and tools necessary to develop strategies and to successfully implement plans of action for clients of The Washington Group.

Ms. Edwards continues to be involved in various advisory roles and serves on the steering committees of Senate Republican members including the Dole for President Health Policy Team and the GOP Convention Official Proceedings Committee. Ms. Edwards received a B.S. degree in Political Science from the University of Mississippi in 1990.

# GERRY KAVANAUGH

Gerry Kavanaugh currently serves as a principal for Integrated Solutions Group.  Mr. Kavanaugh also has been intimately involved in national, state and local politics for over 25 years. He is the founder of several ventures, including DCS Congressional,an Internet communications and software development firm that provides Internet technology and services to congressional offices, state and local governments, political campaign, and advocacy groups.  In addition he is the founder and CEO of Kavanaugh Asset Management, an asset management consulting firm, specializing in providing marketing assistance to money managers, pension funds, and law firms.

Mr. Kavanaugh was a close advisor to the John Edwards for President Campaign, working in both Washington, DC and Iowa to manage all efforts with organized labor movements across the country. Prior to working for John Edwards, he was the Policy Director for the Democratic National Committee.  As the senior policy advisor for the DNC Chairman, he managed the daily messaging effort with both House and Senate leadership.  Mr. Kavanaugh also served as Senator Edward M. Kennedy's Chief of Staff, managing a staff of 75 and advising the Senator on all national and Massachusetts economic issues.  He worked with Senator Kennedy through both his 1994 and 2000 re-elections as well.

Mr. Kavanaugh also possesses a love and understanding of city government. Earning a master's degree in urban planning at the University of Pennsylvania, he worked as a city planner in Quincy and Salem, Massachusetts. He also served as the Chief of Staff for the Boston Redevelopment Authority, the largest redevelopment authority in the country.

# PAUL LOBO

Paul Lobo is senior vice president and chief financial officer at The Washington Group. He is a government affairs and marketing professional with specific expertise in developing innovative public and private partnerships. He also serves as a policy expert on transportation, base redevelopment, port operations and security.

Prior to joining The Washington Group, Mr. Lobo served as a representative of New York City Mayor Michael R. Bloomberg in Washington, DC. He played a key role in helping the newly elected mayor implement the City's post-9/11 federal agenda while leading its federal transportation, environmental and economic development agenda before Congress and the Administration.

Mr. Lobo's private sector experience includes five years at American Express, where he directed the Fortune 50 Company's Cardmember Services Group and created an innovative rewards program in partnership with Delta Air Lines. He also worked with NY Waterway where he developed marketing and government relation strategies for the country's largest privately owned ferry service.

Earlier in his career, Mr. Lobo served on Capitol Hill as Chief of Staff to Congresswoman Susan Molinari who now serves as Chairman and Chief Executive Officer of The Washington Group. He also worked as a professional staff member on the House Transportation and Infrastructure Committee.

Mr. Lobo's political experience includes work on Rudy Giuliani's first campaign for Mayor in 1989. He worked on the Host Committee for the 2004 Republican National Convention where he directed delegate and VIP events. Other political activities include work for the New York State Republican Party, Rudy Giuliani's successful reelection campaign and management of a 1997 New York City-wide campaign. He has also served as an international elections monitor in El Salvador.

Mr. Lobo has a B.A. in Political Science from Colgate University and an M.B.A. from Cornell University's Johnson Graduate School of Management.

# TONYA M. SAUNDERS

Tonya M. Saunders serves as senior vice president at The Washington Group. She has an extensive background in federal government affairs with an emphasis on health care and senior issues. Her other primary areas of responsibility include Medicare reform, telecommunications, banking and airline industry legislation. Having worked on a variety of issues before the House Commerce, Ways and Means, Judiciary and Senate Finance Committees, Ms. Saunders has gained a great working knowledge of the legislative process. She has developed and implemented winning strategies for legislation within the committee structure that have become law.

Ms. Saunders has been an integral part of The Washington Group "team" for more than 10 years. As a part of the team, politically she is well positioned to serve the needs of our clients. Ms. Saunders directs and coordinates fundraising activities for The Washington Group. Serving as host and co-host to a number of events, she is well known throughout Washington on both sides of the aisle. Ms. Saunders is a board member of the Congressional Black Caucus Spouses' Foundation (CBCSF) and received the Most Valuable Player Award for 2002 in recognition of outstanding service and personal contribution to the CBCSF. InfluenceOnline featured Ms. Saunders on the cover of an article, Blacks on K Street: Getting Beyond Race.

In 1990, Ms. Saunders worked on the successful re-election campaign for Senator John D. Rockefeller, IV (D-WV) – then joined the staff as an assistant. Prior to her Capitol Hill experience she was special assistant to Secretary Ken Hechler for the State of West Virginia. In addition, she worked as Project Director of a non-partisan organization that conducted voter registration statewide. Ms. Saunders has clearly demonstrated her capabilities on both state and national fronts.

Ms. Saunders has developed many unique relationships with policy makers from all sectors of Congress. Her lobbying talents are utilized in both House and Senate. She has developed strong working relationships with Democrats and Republicans, including the Congressional Black Caucus. Ms. Saunders in an alumna of West Virginia State College.

# BRETT SHOGREN

Brett Shogren is a senior vice president at The Washington Group with nearly ten years of legislative experience in the House of Representatives, including seven years in the House Leadership.

Prior to joining The Washington Group, Mr. Shogren served as Policy Director and National Security Advisor to the House Majority Leader and brings a unique breadth of experience and expertise in both policy and legislative process, having advised the House Leadership on issues ranging from telecommunications, health care, trade, technology, foreign affairs, National Security and intelligence.

As Policy Director, Mr. Shogren was responsible for developing and implementing the House legislative agenda by working directly with House and Senate Leadership, Congressional Committees and the White House.

Mr. Shogren's role in the Leadership allowed him to play a key role in the development and passage of many major initiatives, including the Medicare Modernization Act, serving as the principle House Leadership staff member on the conference committee. Brett also worked extensively on national security and defense issues, including the annual Defense Authorization Act, the 911 Commission Implementation Act and was the primary leadership staff member during the passage of key trade initiatives such as Trade Promotion Authority, making Permanent Normal Trade Relations with China, and the Central American Free Trade Agreement.

Prior to serving in the House Leadership, Mr. Shogren served as Senior Legislative Aide to Congressman Bob Goodlatte, handling trade, defense, National Security, tax, health care, immigration and welfare reform. Before joining Congressman Goodlatte's staff, he served as a staff member on the House Judiciary Committee.

Mr. Shogren is a graduate of Amherst College in Massachusetts.

# HARRY A. SPORIDIS

Harry A. Sporidis joined The Washington Group as senior vice president in the spring of 2001. Mr. Sporidis specializes in representing clients with legislative and regulatory issues. Mr. Sporidis brings The Washington Group many years of experience with House Republicans and has worked on several issues areas including environment, health, transportation, trade, energy and banking.

Mr. Sporidis was Legislative Director to Congressman Jim Greenwood, Chairman of the House Energy and Commerce Subcommittee on Oversight, from June of 1995 to April of 1998. Mr. Sporidis assisted the Congressman in managing his legislative staff as well as providing the Congressman with institutional knowledge of Congress and the federal legislative process.

From 1991 to 1995, Mr. Sporidis was Legislative Assistant to Congressman Mike Bilirakis, the Chairman of the House Energy and Commerce Subcommittee on Health. Mr. Sporidis developed much of his early legislative expertise while working for Congressman Bilirakis.

Mr. Sporidis began his career in the office of Congressman Clay Shaw, Chairman of the House Ways and Means Subcommittee on Social Security.

Mr. Sporidis earned his B.A. from Washington and Jefferson College with a major in Political Science and a strong concentration in Art History in 1991.

## APPENDIX - CLIENT LIST

American Land Title Association, Washington, DC
American Society of Clinical Oncology, Alexandria, VA
AutoPills, Arlington, TN
Association of American Railroads, Washington, DC
Beverly Enterprises, Forth Smith, AR
Boston Medical Center, Boston, MA
California Association of Winegrape Growers, Sacramento, CA
The Century Council, Washington, DC
Delta Air Lines, Inc., Atlanta, GA
Embassy of the Republic of Panama, Washington, DC
Everglades Trust, Inc., Orlando, FL
Exelon Corporation, Chicago, IL
Freddie Mac, McLean, VA
iDirect Technologies, Inc., Herndon, VA
Martin County Board of Commissioners, Stuart, FL
Massachusetts Development Finance Agency, Boston, MA
Mentor Corporation, Santa Barbara, CA
Metropolitan Transportation Authority, New York, NY
Montgomery County Government, Rockville, MD
Motorola, Washington, DC
National Association of Real Estate Investment Trusts, Washington, DC
National Automobile Dealers Association, McLean, VA
National Cable & Telecommunications Association, Washington, DC
PolyMedica Corporation, Wakefield, MA
Prime Technology, LLC, Dayton, OH
Rape, Abuse & Incest National Network (RAINN), Washington, DC
Real Estate Roundtable, Washington, DC
Rent-A-Center, Plano, TX
Russian Federation, Moscow, Russia
Sanofi Pasteur, Swiftwater, PA
Shield Technologies Corporation, Chicago, IL
SimmonsCooper LLC, East Alton, IL
Skanska Infrastructure Development America, Alexandria, VA
Society of Human Resource Management, Alexandria, VA
State of Connecticut, Hartford, CT
State of Maryland, Annapolis, MD
Time Warner, Inc., Washington, DC
Toyota North America Diversity Advisory Board, New York, New York
Wendy's International, Inc., Dublin, OH

# Deborah Y. Kamin, Ph. D.

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

-----------------------------x

THE WASHINGTON GROUP, INC.,   :

    Plaintiff,          :

    -vs-              : Civil Action

HARRY SPORIDIS,         : No. 1:07-cv-1892 (RBW)

    Defendant.         : PAGES 1 - 76

-----------------------------x

Videotape Deposition of Deborah Y. Kamin, Ph.D.

Washington, D.C.

Friday, November 2, 2007

Reported by:  Tammy S. Newton

JOB NO. 183966

# Deborah Y. Kamin, Ph. D.

Page 14

1 Ketchum as well, or do you just not know?
2    A    Noam was from Ketchum.
3    Q    In addition to Noam, anybody else --
4    A    I don't remember who else was there.
5    Q    Do you know who put together the proposal
6 on behalf of Ketchum and The Washington Group?
7    A    No.
8    Q    Who made the decision to hire Ketchum in
9 response to that request for proposal?
10    A    It was a group decision of our internal
11 leadership.
12    Q    When I asked you the question about The
13 Washington Group being one of the firms that applied
14 for a proposal, you said actually it was Ketchum.  Why
15 do you correct me in that way?
16    A    Because Ketchum Communications was the firm
17 that made the proposal to us.  It was my understanding
18 at the time that The Washington Group was part of
19 Ketchum Communications.
20    Q    Okay.  And was it your understanding when
21 ASCO hired the entity to do the work that it was
22 hiring Ketchum or The Washington Group?

Page 15

1    A    I assumed the contract was with Ketchum,
2 but -- that's my assumption.
3    Q    Were you part of the working group or
4 decision-making group that made the decision to hire
5 Ketchum?
6    A    Yes.
7    Q    And how many other people were in that
8 group?
9    A    As I recall, it was our executive
10 vice-president.  It was the department head for our
11 communications department.  It was the chief operating
12 officer and I believe our finance director, and we
13 have outside counsel -- policy counsel who were part
14 of the interviewing team.  So they were there as well.
15    Q    Okay.  And to your understanding, why was
16 the decision made to go with Ketchum?
17    A    They had the best proposal.
18    Q    Why -- what about it made it stand out?
19    A    I think there were a number of factors.  I
20 don't recall our exact discussion at the time.  But
21 they seemed to be most -- the communications
22 presentation that they made was, in our view, the best

Page 16

1 of the groups that we interviewed.  We particularly
2 liked Harry and what he had to offer.  But I would say
3 it was a package, an overall impression of the group
4 that presented and their proposals and ideas that they
5 presented for turning the situation around that we
6 were concerned about.
7    Q    Did you know anything about Ketchum before
8 they came in to interview with you?
9    A    I did not.
10    Q    Did anyone else on the interview team, to
11 your knowledge, know about Ketchum?
12    A    I don't know.
13    Q    You said, I think their communications
14 presentation was the best.  When you use the term
15 communications in that context, what do you mean?
16    A    Their presentation to us about how to
17 communicate on the issue that we were concerned about
18 was the most focused and the best presentation of the
19 people that we interviewed.
20    Q    Now, my understanding, and please correct
21 me if I'm wrong, is that over the following couple of
22 years, Ketchum and The Washington Group were doing

Page 17

1 sort of two kinds of work for ASCO.  One was lobbying
2 work, and one was public relations work.  I think of
3 public relations work as being sort of communications
4 work.  But is that what you're thinking as well, or
5 are we on different pages?
6    A    They were -- they were doing a number of
7 things for us, but they generally would fall into the
8 two areas, I think, that you're describing.  One was
9 communications, but those communications depended on
10 the policy and how to communicate the policy.  There
11 was sort of a third issue there, which was, as I said
12 earlier, our image and the perception of ASCO and how
13 we were behaving and how we were responding to the
14 issue at the time.  So those two things, in our view,
15 were linked, which was the reason we liked the
16 combination of Ketchum Communications and The
17 Washington Group.
18    Q    Okay.  So I think we are on the same
19 wavelength.  In your understanding, The Washington
20 Group was a lobbying group and Ketchum was a
21 communications firm?
22    A    Right.

**Esquire Deposition Services**
D.C. - 1-800-441-3376

MD - 1-800-539-6398
VA - 1-800-752-8979

## Deborah Y. Kamin, Ph. D.

Page 18

1  Q   And you felt like the communications
2  presentation, which I guess would sort of be led by
3  Ketchum, was particularly strong?
4  A   We thought the package was particularly
5  strong.
6  Q   Okay. The whole package?
7  A   Yes.
8  Q   So Washington -- I'm sorry, ASCO wound up
9  retaining Ketchum and The Washington Group to proceed.
10 And I think you said it was in the 2004, 2005 time
11 frame when the relationship began, correct?
12 A   I'd have to look back, but I think that was
13 the time frame.
14 Q   Okay. And if you will give me an idea of
15 the kind of work that took place over the next two,
16 two and a half years between Ketchum, The Washington
17 Group, and ASCO. I don't need the details of all the
18 work. I just want a general understanding of what
19 work was being done.
20 A   It was during the Medicare Modernization
21 Act debates and the legislation was making its way
22 through. There was a lot of back and forth and

Page 19

1  messaging of we objected to significant portions of
2  it, and Ketchum and The Washington Group were helping
3  us develop messages in two ways. And I left out an
4  important thing.
5       Messaging to Capitol Hill and to the
6  political leadership was one thing, but there was also
7  messaging to our own membership, which was difficult
8  for a lot of reasons that I won't -- won't bore
9  you with. So there were -- we were getting help from
10 Ketchum and The Washington Group in both of those
11 ways.
12      The Washington Group was more involved --
13 Harry specifically, was more involved with making that
14 personal contact on Capitol Hill, which in our view he
15 is uniquely capable of doing, to overturn some of the
16 bad perception that was there.
17 Q   And who was working on the messaging to the
18 membership?
19 A   It was a combination of our own
20 communications department working with Ketchum and
21 with The Washington Group to shape the right message,
22 in the right package, and at the right time to the

Page 20

1  right people.
2  Q   Okay. I can imagine it was a difficult
3  task.
4  A   It was a very difficult task and remains
5  so.
6  Q   Who at The Washington Group and/or Ketchum
7  was assisting you with that area of the work?
8  A   From Ketchum, Noam Gelfond initially was
9  very involved, Louanne Roark at the time. Harry was
10 mainly involved in The Washington Group.
11 Q   You mentioned that you believe, I think you
12 said, Harry was uniquely capable of doing certain
13 things on Capitol Hill. Why -- why do you feel that
14 way? Explain that.
15 A   Harry has a -- he's called by a lot of us,
16 and I'm sure others, the mayor of Capitol Hill. He is
17 not only bright, but he's warm and caring, and in my
18 view, stands far and above most of the people I've met
19 who are in that kind of business and in the advocacy
20 and lobbying business.
21      He's got integrity, and he was able to
22 convey an image for us that we would like to convey,

Page 21

1  that we're about what the right thing to do is, that
2  we have a position. He was able to pick up on a very
3  complicated issue and articulate it in English, which
4  is not easy to do, when you have a title like clinical
5  oncology.
6       And so he -- he almost single-handedly
7  turned around some very bad situations that had been
8  created by people who implied they were part of our
9  organization but were not. And he opened doors that
10 were locked previously.
11      So I hadn't seen anybody who was able to do
12 that in the time that he did it.
13 Q   During your experience from the 2004, 2005
14 time frame to the present, with The Washington Group
15 and Ketchum, did you work with anyone else besides Mr.
16 Sporidis, Noam who you've mentioned, and I think you
17 said Louanne?
18 A   I think it was Louanne Roark, and there was
19 -- there were a couple other folks in the Ketchum
20 team. Zachary, and I'm blanking on his last name
21 right now. There were other people. I'm sure they
22 were working with other folks within their

6 (Pages 18 to 21)

Deborah Y. Kamin, Ph. D.

Page 74

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, Tammy S. Newton, the officer before whom

3    the foregoing proceedings was taken, do hereby certify

4    that the foregoing transcript is a true and correct

5    record of the proceedings; that said proceedings were

6    taken by me stenographically and thereafter reduced to

7    typewriting under my supervision; and that I am

8    neither counsel for, related to, nor employed by any

9    of the parties to this case and have no interest,

10   financial or otherwise, in its outcome.

11        IN WITNESS WHEREOF, I have hereunto set my

12   hand and affixed my notarial seal this 4th day of

13   November, 2007.

14   My commission expires:

15   8/01/2012

16

17   _____

18   Notary Public in and for the

19   District of Columbia

20

21

22

Page 75

1    Elizabeth Anne Lalik, Esquire
     Littler Mendelson
2    1650 Tysons Boulevard, Suite 700
     McLean, Virginia 22102
3
4
     Re:  The Washington Group V. Sporidis
5
     Dear Ms. Lalik:
6
     Enclosed please find your copy of the deposition of
7    Deborah Y. Kamin, Ph.D. along with the original
     signature page.  As agreed, you will be responsible
8    for contacting the witness regarding reading and
     signing the transcript.
9
10   Within 30 days of receipt, please forward the errata
     sheet and original signature page signed to opposing
11   counsel.
12   If you would like to change this procedure or if you
     have any questions, please do not hesitate to call.
13
     Thank you.
14
     Sincerely,
15
16
17
     Tammy Newton
18   Reporter/Notary
19
20
21
22

Page 76

1         DEPOSITION ERRATA SHEET
2    CASE CAPTION:  The Washington Group V. Sporidis
3    DEPONENT:  Deborah Y. Kamin, Ph.D.
4    DEPOSITION DATE:  November 2, 2007
5         I have read the entire transcript of my
     Deposition taken in the captioned matter or the same
6    has been read to me.  I request that the changes noted
     on the following errata sheet be entered upon the
7    record for the reasons indicated.  I have signed my
     name to the Errata Sheet and the appropriate
8    Certificate and authorize you to attach both to the
     original transcript.
9
10   Page/Line     Change          Reason
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
     Signature                Date

20  (Pages 74 to 76)

## Capital Reporting Company

Page 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

------------------------------:

THE WASHINGTON GROUP, INC.        :

      Plaintiff,        : Case No.:

       v        : 07CV01892

HARRY SPORIDIS,        :

      Defendant.        :

------------------------------:

Washington, D.C.

Thursday, November 1, 2007

LORRAINE THELIAN,

called for oral examination telephonically by counsel

for Defendant, pursuant to notice at the Offices of

Robbins, Russell, Englert, Orseck, Untereiner & Sauber,

LLP, 1801 K Street, Northwest, Washington, D.C. before

Natalia Kornilova of Capital Reporting, a Notary Public

in and for the District of Columbia, beginning at 11:08

a.m., when were present on behalf of the respective

parties:

## Capital Reporting Company

Page 10

1    Q    And what kind of dealings did you have with
2   Mr. Sporidis while he was at The Washington Group?
3    A    I saw Harry when I was at The Washington
4   Group for any of their staff meetings or, I think they
5   called them legislative meetings, for the most part.
6   And I also participated in at least one new business,
7   one new business potential. I guess it was a
8   presentation at The Washington Group. And we talked
9   about new business on occasion.
10    Q    You and Harry talked about new business?
11    A    Yes.
12    Q    And the presentation you did with him at the
13   The Washington Group for new business, can you identify
14   the client for us or the potential?
15    A    ASCO.
16    Q    I'm sorry?
17    A    ASCO, the American Society for Clinical
18   Oncology. And I was not actually in the presentation
19   personally but I participated right through their last
20   rehearsal.
21    Q    Do you remember who else participated in the
22   rehearsal?

Page 11

1    A    I probably will not remember everybody
2   because it was a while ago. I know Noam Gelfond was in
3   it, G-e-l-f-o-n-d. I'm trying to remember. Honestly,
4   this is a tough one because it's a while ago. But,
5   let's see, Susan, I believe, was in that, Susan
6   Molinari. I don't -- I think we had at least another
7   person and honestly, I can't remember who it was.
8    Q    And that was --
9    A    It might have been Al Jackson.
10    Q    Where does Mr. Jackson work?
11    A    He works at Ketchum Public Affairs which is
12   part of Ketchum's Washington office.
13    Q    And that's also where Mr. Gelfond works, is
14   at Ketchum Public Affairs?
15    A    Yes. Yes.
16    Q    All right. And this was a proposal for
17   Ketchum to provide both public affair services and
18   lobbying services to ASCO; isn't that right?
19    A    Yes, it was a joint presentation because we
20   brought The Washington Group into it.
21    Q    And had Ketchum prepared a response to an
22   RFP before the presentation?

Page 12

1    A    Yes, we did.
2    Q    And the people who prepared that response
3   for Mr. Gelfond and Mr. Sporidis, right?
4    A    I think it was mostly Mr. Gelfond.
5    Q    You think Mr. Gelfond prepared part of the
6   response that dealt with lobbying?
7    A    I think he prepared 90 percent of the
8   response as Noam does all the time.
9    Q    And that pitch was successful, wasn't it?
10    A    Yes, it was.
11    Q    And ASCO hired Ketchum to provide services
12   for it, right?
13    A    Yes.
14    Q    And the services it was hired to provide
15   involved public affairs and lobbying?
16    A    Yes.
17    Q    Mr. Gelfond was the primary contact on that
18   account, wasn't he?
19    A    Yes, he was.
20    Q    And Mr. Sporidis was the lobbyist who had
21   the primary relationship with ASCO; isn't that correct?
22    A    Yes.

Page 13

1    Q    And Mr. Sporidis has been the primary
2   lobbyist for ASCO during the entire time that ASCO has
3   been a client of Ketchum, correct?
4    A    Yes, that's correct.
5    Q    Did there -- did there come a time when you
6   learned that Mr. Sporidis was leaving The Washington
7   Group?
8    A    Did there come a time?
9    Q    Yeah.
10    A    Yes.
11    Q    And how did you learn?
12    A    I believe -- I'm trying to remember as to
13   whether it was a phone call but I also got an e-mail
14   from -- I actually see it in front of me. But it was
15   from Paul Lobo telling me that Harry was leaving.
16    Q    Okay. Now, do you have in front of you a
17   document that bears Bates labels TWG-80 and 81?
18    MS. LALIK: Yes, this is Beth. That's the
19   document you mentioned you'd be using first off so
20   we have that in front of her.
21   BY MR. STRASSER:
22    Q    Okay. And that one was previously marked as

4  (Pages 10 to 13)

# Capital Reporting Company

|  | Page 50 |
|---|---|
| 1 | you informed ASCO that they cannot use Mr. Sporidis? |
| 2 | A    Yes. |
| 3 | Q    And you believe that Ketchum -- |
| 4 | A    Now wait. |
| 5 | Q    Go ahead. |
| 6 | A    I don't know what we said to ASCO honestly, |
| 7 | but we did call ASCO and say this is a problem and that |
| 8 | we -- again, I know we let them know. |
| 9 | MS. LALIK: Yeah, I just -- neither Mr. |
| 10 | Strasser nor I want you to speculate about things |
| 11 | you don't know about, so -- |
| 12 | THE WITNESS: Okay. |
| 13 | MS. LALIK: -- only testify about what you |
| 14 | know. |
| 15 | THE WITNESS: I do know we contacted ASCO. |
| 16 | I do not know exactly what we said. |
| 17 | BY MR. STRASSER: |
| 18 | Q    And who is it who contacted ASCO? |
| 19 | A    I don't know who had the conversation.  I |
| 20 | know Noam Gelfond tried to call them. |
| 21 | Q    And do you believe that Mr. Gelfond told |
| 22 | them that ASCO was not permitted to use Mr. Sporidis? |

|  | Page 51 |
|---|---|
| 1 | A    No, I don't think he did. |
| 2 | Q    Do you -- what do you think Mr. Gelfond said |
| 3 | to ASCO? |
| 4 | A    I don't know if he ever actually talked to |
| 5 | them.  He tried to call them and left them a number of |
| 6 | messages. |
| 7 | Q    And what do you think the messages were that |
| 8 | he left? |
| 9 | A    Just that there were some -- |
| 10 | MR. LALIK: Do you know what messages he |
| 11 | left?  Do you have some knowledge of -- I don't |
| 12 | want you speculating.  So if you have knowledge, |
| 13 | testify about it. |
| 14 | THE WITNESS: I do know he reached out to |
| 15 | ASCO.  I don't know what message he left. |
| 16 | BY MR. STRASSER: |
| 17 | Q    And how about for Mentor, who do you think |
| 18 | it is he tried to contact at Mentor? |
| 19 | A    I do not know. |
| 20 | Q    Has The Washington Group provided ASCO with |
| 21 | the name of some other lobbyist who might serve them? |
| 22 | A    I don't know if they did provide names.  But |

|  | Page 52 |
|---|---|
| 1 | I know we could. |
| 2 | Q    Do you know if The Washington Group has |
| 3 | provided the name of another lobbyist who might serve |
| 4 | Mentor to Mentor? |
| 5 | A    I do not know but I also know we could. |
| 6 | Q    And who is it at The Washington Group who |
| 7 | would be a suitable lobbyist for ASCO? |
| 8 | A    There would be a number of them. |
| 9 | Q    Just name two or three of them. |
| 10 | A    Do I have to answer that right now?  I |
| 11 | honestly do believe there are a number of them with |
| 12 | healthcare capability as well as just general counsel. |
| 13 | I think one thing that's important -- that's why I don't |
| 14 | want to give names, cause there are probably five of |
| 15 | them.  ASCO, in particular, we could have brought any |
| 16 | lobbyist into that meeting with us.  It did not require |
| 17 | Harry Sporidis.  We could have brought Eugene Patrone |
| 18 | and we would have won just the same way as Harry. |
| 19 | Q    You didn't think there was anything unique |
| 20 | about Harry's services to ASCO? |
| 21 | A    I did not. |
| 22 | Q    And how about for Mentor?  Did you think |

|  | Page 53 |
|---|---|
| 1 | Harry's services were unique for Mentor? |
| 2 | A    You know, honestly, I've never thought about |
| 3 | it.  You know, Harry had some healthcare capabilities so, |
| 4 | you know, I think that was obviously important to Mentor |
| 5 | but, again, based on what I believe the issue was, if |
| 6 | I'm not mistaken it's breast implants? |
| 7 | Q    Right.  That's one of their products, yes. |
| 8 | A    You know, I think there are a lot of people |
| 9 | who could handle that.  I mean, we've done breast |
| 10 | implant issues at Ketchum for years. |
| 11 | Q    So you don't think that Harry's services |
| 12 | were unique for Mentor? |
| 13 | A    No, I don't. |
| 14 | Q    I'm sorry, I couldn't hear you. |
| 15 | A    I do not. |
| 16 | And now we have a person, and I'm just |
| 17 | trying to |
| 18 | remember his last name but if you want a name, we have a |
| 19 | person by the name of Brett.  I can't think of his last |
| 20 | name who has total healthcare capability and could move |
| 21 | in there in, you know, a minute. |
| 22 | Q    So I -- let's go back to the -- an earlier |

14  (Pages 50 to 53)

## Capital Reporting Company

Page 78

1    Q    But they hadn't yet renewed it, correct?
2    A    I am not sure. I am not sure.
3    Q    Well, is there a contract right now between
4    ASCO and Ketchum?
5    A    I'm not sure.
6    Q    Right. And when Mr. Sporidis gave his --
7    A    Oh, I do know that there were -- you know,
8    that I heard that it was -- that there were some
9    renegotiation going on, I just don't know the dates.
10    Q    And when Mr. Sporidis gave his notice that
11    he was leaving, was there a contract in effect between
12    ASCO and Ketchum on that -- on September 26th?
13    A    I believe there may have been.
14    Q    Well, you think there was a contract in
15    effect on September 26th?
16    A    I believe there may have been, but, again,
17    I'm not -- I can't swear.
18    Q    Well, you realize you did swear to begin the
19    deposition?
20    MS. LALIK: No, no, no. She --
21    THE WITNESS: I don't mean it that way.
22    MS. LALIK: I think you're misconstruing

Page 79

1    what she said. I think she said --
2    THE WITNESS: I shouldn't use the word
3    exactly that way. I apologize, but I believe
4    there was a contract in place because it would
5    have been part of the quarter. You know,
6    September 30th is when it was in the month of
7    September that
8    Harry gave notice and I believe our contract went
9    through September 30th.
10    BY MR. STRASSER:
11    Q    Okay. If I tell you that your contract
12    actually went through the end of August, would that be a
13    surprise to you?
14    A    Yes, it would.
15    Q    Are you familiar with the Ketchum contract?
16    A    No, I'm not.
17    Q    And I take it you are -- are you saying that
18    you don't know whether the Ketchum contract with ASCO
19    had been renewed in September or are you saying that you
20    thought it had been renewed by the time Mr. Sporidis
21    gave notice that he was leaving?
22    A    I do not know if the contract itself had

Page 80

1    been renewed. My understanding is we were still doing
2    some consulting work, that Noam was still doing some
3    consulting work with ASCO.
4    Q    But nobody else was working for them when
5    Mr. Sporidis gave notice?
6    A    You know, I don't believe at this point.
7    You know, I think one thing that's very important to me
8    and, you know, probably why I feel so strongly about
9    this, Ketchum intentionally encouraged more work with
10    The Washington Group for ASCO and minimized Ketchum's
11    work in terms of the revenue honestly to make sure that,
12    you know, The Washington Group had some great lobbying
13    clients, so, you know, if anything, we didn't try to
14    keep more revenue, we said, fine, if you can do it, you
15    know, go ahead Washington Group, work on ASCO. So it's
16    probably one of the reasons I feel pretty emotional
17    about it that Ketchum won it, and now a person that
18    works for us is now taking this account or trying to
19    take this account.
20    Q    I asked you whether anyone else was working
21    on it besides Mr. Gelfond. Would you answer that
22    question, please?

Page 81

1    A    I'm not sure but I don't believe so.
2    MR. STRASSER: Okay. That's all the
3    questions I have, thank you.
4    MS. LALIK: All right. Then I think we are
5    done.
6    MR. STRASSER: Okay.
7    MS. LALIK: I believe I have all these
8    exhibits but, Alan, I may bring them with me and
9    compare them against your set this afternoon.
10    MR. STRASSER: Okay.
11    MS. LALIK: If that's all right with you?
12    MR. STRASSER: Yeah.
13    MS. LALIK: And have you talked to the court
14    reporter about the transcript?
15    MR. STRASSER: I have and -- but I'll let
16    her speak for herself here.
17    MS. LALIK: I should add, and I'm not sure
18    if the court reporter would like to put this on
19    the record or not but the witness will go ahead
20    and read and sign the transcript, please.
21    THE COURT REPORTER: Thank you. That was my
22    question.

21 (Pages 78 to 81)

# Capital Reporting Company

## Page 82

1  (Whereupon, at 12:41 p.m., the
2  deposition of LORRAINE THELIAN
3  was concluded.)
4          * * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 83

1          CERTIFICATE OF NOTARY PUBLIC
2      I, Natalia Kornilova, the officer before whom the
3  foregoing deposition was taken, do hereby certify that
4  the witness whose testimony appears in the foregoing
5  deposition was duly sworn by me; that the testimony of
6  said witness was taken by me in stenotype and thereafter
7  reduced to typewriting under my direction; that said
8  deposition is a true record of the testimony given by
9  said witness; that I am neither counsel for, related to,
10  nor employed by and of the parties to the action in
11  which this deposition was taken; and, further, that I am
12  not a relative or employee of any counsel or attorney
13  employed by the parties hereto, nor financially or
14  otherwise interested in the outcome of this action.
15
16
17          _____
18              NATALIA KORNILOVA
19          NOTARY PUBLIC IN AND FOR
20          THE DISTRICT OF COLUMBIA
21  My commission expires:
22  April 14, 2012

## Page 84

1      ACKNOWLEDGEMENT OF DEPONENT
2      I, LORRAINE THELIAN, do hereby acknowledge I have
3  read and examined the foregoing pages of testimony, and
4  the same is a true, correct and complete transcription of
5  the testimony given by me and any changes or corrections,
6  if any, appear in the attached errata sheet signed by
7  me.
8
9
10
11
12
13
14
15
16
17
18
19
20
21  _____  _____
22  Date              LORRAINE THELIAN

## Page 85

1  Elizabeth A. Lalik, Esq
2  Littler Mendelsson, PC
3  1650 Tysons Boulevard
4  Suite 700
5  McLean, VA 22102
6  Washington, D.C.  90562
7
8  IN RE:  The Washington Group, Inc. v. Harry Sporidis
9
10  Dear Ms. Lalik:
11      Enclosed please find your copy of the deposition
12  of LORRAINE THELIAN, along with the original signature
13  page.  As agreed, you will be responsible for contacting
14  the witness regarding signature.
15      Within thirty (30) day of receipt, please forward
16  errata sheet and original signed signature page to counsel for
17  Defendant, Alan Strasser. If you have any questions,
18  please do not hesitate to call.
19
20  Yours,
21  Natalia Kornilova
    Reporter/Notary
22  cc:  Alan Strasser,Esq.

22  (Pages 82 to 85)

Susan Molinari                                        October 31, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


THE WASHINGTON GROUP, INC.,


Plaintiff


v.                        Civil Action
                          No. 1:07-cv-1892(RBW)


HARRY SPORIDIS,


Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

SUSAN MOLINARI

October 31, 2007
10:10 a.m.

Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP
1801 K Street, NW, Suite 411
Washington, DC

Tracy E. Barksdale, Certified Shorthand Reporter
and Notary Public in and for the District of Columbia

Susan Molinari                                    October 31, 2007

| Page 22 | Page 24 |
|---|---|

**Page 22**

1      A.   In general, it is my recollection
2  that we were all hoping that we could work
3  something out between Harry and Ketchum so
4  that we wouldn't be here.
5      Q.   Do you know who decided to bring
6  the lawsuit?
7      A.   Ketchum.
8      Q.   But an individual at Ketchum?
9      A.   Yes.
10     Q.   Do you know that was?
11     A.   No, I don't.
12     Q.   Did you talk to Ms. Thelian about
13 the lawsuit?
14     A.   Early on.
15     Q.   What was your discussion with her?
16     A.   That I would hope that we would be
17 able to work something out with Harry so that
18 we wouldn't take this measure.
19     Q.   What did Ms. Thelian say to you?
20     A.   She was hoping we could do that
21 too.
22     Q.   Let's talk a little bit about --
23 well, before we go to that, was there any
24 controversy within The Washington Group about
25 whether to bring the lawsuit?

**Page 23**

1      A.   Yes.
2      Q.   What was the controversy?
3      A.   That we felt that we wanted to do
4  what was in Harry's best interests as well as
5  the remaining employees at The Washington
6  Group, and we were urging both Harry and
7  Ketchum to try to negotiate a settlement.
8      Q.   Was there anybody taking a
9  different view in The Washington Group?
10     A.   No.
11     Q.   So the --
12     A.   Not that I'm aware of.
13     Q.   So the controversy was really
14 between The Washington Group and Ketchum, not
15 within The Washington Group?
16     A.   Correct.
17     Q.   Is this the first lawsuit that The
18 Washington Group has ever been involved in?
19     A.   To my knowledge.
20     Q.   Has The Washington Group -- I take
21 it, then, The Washington Group has never sued
22 someone for breach of a noncompete agreement?
23     A.   To my knowledge.
24     Q.   The people who have left The
25 Washington Group in the last five years, did

**Page 24**

1  any of them have, in your view, a noncompete
2  agreement?
3      A.   Yes.
4      Q.   Who was that?
5      A.   John Rafaelli.  And if I can
6  clarify, I was not aware of at the time that
7  Richard Sullivan would have had a noncompete,
8  but clearly, because he also received stock,
9  he probably has a noncompete.  Bill Burke did
10 not.  He had a separate contract.  I don't
11 think Tripp had stock.  So to the best of my
12 knowledge, I'm answering that it would be
13 John Rafaelli and Richard Sullivan and, I'm
14 sorry, David Crane I left out of that list.
15 He worked for us, he left, and I think he
16 has received stock.
17     Q.   And you think that those three
18 men, John Rafaelli, Richard Sullivan, and
19 David Crane, had noncompete agreements?
20     A.   Yes.  And John O'Hanlon who left
21 and is now with ISG.
22     Q.   You think Mr. O'Hanlon also had a
23 noncompete?
24     A.   He was part of the buy-out, so
25 yes.

**Page 25**

1      Q.   What do you mean by that, he was
2  part of the buy-out?
3      A.   When Ketchum purchased The
4  Washington Group, they purchased the business
5  of John O'Hanlon, John Rafaelli, Rita Lewis,
6  and myself, and that subjected us to the
7  nonsolicitation, noncompete.
8      Q.   But Mr. Sullivan and Mr. Crane
9  were not part of the buy-out, correct?
10     A.   No.
11     Q.   Do you know why The Washington
12 Group did not sue Mr. Sullivan?
13     A.   It is my understanding that they
14 are negotiating with Richard and John Rafaelli
15 now.
16     Q.   Who is negotiating with them?
17     A.   Ketchum.
18     Q.   Negotiating with them about what?
19     A.   About clients that were Washington
20 Group clients that left.
21     Q.   How about Mr. Crane?  Do you know
22 why The Washington Group has not sued Mr.
23 Crane?
24     A.   I would prefer for Ketchum to
25 answer this definitively, but I will answer

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  for myself that at that point David -- we
2  were not unhappy to see David go.
3  　　Q.　I take it he is working at some
4  other lobbying organization here in town?
5  　　A.　Yes.
6  　　Q.　Now, were you involved in any of
7  the decision making in 2002 about whether Mr.
8  Sporidis should receive a grant of stock?
9  　　A.　I may have been.
10  　　Q.　Why do you say you may have been?
11  　　A.　Forgive my memory. Again, I was
12  not in the direct line as I am now, but I
13  would imagine that was a decision made by --
14  a recommendation made by John Rafaelli to the
15  rest of the group in 2002.
16  　　Q.　Rest of the group means who?
17  　　A.　The managing group at the time,
18  which was Rita Lewis, John O'Hanlon, actually
19  Kevin Allen, and myself.
20  　　Q.　And how about in 2003? Were you
21  involved in the decision to give stock to Mr.
22  Sporidis in 2003?
23  　　A.　It would be under those same
24  circumstances.
25  　　Q.　You think you were part of the

**Page 27**

1  managing group that got a recommendation about
2  that?
3  　　A.　Yes, sir.
4  　　Q.　How about in 2005? Were you part
5  of the decision making group about whether to
6  give restricted stock to Mr. Sporidis in
7  2005?
8  　　A.　Yes.
9  　　Q.　Tell us what went into that
10  decision.
11  　　A.　As best as I can recall, John
12  Rafaelli and I were looking to use stock to
13  assist in compensating those individuals that
14  we wanted to keep incentivized and felt that
15  they deserved it, based on their work.
16  　　Q.　Did you think the considerations
17  for the stock awarded in 2005 were any
18  different than the stock awarded in 2002 or
19  2003?
20  　　A.　No.
21  　　Q.　Did you tell Mr. Sporidis in 2002
22  that he was getting a stock award?
23  　　A.　I might have; John might have. I
24  could well have been, but I don't recall.
25  　　Q.　How about in 2003? Did you tell

**Page 28**

1  him?
2  　　A.　Same answer, sir.
3  　　Q.　You don't remember, one way or the
4  other?
5  　　A.　No.
6  　　Q.　How about 2005? Did you tell Mr.
7  Sporidis about a stock award?
8  　　A.　Again. I could have, somebody
9  else in the firm could have.
10  　　Q.　You just don't remember, one way
11  or the other?
12  　　A.　That's correct.
13  　　Q.　Let's talk a little about what Mr.
14  Sporidis did at The Washington Group. What
15  was his job there?
16  　　A.　He was a lobbyist.
17  　　Q.　Was that his job the entire time
18  there?
19  　　A.　Yes.
20  　　Q.　And do you know what his title was
21  when he joined The Washington Group?
22  　　A.　No.
23  　　Q.　How about his title when he left?
24  　　A.　I'm guessing it was senior vice
25  president, but I'm not sure.

**Page 29**

1  　　Q.　And I take it you don't attribute
2  too much significance to the titles people
3  have at The Washington Group?
4  　　A.　I think they're all deserved, but
5  I -- my memory is -- I remember their
6  performance rather than their titles.
7  　　Q.　That's what is important, their
8  performance rather than their title?
9  　　A.　That's correct, yes, sir.
10  　　Q.　All right. So one of the clients
11  that Mr. Sporidis had was an organization
12  called ASCO, American Society of Clinical
13  Oncologists?
14  　　A.　Yes.
15  　　Q.　Do you know, how did ASCO come to
16  be a client of The Washington Group?
17  　　A.　I believe it was brought, to the
18  best of my knowledge, I believe it was
19  brought to our attention through Ketchum, and
20  I know we were all part of a pitch to the
21  deciding group of the clinical oncologists,
22  several individuals from Ketchum, several of
23  us from The Washington Group.
24  　　Q.　Who was it from Ketchum?
25  　　A.　Noam Gelfond, I know is one.

Susan Molinari                                                          October 31, 2007

| Page 46 | Page 48 |
|---|---|

**Page 46**

1       THE WITNESS: I'm not a lawyer,
2 sir.
3     BY MR. STRASSER:
4     Q.   I know that. We're not holding
5 that against you.
6     A.   Talk to my father, will you?
7     Q.   I won't touch that.
8     A.   May I take one minute to read this
9 before I answer?
10     Q.   Of course.
11     A.   I'm sorry. Your question again,
12 sir?
13     Q.   Do you interpret that sentence that
14 I read aloud before to mean that ASCO
15 regarded Mr. Sporidis' services as key to the
16 performance of Ketchum's business for ASCO?
17     A.   I believe that's what the sentence
18 says specifically, yes, sir.
19     Q.   That's how you interpreted it?
20     MR. GREENBERG: Objection. Asked
21 and answered and speaks for itself.
22     You can go ahead and answer again
23 your interpretation.
24     THE WITNESS: The sentence says
25 that they are key to the satisfactory

**Page 47**

1 performance of Ketchum.
2     BY MR. STRASSER:
3     Q.   Let me ask you to keep reading
4 that same paragraph. In fact, if you just
5 read to yourself the very next sentence in
6 that paragraph.
7     A.   Yes, sir.
8     Q.   And that sentence talks about the
9 substitute individuals for either Mr. Gelfond
10 or Mr. Sporidis if either of them leave
11 Ketchum, right?
12     A.   Yes.
13     Q.   Mr. Sporidis left Washington Group
14 October 12th, right, that was his last day of
15 work?
16     A.   Yes.
17     Q.   Has The Washington Group identified
18 a substitute individual to provide services to
19 ASCO?
20     A.   No, sir.
21     Q.   Do you know why that is?
22     A.   I believe, speaking only for The
23 Washington Group, not Ketchum, that we were
24 hoping that we would continue working with
25 Harry.

**Page 48**

1     Q.   What do you mean by that?
2     A.   That Harry would -- let me say no,
3 we have not.
4     Q.   I got that answer already. Now
5 I've asked you why.
6     A.   At a certain point, we were hoping
7 that we would be able to negotiate something
8 with Harry with regard to ASCO, and then
9 Harry got lawyers involved, and we all just
10 decided it was best to not continue down that
11 road at this point.
12     Q.   Not continue down the road of --
13     A.   Of even looking at the contracts
14 that may be in dispute between Harry and
15 Ketchum.
16     Q.   So you decided, because Mr.
17 Sporidis got a lawyer involved, not to
18 identify a substitute individual for ASCO?
19     A.   I guess we figured it would all be
20 worked out here, one way or the other.
21     Q.   Here meaning where?
22     A.   Between the lawyers.
23     Q.   So I take it, then, no one at The
24 Washington Group has contacted ASCO since Mr.
25 Sporidis left The Washington Group?

**Page 49**

1     A.   No, sir.
2     Q.   Nobody has?
3     A.   Not to my knowledge.
4     Q.   Well, you would know, wouldn't you?
5     A.   I would hope.
6     Q.   And have you taken any steps to
7 identify a substitute individual for ASCO?
8     A.   No, sir.
9     Q.   Has anyone else taken any steps to
10 identify a substitute individual for ASCO?
11     A.   No, sir.
12     Q.   When you say The Washington Group
13 hoped to continue working with Mr. Sporidis,
14 what did you mean by that?
15     A.   There has been precedence that when
16 people have left Ketchum, or The Washington
17 Group, with a noncompete, for maintaining that
18 client, if there is some kind of amicable
19 split based on revenue, and that was our
20 hope.
21     Q.   So you hoped that The Washington
22 Group would continue to receive revenue from
23 ASCO?
24     A.   With Harry being able to maintain
25 his relationship with them, yes, sir.

Susan Molinari                                        October 31, 2007

| Page 62 |
|---|
| 1     enjoyed working with you, didn't he? |
| 2     A.   Yes, sir. |
| 3     Q.   You're under oath, you have to |
| 4     say. |
| 5     A.   Yes. |
| 6     Q.   Did he tell you where he was |
| 7     going? |
| 8     A.   No, he did not. |
| 9     Q.   Did he tell you he was going to a |
| 10    law firm? |
| 11    A.   He did tell me that day he was |
| 12    going to a lobbying firm within a law firm, |
| 13    yes. |
| 14    Q.   Did you tell him that you were |
| 15    happy for him? |
| 16    A.   Yes, sir. |
| 17    Q.   Were you happy for him? |
| 18    A.   Yes, sir. |
| 19    Q.   Why were you happy for him? |
| 20    A.   I'm happy when Harry's happy. |
| 21    Q.   Why do you say that? |
| 22    A.   Because I think of him as a |
| 23    terrific person and a good friend, and if he |
| 24    thought this was a better fit for him, I |
| 25    thought I was happy for him. |

| Page 63 |
|---|
| 1     Q.   Did you also tell him it was also |
| 2    a good idea for him and his family? |
| 3    A.   If he thought it was, yes. |
| 4    Q.   But did you tell him that? |
| 5    A.   To the best of my recollection, I |
| 6    don't recall that. I could have, but for |
| 7    him, I thought, if he was happy in making |
| 8    this move, and he felt it was better for him |
| 9    and his family, then I was not going to |
| 10    argue. |
| 11    Q.   Was anybody else in the room with |
| 12    you? |
| 13    A.   No. |
| 14    Q.   About how long did the whole |
| 15    conversation take? |
| 16    A.   15 minutes. |
| 17    Q.   Did you talk with him about his |
| 18    transition? |
| 19    A.   Yes. |
| 20    Q.   Did you tell him you wanted it to |
| 21    be a smooth transition? |
| 22    A.   Yes. |
| 23    Q.   Wanted it to be an easy transition |
| 24    for him? |
| 25    A.   Yes. |

| Page 64 |
|---|
| 1     Q.   Why did you say that? |
| 2     A.   Because I like and respect Harry |
| 3    very much. |
| 4     Q.   Did you talk to him about what he |
| 5    should do about his clients? |
| 6     A.   Yes. |
| 7     Q.   What did you say? |
| 8     A.   I asked him how long he thought |
| 9    he'd stay at The Washington Group. |
| 10    Q.   What did he say? |
| 11    A.   He said, to the best of my |
| 12    recollection, he wasn't sure. He wanted it |
| 13    to be a smooth transition, and then I |
| 14    proceeded to tell him that he needed to make |
| 15    sure that the clients that he was taking gave |
| 16    us 30-day notice. |
| 17    Q.   Why would you say that? |
| 18    A.   Number one, because I was not |
| 19    aware of any sort of noncompete that he was |
| 20    under, and more concerned with knowing that |
| 21    Ketchum and The Washington Group has been |
| 22    very steadfast in making sure that all our |
| 23    clients adhere to the 30-day opt-out clause. |
| 24    That's in all their contracts, I believe. |
| 25    Q.   Okay. And is there a clause like |

| Page 65 |
|---|
| 1     that in the Mentor contract? |
| 2     A.   I don't know. |
| 3     Q.   Let's go look. And we're looking |
| 4    at Exhibit 4. |
| 5     Is there -- I'm not seeing it |
| 6    here, is there some particular thing that |
| 7    you're thinking of? |
| 8     A.   It was my understanding that that |
| 9    was written into, I thought, all of our |
| 10    contracts. |
| 11    Q.   And when you say that was written |
| 12    in, it is a requirement that the client give |
| 13    30 days' notice of the termination? |
| 14    A.   Correct. |
| 15    Q.   And you wanted Mr. Sporidis to |
| 16    have his client submit those termination |
| 17    notices timely? |
| 18    A.   Yes. |
| 19    Q.   Did you tell him that Mr. Lorfink |
| 20    was a stickler about that? |
| 21    A.   Yes, sir. |
| 22    Q.   Who is he? |
| 23    A.   He's the CFO to Ketchum. |
| 24    Q.   When you say he's a stickler, what |
| 25    did you mean? |

Susan Molinari                                October 31, 2007

|   | Page 66 |
|---|---------|
| 1 | A.    That they wanted to make sure, if |
| 2 | that was the terms of the contract, that that |
| 3 | was upheld. |
| 4 | Q.    And you wanted to minimize the |
| 5 | overlap between the services provided, that |
| 6 | Harry provided to those clients at The |
| 7 | Washington Group and the services he would |
| 8 | provide at his new place? |
| 9 | A.    I just want Harry to be aware that |
| 10 | that was something that Ketchum took very |
| 11 | seriously. |
| 12 | Q.    Okay.  And I think you said along |
| 13 | the way here that you were not aware of any |
| 14 | noncompete clause that governed Mr. Sporidis |
| 15 | at that time? |
| 16 | A.    At that time, that's correct. |
| 17 | Q.    All right.  Was there anything |
| 18 | else that you said during that conversation? |
| 19 | A.    I'm sure I said that I wished him |
| 20 | well and that we would miss him, and I |
| 21 | wanted him to be happy. |
| 22 | Q.    Did you make him promise to call |
| 23 | you up every Tuesday and gossip with you? |
| 24 | A.    Probably. |
| 25 | Q.    Did you make him promise to have |

|   | Page 68 |
|---|---------|
| 1 | Lobo. |
| 2 | Q.    What did you say to Mr. Lobo? |
| 3 | A.    That Harry was going to call him. |
| 4 | Q.    Did you have that conversation with |
| 5 | Mr. Lobo that same day? |
| 6 | A.    Yes. |
| 7 | Q.    Where were you when you had that |
| 8 | conversation? |
| 9 | A.    I was on a cell phone. |
| 10 | Q.    Do you know where Mr. Lobo was? |
| 11 | A.    I don't recall. |
| 12 | Q.    Did you tell Mr. Lobo why Harry |
| 13 | was trying to reach him? |
| 14 | A.    Yes. |
| 15 | Q.    What did you say? |
| 16 | A.    Harry is going to leave.  He |
| 17 | doesn't want me to say anything to anybody |
| 18 | until he talks to you and Eugene.  Please |
| 19 | make yourselves available as soon as possible. |
| 20 | Q.    And do you know if Harry met with |
| 21 | Mr. Lobo that same day? |
| 22 | A.    I believe it was the morning |
| 23 | after. |
| 24 | Q.    And did Mr. -- were you present |
| 25 | for that meeting? |

|   | Page 67 |
|---|---------|
| 1 | lunch with you every month? |
| 2 | A.    Yeah, probably. |
| 3 | Q.    And he was happy to agree with |
| 4 | that? |
| 5 | A.    I can't speak.  That's speculation. |
| 6 | I think he was. |
| 7 | Q.    He seemed happy? |
| 8 | A.    He seemed happy. |
| 9 | Q.    You expressed some affection for |
| 10 | him, and he expressed some affection for you |
| 11 | after the meeting? |
| 12 | A.    Yes, sir. |
| 13 | Q.    And you actually hugged? |
| 14 | A.    Probably. He's ethnic, I'm ethnic. |
| 15 | Probably. |
| 16 | Q.    But that was because you had a |
| 17 | good relationship with him, right? |
| 18 | A.    Yes, sir. |
| 19 | Q.    You liked working with him? |
| 20 | A.    Very, very much so. |
| 21 | Q.    And he liked working with you? |
| 22 | A.    Very much. |
| 23 | Q.    After you had this conversation |
| 24 | with Mr. Sporidis, did you tell anybody else? |
| 25 | A.    No.  Actually, I did; I told Paul |

|   | Page 69 |
|---|---------|
| 1 | A.    No. |
| 2 | Q.    Did Mr. Lobo tell you about the |
| 3 | meeting? |
| 4 | A.    Not in detail, no. |
| 5 | Q.    Did you ask Mr. Sporidis to talk |
| 6 | to Mr. Lobo because you knew Mr. Lobo was |
| 7 | preparing budgets for the coming year? |
| 8 | A.    Yes. |
| 9 | Q.    You told Mr. Sporidis that? |
| 10 | A.    Yes. |
| 11 | Q.    And the budgets would contain |
| 12 | revenue projects for The Washington Group for |
| 13 | 2008? |
| 14 | A.    Correct. |
| 15 | Q.    You wanted Mr. Lobo to have an |
| 16 | accurate idea of what the revenues would be |
| 17 | for the year coming? |
| 18 | A.    Correct. |
| 19 | Q.    You wanted to be sure that Mr. |
| 20 | Lobo heard from Mr. Sporidis that Mr. |
| 21 | Sporidis' clients were not likely to be there |
| 22 | in the following year? |
| 23 | A.    Correct. |
| 24 | Q.    And did you explain that to Mr. |
| 25 | Sporidis? |

Susan Molinari                                          October 31, 2007

| Page 114 |
|---|
| DESCRIPTION OF DEFENDANT'S EXHIBITS |
| EXHIBIT DESCRIPTION |

1    DESCRIPTION OF DEFENDANT'S EXHIBITS
2    EXHIBIT DESCRIPTION
3    1    Memo dated January 10, 2006, from
4        Harry Sporidis to Susan Molinari
5    2    Year-End Performance Self-Assessment
6    3    Public Relations Services Agreement
7    4    Letter dated November 7, 2006, from
8        Susan Molinari to Mr. Josh Levine
9    5    E-mail chain; top e-mail dated
10       September 27, 2004, from Paul Lobo to
11       Lorraine Thelian
12    6    E-mail chain; top e-mail dated
13       October 3, 2007, from Harry Sporidis
14       to Susan Molinari
15    7    E-mail dated October 3, 2007, from
16       The Washington Group to Eugene Patrone
17    8    E-mail (with attachment) dated
18       October 3, 2007, from Tracey Gray to
19       Eugene Patrone and Paul Lobo
20    9    E-mail chain; top e-mail dated
21       September 10, 2007, from Harry
22       Sporidis to Susan Molinari
23    10   E-mail chain dated September 29, 2007,
24       between Harry Sporidis and
25       Susan Molinari

**Page 115**

1    DESCRIPTION OF DEFENDANT'S EXHIBITS (CONT.)
2    EXHIBIT DESCRIPTION
3    11   Code of Business Ethics
4
5    (Exhibits 1 through 11 were attached by
6    counsel.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 116**

1    CERTIFICATE OF COURT REPORTER
2    I, TRACY E. BARKSDALE, the court
3    reporter before whom the foregoing deposition
4    was taken, do hereby certify that the witness
5    whose testimony appears in the foregoing
6    deposition was duly sworn by a Notary Public;
7    that the foregoing testimony is a complete,
8    true, and correct transcription of the
9    stenographic notes as taken by me in said
10    manner on said date; that I am neither
11    counsel for, related to, nor employed by any
12    of the parties to the action in which this
13    deposition was taken; and, further, that I am
14    not a relative or employee of any counsel or
15    attorney employed by the parties hereto, nor
16    financially or otherwise interested in the
17    outcome of this action.
18    DATED: _____
19
20    _____
21    TRACY E. BARKSDALE, RPR
22    Notary Public for the
23    District of Columbia
24    My commission expires
25    November 14, 2011

**Page 117**

1    CAPTION
2    The Deposition of Susan Molinari,
3    taken in the matter, on the date, and at the
4    time and place set out on the title page
5    hereof.
6    It was requested that the deposition
7    be taken by the reporter and that same be
8    reduced to typewritten form.
9    It was agreed by and between counsel
10    and the parties that the Deponent will read
11    and sign the transcript of said deposition.
12
13
14
15
16
17
18
19
20
21
22
23
24
25