## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **THE WASHINGTON GROUP, INC.,** | : | **Civil Action No.** |
| **Plaintiff,** | : | |
| | : | **1:07-cv-1892(RBW)** |
| **v.** | : | |
| **HARRY SPORIDIS,** | : | |
| **Defendant.** | : | |

## MEMORANDUM OF LAW IN OPPOSITION
## TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Alan D. Strasser        (Bar No. 967885)
Kathryn S. Zecca        (Bar No. 457244)
Rachel Li Wai Suen       (Bar No. 500527)
Alice W. Yao          (Bar No. 493789)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW
Suite 411
Washington, DC  20006
Phone: (202) 775-4500
Fax: (202) 775-4510

*Attorneys for Defendant Harry Sporidis*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................................................iii

INTRODUCTION........................................................................................... 1

STATEMENT OF FACTS .............................................................................. 2

ARGUMENT ................................................................................................ 14

I. THERE IS NOT A SUBSTANTIAL LIKELIHOOD THAT TWG
   WILL SUCCEED ON THE MERITS ............................................... 14

   A. TWG Has Not Met Its Burden Of Establishing That A
      Contract Containing A Restrictive Covenant Was Ever
      Formed.................................................................................. 14

      1. TWG Has Not Offered Any Evidence Of The 2005
         Grant Acceptance Process........................................... 15

      2. TWG Has Not Offered Any Evidence Of The 2005
         Restricted Stock Agreement That Mr. Sporidis
         Supposedly Signed ..................................................... 17

      3. TWG Has Not Offered Any Evidence Of
         Mr. Sporidis' Conduct In July 2005 ........................... 18

   B. Even If A Contract Was Formed, TWG Waived Its Right
      To Enforce The Restrictive Covenant .................................... 19

   C. New York Law Prohibits The Enforcement Of The
      Restrictive Covenants Contained In The RSA ........................ 21

II. TWG WILL NOT SUFFER IRREPARABLE INJURY IF AN
    INJUNCTION IS NOT GRANTED................................................... 27

   A. Under Controlling D.C. Circuit Precedent, TWG Cannot
      Obtain Injunctive Relief Because It Cannot Establish That
      Such Relief Would Help It Keep Its Clients............................ 27

   B. Any Injury To TWG Can Be Compensated By Damages........................ 28

III. THE ISSUANCE OF AN INJUNCTION WILL
     SUBSTANTIALLY HARM OTHER INTERESTED PARTIES........................ 31

IV. THE PUBLIC INTEREST WILL NOT BE FURTHERED BY
    THE GRANT OF AN INJUNCTION ............................................... 32

i

**TABLE OF CONTENTS—continued**

**Page**

CONCLUSION ......................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ajilon Professional Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358 (D.D.C. 2007)................................................................................................29

*Bailey v. Fed. Nat'l Mort. Assoc.*, 209 F.3d 740 (D.C. Cir. 2000) ...................................14

*Bar-Ayal v. Time Warner Cable Inc.*, 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006) ................................................................................................16

*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 712 N.E.2d 1220 (1999)...........................23

*Boston Laser, Inc. v. Qinxin Zu*, Slip Copy, 2007 WL 2973663 (N.D.N.Y. Sept. 21, 2007) ..............................................................................22

*Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496 (1977)...................................................................................................21

*Davis v. Winfield*, 664 A.2d 836 (D.C. 1995)................................................................18

*Deutsch v. Barsky*, 795 A.2d 669 (D.C. 2002) ..............................................................22

*Fed. Trade Comm'n v. Cleverlink Trading Ltd.*, ___ F. Supp. 2d ___, 2007 WL 2875626 (N.D. Ill. Sept. 28, 2007).......................................................17

*Feldman v. Google*, __ F. Supp. 2d __, 2007 WL 966011 (E.D. Pa. Mar. 29, 2007)...............................................................................................16

*Horne v. Radiological Health Servs., P.C.*, 371 N.Y.S.2d 948, 83 Misc.2d 446 (N.Y. Sup. Ct. 1975).......................................................................19

*International Shared Services, Inc. v. McCoy*, 686 N.Y.S.2d 828, 259 A.D.2d 668 (2d Dep't. 1999)....................................................................19

*Investor Access Corp. v. Doremus*, 588 N.Y.S.2d 842, 186 A.D.2d 401 (1st Dep't. 1992) ...............................................................................25

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd.* 8 Misc.3d 412, 797 N.Y.S.2d 883 (N.Y. Sup. Ct. 2005).............................. 22, 23, 25, 30

*L.G. Balfour Co., Inc. v. McGinnis*, 759 F. Supp. 840 (D.D.C. 1991)............................31

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).................................................................14

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) ...........................31

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Neumann v. Reinforced Earth Co.*, 786 F.2d 424 (D.C. Cir. 1986)................................32

*Production Resource Grp., LLC v. Oberman*, 2003 WL 22350939
(S.D.N.Y. Aug. 27, 2003).............................................................................30

*Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600
(1963)..................................................................................................22

*RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp.
2d 70 (D.D.C. 2007) ............................................................... 1, 14, 30

*Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 353 N.E.2d
590 (1976)........................................................................................ 23, 24

*Savannah Bank N.A. v. Savings Bank of Fingerlakes*, 261 A.D.2d 917, 691
N.Y.S.2d 227 (N.Y. App. Div., 4th Dep't. 1999) ........................................21

*Sentinel Service v. Mercury Service*, 227 N.Y.S.2d 272, 34 Misc.2d 50
(N.Y. Sup. Ct. 1962)...................................................................................19

*Smith, Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476
(D.C. Cir. 1996) .........................................................................1, 27, 28, 29, 30

*Walter Karl, Inc. v. Wood*, 528 N.Y.S.2d 94, 137 A.D.2d 22 (2d Dep't.
1988)..................................................................................................25

### Other Authorities

3 Fed. Jury Prac. & Instr. § 108.01 (5th ed. 2007)..........................................20

Restatement (Second) of Contracts: Restraint of Trade (1981)......................................22

**INTRODUCTION**

Plaintiff The Washington Group (TWG) seeks to enforce a contract that it cannot prove exists. TWG asks this Court to enjoin its former employee, Harry Sporidis, from violating restrictive covenants buried in a Restricted Stock Agreement that he supposedly electronically signed on Fidelity's website in 2005. But TWG has not produced a contract signed by Mr. Sporidis. It has not produced the web pages supposedly viewed by Mr. Sporidis on Fidelity's website. It has produced only a patchwork of testimony about what might have happened, evidence that falls far short of sustaining its burden of proving what did happen to form a contract.

But that is only the beginning, not the end, of TWG's problems. Even it could prove the *existence* of a contract, TWG has waived its right to enforce the contract because its CEO – Mr. Sporidis' direct supervisor – ordered him to engage in the conduct that supposedly breached the restrictive covenants. TWG thus asks this Court to enjoin Mr. Sporidis from doing what his supervisor instructed him to do. And, under New York law, which governs the restrictive covenants, the covenants are unenforceable.

To make matters worse for TWG, this is not simply an action to enforce a contract – this is a request for an *injunction* to enforce that contract. In order to obtain such and "extraordinary and drastic" remedy (*RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70, 72 (D.D.C. 2007)), TWG must also show that it will suffer irreparable harm if the injunction is not granted, and that the injunction will not harm the interests of other parties. Under controlling authority, *Smith Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476 (D.C. Cir. 1996), a court may not issue an injunction to enforce a non-compete clause where the former employer cannot show that that injunction will allow it to retain its former clients. As TWG has made no effort to

service the clients, and the clients have already followed Mr. Sporidis to his new firm, Plaintiff's motion should be denied.

## STATEMENT OF FACTS

When Harry Sporidis first interviewed for a job at TWG in 2001, he asked whether the organization insisted that its employees enter into non-compete agreements. John Raffaelli, the Chairman, told him "there are no restrictive covenants at The Washington Group, and there never will be." Raffaelli added "if you ever want to leave the firm, go ahead and leave the firm and take your clients with you. Nobody is going to stop you. Sporidis Deposition ("Sporidis Dep.") 27.[1] Raffaelli assured him that the policies would remain unchanged even after Ketchum acquired TWG. *Id*. at 28.[2] Mr. Sporidis would have rejected the job had Ketchum or TWG insisted that he sign a non-compete. *Id*. at 31. Over the years, Mr. Sporidis' supervisors at TWG consistently told him that he did "not operate under any non-compete or restrictive covenants." *Id*. at 36-37.

Mr. Sporidis joined TWG in June, 2001 and soon succeeded in attracting clients. Within six months, he had brought in Amgen and E*Trade as clients for lobbying services; Amgen had been his client at a prior firm. Sporidis Dep. 38. During his tenure there, he brought in other clients as well, and attracted the two organizations that are at issue in this case: the American Society of Clinical Oncologists (ASCO) and Mentor Inc. It was Mr. Sporidis' efforts that attracted these clients to begin with, and his hard work and success that kept them as clients of TWG.

---

[1] Excerpts from each deposition are attached as exhibits bearing the name of the deponent. All text references to the depositions appear in the form "Name" Dep., where name identifies the deponent. Documents are attached as numbered exhibits.

[2] Other members of the management group at TWG confirmed the same point at a later meeting. Sporidis Dep. 32-33.

Mr. Sporidis' clients developed strong loyalty to him for the vigorous work he had done for them. For example, Dr. Deborah Kamin, the Senior Director for Cancer Policy and Clinical Affairs at ASCO, told Mr. Sporidis that "if you ever leave, I'm going to be grabbing onto your coat as you go out the door and go wherever you go." Kamin Dep. 37. Josh Levine, the CEO of Mentor, had expressed a similar sentiment. Sporidis Dec. ¶ 10;[3] Sporidis Dep. 185-86. When TWG inserted a provision in its engagement letter that would have prevented Mentor from retaining Mr. Sporidis if he left TWG, Mr. Levine struck the provision before entering into the engagement. Molinari Dep. 54-55; Ex. 1. Despite Mentor's rejection of the limitation on hiring Mr. Sporidis if he left, TWG continued to provide lobbying services to Mentor. Ms. Molinari, the CEO of TWG, agreed with Mr. Sporidis' assessment that "most of [his] work product is done with little assistance from [his] colleagues." Molinari Dep. 40; Ex. 2.

After more than five years at TWG, though, Mr. Sporidis decided it was time to explore other working arrangements. In April 2007, he met briefly with a partner at Powell Goldstein LLP, a Washington law firm with a lobbying practice, because they had worked together on government relations matters for a joint client. Some months later he met other partners at Powell Goldstein and began to interview for job.

On September 18, Mr. Sporidis mentioned to someone at ASCO that he was thinking of leaving TWG, but that "nothing was in stone." Sporidis Dep. 187-88. ASCO knew, in mid-or late September, only that he was "thinking of leaving" Kamin Dep. 33-34. All he said was "he was thinking about [leaving] and that was it." *Id.* at 35. Dr. Kamin asked him to tell her "when you make up your mind because we would like to be

---

[3] The Declaration of Harry Sporidis dated October 21, 2007 is attached hereto as Ex. 22.

wherever you are." *Id.* at 36. There were no other conversations about Mr. Sporidis'
departure between that initial conversation and Mr. Sporidis' e-mail on September 26
informing Dr. Kamin that he had announced his departure. *Id.* at 41-42; Ex. 3. ASCO did
not know that Mr. Sporidis had decided to leave, and did not know where he was going,
until after he informed TWG.

Mr. Sporidis had not told Mr. Levine of Mentor that he was contemplating a
departure from TWG. The first notice Mr. Levine received came when Mr. Sporidis
telephoned him on September 26, 2007 to say "I am going to be leaving The Washington
Group." Mr. Levine learned of. Mr. Sporidis' departure only after Mr. Sporidis had
informed TWG. Sporidis Dep. 183.

Alan Parver, a Powell Goldstein partner, telephoned Mr. Sporidis on September
24, 2007 to offer him a job. Mr. Sporidis accepted the offer the following day. Sporidis
Dep. 154-55, 164; Sporidis Dec. ¶ 16.

**Mr. Sporidis' Departure from TWG**

Mr. Sporidis promptly informed Ms. Molinari, the CEO of TWG, once he had
decided to accept the offer to join Powell Goldstein, and they describe the conversation in
virtually identical terms. Mr. Sporidis informed Ms. Molinari, his supervisor, on
September 26, 2007 that he intended to leave TWG. He went to her office in the "late
morning" or "early afternoon" and told her that he needed to have a "difficult"
conversation with her.[4] Sporidis Dep. 164; Molinari Dep. 61. After telling her that he had
enjoyed working with her, Mr. Sporidis said he had "found a place that he thought would
be a better fit for him and his life going forward." *Id.* at 61. Ms. Molinari told him that

---

[4] Ms. Molinari had suspected, but did not know, that he was looking for a new job, so she was not
completely surprised by the conversation. Molinari Dep. 59, 61. Mr. Lobo confirmed the same sentiment.
Lobo Dep. 25.

she was happy for him (*id.* at 62) and that he had made "the right decision" for him and his family. Sporidis Dep. 165. She added that she wanted him to have a smooth and easy transition (Molinari Dep. 63), and added:

> I want this transition to be easy for you. Let your clients know to put –
> submit their termination notices in. Rob Lorfink [the CFO of Ketchum] is
> a stickler on the 30-day termination, so, you know, make sure that they –
> you know, you get the 30-day termination notices in,

Sporidis Dep. 165. Molinari Dep. 64-66. Ms. Molinari emphasized that "he needed to make sure that the clients that he was taking gave us 30-day notice" because "Ketchum and TWG has been very steadfast in making sure that all our clients adhere to the 30-day opt-out clause." Molinari Dep. 64. She added that Mr. Sporidis should "make sure to let Paul Lobo[the CFO of TWG] know about what you're doing and about what clients are going to be going so that he can estimate that into the annual budget because they're preparing the budget right now for the office." Sporidis Dep. 165-66. Even though she was the CEO of TWG, she was unaware that any non-compete clause that allegedly applied to Mr. Sporidis. Molinari Dep. 64

Mr. Sporidis met with Paul Lobo the following morning and informed him that he was leaving. As Ms. Molinari already had spoken to Mr. Lobo, he knew that Mr. Sporidis was leaving. Lobo said to Mr. Sporidis:

> Susan wants your transition to be as easy as possible. He said, Harry, just
> get your clients to terminate the contracts. An e-mail would suffice, he
> said to me. Just have them e-mail a termination. That's all we need, but
> have that done sooner rather than later so the clock can start ticking.

Sporidis Dep. 170-71.[5] Mr. Sporidis then sought an e-mail termination notice from one of

---

[5] Mr. Lobo was unable to recall many details of the conversation: Mr. Lobo professed a failure of recollection on whether he had told Mr. Sporidis that Ms. Molinari wanted him to have a "smooth"

his clients, Mentor Inc. Sporidis Dec. ¶ 21; Ex. 4.[6] Mr. Lobo and Mr. Sporidis discussed the notification e-mail that Mr. Sporidis would send to the office announcing his departure, and Mr. Lobo approved the text of the one that Mr. Sporidis had drafted. Sporidis Dep. 172-73; Ex. 6. Mr. Sporidis circulated the e-mail later that day.

Mr. Lobo forwarded the e-mail to Lorraine Thelian, a senior partner at Ketchum who had overall responsibility for TWG. Thelian Dep. 6, 13-14. She felt "aggravated" upon learning of Mr. Sporidis' departure, which she thought showed disloyalty. *Id*. at 14-15. She immediately asked by e-mail "how much biz are we going to lose?" *Id*. at 18-19; Ex. 7. Mr. Lobo told her it would be "540K," which was Mr. Lobo's estimate of "the annualized revenue from Mentor Corporation and ASCO." Lobo Dep. 43; Thelian Dep. 19; Ex. 7.[7]

Ms. Thelian recognized, though, that TWG would have no bargaining position with Mr. Sporidis unless he had signed a non-compete agreement that would prevent him from working for the two clients at issue – ASCO and Mentor. Thelian Dep. 24. On Friday, September 28, Mr. Lobo telephoned Mr. Sporidis and told him "unofficially" that Ketchum believed that Mr. Sporidis had entered into a non-compete agreement. Sporidis

---

transition; on whether Ms. Molinari had *told* Mr. Lobo that she wanted Mr. Sporidis to have a smooth transition; on what he said upon learning that ASCO had no existing contract; on what he had said to Mr. Sporidis upon learning that Mentor had a 30-day termination notice in its contract; on what he said Mr. Sporidis should do after Mr. Sporidis told him about the 30-day termination provision in the Mentor contract; (Lobo Dep. 28-33); on whether he told Mr. Sporidis that his clients could terminate their contracts by e-mail; on whether he told Mr. Sporidis that an e-mail would suffice to terminate a contract; or on whether he told Mr. Sporidis it was important for clients to send in termination notices to "start the clock ticking." Lobo Dep. 56-57. He nonetheless denied telling Mr. Sporidis to have his clients send in their termination notices (*id*. at 30), but did acknowledge thinking that Mr. Lorfink was a "stickler." Lobo Dep. 57.

[6] Mr. Sporidis promptly forwarded the Mentor termination e-mail to Mr. Lobo. Sporidis Dec. ¶ 22; Exhibit 5.

[7] As TWG earns gross revenue between $5.5 and $6 million a year, this loss of revenue amounted to approximately 8% of its revenue for the year. Thelian Dep. 20-21.

Dep. 235. Mr. Sporidis rejected the suggestion in strong terms–terms that were so strong that he felt he should apologize to Lobo for his forceful expression of them. Ex. 8. Lobo promised to look into the matter and get back to Mr. Sporidis. Sporidis Dep. 236. Lobo told Mr. Sporidis that he did not have a copy of the non-compete agreement and that Ketchum was looking for a copy. Lobo Dep. 47.

On the following Monday, October 1, 2007, Eugene Patrone forwarded to Mr. Sporidis by e-mail a copy of a Restricted Stock Agreement that Ketchum contended Mr. Sporidis had accepted. That was the first time that Mr. Sporidis had ever seen the agreement. Sporidis Dep. 129. Mr. Sporidis had never signed, or accepted that agreement. He has told everyone consistently that he never entered into a non-compete agreement. Lobo Dep. 34-35; Molinari Dep. 80-81. Even the document produced to Mr. Sporidis did not contain his name, signature, or number of shares granted to him. Ex. 9. Mr. Lobo was skeptical that there was such an agreement and suggested he needed to see "the no compete language [Mr. Sporidis] supposedly agreed to." Lobo Dep. 55-56; Ex. 10.

Having been unable to produce a copy of any agreement that Mr. Sporidis ever had seen, signed or accepted,  Ketchum then embarked on a campaign to try to intimidate him into staying at TWG. Thelian Dep. 33 (her "goal was to devise a strategy to keep Mr. Sporidis at The Washington Group rather than to negotiate with him about which clients would stay and which clients would leave."). Mr. Patrone telephoned Mr. Sporidis and told him that "these people don't care about your family, Harry. You have three babies at home. They don't care about your three babies at home. They're going to go after you." Mr. Patrone explained that "They're going to litigate against you. You don't have the money to be litigated against. They're going to hurt you financially." Sporidis

Dep. 247. Mr. Patrone repeated the same message at lunch the following day. Sporidis Dep. 248. Ms. Thelian later wrote that Mr. Patrone had made it clear that "Ketchum was not going to let Mr. Sporidis walk with his clients would make it ugly and ultimately endanger his chance of having a real job at his law firm." Thelian Dep. 38-39; Ex. 11.[8] Ketchum eventually offered Mr. Sporidis a modest salary increase on October 9 or 10, which he rejected. Thelian Dep. 73.

**Mr. Sporidis' Clients at TWG**

<u>Mentor</u>

Mentor came to TWG initially because one of Mentor's outside lawyers recognized that Mentor needed advice in addressing a request that had been made by Congressman Greenwood, who then was the chair of House subcommittee with oversight over the FDA. As Mr. Sporidis had worked as a legislative aide for Congressman Greenwood, the lawyer thought Mr. Sporidis might prove helpful. She contacted TWG and Mr. Sporidis soon began to work on the matter. Sporidis Dep. 43. Following some success with that matter, Mr. Sporidis continued to provide government advocacy services to Mentor. During the four years that Mentor was a client of TWG, Mr. Sporidis provided virtually all of the services that Mentor received. Sporidis Dep. 54; Molinari Dep. 35. He requested assistance from other professionals at TWG, but, with rare exceptions, "nobody really cared enough to do anything for the client." Sporidis Dep. 54. Mentor wants to continue to use Mr. Sporidis as its advisor and already has entered into a new engagement with Powell Goldstein. Sporidis Dep. 294.

---

[8] Ms. Thelian testified that she meant only that Ketchum would sue Mr. Sporidis, but she acknowledged that the prospect of endangering his job at the law firm "sounds kind of scary." Thelian Dep. 43.

ASCO

ASCO became a client of TWG after an open competition in which TWG and Ketchum Public Affairs responded to a Request for Proposal (RFP) that ASCO had issued to obtain assistance in issues growing out of the Congressional debate surrounding the passage of the Medicare Modernization Act in 2004. Sporidis Dep. 60. Dr. Kamin testified that ASCO needed advice on how best to counteract these problems, and so issued an RFP to elicit proposals to address them. Kamin Dep. 11-12. Neither TWG nor Ketchum had any prior relationship with ASCO. *Id.* at 12-13; Sporidis Dep. 61. Mr. Sporidis prepared the response to the RFP that concerned lobbying matters, and Noam Gelfond prepared the portion of the response that concerned public affairs and communications. Sporidis Dep. 61-62. That strategy proved successful, and ASCO then used more and more of Mr. Sporidis' services and less and less from Ketchum. Kamin Dep. 30.

Mr. Sporidis served as the only lobbyist for ASCO from TWG. Sporidis Dep. 66; Kamin Dep. 23. He tried to enlist the assistance of two other lobbyists, but neither of them would do the work. Sporidis Dep. 64-66. Ms. Molinari confirmed that Mr. Sporidis "did just about everything on the account" apart from occasional contact with Ms. Molinari. Molinari Dep. 32. ASCO made plain to her that it was "very satisfied with Harry's representation." *Id.* at 34-35. Dr. Kamin testified that Mr. Sporidis was "very important to our work." Kamin Dep. 38. She added that "I would have had no interest in continuing to work with The Washington Group if it did not include Harry." *Id.* at 70.

ASCO would prefer to work with Mr. Sporidis. If he were forbidden to work for ASCO, ASCO would not seek government relations services from TWG. Kamin Dep. 71.[9]

SHRM

Mr. Sporidis served as the principal lobbyist for the Society for Human Resource Management (SHRM) while at TWG. SHRM terminated its contract with TWG in early September 2007 for reasons wholly unrelated to Mr. Sporidis. As Ms. Molinari testified, SHRM had hired TWG only for a specific period of time, and then had declined to extend its contract. Molinari Dep. 104. SHRM informed TWG that it had terminated the relationship on August 8, 2007, and confirmed the termination by e-mail on September 7, 2007. Molinari Dep. 103-04 & Ex. 12. The termination had nothing to do with Mr. Sporidis, and he not engaged in earnest interviewing with his new employer by that time. Mr. Sporidis does not expect that SHRM will seek his lobbying services at his new employer. Sporidis Dec. ¶ 27.

ASPS

The American Society of Plastic Surgeons (ASPS) contacted Mr. Sporidis while he was at TWG. ASPS sent an RFP to a dozen firms. Mr. Sporidis drafted and submitted a response on behalf of TWG. Sporidis Dep. 74-75. He did not hear a response prior to announcing his departure. After he had resigned, Mr. Sporidis notified ASPS that he was going to Powell Goldstein, and ASPS gave him permission to extend his proposal. Ex. 13. Mr. Sporidis *then* sent a copy of the ASPS proposal he had drafted to Cynthia Berry of Powell Goldstein who was drafting a new proposal to ASPS. Ms. Berry looked at the

---

[9] Dr. Kamin explained in her testimony that ASCO would reject TWG because "we don't have a relationship with people there." She elaborated: "this situation has dismayed us, to put it mildly, and we would not want to have a relationship with a group that would behave in such a way. So we would seek help elsewhere, and it will be at great cost and a reinvestment of time that we've built over the last couple of years." Kamin Dep. 71-72.

proposal that Mr. Sporidis had prepared, but did not rely on it. Berry Dep. 96. Instead, she consulted with her colleague, Julius Hobson Jr., who had extensive experience in representing doctors, and the two of them "started from scratch" and prepared a proposal following the usual Powell Goldstein protocols and format. Berry Dep. 96-97. In fact, Powell Goldstein "basically didn't use the TWG proposal." *Id*. at 96. Ms. Berry and Mr. Sporidis made a presentation to ASPS in Baltimore on October 25, which was after Mr. Sporidis had begun to work at Powell Goldstein. *Id*. at 84.

**TWG Makes No efforts to Retain its Clients after Harry Sporidis Departs**

TWG has taken no steps to continue to serve any other clients at issue in the case. TWG has not even identified another legislative professional who could serve ASCO or Mentor since Mr. Sporidis announced that he was leaving. Ms. Molinari testified that no one had identified another possible lobbyist for Mentor, nor even *contacted* Mentor since Mr. Sporidis left. Molinari Dep. 57. Similarly, TWG has not identified anyone who could serve ASCO, and no one from TWG has *contacted* ASCO since Mr. Sporidis left. Molinari Dep. 48-49; see also Kamin Dep. 51.[10] TWG does not expect that it will continue to serve those clients. Instead, it hopes that Mr. Sporidis will continue to serve them at his new employer – who will bear the expense of paying Mr. Sporidis and paying for any support he needs – and that TWG would continue to receive revenue from ASCO. Molinari Dep. 49-50.

TWG has failed in this most basic effort to serve its former client even though ASCO's contract, which had expired only weeks before Mr. Sporidis submitted notice of his resignation, *required* TWG to identify a substitute for Mr. Sporidis acceptable to

---

[10] Although Ms. Thelian claimed someone "reached out" to ASCO, she admitted "I don't know what we said to ASCO" nor who even had the conversation. Thelian Dep. 50-51.

ASCO *within ten days* of Mr. Sporidis' departure from the firm. Ex. 14, p. 2. The expired contract provided:

> The parties agree that the services of Noam Gelfond and Harry Sporidis are key to the satisfactory performance by Ketchum of the Services. The parties further agree that if such individuals leave the employ of Ketchum during the term of this Agreement for any reason or are unavailable to continue the same level of work called for (including without limitation, Noam Gelfond's role as the daily contact for the ASCO account), and if substitute individuals acceptable to ASCO are not available to continue the work within 10 days, ASCO shall have the right to terminate this agreement immediately.

Although this agreement had expired on August 31, 2007, Ketchum Public Affairs had continued to try to provide services to ASCO via Mr. Gelfond, and Mr. Sporidis had continued to work for ASCO while the new contract was being negotiated. Kamin Dep. 29-31. Nonetheless, TWG has taken no steps to provide lobbying services for ASCO, or to keep this valuable client.

**The Supposed Non-Compete Agreement**

Mr. Sporidis learned on October 1, 2007 that Ketchum contended that he had signed a non-compete agreement in 2005 when he received restricted shares. Sporidis Dep. 129. Mr. Sporidis immediately doubted the veracity of that claim, for two reasons: 1) he had scrupulously avoiding any non-compete agreements in joining and while working at TWG, and 2) he had previously received grants of restricted stock and signed restricted stock agreements that contained no non-compete provisions. In 2002, he had received a grant of restricted stock, and signed an agreement that contained no such provision. Sporidis Dep. 81; Ex. 15. Similarly in 2003, he had received another grant of restricted stock, and the agreement contained no restrictive covenants. Sporidis Dep. 87-88; Ex. 16. Both stock grants provided that 20% of the grant would vest each July over the ensuing five years.

Mr. Sporidis followed a simple practice to redeem the stock when it was granted. He would go to the website of Fidelity company, Fidelity.com, access his account at Fidelity, and select "net shares" – that is, he would receive the shares net of the taxes due on them. Sporidis Dep. 84. ("net shares is the way Fidelity will take out the taxable income of the stock. So that's what I would do. I would select net shares and be done with it.") Mr. Sporidis went to net shares when he received notification from Fidelity that he had to take some action. *Id*. at 84-85. It was his understanding that the Fidelity notifications pertained to the stock awards that were described in the 2002 stock agreement or the 2003 agreement. Mr. Sporidis did not distinguish between the two. *Id*. at 87, 92. Mr. Sporidis was unaware that he received any other awards of stock, and no one at TWG told him that he had. *Id*. at 93-94.[11] Mr. Sporidis had never seen the June 29 letter until the lawsuit was filed, when he saw it attached to a declaration. *Id*. at 99-100.

Plaintiff showed Mr. Sporidis copies of a generic "walk through" of computer screens entitled "Grant Agreement Walk Through for NetBenefits." Mr. Sporidis had never seen these screens until the lawsuit was filed. Sporidis Dep. 115. While some of the standard items on the screen – such as tabs, a button for help and a button for home – resemble current Fidelity screens, they also resemble other screens that have nothing to do with Fidelity. Sporidis Dep. 117-18. Nor could Mr. Sporidis ever remember seeing a Fidelity screen that required him to review terms and conditions of an agreement before permitting him to proceed. *Id*. at 128.

---

[11] Mr. Sporidis was shown an e-mail, dated June 29, 2005, that lists him as a recipient and stated that he would be receiving a letter from Omnicom regarding a 2005 stock award. Mr. Sporidis never saw the e-mail, Sporidis Dep. 95, and never received a letter from Omnicom informing him that he had received additional stock. *Id*. at 99-100.

**ARGUMENT**

Injunctive relief is plainly inappropriate in this case. "The standard for issuance of the 'extraordinary and drastic' remedy of a temporary restraining order or a preliminary injunction is very high. . . ." *RCM Technologies, Inc. v. Beacon Hill Staffing Group, LLC*, 502 F. Supp. 2d 70, 72 (D.D.C. 2007) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (denying motion to enforce non-competition agreements). "The movant must demonstrate (1) a substantial likelihood of success on the merits of its claims; (2) that it will suffer irreparable harm if an injunction is not granted; (3) that the issuance of an injunction will not unduly or substantially harm other parties; and (4) that the public interest favors issuance of an injunction." *RCM Technologies*, 502 F. Supp. 2d at 73. TWG cannot establish any of these factors, and injunctive relief therefore must be denied.

**I.    THERE IS NOT A SUBSTANTIAL LIKELIHOOD THAT TWG WILL SUCCEED ON THE MERITS**

**A.    TWG Has Not Met Its Burden Of Establishing That A Contract Containing A Restrictive Covenant Was Ever Formed**

TWG devotes much of its brief (at 12-17) to establishing a proposition that we do not dispute: a party may enter into a contract on line provided that he has adequate notice of its terms and manifests assent to those terms. TWG cannot, however, provide competent evidence of what Mr. Sporidis saw and what he did in 2005, when he allegedly entered into the Restricted Stock Agreement (RSA). "The party asserting the existence of a contract has the burden of proving its existence" (*Bailey v. Fed. Nat'l Mort. Assoc.,* 209 F.3d 740, 726 (D.C. Cir. 2000) (citations omitted)), but TWG has failed to meet that burden: It has not produced a contract containing all the material terms signed by both Mr. Sporidis and TWG, nor has TWG offered a shred of evidence

establishing that Mr. Sporidis electronically accepted the terms of the 2005 Restricted Stock Agreement.

### 1. TWG Has Not Offered Any Evidence Of The 2005 Grant Acceptance Process

Plaintiff has not produced any evidence of the electronic process by which Mr. Sporidis supposedly agreed to the 2005 RSA. Although the Court requested that TWG produce the "actual screen[s] that [Mr. Sporidis] would have looked at or that he would have clicked" (10/22/07 Tr. at 23), Plaintiff has not done so.

First, the declaration of an Omnicom employee describes the *current* grant acceptance process and attaches a generic "walk through" that does not even name Omnicom, Inc. Declaration of Steven Azzopardi ("Azzopardi Dec.") ¶¶ 6, 7 & Ex. B. As the Court correctly observed, the Azzopardi Declaration is insufficient proof of the alleged contract because it is nothing more than "an affidavit from someone [saying] what is *supposed* to have occurred before someone can accept these stocks" and fails to "show definitively [what] did *in fact* occur." 10/22/07 Tr. at 20 (emphases added). The declaration from a Fidelity employee suffers from the same defects, attaching the same 2007 screens in an attempt to establish the *2005* process. See Declaration of James Meyer ("Meyer Dec.") ¶ 3. Mr. Sporidis testified at his deposition that he had not previously seen these screens, and that he did not recall ever being asked on the Fidelity website to review the terms and conditions of an agreement. Sporidis Dep. 117, 128.

Furthermore, inconsistencies between the Azzopardi and Meyer Declarations, and within the Meyer Declaration itself, cast serious doubt on whether these declarations correctly describe the 2005 grant acceptance screens. While Mr. Meyer declares that the Fidelity grant acceptance process has remained the same since 2004 (Meyer Dec. ¶ 30),

Mr. Azzopardi says that there have been changes to the process since 2005. Azzopardi Dec. ¶ 7. The Meyer Declaration states that the attached screens accurately depict the 2005 Fidelity process, but, on closer examination, the "walk through" appended to the Meyer Declaration creates a *2007* confirmation screen that differs in several respects from the confirmation screen that Fidelity states was generated by the process Mr. Sporidis allegedly followed. *Compare* Meyer Dec. ¶ 6, Ex. A at 7 *with* Meyer Dec. Ex. B. Significantly, the confirmation screen produced that supposedly relates to Mr. Sporidis' acceptance of a stock grant contains no link to the "Grant Agreement" which, in this case, is the document that purportedly contained the restrictive covenants that plaintiff is attempting to enforce. See Meyer Dec. Ex. B.

In light of these contradictions and defects in Plaintiff's evidence, there is no reason to believe that TWG can establish with any accuracy the actual screens that Mr. Sporidis allegedly viewed in July 2005. Indeed, the cases cited by plaintiff show that plaintiff's evidence is insufficient to establish a contract. In *Bar-Ayal v. Time Warner Cable Inc.*, 2006 WL 2990032 (S.D.N.Y. Oct. 16, 2006), defendant established that plaintiff had adequate notice of and assented to an arbitration clause by showing that plaintiff had physically signed a work order that stated that he had agreed to arbitrate any disputes (*id.* at *3) and by producing a software installation CD that was "identical" to the one defendant sent to the plaintiff. *Id* at *4 n.9. And in *Feldman v. Google*, __ F. Supp. 2d __, 2007 WL 966011, *3 (E.D. Pa. Mar. 29, 2007), also relied on by TWG, the plaintiff did not dispute that he followed the process outlined in the company's submissions. As this Court observed, "technology is not . . . foolproof, and things can

16

happen." 10/22/07 Tr. 14. TWG has not offered any evidence of what actually did happen when Mr. Sporidis logged on to Fidelity's website in 2005.

### 2. TWG Has Not Offered Any Evidence Of The 2005 Restricted Stock Agreement That Mr. Sporidis Supposedly Signed

TWG has not produced any agreement actually signed by Mr. Sporidis. Indeed, plaintiff has not even produced the agreement that Mr. Sporidis supposedly did or could have viewed had he clicked on the link to that document on the Fidelity website. The only thing plaintiff has produced, as its own declarants acknowledge, is a generic version missing critical information specific to Mr. Sporidis. See Azzopardi Dec. Ex. C.[12] And, although Omnicom's Manager for Equity Compensation instructed Fidelity to provide the "5-20 variant of the 2005 RSA as [Mr. Sporidis'] Grant Agreement" (Speck Dec. ¶ 4), *no* declaration states that Fidelity followed those instructions and actually posted on its website the 2005 agreement that TWG now seeks to enforce. In short, none of the declarations offers any proof that the RSA attached to plaintiff's papers was the document actually linked to the Fidelity website at the time that Mr. Sporidis allegedly assented to the contract. Mr. Sporidis testified at his deposition that he did not see the 2005 version of the RSA until October 2007 (Sporidis Dep. Tr. at 129), thereby casting doubt on whether that document was actually available to be viewed on Fidelity's website. See *Fed. Trade Comm'n v. Cleverlink Trading Ltd.*, ___ F. Supp. 2d ___, 2007 WL 2875626, *11 (N.D. Ill. Sept. 28, 2007) (no evidence that the contract was the actual document displayed upon clicking the hyperlink).

---

[12] Although the Meyer Declaration states that the employee must review and accept the Grant Agreement in the course of accepting the stock grant (Meyer Dec. ¶ 4), it says nothing about what the agreement actually was in 2005.

### 3. TWG Has Not Offered Any Evidence Of Mr. Sporidis' Conduct In July 2005

The party seeking to enforce a contract bears the burden of proving assent to its terms. *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995). Here, Plaintiff has offered no evidence of Mr. Sporidis' conduct in July 2005. Although Plaintiff points to an internal Omnicom memorandum (dated June 2005) describing the new RSA, Plaintiff has not produced any evidence that Mr. Sporidis actually received the memo, which was in fact addressed to an employee of Ketchum rather than of TWG. Retter Dec. Ex. B. Mr. Sporidis testified that he had not seen the memorandum until he saw it in this litigation. Sporidis Dep. Tr. at 98-100. Plaintiff also cannot point to any evidence that Mr. Sporidis received an e-mail message informing Omnicom employees of an additional stock award in 2005 (Retter Dec. ¶ 7 & Ex. C); Mr. Sporidis does not recall receiving this e-mail. Sporidis Dep. 94-95.

On the other hand, Mr. Sporidis vigorously disputes Plaintiff's allegation that he assented to the non-solicitation clause, testifying at his deposition that he never accepted a new grant of stock on the Fidelity website or agreed to the 2005 RSA. See Sporidis Dep. 128-29, 137 ("The only thing I have ever done on the Fidelity website . . . is do net shares. I have gone on and I have selected net shares in terms of taking out my taxable income. . . . I don't recall ever accepting a new grant of stock [on the Fidelity website]").

In short, Plaintiff's evidence of a contract between Mr. Sporidis and TWG is virtually non-existent. TWG has not produced the actual RSA that Mr. Sporidis allegedly signed, nor has it produced the Fidelity screens that Mr. Sporidis allegedly saw. It has produced evidence only of what is *supposed* to have happened, as opposed to what did *in*

*fact* happen. This falls far short of sustaining its burden of proving the existence of the particular contract.

>    **B.    Even If A Contract Was Formed, TWG Waived Its Right To Enforce The Restrictive Covenant**

Even assuming that the Restricted Stock Agreement is a valid contract, and that the restrictive covenants are enforceable, TWG has waived any right to enforce those covenants and is estopped from doing so. Mr. Sporidis' direct supervisor instructed Mr. Sporidis to engage in conduct that violated the restrictive covenants by requesting that his clients send in their termination notices. See Molinari Dep. 64-65; Sporidis Dep. 165.[13] Although TWG argues that Ms. Molinari did not make an "unequivocal statement" necessary to constitute waiver (Mem. at 27), courts have consistently held that an employer waives its right to enforce a restrictive covenant when it "knowingly aids" its employee in conduct that violates that covenant. For example, in *International Shared Services, Inc. v. McCoy*, 686 N.Y.S.2d 828, 259 A.D.2d 668, 669 (2d Dep't. 1999), the court found that the employer waived right to enforce restrictive covenant by assisting employee in finding a new job with a competitor. See also *Horne v. Radiological Health Servs., P.C.*, 371 N.Y.S.2d 948, 83 Misc.2d 446, 454 (N.Y. Sup. Ct. 1975) ("[A]n employer waives the right to enforce a negative covenant not to compete executed by a former employee were the employer knowingly aids such an employee in his efforts to obtain competing employment."). And in *Sentinel Service v. Mercury Service*, 227 N.Y.S.2d 272, 34 Misc.2d 50, 51 (N.Y. Sup. Ct. 1962), the court held that a investigative agency had waived its right to enforce a non-compete agreement that prohibited the defendant from working as a private investigator by providing a character reference for

---

[13] We do not contend, as plaintiff intimates (Mem. at 27-28), that TWG's history of selectively enforcing restrictive covenants constitutes waiver of its right to enforce any such covenants that may exist here.

the defendant in support of an application for a license to work as a private detective. Just as in these cases, Ms. Molinari, Mr. Sporidis' supervisor, "knowingly aided" any breach of the restrictive covenant by directing Mr. Sporidis to have his clients submit termination notices so that they could easily follow him to his new firm.[14]

TWG argues, however, that Ms. Molinari could not have waived TWG's right to enforce the restrictive covenants because she didn't know about them. Mem. at 26. This argument confuses the requirements for Ms. Molinari's waiver of her personal rights with the standard for an organization's waiver. TWG undoubtedly has knowledge of the terms of its own contracts (see, *e.g.*, Azzopardi Dec. ¶¶ 2-3 (describing RSA)), and Ms. Molinari was acting on behalf TWG when she instructed Mr. Sporidis to have his clients send in their termination notices. See, *e.g.*, 3 Fed. Jury Prac. & Instr. § 108.01 (5th ed. 2007) ("[A]gents or employees of a corporation may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation. . . ."). And whether or not Ms. Molinari's statement to Mr. Sporidis is fairly characterized as "off-handed" (Mem. at 27), TWG must live with the consequences of statements its CEO made to an employee she directly supervised.

TWG's waiver of its right to enforce the RSA is fortified by TWG's interaction with Mentor regarding the 2006 retainer agreement. TWG prepared an engagement letter with Mentor that provided that Mentor could not use the services of Mr. Sporidis if Mr. Sporidis left the employment of TWG. Molinari Dep. 54; Ex. 1. Mentor refused to agree to such a provision, and returned the contract to TWG with that provision struck

---

[14] Ms. Molinari's instruction that Mr. Sporidis have his clients terminate their relationship with TWG (see Mem. at 18) also preceded his providing Powell Goldstein with a copy of the proposal he prepared for ASPS. Only after Mr. Sporidis spoke with Ms. Molinari did he request that ASPS give him additional time to submit a new proposal so he could include new team members. See Ex. 13.

out. Ex. 1. Notwithstanding Mentor's rejection of the restrictive covenant, TWG permitted Mr. Sporidis to provide services to Mentor. Molinari Dep. 56. TWG's disavowal of the importance of the restrictive covenant, particularly when combined with Ms. Molinari's request that Mr. Sporidis' clients terminate their contracts, waived TWG's right to enforce a restrictive covenant here.

Additionally, TWG is estopped from enforcing the restrictive covenants in the RSA because Ms. Molinari directed Mr. Sporidis to violate them. TWG claims that it is not estopped because Mr. Sporidis did not rely on her instruction. But Mr. Sporidis unequivocally testified that he relied on her instruction. Sporidis Dec. ¶¶ 21, 23; Sporidis Dep. 182-84, 198-201, 301-02. TWG's showing to the contrary (Mem. at 29) is nothing more than selective quotes from a couple of e-mails. But these e-mails say only that Mr. Sporidis intended to tell his clients "what's going on" – they do not say that he informed them that he was definitively leaving TWG, that he was moving to Powell Goldstein, or that he solicited their business. Indeed, the evidence establishes that he did *not* solicit their business prior to his conversation with Ms. Molinari. See Kamin Dep. 34-38; Sporidis Dec. ¶ 21. Accordingly, Mr. Sporidis' testimony that he relied on his supervisor's direct instruction is uncontradicted, and TWG is estopped from enforcing the restrictive covenants.

### C.   New York Law Prohibits The Enforcement Of The Restrictive Covenants Contained In The RSA

Courts throughout the United States are generally reluctant to enforce restrictive employment covenants. Such covenants are subject to exacting scrutiny since public policy favors economic competition and individual liberty. *Columbia Ribbon & Carbon Mfg. Co. v. A-1-A Corp.*, 42 N.Y.2d 496 (1977); see also, *Savannah Bank N.A. v. Savings*

*Bank of Fingerlakes*, 261 A.D.2d 917, 691 N.Y.S.2d 227 (N.Y. App. Div., 4th Dep't. 1999).

In some jurisdictions post employment restrictive covenants are all but unenforceable. In other jurisdictions, the courts have adopted a test allowing post-employment restrictive covenants if, and only if, such covenants are not unreasonable. See, *e.g.*, *Deutsch v. Barsky*, 795 A.2d 669 (D.C. 2002). As set forth in Section 188 of the Restatement (Second) of Contracts: Restraint of Trade (1981), a restraint on post-employment work

> may be unreasonable in either of two situations. The first occurs when the restraint is greater than necessary to protect the legitimate interests of the promisee. The second occurs when, even though the restraint is not greater than necessary to protect those interests, the promisee's need for protection is outweighed by the hardship to the promisor and the likely injury to the public. In the second situation the court may be faced with a particularly difficult task of balancing competing interests. No mathematical formula can be offered for this process.

Restatement 188, comment a.[15]

In the present case, Omnicom, the drafter of the RSA, chose to have the agreement be interpreted under New York Law. "With few exceptions, New York courts are generally reluctant to enforce restrictive covenants contained in employment agreements due to public policy considerations which militate against sanctioning the loss of a person's livelihood." *Kanan, Corbin, Schupak & Aronow, Inc. v. FD International, Ltd*. 8 Misc.3d 412, 797 N.Y.S.2d 883 (N.Y. Sup. Ct. 2005) *citing Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 271, 246 N.Y.S.2d 600 (1963); *Boston Laser, Inc. v. Qinxin Zu*, Slip Copy, 2007 WL 2973663 (N.D.N.Y. Sept. 21,

---

[15] Sections 186-88 of the Restatement describe generally the limits on enforceability of contracts that restrain trade.

2007). And applying New York law here, *even if* Mr. Sporidis had knowingly signed a restrictive covenant with TWG, TWG cannot show a "legitimate interest" protected by Omnicom's RSA.

The seminal New York case is *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976), in which the New York Court of Appeals ruled on the enforceability of a non-competition agreement signed by the former vice-president of a consulting firm. The *Reed* court stated that a restrictive covenant could only be specifically enforced if it were "reasonable in time and area, *necessary to protect the employer's legitimate interests*, not harmful to the general public and not unreasonably burdensome to the employee." 40 N.Y.2d at 307 (citations omitted, emphasis added). Under the "legitimate interest" inquiry, the Reed court held that restrictive covenants will be enforceable "to the extent necessary to prevent the disclosure or use of trade secrets or confidential information" (*id.* at 309) or where the employee's services are "unique or extraordinary." *Id.* at 308.

The Court of Appeals elaborated on the *Reed* standard in *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 712 N.E.2d 1220 (1999), the case relied upon by TWG. Although the Court of Appeals held that an employer sometimes may have a legitimate and protectable interest in the goodwill created by its client relationships, the Court noted that a restrictive covenant cannot be enforced to the extent that it seeks to protect client relationships not dependent upon the former employer's goodwill or developed independent of considerable expense and effort by the former employer.

*Kanan, Corbin, supra*, illustrates the application of *Reed* and *Seidman*. In that case the plaintiff (KCSA) sought a preliminary injunction against two former employees

23

who had accepted employment at a competing firm. KCSA alleged that the defendants were soliciting its clients to terminate their agreements with KCSA and retain their new employer to perform those services, in breach of non-compete covenants contained in defendants' respective employment agreements.

In holding that "it is evident the restrictive covenants contained in the [employment] agreements fail to meet the 'legitimate interest' standard of *Reed* and *Seidman*," the court reasoned: (1) the employees' recollection of the identity of their clients and of the details of their accounts does not amount to misappropriation within the context of *Reed's* first prong; (2) the employees' services could not be termed either "unique" or "extraordinary" nor were their skills "of such a character as to make replacement impossible;" and (3) KCSA could not show that the client relationships which the employees enjoyed while employed by KCSA were due to its goodwill. Under this analysis, the restrictive covenants here do not meet the "legitimate interest" standard set forth by New York Courts.

*First*, Mr. Sporidis did not misappropriate any confidential information from TWG. See *Reed*, 40 N.Y.2d at 308. Here of course, Mr. Sporidis knew the identity of Mentor because he had attracted it to TWG, and knew ASCO because he was the principal drafter of the response to the RFP for the government services that TWG provided. There is no confidential "customer list" in this case, nor does TWG claim that there is.

*Second*, TWG does not argue that Mr. Sporidis' services were "unique" or "extraordinary." Indeed, Lorraine Thelian denied that Mr. Sporidis' services were unique. Thelian Dep. 52-53.

*Third*, there is no "goodwill" between these TWG and ASCO or Mentor. Plaintiff intimates that client relationships constitute protectable goodwill as a matter of law (Mem. at 20-22), but, in fact, "whether client goodwill is developed as a result of the defendant's own efforts, rather than being generated and maintained primarily at the employer's expense, is a triable issue of fact which militates against the issuance of a preliminary injunction." *Kanan, Corbin*, 8 Misc.2d at 420. Indeed, in numerous cases, New York courts have denied requests for injunctions to enforce restrictive covenants even when the employer's clients had followed the former employee to his new employment. Thus, in *Walter Karl, Inc. v. Wood*, 528 N.Y.S.2d 94, 137 A.D.2d 22, 28 (2d Dep't. 1988), the appeals court reversed a grant of preliminary injunction to enforce restrictive covenant where the defendant presented "direct evidence" that clients ceased doing business with plaintiff employer "based upon the defendant's personal familiarity with and knowledge of their needs as well as his outstanding ability in the field." And in *Investor Access Corp. v. Doremus*, 588 N.Y.S.2d 842, 186 A.D.2d 401, 404 (1st Dep't. 1992), the Court refused to enforce a restrictive covenant where major account followed defendant to a new firm because the client's decision to follow the defendant to his new employment was based on the defendant's familiarity of the client's needs and special ability.

Here, the evidence is clear that TWG has no "goodwill" in these clients. It has made absolutely no effort to try to retain these clients – a failure all but conceding that the any existing goodwill ran to Mr. Sporidis and not TWG. Indeed, TWG has not even *contacted* these two clients since Mr. Sporidis announced his departure. Molinari Dep. 48-49, 57. And both ASCO and Mentor have made unequivocally clear that there existed

no goodwill between themselves and TWG and that under no circumstances would they be future clients of TWG. Kamin Dep. 70-71; Sporidis Dep. 186. Indeed, despite plaintiff's conclusory assertions to the contrary (Mem. at 22), ASCO and Mentor were not acquired by TWG as the result of considerable expense or effort. Rather, ASCO came to the firm as a result of an RFP to which Mr. Sporidis responded and Mentor became a client primarily because of its interest in Mr. Sporidis' expertise. Sporidis Dep. 60.

What is more, the record establishes that TWG did not even consider its client relationships to be a sufficiently important interest to be protected through a measure that courts are "reluctant" to enforce. TWG itself did virtually nothing to communicate to its employees that it considered any "goodwill" that existed between the firm and its clients to be a protectable interest. There appears to have been no separate non-compete agreements required of professional employees, no training on such restrictions or any other indicia suggesting that TWG ever considered its purported "interest" to be of much significance. Thelian Dep. 29-30. The non-compete does not even appear in the Ketchum code of ethics. Ex. 17. Most employees at TWG do not know whether there are restrictive covenants in their employment agreements. Ex. 18. The restrictive covenants in the RSA appear on page 6 of a 14-page single spaced document, and are not even referenced in the "whereas" clauses that preface the document. Even the CEO of TWG appears to have been totally unaware that Omnicom had surreptitiously inserted restrictive covenants in its stock agreements. Molinari Dep. 64-66. In sum, even if there ever existed an agreement between Mr. Sporidis and TWG restricting his right to represent the two clients at issue in this matter, such an agreement would be unenforceable under New York law.

## II.    TWG WILL NOT SUFFER IRREPARABLE INJURY IF AN INJUNCTION IS NOT GRANTED

At issue here are two clients of Mr. Sporidis – ASCO and Mentor – that have continued using Mr. Sporidis' services after his departure from TWG. TWG has presented no evidence that Mr. Sporidis intends to solicit any other TWG clients; indeed, Mr. Sporidis has testified that he has no expectation that any additional TWG clients will use his services at Powell Goldstein. Sporidis Dec. ¶ 26-28.

### A.    Under Controlling D.C. Circuit Precedent, TWG Cannot Obtain Injunctive Relief Because It Cannot Establish That Such Relief Would Help It Keep Its Clients

TWG has presented no evidence that an injunction would help it regain either ASCO or Mentor as clients. Accordingly, TWG cannot establish irreparable harm.

*Smith, Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476 (D.C. Cir. 1996) is directly on point. There, as in this case, the plaintiff sought to enforce a restrictive covenant by enjoining two former employees from working for the plaintiff's prior clients. The district court denied plaintiff's request for a preliminary injunction, concluding that plaintiff had not established that the former employees had breached their employment agreements. *Id.* at 478. The D.C. Circuit reversed that holding, concluding that the employees had, in fact, violated the restrictive covenants contained in their employment contracts. *Id.* at 479-80. Nonetheless, the Court concluded that injunctive relief was not appropriate because plaintiff could not establish irreparable harm. Plaintiff had identified one lost client, NAMF, that generated $600,000 in annual revenue. Notwithstanding this substantial loss in revenue, the Court held:

> [Plaintiff] has not . . . explained how a preliminary injunction would help regain NAMF as a client or maintain any current dealings with NAMF. As [plaintiff] acknowledged at oral argument, whatever damage has been inflicted on its relationship with NAMF would likely remain unchanged

by a preliminary injunction. Any damage that has occurred can be adequately compensated at law.

*Id.* at 481.

Precisely the same analysis applies here. A preliminary injunction will not help TWG regain either ASCO or Mentor as clients. Deborah Kamin of ASCO, testified that "I would have had no interest in continuing to work with The Washington Group if it did not include Harry" (Kamin Dep. 70) and stated that she would not seek services from TWG even if Mr. Sporidis were forbidden from working for her company. *Id.* at 71. Similarly, TWG is unable to offer evidence that it even has contacted Mentor, or wants to continue servicing Mentor. Molinari Dep. 57. Indeed, Susan Molinari acknowledged in her deposition that TWG has no interest in continuing to serve these clients. TWG has not contacted these clients nor has it even identified a lobbyist who could work with these clients since Mr. Sporidis announced his departure. Molinari Dep. 48-49 (ASCO), 57 (Mentor); see also Kamin Dep. 51 (TWG has not contacted ASCO since Mr. Sporidis announced his departure). To the contrary, Ms. Molinari testified that she fully expected that Mr. Sporidis would continue to provide government relations services to ASCO and Mentor, and that she hoped only that TWG might be able to share in some of the revenue generated by his work. Molinari Dep. 49-50.

### B.    Any Injury To TWG Can Be Compensated By Damages

The testimony here firmly establishes that any breach of a restrictive covenant by Mr. Sporidis resulted in no damages to TWG. As everyone agrees, Mr. Sporidis had every right to resign from TWG and begin to work for another employer. The two clients at issue have made clear that, once Mr. Sporidis left TWG, they would not continue to work with the firm and that they would seek the services of another government relations

firm if not permitted to continue using Mr. Sporidis' services. Accordingly, it is Mr. Sporidis' departure – *not* any breach of a restrictive covenant – that has caused TWG to lose revenue from these two clients.

In any event, even if it was a breach of a restrictive covenant that caused TWG to lose revenue from ASCO and Mentor, courts have routinely held that lost income is compensable by monetary damages, and accordingly that injunctive relief is not appropriate. For example, in *Ajilon Professional Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 (D.D.C. 2007), Judge Leon denied a motion for an injunction enforcing a restrictive covenant, finding that there was no irreparable harm because "damages are . . . limited to lost revenues." The D.C. Circuit relied on the same analysis in *Smith, Bucklin*, 83 F.3d at 481, *supra*, to conclude that plaintiff had not established irreparable harm. TWG's CFO, Paul Lobo, was able to quantify the annual revenue that would be lost due to Mr. Sporidis' departure within 24 hours of Mr. Sporidis' resignation. Ex. 19. There can be no doubt that plaintiff's losses can be quantified and compensated by damages.

Nor is there any merit to support TWG's argument (Mem. at 32) that it may lose clients other than ASCO or Mentor. There is not one shred of evidence that Mr. Sporidis has solicited or intends to solicit any TWG clients. He has denied that he has any expectation of providing services to any other clients. Sporidis Dec. ¶¶ 27, 28. Even TWG is constrained to admit (albeit in a footnote) that it was unable to develop evidence that he has solicited SHRM, a client that featured so prominently in TWG's first motion for injunctive relief. See Mem. at 9 n.8. Indeed, Powell Goldstein's business plan for Mr. Sporidis lists only ASCO and Mentor as his significant, portable clients. Ex. 20. "[T]he injury in support of extraordinary preliminary injunctive relief must be both

certain and great, it must be actual and not theoretical. . . ." *RCM Technologies*, 502 F. Supp. 2d at 74 (internal quotations omitted). Here, the injury is theoretical, not certain, and injunctive relief is not warranted.

TWG also fails in its attempt (Mem. at 30-31) to transform this lost revenue case into "irreparable injury" by arguing that it may have lost revenue from its clients for an indeterminate period. The alleged restrictive covenant here lasts for twelve months. Where there is a fixed term on the restrictive covenant at issue, the law is clear that lost income is limited to the length of the restrictive covenant. In *Kanan, Corbin*, 77 N.Y.S.2d at **6, the Court found that plaintiff employer had not established irreparable harm because "[defendant's] restrictive covenant has a duration of 12 months, making it unnecessary to attempt quantifying an indeterminate amount of business in the years to come.") See also *Production Resource Grp., LLC v. Oberman*, 2003 WL 22350939, *7 (S.D.N.Y. Aug. 27, 2003) (amount of damages can be calculated by measuring lost income during period that employee "was not entitled to obtain [former employer's] business").

In a last ditch attempt to establish irreparable injury, TWG cites to language in the RSA that states that breach of the restrictive covenants constitutes irreparable harm. Mem. at 33. In *Smith, Bucklin, supra*, however, the D.C. Circuit squarely rejected such an argument: "Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop." 83 F.3d at 481. Simply put, issuance of an injunction will not give TWG the relief it claims to seek – a return of its lost clients – and TWG therefore cannot establish irreparable harm.

## III. THE ISSUANCE OF AN INJUNCTION WILL SUBSTANTIALLY HARM OTHER INTERESTED PARTIES

The balance of harm prong (also known as the balance of equities) (see *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001)) strongly militates against the grant of an injunction. As discussed in Section II, *supra*, TWG will suffer little harm – and no harm that cannot be monetarily compensated – if injunctive relief is not granted. Indeed, it has made no effort to service or retain Mr. Sporidis' clients since his departure. Mr. Sporidis, on the other hand, has started his new employment, and preventing him from working for clients who want to use his services will impair his livelihood. In *L.G. Balfour Co., Inc. v. McGinnis*, 759 F. Supp. 840, 846 (D.D.C. 1991), the court denied a motion for a preliminary injunction to enforce a non-compete agreement, in part because "the potential harm to [the employee] from eliminating his livelihood appears greater than the potential harm to [the employer] from allowing him to continue pursuing clients in which it had lost interest."

What is more, TWG is hard-pressed to argue that equities weigh in its favor given its conduct towards Mr. Sporidis in early October. In its campaign to pressure Mr. Sporidis to change his mind and stay on at TWG, TWG threatened make things difficult for him and his family, to interfere with his relationship with his new employer, and to run up his legal bills. See Thelian Dep. 33, 38-39; Sporidis Dep 247-48; Ex 21. It devoted its efforts to intimidating Mr. Sporidis and building a case to punish him for disloyalty. See Thelian Dep. 14-16; Sporidis Dec. ¶¶ 33, 34, 40. Such tactics do not merit the award of injunctive relief.

## IV.    THE PUBLIC INTEREST WILL NOT BE FURTHERED BY THE GRANT OF AN INJUNCTION

Mr. Sporidis' clients have a First Amendment right to petition the government for action on their behalf (see, *e.g.*, *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 427 (D.C. Cir. 1986)), and they use Mr. Sporidis' expertise and experience to exercise this right. TWG's claim that an injunction will not "restrict TWG's clients from engaging the firm of their choice" (Mem. at 35) is belied by the evidence. As Dr. Kamin testified

> [Mr. Sporidis is] very important to our work. We've invested a lot of time in his – getting him up to speed. As I said, these issues are very difficult issues. A huge amount of energy has been spent working with him and bringing him into the fold, and I did not want that energy to be wasted and lost, and more importantly, the value of Harry to be lost to us.

Kamin Dep. 38. Indeed, when TWG sent Mentor an engagement letter that would have prevented Mentor from using the services of Mr. Sporidis if he left TWG, TWG crossed that provision out of the engagement letter before signing it. Ex. 1. TWG's request for an injunction accordingly interferes with ASCO's and Mentor's ability to use the professional they have identified as the best qualified to accomplish their goals without serving any legitimate need for TWG. Such a result would run contrary to the public interest.

## CONCLUSION

TWG cannot establish any of the four factors necessary to obtain injunctive relief.

Plaintiff's motion for a preliminary injunction must be denied.

Respectfully submitted,


/s/ Alan D. Strasser
Alan D. Strasser          (Bar No. 967885)
Kathryn S. Zecca          (Bar No. 457244)
Rachel Li Wai Suen        (Bar No. 500527)
Alice W. Yao              (Bar No. 493789)
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, NW
Suite 411
Washington, DC 20006
Phone: (202) 775-4500
Fax: (202) 775-4510

*Attorneys for Defendant Harry Sporidis*

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

--------------------- X

THE WASHINGTON          )

GROUP, INC.,            )   Civil Action No.

      Plaintiff,    )   1:07-cv-1892 (RBW)

  -against-              )

HARRY SPORIDIS,         )

      Defendant.    )

--------------------- X

Deposition of Harry Sporidis

Tuesday, October 30, 2007

Washington, D.C.

Pages 1 - 306

Job No. 183948

Reported by:  Deborah Larson Hommer, RPR

Harry Sporidis

Page 27

1  BlackBerry.  And I think that's about it.

2       Q.   At or around the time that you were

3  joining The Washington Group, did you ever

4  discuss restrictive covenant agreements with

5  anybody at the group?

6       A.   I did, with John Raffaelli.

7       Q.   What did he say?

8       A.   He said there are no restrictive

9  covenants at The Washington Group, and there

10 never will be.

11      Q.   He said specifically restrictive

12 covenants?

13      A.   He said there are no noncompetes.

14      Q.   No noncompetes?

15      A.   Correct.

16      Q.   Okay.  Did he give you any more

17 detail than that about what he was talking

18 about?

19      A.   He said -- Harry, he said, if you

20 ever want to leave the firm, go ahead and

21 leave the firm and take your clients with you.

22 Nobody is going to stop you.

Harry Sporidis

Page 28

1        Q.    And was that in response to a

2    question you had asked him?

3        A.    I had asked him if there was going

4    to be any noncompetes, if I would have to sign

5    a noncompete.  That was his response.

6        Q.    Do you recall if you specifically

7    discussed -- strike that.

8              Did you discuss anything else with

9    him about noncompetes?

10       A.    That was about it.

11       Q.    You basically told me everything

12   the two of you discussed?

13       A.    That's it.

14       Q.    Okay.

15       A.    Actually, I should make a

16   correction.  He also told me that the policies

17   of The Washington Group would not change just

18   because Ketchum was buying The Washington

19   Group.

20       Q.    You discussed Ketchum buying The

21   Washington Group?

22       A.    Yes, we did, because the buyout

Harry Sporidis

1      A.   He wasn't -- he did not say that,

2  no.

3      Q.   Would you have refused to join The

4  Washington Group if they had a policy of

5  requiring their employees to --

6      A.   I would have.

7      Q.   Sorry.  Let me finish the question.

8      Would you have refused to join The

9  Washington Group if they had a policy of

10  requiring their employees to sign

11  noncompetition agreements?

12      A.   I would have, yes.

13      Q.   And that would include, I assume, a

14  nonsolicitation agreement or a nonservice

15  agreement as well?

16      A.   I would have.

17      Q.   Where would you have gone to work

18  instead?

19      A.   Van Scoyoc & Associates.

20      Q.   I'm sorry?

21      A.   Van Scoyoc & Associates.  It was up

22  to two firms at that time when I was looking,

Harry Sporidis

Page 32

1    and it was between Van Scoyoc & Associates and

2    The Washington Group.

3         Q.   I see.  And you had interviewed

4    with Van Scoyoc?

5         A.   I did.

6         Q.   And you had an offer outstanding

7    there?

8         A.   I did not at that point, no.

9         Q.   Did you have offers pending

10   anywhere else?

11        A.   No, not at that point.

12        Q.   After you joined The Washington

13   Group -- first of all -- I'm sorry.  Let me

14   back up for a minute.

15             Other than John Raffaelli, at the

16   time you were joining The Washington Group did

17   you discuss the issue of noncompetition or

18   nonservice -- nonsolicit agreements with

19   anyone else in the group?

20        A.   I did.  There was a point where

21   Rita Lewis and John O'Hanlon and John

22   Raffaelli -- we were all sitting in the

Harry Sporidis

Page 33

```
 1     conference room together.  I had brought up

 2     the issue again, and they all said no, we

 3     don't have noncompetes here.

 4         Q.   And what specifically had you asked

 5     them?

 6         A.   I said, are there any noncompete

 7     agreements that I would have to sign?  And

 8     they said no.

 9         Q.   And did you mean as a condition of

10     becoming an employee?

11         A.   Correct.

12         Q.   And subsequent to those initial

13     conversations before you joined, did you

14     discuss noncompetes after -- like after you

15     had been with the group for a period of

16     time -- let's say up until and not including

17     this lawsuit.

18         A.   The issue had come up but it was

19     never -- I was -- actually, yes.  I was told

20     actually just several months ago by Susan

21     Molinari, the chairman and CEO of The

22     Washington Group, president of Ketchum Public
```

Harry Sporidis

Page 36

1    you discussed noncompetes with -- noncompetes

2    or nonsolicitation, nonservice agreements?

3        A.   Well, obviously since --

4        Q.   Not counting the issue we're

5    talking about in this lawsuit.

6        A.   No.  Just consistently told that I

7    don't have one.

8        Q.   Consistently told -- you mean --

9        A.   Consistently told by my superiors

10   at The Washington Group that I do not operate

11   under any noncompete or restrictive covenants.

12       Q.   When was that?

13       A.   Consistently.

14       Q.   You're saying this issue was

15   discussed on more than occasion --

16       A.   Correct.

17       Q.   -- over the years?

18       A.   Yes.

19       Q.   Can you recall specifics as to when

20   those conversations happened?

21       A.   I can't give you the specifics, but

22   they did happen.

1        Q.    How often do you think that was?

2        A.    Several times.

3        Q.    Over the period of 2001 until 2007?

4        A.    Yes.

5        Q.    About how many?

6        A.    I don't know.

7        Q.    Ten?

8        A.    I don't know.

9        Q.    More?

10       A.    I don't know.

11       Q.    What was your salary with The

12   Washington Group when you joined?

13       A.    I think it was $100,000.

14       Q.    That was in 2001?

15       A.    Yes.

16       Q.    And did it increase subsequently?

17       A.    It did.

18       Q.    What was it when you departed in

19   September?

20       A.    230.

21       Q.    I'm sorry?

22       A.    230.

Harry Sporidis

Page 38

1      Q.   Which clients did you service while

2   you were with The Washington Group?

3          MR. STRASSER:  Over what period?

4          THE WITNESS:  Over what --

5          BY MR. GREENBERG:

6      Q.   Well, let's say, who were you

7   servicing when you joined?

8      A.   When I joined The Washington Group,

9   I was servicing all the clients of the firm.

10  Specifically within six months -- do you want

11  me to go into this?

12     Q.   Please.

13     A.   Within six months, I brought in

14  Amgen and E*TRADE and was specifically

15  focusing on those two clients.

16     Q.   You say you brought them in.  Can

17  you elaborate for me?

18     A.   I solicited them to join -- to come

19  and use the firm, the firm's services.

20     Q.   You made a proposal to them?

21     A.   I did.

22     Q.   Did you have a specific contact at

**Harry Sporidis**

Page 39

1    Amgen?

2          A.    I did.

3          Q.    Who was that?

4          A.    Peter Teeley.

5          Q.    And he was somebody that you knew

6    previously?

7          A.    Correct.

8          Q.    How did you know him?

9          A.    I actually represented Amgen at my

10   prior firm.

11         Q.    How about E*TRADE?  Did you have a

12   contact there?

13         A.    I did.

14         Q.    And who was that?

15         A.    Betsy Barclay and Tara Wade.

16         Q.    How did you know them?

17         A.    Small town.

18         Q.    I'm sorry?

19         A.    It's a small town.

20         Q.    Can you tell me some of the other

21   significant clients you serviced subsequent to

22   your joining The Washington Group?

Harry Sporidis

Page 43

1    referred to us, The Washington Group, because

2    of my specific contacts with Congressman Jim

3    Greenwood.

4         Q.   Congressman Jim Greenwood?

5         A.   Yes.

6         Q.   Can you elaborate on that?  How was

7    it that your contact with Jim Greenwood

8    resulted in that referral?

9         A.   Congressman Greenwood was the

10   chairman of the House Energy and Commerce

11   Oversight Investigative Subcommittee.

12   Congressman Greenwood had an inquiry into the

13   FDA on an OCI, Office of Criminal

14   Investigation, investigation that was pending

15   on Mentor.  So they had requested my services

16   to help them with Congressman Jim Greenwood.

17        Q.   Okay.  So you had worked with them

18   prior to joining -- I'm sorry.  Strike that.

19             And who was your primary contact at

20   Mentor?

21        A.   My primary contact at Mentor for a

22   good time was a gentleman named Clarke

Harry Sporidis

Page 54

1    which I don't believe ever happened.

2                So there had been on more than one

3    occasion that I had been left in the lurch.

4        Q.    So you can't recall any instances

5    where you sought out assistance like that and

6    it was actually provided to you?

7        A.    Well, no.  I named you --

8        Q.    You mentioned one earlier.

9        A.    I named you about three, but that's

10   about it.

11       Q.    Okay.  You testified that, as we

12   have been discussing, you were the primary

13   and, in your opinion, the only person really

14   servicing Mentor on behalf of The Washington

15   Group?

16       A.    Correct.

17       Q.    Is it fair to say, then, that The

18   Washington Group entrusted you with managing

19   that relationship on your own?

20       A.    I don't know if it was they

21   entrusted me or if nobody really cared enough

22   to do anything for the client.

**Harry Sporidis**

Page 60

1    Investigation.

2         A.    No.   There was a specific need.

3    They were having some -- they were having some

4    serious image problem on the Hill, and they

5    needed to reshape their image.

6         Q.    Can you elaborate on that at all?

7         A.    There was -- it was an ugly debate

8    in the Medicare Modernization Act with the

9    oncologists, and they soured a lot of

10   relationships with members of Congress.  So it

11   was my task to rebuild their relationships

12   with House Energy and Commerce Committee

13   members and House Ways and Means Committee

14   members.

15        Q.    I see.  And do you know if they

16   were -- they were soliciting bids, let's say,

17   from other agencies?

18        A.    I believe so.

19        Q.    Do you know who else was bidding

20   for them?

21        A.    I don't.  I don't -- I don't

22   recall.

**Harry Sporidis**

Page 61

1    Q.    But you believe that there were

2    others besides Ketchum and The Washington

3    Group?

4    A.    I believe so because I believe we

5    were one of three that made it to the final

6    round, so yes.

7    Q.    And what was your role in preparing

8    that bid?

9    A.    I assisted in putting the actual

10   proposal together for The Washington Group,

11   for The Washington Group's portion, and was

12   one of the presenters at the actual pitch.

13   Q.    Who else presented?

14   A.    David Crane, Susan Molinari, Noam

15   Gelfond, and I believe it was Steve Erickson,

16   but I'm not sure on that one.

17   Q.    And who else assisted you in

18   preparing the documentation that you

19   submitted?

20   A.    Nobody.

21   Q.    You did that on your own?

22   A.    Correct.

**Harry Sporidis**

Page 62

 1        Q.    Was that pursuant to a specific

 2    request from somebody specific?

 3        A.    It was pursuant to a specific

 4    request from Noam Gelfond at Ketchum.

 5        Q.    Noam Gelfond spoke directly with

 6    you about this?

 7        A.    Yes, and he asked me if I could get

 8    this done, and I got it done for him.

 9        Q.    Had they previously been a Ketchum

10    client?

11        A.    Not that I -- not that I -- no.

12        Q.    And are you familiar with the

13    billing arrangement between The Washington

14    Group and ASCO?

15        A.    Somewhat.  It's a little strange

16    the way it was set up.  Basically, the billing

17    arrangement was that ASCO would give a lump

18    sum, cut a check to Ketchum and then Ketchum

19    distribute The Washington Group's portion to

20    The Washington Group.  So it was kind of a

21    roundabout way --

22        Q.    Okay.

**Harry Sporidis**

Page 64

1    able to take advantage of others' connections

2    in order to service them?

3         A.    David, I tried.  I tried, actually,

4    to integrate other people into the account,

5    and unfortunately it just didn't work.

6              I tried to integrate Missy Edwards

7    into the account.  It didn't work.  It didn't

8    happen.  At the time, Tripp Funderburke who

9    was at The Washington Group -- no longer

10   there -- I tried to integrate him into the

11   account.  Just somewhat of a disconnect.

12             So I made a point to try to

13   integrate other people in, but it just didn't

14   happen.

15        Q.    What was the context of you trying

16   to get Missy Edwards involved?

17        A.    I brought her to the first few

18   meetings that we had out at ASCO.  The context

19   was to get her involved in terms of Senate

20   Republicans.

21        Q.    And you say it didn't work.  She

22   didn't -- she never maintained interest in the

**Harry Sporidis**

Page 65

1    account?  She still works at The Washington --

2        A.    She still works at The Washington

3    Group, and there wasn't a lot of interest in

4    the account, no.

5        Q.    And Chip Under --

6        A.    Tripp.  Tripp Funderburke.

7        Q.    Tripp?

8        A.    Yes.

9        Q.    My apologies.

10        A.    He is no longer at The Washington

11    Group.

12        Q.    And how did you try and get him

13    involved?

14        A.    I brought Tripp to the first

15    meetings, too.  He worked for an

16    Appropriations Committee member.  So, you

17    know, it would have been a good fit.  But,

18    unfortunately, there was no interest.

19        Q.    There was no interest on Tripp's

20    part --

21        A.    Correct.

22        Q.    -- and Missy's part?

Harry Sporidis

Page 66

1       A.    Correct.

2       Q.    Did any of the other senior

3   personnel at The Washington Group have contact

4   with ASCO or people at ASCO?

5       A.    Not that I know of.

6       Q.    So they pretty much left ASCO to be

7   serviced by you?

8       A.    Correct.

9       Q.    Another one of the clients you

10  mentioned earlier was SHRM?

11      A.    Society of Human Resource

12  Management.

13      Q.    And they were one of the clients

14  that you serviced for The Washington Group?

15      A.    Yes.

16      Q.    And what kind of service did you

17  provide them?

18      A.    Government affairs advocacy,

19  strategic counseling.

20      Q.    The same as we have been

21  discussing?

22      A.    Correct.

**Harry Sporidis**

Page 74

1    this a pitch that originated with the group or

2    was it in response to a request for proposals?

3           A.    It was a favor.  I asked Dolly

4    Judge if she would made with us.

5           Q.    Dolly Judge is at Pfizer?

6           A.    Yes.

7           Q.    How about Merck?

8           A.    Again, it was a favor.  I asked if

9    they would meet with us.

10          Q.    Biotech?  Bio -- yes, Biotech.

11          A.    I asked if they would meet with us.

12          Q.    And ASPS?

13          A.    They sent me the request for

14   proposal.

15          Q.    Did we, by the way, say what ASPS

16   stands for?

17          A.    American Society of Plastic

18   Surgeons.

19          Q.    I know that, but I'm not sure if it

20   was on the record.

21                I apologize if you just answered

22   this, but the proposal to ASPS, was that for a

**Harry Sporidis**

Page 75

1    specific task or was that general public

2    affairs?

3        A.   No.  It was general lobbying.  It

4    was government relations.

5        Q.   General government -- I'm sorry.

6    Government relations?

7        A.   Correct.  And I believe that the

8    RFP went out to -- I think it was told 12

9    firms, maybe more.

10       Q.   Do you know who any of the other

11   firms were?

12       A.   I don't.

13       Q.   And did -- all you did was -- all

14   The Washington Group submitted was an initial

15   proposal?

16       A.   All I submitted was an initial

17   proposal.

18       Q.   And that was on behalf of whom?

19       A.   The Washington Group.

20       Q.   No one ever heard back from ASPS on

21   that?

22       A.   Not while I was at The Washington

**Harry Sporidis**

Page 81

1    receive stock?

2        A.    I believe it was -- you know, I'm

3    not quite sure, David.  I'm just not quite

4    sure.

5        Q.    Okay.  Do you remember receiving a

6    stock award in 2002, generally?

7        A.    I believe I did.  I'm just not

8    sure.

9        Q.    Maybe we can refresh your memory.

10            MR. GREENBERG:  Mark that as 1.

11            (Deposition Exhibit No. 1 was

12    marked for identification.)

13            BY MR. GREENBERG:

14        Q.    The reporter has just handed you

15    what we have marked as Plaintiff's 1.  Take a

16    minute to look that over.

17        A.    Okay.

18        Q.    Do you recognize this document?

19        A.    I do.

20        Q.    And what is it?

21        A.    I believe this is the document that

22    I signed to receive the restricted shares.

Harry Sporidis

Page 84

1    $20,000 worth of stock.  Thank you.

2        Q.   Sounds good to me.

3        A.   That was it.

4        Q.   Right.  Did you have to do anything

5    besides sign this letter and return it in

6    order to receive the stock?

7        A.   I don't -- well, other than having

8    to go on to the Fidelity website to select net

9    shares -- that would be the only thing I would

10   have to do.

11       Q.   Can you clarify that for me?

12       A.   That would be -- net shares is the

13   way Fidelity will take out the taxable income

14   of the stock.  So that's what I would do.  I

15   would select net shares and be done with it.

16       Q.   When did you do that in relation to

17   receiving this letter?

18       A.   No -- I would always do it when

19   Fidelity would send me a notice saying, hey,

20   you know, get on-line and do this or you lose

21   it, or something like that.  You know, you

22   need to get this done.  That's when I would do

**Harry Sporidis**

Page 85

1    it.  That's what would prompt me.

2        Q.   That would be an e-mail from

3    Fidelity?

4        A.   No.  It was actually -- I think it

5    was actually a letter from Fidelity.

6        Q.   It was a letter?

7        A.   I think so, but I'm not quite sure.

8        Q.   And that letter would have been

9    something you received after getting this

10   letter?

11       A.   Yes.

12       Q.   Okay.  So is it your understanding

13   that you lost the shares if you didn't go on

14   to do whatever Fidelity had asked you to do?

15       A.   It was my understanding.  That's

16   what I thought.

17       Q.   And that's based on what Fidelity

18   said in their letter?

19       A.   You know, to be honest with you,

20   David, I really don't -- I just, you know, got

21   on there, did it, did net shares.  I don't

22   even know how much money is in the account.

Harry Sporidis

Page 87

1          David, should I give this back to

2    you?

3       Q.    You can hold onto that for now.    I

4    will take it back when I'm done.    I may be

5    done with it.    We will see.

6          And was it your understanding that

7    when you would receive a notification from

8    Fidelity, you were still accepting the same

9    stock award that you had been notified of in

10   this 2002 letter?

11      A.    Yes.

12      Q.    Do you recall how often you

13   received these notifications from Fidelity?

14      A.    I don't.

15      Q.    Would it be like once a year?

16      A.    I just don't know.

17      Q.    Okay.    I will take that back.

18          (Deposition Exhibit No. 2 was

19   marked for identification.)

20          BY MR. GREENBERG:

21      Q.    The reporter has just handed you

22   Plaintiff's Exhibit 2.    Just take a moment and

**Harry Sporidis**

Page 88

1    review that, if you would.

2         A.    Okay.

3         Q.    Do you recall receiving this

4    letter?

5         A.    I do.

6         Q.    And do you recall reading it when

7    you received it?

8         A.    I do.

9         Q.    And unlike the Exhibit 1, which we

10   just looked at, Exhibit 2 does not actually

11   appear to be signed by you.  Do you recall

12   signing this?

13        A.    I believe I signed this and gave it

14   back to Tracey Gray.

15        Q.    Like you did with the others?

16        A.    Yes.

17        Q.    And then I presume you filed this

18   away somewhere?

19        A.    I did.

20        Q.    Okay.  And was it your

21   understanding, upon receiving this letter,

22   that you were receiving an additional 352

**Harry Sporidis**

Page 92

1    this award?

2         A.    I believe I did.

3         Q.    And did you understand that the

4    Fidelity notifications were in relation to

5    either your initial award in 2002 or this

6    award in 2003?

7         A.    No, I didn't.

8         Q.    You made no distinction between

9    those?

10        A.    I made no distinction.

11        Q.    But you did understand that this

12   was a second award of shares?

13        A.    Honestly, I didn't know what this

14   was.  All I know, it was on my desk.  I signed

15   it and returned it.  Nobody ever told me about

16   it.  And if it was a second lot or second

17   batch, I did not know.

18        Q.    I think you testified earlier that

19   you understood this was an additional 352

20   shares.  I want to make sure --

21        A.    I'm not sure.  I'm not -- I'm not

22   sure.

**Harry Sporidis**

Page 93

1     Q.   Okay.  Did you discuss your -- did

2  you discuss these stock awards that we have

3  been reviewing in Exhibit 1 and Exhibit 2 with

4  anybody at The Washington Group?

5     A.   No.

6     Q.   Just that initial conversation

7  with -- the first one with John Raffaelli?

8     A.   Correct.  And John O'Hanlon.

9     Q.   And John O'Hanlon.

10    A.   Yes.

11    Q.   Right.  Okay.  You can give that

12  back to me now.

13       Subsequent to these letters you

14  received in 2002 and 2003 that we've just

15  looked at, Plaintiff's Exhibits 1 and 2, do

16  you recall receiving any additional awards of

17  stock?

18    A.   I don't, no.  I don't.  I thought

19  there was another letter that I struck

20  language out of, but I don't -- I don't have a

21  copy of it.  So I -- I don't.

22    Q.   And this other letter you're

**Harry Sporidis**

Page 94

1    referring to, you think it was a letter

2    similar to these?

3        A.   Similar to these, yes.

4        Q.   And that you think you struck

5    certain language?

6        A.   I believe I did, but I just

7    don't -- I don't have a copy of it.

8        Q.   Do you recall discussing with

9    anybody in 2005 an additional award of stock

10   that you were receiving?

11       A.   No.

12           (Deposition Exhibit No. 3 was

13   marked for identification.)

14           BY MR. GREENBERG:

15       Q.   Take a moment to look at Exhibit 3.

16   Exhibit 3, which the reporter has handed to

17   you, appears to be an e-mail from Karen

18   Wilkinson to a blank recipient with -- I hope

19   it's legible on your copy -- a number of blind

20   copies.  One of them -- does your name appear

21   in the blind copy field?

22       A.   I see it here, yes.

**Harry Sporidis**

Page 95

1      Q.   Do you recall receiving this
2   message?
3      A.   No, I don't.
4      Q.   Do you recall discussing with
5   anybody at Ketchum stock awards given out in
6   2005?
7      A.   No.
8      Q.   Do you have a reason to doubt that
9   you received this message?
10      A.   I have never seen this before.
11      Q.   Is it possible that you did receive
12   this and you just don't recall?
13      A.   I have never seen it.
14      Q.   You are sure you have never seen
15   this message?
16      A.   I don't believe I have ever seen
17   this message.
18      Q.   Do you know why there would be a
19   message like this blind copied to you that you
20   hadn't seen?
21      A.   I don't know.
22      Q.   Do you generally read all of your

Harry Sporidis

Page 98

1    identity.  If he would like, I can give him

2    back the exhibit.  But I want to know -- do

3    you want me to give him back the exhibit?

4            MR. STRASSER:  Well, I think --

5            MR. GREENBERG:  I don't need him to

6    do a side-by-side comparison.

7            MR. STRASSER:  Well, I think you

8    can look at them and tell they're different.

9    But are you asking him to testify to that?

10           MR. GREENBERG:  No.  I don't need

11   him -- I don't need him to -- strike the

12   question.  Strike the question.

13           BY MR. GREENBERG:

14       Q.    My question for you -- your

15   attorney is correct in this instance.  I don't

16   need you to testify about that in comparison.

17   My question for you is simple:  Do you recall

18   ever receiving this message --

19       A.    No.

20       Q.    -- in June of 2005?

21       A.    No.

22       Q.    Okay.  Now, if you will turn to

**Harry Sporidis**

Page 99

```
 1    Exhibit B --

 2         A.   Okay.

 3         Q.   -- do you recognize this letter at

 4    all?

 5         A.   Can I -- can I go through it?

 6         Q.   Please.  Please take your time.

 7         A.   Okay, David.

 8         Q.   Do you recognize this letter at

 9    all?

10         A.   I do not.

11         Q.   Have you ever seen it before

12    sitting here with me today?

13         A.   I have seen it in the declarations,

14    but I have never seen it before --

15         Q.   So the first time you have ever

16    seen this was after this lawsuit had been

17    filed?

18         A.   Correct.

19         Q.   Have you ever seen a letter like

20    this addressed specifically to you?

21         A.   No.

22         Q.   So you don't recall receiving a
```

**Harry Sporidis**

Page 100

1    letter like this in or about June of 2005?

2         A.    I do not.

3         Q.    Are you certain you never received

4    this?

5         A.    I have never received this letter.

6         Q.    You're certain?

7         A.    I have never received this letter.

8         Q.    It's not possible that you received

9    it and don't recall?

10        A.    No.

11        Q.    Why is that not possible?

12        A.    Because I generally keep all paper

13   that I have, so I -- no.

14        Q.    Is there some reason you're aware

15   of that if a document like this were sent to

16   you via inter-office mail at The Washington

17   Group you wouldn't have received it?

18        A.    I have no idea.

19        Q.    Do you generally read all of your

20   inter-office mail?

21        A.    I do.

22        Q.    If you had received a letter like

Harry Sporidis

Page 115

1    declarations.  I believe -- is it Mr. Az --

2    how do you pronounce his name?  From Omnicom.

3        Q.    Azzopardi.  I understand what

4    you're referring to.

5        A.    Yes.

6        Q.    Prior to reading it as a part of

7    that declaration, had you ever seen screens

8    like those contained in this document?

9        A.    I have not.

10       Q.    Okay.  Have you ever seen screens

11   similar to these with Omnicom's name and logo

12   rather than Theta Corporation?

13       A.    I have not.

14       Q.    Is it your testimony that this does

15   not resemble the Fidelity website when you log

16   in to manage your account?

17           MR. STRASSER:  You're asking what

18   it now shows?

19           MR. GREENBERG:  At any time.

20           MR. STRASSER:  Okay.  You can

21   answer that.  Go right ahead.

22           THE WITNESS:  Well, no.  It -- I'm

Harry Sporidis

Page 117

1    have seen on Fidelity's website?

2            THE WITNESS:  Quite honestly,

3    David, again, I don't know what you're driving

4    at.  I don't understand.

5            BY MR. GREENBERG:

6        Q.    You testified that -- all right.

7    Finish your answer.

8        A.    I have not seen these screens

9    before.  I mean, I guess one could say it's a

10    similar layout, but I haven't seen these

11    particular screens before.

12        Q.    Okay.  Well, that's a start.  This

13    is a similar layout to what you have seen on

14    Fidelity's website?

15        A.    Possibly.

16        Q.    Meaning the tabs across the top,

17    for example:  Home, savings and retirement,

18    health and insurance?  Is that what you're

19    referring to?

20        A.    And logout and help, yes.

21        Q.    Okay.

22        A.    But there are a lot of computer

**Harry Sporidis**

Page 118

1    screens out there that are similar to this,

2    David.

3        Q.    My question to you --

4            MR. STRASSER:  Let him finish --

5            MR. GREENBERG:  You can let him

6    finish his answer.

7            MR. STRASSER:  I think he did.  I

8    think -- I told him to wait for a question

9    from you.

10            BY MR. GREENBERG:

11        Q.    But my question to you is, I

12    understand that there are a lot of screens out

13    there that are similar to this, would you

14    agree with me that if you went to Amazon.com

15    to purchase a novel or a video or a CD, this

16    is not what you would see?

17        A.    I don't know.

18        Q.    Have you ever visited Amazon.com?

19        A.    I have.

20        Q.    Have you ever purchased anything?

21        A.    I haven't been through the entire

22    website, though.  It's a huge website.

**Harry Sporidis**

Page 128

1      A.    Right.

2      Q.    And you understood that by clicking

3    "accept," you were accepting the terms and

4    conditions of the agreement?

5      A.    Correct.

6      Q.    Okay.  Going back to your visits to

7    the Fidelity website for a minute, have you

8    ever been asked, in the context of managing

9    your account, to review terms and conditions

10    similar to what we just discussed for your

11    installation of Leopard?

12      A.    I don't recall, no.

13      Q.    You don't recall ever having done

14    that?

15      A.    No.

16      Q.    Okay.  Do you have any reason to

17    believe that if you had been asked to, you

18    would not have done so?

19      A.    No, I don't have any reason to

20    believe that I would not have done so.

21      Q.    So do you believe it's important to

22    always review the terms and conditions of --

Harry Sporidis

Page 129

1        A.   I do.

2        Q.   -- something like that?

3             You can give that back.

4             (Deposition Exhibit No. 7 was

5   marked for identification.)

6             BY MR. GREENBERG:

7        Q.   The reporter has just handed you

8   Plaintiff's Exhibit 7.  Do you recognize this?

9        A.   I do recognize it because it has

10  been shown to me recently.

11       Q.   What do you understand this to be?

12       A.   I understand this to be a

13  restricted stock agreement.

14       Q.   For?

15       A.   Omnicom.

16       Q.   Okay.  And when was the first time

17  you saw this?

18       A.   October 1, 2007.

19       Q.   2007, okay.  If you would like, you

20  can have a chance to review it.  I am sure you

21  have done so many times over the past several

22  weeks.

Harry Sporidis

Page 137

1    know how many shares of stock vested, so...

2        Q.    Can you say with certainty that you

3    never accepted a grant of stock via Fidelity's

4    website?

5        A.    I've accepted stock via Fidelity

6    website using net shares.

7        Q.    I guess my question to you is, as

8    opposed to instructing Fidelity as to how to

9    pay the costs of vesting shares as those

10   shares vested, are you able to say that you

11   have never accepted a new grant of stock via

12   the website?

13       A.    The only thing I have ever done on

14   the Fidelity website, David, is do net shares.

15   I have gone on and I have selected net shares

16   in terms of taking out my taxable income.

17   That's what I've done on the Fidelity website.

18       Q.    Okay.  So you're saying that you're

19   able to say with certainty that you never

20   accepted a new grant of stock?

21       A.    I don't recall ever accepting a new

22   grant of stock.

Harry Sporidis

Page 154

1          Q.    Okay.  Did you talk to any of those

2     people about why you were leaving The

3     Washington Group or looking to leave?

4          A.    No, not necessarily.

5          Q.    Nobody asked?

6          A.    No.

7          Q.    Then obviously you didn't volunteer

8     that?

9          A.    (Shakes head from side to side.)

10          Q.    Did you discuss with any of them

11     bringing clients with you to Powell,

12     Goldstein?

13          A.    No, I did not.

14          Q.    Did anybody ask you about potential

15     restrictions on your ability to service

16     clients --

17          A.    No.

18          Q.    -- of The Washington Group after

19     you left?

20          A.    No.

21          Q.    Did you receive an offer from

22     Powell, Goldstein at some point?

Harry Sporidis

Page 155

1          A.   I did, about a week and a half, I

2     believe, later.  I think it was on

3     September 24.

4          Q.   Who did that offer come from?

5          A.   It came from Alan Parver.

6               (Deposition Exhibit No. 9 was

7     marked for identification.)

8               THE WITNESS:  The offer letter

9     okay.

10              MR. STRASSER:  Wait until he asks

11     you a question.

12              BY MR. GREENBERG:

13         Q.   Sorry.  Just before we give up on

14     Exhibit 8 for a minute, let me take it back

15     for a minute.  Did you meet with Jim McAlpin?

16         A.   I did meet with Jim McAlpin.

17         Q.   And what did you discuss with him?

18         A.   We discussed the fact that I had

19     two baby boys at home and how difficult that

20     was, and we also discussed how close Dave

21     Armitage and Tom McNeil are and how they both

22     own a pickup truck together, which was a very

Harry Sporidis

Page 164

1        A.    September 24.

2        Q.    And how was that communicated to

3    you?

4        A.    Verbally.

5        Q.    Okay.  And the first written

6    communication you had about that was this

7    letter?

8        A.    Correct.

9        Q.    Okay.  Did there come a time when

10    you notified The Washington Group that you

11    were leaving?

12        A.    September 26.

13        Q.    Who did you notify?

14        A.    Susan Molinari.

15        Q.    And was that like in the morning?

16    In the evening?

17        A.    I believe it was late morning,

18    early afternoon.

19        Q.    Describe that for me, if you would.

20        A.    Well, I went into Susan's office.

21    I was -- I went into Susan's office and I sat

22    down with her.  I told her I needed to speak

Harry Sporidis

Page 165

1    with her.  We sat down together and we chatted

2    for a while.  And I told her -- I said that I

3    had two options that I was seriously

4    considering, one partnering up with a friend

5    of mine and the other going with a law firm.

6    And I had decided that I would probably go

7    with option B of going with the law firm.  And

8    she was very happy to hear about the decision

9    that I made.

10              She said that if -- she thought it

11    was the right decision for me and my family.

12    She said that she supports me in the decision.

13    And she told me at that point, you know, I

14    want this transition to be easy for you.  Let

15    your clients know to put -- submit their

16    termination notices in.  Rob Lorfink is a

17    stickler on the 30-day -- Rob Lorfink is the

18    CFO of Ketchum.  He is a stickler on the

19    30-day termination, so, you know, make sure

20    that they -- you know, you get the 30-day

21    termination notices in, and also make sure to

22    let Paul Lobo know about what you're doing and

Harry Sporidis

Page 166

1    about what clients are going to be going so

2    that he can estimate that into the annual

3    budget because they're preparing the budget

4    right now for the office.

5              And then she said to me, you know,

6    you need to make me a promise.  And I said,

7    well, what's that?

8              And she said, every Tuesday you

9    call me up so we can gossip, and every third

10   Thursday of every month we have lunch

11   together.  And I said, okay.  That's a promise

12   I will keep.

13        Q.   Every Thursday?

14        A.   Every third Thursday of the month.

15        Q.   I see.  Okay.  Did you explain to

16   her the reasons why you were leaving?

17        A.   There was no reason to explain any

18   reasons.

19        Q.   She never asked?

20        A.   She actually said that she thought

21   it was the right thing for me to do because

22   she has always been concerned about me and my

Harry Sporidis

Page 170

1    too.

2         Q.   Okay.  And I believe you testified

3    she told you to speak to Paul Lobo?

4         A.   She did.

5         Q.   Okay.  And did you do that?

6         A.   I did that the next day.

7         Q.   And that was the 27th?

8         A.   Correct.

9         Q.   Tell me about that conversation.

10        A.   I walked into the office.  It was

11   the first thing I did.  I walked in and I went

12   into Paul's office and I said, I have

13   something to talk to you about.  And he looked

14   at me, and I knew as soon as he looked at me

15   that he already knew what I had to talk to him

16   about.

17             And I said, Susan talked to you,

18   didn't she?  And he said, yes, she did.

19             And I said, well -- I said, I am

20   going to be leaving the firm.  He said, I

21   know.  He said, Susan wants your transition to

22   be as easy as possible.  He said, Harry, just

Harry Sporidis

Page 171

1    get your clients to terminate the contracts.

2    An e-mail would suffice, he said to me.  Just

3    have them e-mail a termination.  That's all we

4    need, but have that done sooner rather than

5    later so the clock can start ticking.

6         Q.   He told you that at this first

7    meeting with him after he spoke to Susan?

8         A.   Yes.

9              MR. GREENBERG:  Can you read back

10   that answer -- the one before that?

11             (The reporter read the record as

12   requested.)

13             BY MR. GREENBERG:

14        Q.   Did Paul mention with you in that

15   conversation the possibility that you might be

16   subject to restrictive covenants?

17        A.   No.

18        Q.   At no time during that

19   conversation?

20        A.   No.

21        Q.   Did you and Paul discuss the

22   possibility that you had restrictive covenants

Harry Sporidis

Page 172

1    anytime that day?

2        A.    No.

3        Q.    Did you discuss sending a message

4    to the other people at The Washington Group?

5        A.    We did.

6        Q.    And what did you discuss about

7    that?

8        A.    He asked how he would like us to

9    communicate this with the rest of the firm.  I

10   had suggested that maybe it would be better if

11   I send out an e-mail, office-wide e-mail so

12   nobody feels slighted that I didn't go to them

13   directly.  And he thought that was a good

14   idea.  And prior to sending that e-mail out, I

15   had him review it first.

16       Q.    And did he -- when did you have him

17   review that?

18       A.    That was later in the afternoon,

19   shortly before I had sent it -- you probably

20   have the e-mail, so --

21       Q.    We will take a look at it in a

22   minute.

Harry Sporidis

Page 173

1        A.    Yes, take a look at the time there.

2        Q.    And what did he say upon reviewing

3    the e-mail?

4        A.    He said, it's fine.

5        Q.    Did he tell you to send it?

6        A.    Uh-huh.

7        Q.    And he didn't tell you to hold off

8    on sending it?

9        A.    No, he did not.

10        Q.    Did you discuss the potential that

11    you were subject to restrictive covenants with

12    anybody at The Washington Group that day?

13        A.    No.

14        Q.    When was the first time you spoke

15    with someone at The Washington Group about the

16    potential -- about the possibility that you

17    were subject to restrictive covenants?

18        A.    Friday the 28th, in the morning.

19        Q.    So the following day in the

20    morning.  Who did you speak with then?

21        A.    Paul Lobo came in and talked to me.

22            (Deposition Exhibit No. 10 was

**Harry Sporidis**

Page 182

1      Q.   And why did you forward it to

2    yourself at your home address?

3      A.   This was for my wife.

4      Q.   She checks your e-mails as well?

5      A.   Well, we both use this account.

6      Q.   You share an e-mail address?

7      A.   Yes.

8           MR. GREENBERG:  Let's take five.

9           (Recess.)

10           BY MR. GREENBERG:

11      Q.   Mr. Sporidis, did there come a time

12    when you notified Joshua Levine at Mentor that

13    you were leaving The Washington Group?

14      A.   There did.

15      Q.   And when was that?

16      A.   I believe it was September 26.

17      Q.   What was the context of that

18    discussion?

19      A.   I called him to let him know that I

20    was leaving The Washington Group.

21      Q.   Was this before or after you had

22    spoken to Susan?

Harry Sporidis

Page 183

1          A.    After I had spoken to Susan.

2          Q.    And had you discussed with him

3    previously the possibility that you would be

4    leaving?

5          A.    I had not discussed with him

6    previously the possibility of me leaving, no,

7    not before that time.

8          Q.    So the first he heard that you

9    might be leaving The Washington Group was when

10   you called him --

11         A.    Correct.

12         Q.    -- before speaking to Susan?

13         A.    Correct.

14         Q.    What did you say on that call?

15         A.    I told him -- I said, Josh, you

16   know, I just want to let you know that I am

17   going to be leaving The Washington Group.

18         Q.    What did he say?

19         A.    He said, where are you going?  And

20   I told him where I was going.  He said, okay.

21   He said, well, Harry, my loyalty is -- you

22   know, our loyalty has been with you; it's not

Harry Sporidis

Page 184

1    with The Washington Group.

2         Q.   What else did -- what did you say?

3         A.   I said, thank you very much.   I

4    appreciate that.

5         Q.   What else did you discuss with

6    Josh?

7         A.   He said -- you know, basically, we

8    discussed about the new letter of engagement,

9    to send it out to him and -- submitting his

10   termination request.

11        Q.   You discussed that with him on the

12   phone?

13        A.   I -- we did discuss that, yes.

14        Q.   And what did you say?

15        A.   I said Susan had -- well, I had

16   told him that we need to get your termination

17   request in because of the 30-day parachute.

18   But I told him that I would still be at The

19   Washington Group for a couple of weeks so, you

20   know, I would be still servicing the account

21   while there.

22        Q.   Okay.  Did he ask you anything

**Harry Sporidis**

Page 185

```
 1    about your ability to continue servicing

 2    Mentor after leaving The Washington Group?

 3         A.   No.

 4         Q.   Did you say anything to him about

 5    that?

 6         A.   No.

 7         Q.   Had he previously asked you about

 8    that?

 9         A.   About what?

10         Q.   About your ability to service

11    Mentor after leaving The Washington Group?

12         A.   No.

13         Q.   Or I should say in the event you

14    left The Washington Group.

15         A.   No.

16         Q.   And had you previously discussed --

17         A.   Well, I mean, there was a time --

18    actually, David, there was a time a couple of

19    years ago Josh said to me, you know, Harry,

20    you're our guy.  Anywhere you go, just send me

21    a contract; we're going to be there with you.

22    This was a few years ago.
```

**Harry Sporidis**

Page 186

1        Q.    What was the context of that

2    discussion?

3        A.    He just brought it up, unsolicited.

4        Q.    Out of nowhere?

5        A.    Out of nowhere.

6        Q.    And this was about --

7        A.    This was a couple of years ago.  He

8    was here in town and I was taking him around

9    to Hill meetings.

10        Q.    Okay.  Did there come a time that

11    you notified ASCO that you were leaving The

12    Washington Group?

13        A.    There came a time that I notified

14    ASCO that I was considering leaving The

15    Washington Group, yes.

16        Q.    When was that?

17        A.    This was -- I don't remember

18    exactly when it was, but Deborah Kamin had

19    asked me -- at one time the conversation --

20    Deborah Kamin had said to me, if you are ever

21    thinking of leaving The Washington Group, I

22    want you to let me know; I want you to give me

Harry Sporidis

Page 187

1    plenty of lead time so we can follow you out

2    the door.

3              So I let Deborah know that nothing

4    was in stone, but there was a possibility of

5    my leaving The Washington Group.

6         Q.   And you don't recall when that was?

7         A.   I don't recall.

8         Q.   Was it six months before you left?

9         A.   I don't -- I don't recall.

10        Q.   You can't recall with any

11   generality?

12        A.   I don't recall.

13        Q.   And did you discuss that issue with

14   them after that conversation?

15        A.   Yes.  As we came closer to -- after

16   the September 12 meeting down in Atlanta, I

17   had spent a day with Shelagh Foster and

18   Dr. Alan Lichter, the president and CEO of

19   ASCO.  We were on the Hill all day doing our

20   round of Hill meetings.  And at the end of the

21   day I told Shelagh that the possibility might

22   actually happen.  But nothing was in stone, I

Harry Sporidis

Page 188

1    told her.

2         Q.    This was after you went to Atlanta?

3         A.    Yes.  This was on September 18.

4    But, again, I told her nothing was in stone.

5         Q.    What did -- I'm sorry.  You were

6    speaking with Shelagh Foster and Deborah Kamin

7    at that time?

8         A.    No.  It was just Shelagh.

9         Q.    Just Shelagh?  What did Shelagh say

10   in response?

11        A.    She sounded very happy for me.

12        Q.    Did she say anything specific?

13        A.    She said, that's great.  It's a

14   great firm.

15        Q.    Any discussions with anyone else

16   around that time?

17        A.    No.

18        Q.    I meant at ASCO, of course.

19        A.    No.  Not at that point, no.

20             (Deposition Exhibit No. 13 was

21   marked for identification.)

22             BY MR. GREENBERG:

**Harry Sporidis**

Page 198

1    ASCO -- strike that.

2         Did there come a time when you

3    spoke with ASCO to notify them that, yes, you

4    were officially leaving The Washington Group?

5         A.    On September 26.

6         Q.    And was that -- I'm sorry.  Go

7    ahead.  I didn't mean to cut you off.

8         A.    No.

9         Q.    And was that before or after you

10   spoke with Susan Molinari?

11        A.    It was after I spoke with Susan

12   that I officially told them that I was leaving

13   The Washington Group.

14        Q.    Did you have a discussion with them

15   prior to that official, quote/unquote,

16   notification that you would be -- that you had

17   decided you were leaving?

18        A.    I don't believe I did, no.  I don't

19   believe so.

20             (Deposition Exhibit No. 16 was

21   marked for identification.)

22             BY MR. GREENBERG:

**Harry Sporidis**

Page 199

1      Q.   Do you recognize this document?

2      A.   I do.

3      Q.   Identify it, please.

4      A.   It's an e-mail that I sent to

5  Deborah Kamin on September 26.

6      Q.   And was this e-mail -- I'm sorry.

7  The e-mail you sent to her on the 26th, can

8  you tell me where that begins?  Or are you

9  referring to the main body of the message?

10     A.   Yes.  The main body of the message.

11  It begins at 3:30 there, September 26.

12     Q.   And was this the first time you

13  notified them that --

14     A.   Correct.

15     Q.   -- you were leaving The Washington

16  Group?

17     A.   Yes, this was the official

18  notification.

19     Q.   And you hadn't spoken to them about

20  that previously?

21     A.   I had not -- no, I had not.  I

22  don't believe I had, no.

**Harry Sporidis**

Page 200

1      Q.    Did you speak to them in advance to

2  let them know you would be talking to Susan?

3      A.    I don't think so.

4      Q.    Take a look in that message you

5  sent to her initially.  It says, "I will be

6  moving to my new firm on October 22.  I wanted

7  to discuss with you how we should proceed on

8  the new agreement."

9      A.    Uh-huh.

10     Q.    Had you discussed a new agreement

11  with your new employer with her previously?

12     A.    No, I had not.  I had -- basically,

13  I'm giving Deborah the option right now.  I am

14  asking her what she -- how does she want me to

15  proceed?  What does she want?

16     Q.    And when you're discussing "how we

17  should proceed on the new agreement," were you

18  referring to an agreement with Powell,

19  Goldstein?

20     A.    Correct.

21     Q.    But this was the first time that

22  either you or she had raised that issue?

**Harry Sporidis**

Page 201

1     A.    Correct.   This was after I had

2   spoken with Susan.   Considering that ASCO's

3   contract had not been inked yet, there was no

4   reason to ask ASCO to terminate.

5     Q.    And then I see Deborah Kamin

6   replied, and then you replied to her.   She

7   replied, "How did it go with Susan?"   Correct?

8     A.    Right.   And I say, "It went great.

9   I'll call you in the a.m., and give you the

10   download."

11     Q.    And did you call her?

12     A.    I did.   I called her in the morning

13   and told her how great it actually was.   Susan

14   and I had a fantastic conversation on that

15   day.

16     Q.    And that's what you told Deborah

17   Kamin?

18     A.    Yes.

19     Q.    What else did you tell her?

20     A.    That Susan is a class act.

21           (Deposition Exhibit No. 17 was

22   marked for identification.)

**Harry Sporidis**

Page 235

```
 1    meetings set up.

 2         Q.   Who else was present at that

 3    meeting?

 4         A.   Paul Lobo was present at that

 5    meeting.

 6         Q.   What did Paul say?

 7         A.   Paul didn't say much, if anything.

 8         Q.   Do you recall anything he said?

 9         A.   I don't recall anything that Paul

10    said.  But we were in the conference room at

11    The Washington Group.

12         Q.   Did Susan say anything to Paul?

13         A.   I don't recall.

14         Q.   All right.  Let's go back to

15    something we talked about a few hours ago.

16    When was the first time you discussed with

17    anyone at The Washington Group their belief

18    that you were bound by a restrictive covenant?

19         A.   September 28, Friday morning.

20         Q.   Okay.  And who was that?

21         A.   Paul Lobo.

22         Q.   What did Paul say to you?
```

Harry Sporidis

Page 236

1    A.    He said, Harry, this isn't

2    official.  I am giving you a heads-up.  This

3    is just a courtesy, but Craig Mersky at

4    Ketchum, general counsel, says that you might

5    be bound by a noncompete because of a 2005

6    stock agreement.

7              And my response to Paul was, that's

8    bullshit.

9              I had later sent him an e-mail

10    apologizing for that outburst.  And he said,

11    well, this isn't official.  I am trying to get

12    as much information as I possibly can, but I

13    just wanted to give you the heads-up.  Susan

14    wants this to be an easy transition for you,

15    is what he said to me.  So she is doing

16    whatever she can to smooth things over.

17    Q.    And this conversation on

18    September 28 was the first time anyone had

19    mentioned to you the noncompete --

20    A.    Correct.

21    Q.    -- or the issue of a noncompete?

22    A.    Correct.

**Harry Sporidis**

Page 247

1    Q.   Was there some reason you believed

2    you had to wait for Ketchum to propose an

3    idea?

4    A.   Well, Ketchum was the one that was

5    threatening litigation and threatening to harm

6    my family, so yes.

7    Q.   When you say Ketchum threatened to

8    harm your family, can you explain what you

9    mean?

10   A.   Eugene Patrone told me on the

11   phone, these people don't care about your

12   family, Harry.  You have three babies at home.

13   They don't care about your three babies at

14   home.  They're going to go after you.  They're

15   going to litigate against you.  You don't have

16   the money to be litigated against.  They're

17   going to hurt you financially.

18   Q.   This was in a phone conversation?

19   A.   This was in a phone conversation.

20   Q.   When did that take place?

21   A.   And -- that was on October -- it

22   was the day before we had lunch, and I believe

**Harry Sporidis**

Page 248

```
1    lunch was October 3 and -- no, it was on

2    the 1st.  It was October 1.  And then

3    October 3 the same thing happened.  We had the

4    same thing transpire.

5         Q.   The same thing transpire?

6         A.   He said the same things to me.

7         Q.   And that was at lunch?

8         A.   Yes.  At Oceanaire.

9         Q.   Before we get back to your

10   conversation with Eugene -- I don't want to

11   leave the topic of Powell, Goldstein.  Did

12   you -- we already discussed your conversation

13   with Alan Parver on the 28th.

14        A.   Uh-huh.

15        Q.   Do you recall speaking with Cynthia

16   Berry on the 28th about the same topic?

17        A.   I don't know if I spoke with her

18   directly or if I sent her an e-mail.  I don't

19   remember.

20        Q.   Do you remember generally what you

21   and Cynthia discussed regarding the agreement

22   that you were being told you were bound by?
```

**Harry Sporidis**

Page 301

1    declaration one more time, paragraph 10.  It's

2    Exhibit?

3         A.    Exhibit 5.  Let's see if I can find

4    it here.  Paragraph 10.

5         Q.    You're referring to speaking to

6    Josh and telling him you were leaving The

7    Washington Group.  Is that the conversation

8    that you and I discussed earlier after you

9    spoke to Susan?

10        A.    This was -- no.  This was in 2006,

11   David.  This wasn't -- this wasn't this year.

12        Q.    Well, if you look at the second

13   half of paragraph 10, did you tell him in 2006

14   you were leaving The Washington Group?

15        A.    No, no, no.  This was an

16   unsolicited 2006 comment.  Just send me the

17   new -- "just send me the new contract" was an

18   unsolicited comment.

19              But then here in -- when I just

20   spoke to him on September 26, when I spoke to

21   Josh and told him that I was leaving The

22   Washington Group, he told me that I was a big

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

------------------------------x

THE WASHINGTON GROUP, INC.,    :

     Plaintiff,             :

    -vs-                    : Civil Action

HARRY SPORIDIS,               : No. 1:07-cv-1892 (RBW)

    Defendant.               : PAGES 1 - 138

------------------------------x

Videotape Deposition of Cynthia E. Berry

Washington, D.C.

Thursday, November 1, 2007

Reported by:  Tammy S. Newton

JOB NO. 183964

Cynthia Berry

Page 84

1    Q    Anyone at the American Society of Plastic

2  Surgeons?

3    A    Yes.

4    Q    When did you have communications with

5  anyone at ASPS?

6    A    I don't recall having direct conversations

7  with them until we actually presented to them in

8  Baltimore on the 25th of October.

9    Q    Okay.

10   A    I submitted a proposal.

11   Q    I'll get back to that in just a moment.

12  Did you have -- I should say, have you had any

13  conversations or communications with anyone at Pfizer?

14   A    No.

15   Q    Have you had any conversations or

16  communications with anyone at BIO?

17   A    No.  To clarify --

18   Q    Yes.

19   A    -- are you putting a time?

20   Q    Yes.  In the last several months.

21   A    No.

22        MR. CRENSHAW:  This related to Mr.

Cynthia Berry

Page 96

1    correct?

2         A    Yes.

3         Q    In your e-mail to Mr. Sporidis, you

4    indicate that, quote, we rewrote the proposal to

5    include all the PoGo info.  Do you see that?

6         A    Yes.

7         Q    Does that change your testimony at all

8    about how much of The Washington Group proposal you

9    used when you drafted a version of the Powell

10   Goldstein proposal to ASPS?

11        A    No.  It was a polite way of saying we

12   basically didn't use The Washington Group proposal.

13   We did our own.

14        Q    Did anything in The Washington Group

15   proposal that you saw from Mr. Sporidis help you draft

16   Powell Goldstein's proposal from a competitive

17   standpoint?

18        A    No.  We started from scratch.

19        Q    And I'm asking a slightly different

20   question.  Did it help you in drafting the Powell

21   Goldstein proposal to know what The Washington Group

22   had already proposed to ASPS?

Cynthia Berry

Page 97

1      A      Really, it didn't.

2      Q      Why is that?

3      A      I relied on how we put together proposals

4   and in conversations I had with Harry as to what he

5   thought their issues are and what they care most

6   about.  Also, I spoke and worked with Julius Hobson

7   from our firm.  He and I have experience representing

8   physicians.  So we relied on that more than anything

9   else.

10     Q      May I take a look at the, I guess, Exhibit

11  14, please.  You may be able to point me to it even

12  faster than I can find it, since I'm just seeing this

13  now.

14             But in The Washington Group proposal, was

15  there a reference to a monthly fee proposal; do you

16  know?

17     A      As I recall, what Harry had sent me -- I

18  don't know what's in this one, if this is a final.

19  What he had sent me, I didn't see any reference to it.

20  And I asked Harry what fee do you want to charge,

21  because I didn't see it in the version that was

22  e-mailed to me.  As I said, I think or he thought at

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

------------------------------x

THE WASHINGTON GROUP, INC.,     :

    Plaintiff,                  :

    -vs-                        : Civil Action

HARRY SPORIDIS,                 : No. 1:07-cv-1892 (RBW)

    Defendant.                  : PAGES 1 - 76

------------------------------x

Videotape Deposition of Deborah Y. Kamin, Ph.D.

Washington, D.C.

Friday, November 2, 2007

Reported by:  Tammy S. Newton

JOB NO. 183966

**Deborah Y. Kamin, Ph. D.**

Page 11

1    relations, I believe, as one of your responsibilities?

2        A    Yes.

3        Q    Is there a government relations group at

4    ASCO?

5        A    Yes.  There is a small staff headed by an

6    attorney, Shelagh Foster, and she has mainly program

7    assistant level folks working for her.

8        Q    How many program assistant level folks are

9    in that group?  And I understand it probably varies

10   over time, but generally speaking.

11       A    There are three additional people --

12   excuse me, four.

13       Q    When did you first meet Mr. Sporidis?

14       A    I met him when ASCO was interviewing for

15   firms that would represent us with some support work

16   on Capitol Hill and communications.  I'm trying to

17   remember the year that was.  It must have been 2005.

18   I may not have that exactly correct.

19       Q    Okay.

20       A    Maybe 2004.

21       Q    Okay.  Had ASCO put out some sort of

22   request for proposal for government relations work at

Deborah Y. Kamin, Ph. D.

1    that time?

2        A    We had put out a proposal, and reaching

3    back here, we needed some help at the time with a very

4    difficult issue.  It was when there was a debate going

5    on about Medicare reform.  There were some groups that

6    had caused us a particular problem and had created

7    issues with our image on Capitol Hill and in other

8    places.  So we put out a request for firms to bid on

9    helping us with communications efforts and with some

10   targeted work on Capitol Hill to correct some of those

11   situations.

12       Q    And how many proposals did you receive in

13   response to that request that you put out?

14       A    As I recall, there were three or four firms

15   that we interviewed.

16       Q    And The Washington Group was among those

17   three or four?

18       A    Yes.

19       Q    Had there --

20       A    It was actually Ketchum.

21       Q    And that goes to my next question.  Thank

22   you.  Had there been a relationship between Ketchum

**Deborah Y. Kamin, Ph. D.**

```
                                          Page 13
 1   and ASCO prior to your putting out this request for

 2   proposal?

 3       A    Not to my knowledge.

 4       Q    Had there been any -- well, strike that.

 5   Let me ask this question.

 6            Do you know how Ketchum came to put in some

 7   sort of proposal in response to your request for

 8   proposals?

 9       A    No.

10       Q    Who was part of the interview team on

11   Ketchum's part in response to ASCO's request for

12   proposal?

13       A    Who came to present to us?

14       Q    Yes.  And I know we're talking about a few

15   years ago.  I don't know if you remember or if you

16   don't.

17       A    I don't remember everybody.  I remember --

18   I believe Susan Molinari was there for one of the

19   meetings, and Noam Gelfond, Harry, and there may have

20   been some other folks from The Washington Group.  I

21   don't remember everybody who was there.

22       Q    Might there also have been some people from
```

**Deborah Y. Kamin, Ph. D.**

Page 23

1              MS. MICHELS:  You're getting a little

2      argumentative.  She said it's not easy to put them

3      into two categories.

4              MS. LALIK:  Sure.  I'm just trying to

5      understand what you understand.

6      BY MS. LALIK:

7         Q     You don't know necessarily who was from The

8      Washington Group then and who was from Ketchum?

9         A     I know Harry was with The Washington Group

10     and Noam was with Ketchum.  How bright the line they

11     draw themselves between those two organizations, I

12     don't know.

13        Q     Okay.  And how about Louanne?

14        A     She was with the Ketchum.

15        Q     And I think you mentioned a person named

16     Zach?

17        A     Ketchum.

18        Q     So to your knowledge, besides Mr. Sporidis,

19     did you work with anyone else from The Washington

20     Group?

21        A     Our day-to-day interaction was with Harry.

22        Q     Okay.  I understand that, and that has been

**Deborah Y. Kamin, Ph. D.**

Page 29

1    Q    So when you said when this was written,

2    you're talking about mid September 2007?

3    A    That -- yes, that's my understanding of how

4    it was.

5    Q    Before that time, had the distribution been

6    different and/or the monthly retainer been different?

7    A    I believe the monthly retainer as it

8    started -- I'd have to look back at the records, but

9    there was a more even balance because our first --

10   when we first started out, there was essentially an

11   equal distribution of the need between a

12   communications support function and policy support.

13   Q    Okay.  And do you know when that equal

14   distribution started changing so that it was more

15   heavily distributed towards The Washington Group?

16   A    I don't recall exactly when the shift

17   occurred, but I would say over the last year and a

18   half or so.  Most of the focus was on policy support

19   as opposed to communications.  I don't recall exactly

20   when we changed the distribution.

21   Q    So as far as you're concerned, the

22   intentions of the parties as of the mid September time

**Deborah Y. Kamin, Ph. D.**

Page 30

1    frame were to move forward and continue the

2    relationship between ASCO, The Washington Group, and

3    Ketchum?

4        A    It was our goal to stay with Harry, and

5    that was going to be activated in this plan.

6        Q    Okay.  How did you feel about the work

7    that, I guess, Noam Gelfond was performing for you?

8        A    Noam Gelfond did fine work.  We didn't need

9    as much of it.  In fact, we really didn't need much of

10   it at all at this point.  Mostly what we needed was

11   Harry.

12       Q    Okay.  But again, the intention was to

13   continue with the contract?

14       A    I believe so, in a much -- much scaled back

15   scope though.

16       Q    Now, if you could explain that, because

17   that's not what I understood, please.

18       A    Well, the dollar amount, as you can see

19   there, is $5,000 for Ketchum, which was significantly

20   reduced.

21       Q    Oh, no.  You and I are -- you're answering

22   a different question than I intended to ask.  So my

**Deborah Y. Kamin, Ph. D.**

Page 31

1    apologies.  But in terms of the entire relationship,

2    the ASCO, Ketchum, The Washington Group contract, it

3    was the intention of the parties, at least to your

4    understanding, to continue with that arrangement?

5         A    Yes.

6         Q    Okay.  And to continue with the

7    distribution that, I guess, had been going on for at

8    least a little bit of time where about $20,000 of the

9    retainer was for services from The Washington Group

10   and about $5,000 was for services from Ketchum?

11        A    Right.

12        Q    Okay.  If you'll look at the next e-mail up

13   on this e-mail chain, there's a person included on the

14   to line, Jenny, who you just said works for Kristin,

15   correct?

16        A    Jenny Heumann.

17        Q    Yes.  And is that right, she works for

18   Kristin Ludwig?

19        A    Yes.

20        Q    Just below Jenny Heumann, you'll see a name

21   Jennifer Colpitts.  Do you know who she is?

22        A    I'm not -- I'm not recalling who she is,

**Deborah Y. Kamin, Ph. D.**

Page 33

1     A    I don't remember exactly.  It was -- I

2   think I had awareness maybe mid to late September that

3   that was something he was considering.

4     Q    How did you find that out?

5     A    Well, he called me.  I recall a telephone

6   call in late September.  He notified me that he had

7   made that decision that he was -- had had a

8   conversation with Susan.

9     Q    Before he notified you that he had a

10  conversation with Susan in that telephone call you're

11  just describing, had you and he had any discussions

12  about the possibility of him leaving The Washington

13  Group?

14    A    I was aware that he was thinking of it, but

15  he had not told me that he was leaving.  When he did,

16  when I knew he was thinking about it, I said I want to

17  know where you're going, because I would like to go

18  with you.

19    Q    Okay.  When did you learn that Mr. Sporidis

20  was aware that he was thinking about it?  I'm sorry.

21  That was totally messed up.  When did you first become

22  aware that Mr. Sporidis was thinking about leaving The

Deborah Y. Kamin, Ph. D.

Page 34

 1    Washington Group?

 2         A     I say in mid to late September.

 3         Q     How long before the call that you just

 4    described in which he told you that he had spoken with

 5    Ms. Molinari?

 6         A     I don't remember exactly the day I became

 7    aware of it.  So somewhere around the middle of

 8    September I knew he was thinking about it.  Then he

 9    called to let me know that he had had the

10    conversation.

11         Q     Okay.

12         A     So maybe I knew about it a week, couple of

13    weeks.

14         Q     So I want to focus your attention on sort

15    of the first time you heard that he might be leaving

16    The Washington Group, and then we can go from there in

17    a chronological order.  I think we sort of established

18    the time frame.

19               In what type of communication did Mr.

20    Sporidis tell you he was thinking or considering

21    leaving The Washington Group?  Was it by phone?  Was

22    it in person, in writing?

Deborah Y. Kamin, Ph. D.

Page 35

1        A      I don't -- I really don't remember.

2        Q      Okay.  Do you know if he told anyone else

3    at ASCO that he was considering leaving The Washington

4    Group around the time he told you he was considering

5    leaving?

6        A      He may have -- I was aware that Shelagh

7    knew about the same time I did.

8        Q      Okay.  Shelagh Foster?

9        A      Uh-huh.

10       Q      So was it your understanding that Mr.

11   Sporidis had mentioned to Ms. Foster as well that he

12   was considering leaving?

13       A      Shelagh and I discussed that he was

14   contemplating leaving, and I said to Shelagh, make

15   sure we know where he goes, because I would like to go

16   with him.

17       Q      Okay.  What did Mr. Sporidis tell you in

18   that initial discussion you and he had about the fact

19   that he was considering leaving The Washington Group?

20       A      Nothing.  I mean, he didn't -- he was

21   thinking about it, and that was it.  That was the end

22   of the conversation.  And I said to him, like I said,

Deborah Y. Kamin, Ph. D.

Page 36

1    let us know when you make-up your mind because we

2    would like to be wherever you are.

3        Q    And do you know what Mr. Sporidis said to

4    Ms. Foster during the conversation that they had?

5        A    No.  I wasn't there.

6        Q    So is it your testimony that during that

7    initial conversation you had with Mr. Sporidis about

8    the prospect of him leaving The Washington Group, he

9    did not tell you where he was going?

10        A    No, he did not.  He hadn't made up his mind

11    he was even leaving.

12        Q    Okay.  Did you and Mr. Sporidis during that

13    initial conversation talk about entering into a new

14    contract between ASCO and Mr. Sporidis' new employer?

15        A    No.  Like I said, he hadn't made up his

16    mind.  I said to him, when you do make-up your mind,

17    please tell us, because we want to go where you're

18    going.

19        Q    During that initial conversation, did Mr.

20    Sporidis reveal to you that he had some

21    post-employment restrictions with The Washington

22    Group?

Deborah Y. Kamin, Ph. D.

Page 37

1          A      No.

2          Q      Did he mention anything about a

3    non-competition provision that he had agreed to?

4          A      No.

5          Q      Did he mention anything about a

6    non-solicitation provision that he --

7          A      No.

8          Q      -- had agreed to?  Did he mention to you

9    that he may not be able to serve ASCO because he has a

10   non-service provision that he had entered into?

11         A      No.

12         Q      Before this initial discussion that you've

13   testified about that took place a couple weeks before

14   you heard from him about the conversation with Ms.

15   Molinari, had you and he ever discussed the prospect

16   of him leaving The Washington Group?

17         A      No.  I mean, Harry and I, as I said, had a

18   brief conversation where he was contemplating making a

19   change.  That was the extent of that conversation.  I

20   said if you ever leave, I'm going to be grabbing onto

21   your coat as you go out the door and go wherever you

22   go.

Deborah Y. Kamin, Ph. D.

Page 38

1              He's very important to our work.  We've

2     invested a lot of time in his -- getting him up to

3     speed.  As I said, these issues are very difficult

4     issues.  A huge amount of energy has been spent

5     working with him and bringing him into the fold, and I

6     did not want that energy to be wasted and lost, and

7     more importantly, the value of Harry to be lost to us.

8              So no, I just said, if you ever decide to

9     act on your thoughts that you may go somewhere else,

10    we would like to be involved.

11              MS. LALIK:  Okay.  Allow me to mark this

12    document as the next exhibit.

13              (Deposition Exhibit No. 2 was marked for

14    identification and retained by counsel.)

15              MS. LALIK:  Alan, just let me know when

16    you're all set.

17              MR. STRASSER:  I'm all set.  Thank you.

18    BY MS. LALIK:

19       Q    Before we actually get to Exhibit 2, during

20    that initial conversation you had with Mr. Sporidis

21    about the prospect of him leaving The Washington

22    Group, did he ask you to hold in confidence the fact

Deborah Y. Kamin, Ph. D.

Page 41

1    with him.  Beyond that, there was no conversation

2    about where he was going, who it might be.  I had no

3    idea who he was even considering, and I certainly

4    didn't discuss a new agreement because I didn't know

5    if we needed a new agreement.  So no, I did not have

6    any knowledge of where he was going.

7         Q    So you're saying before you received this

8    e-mail from Mr. Sporidis on September 26th,

9    referencing the new agreement, you and he had never

10   discussed any new agreement?

11        A    He was -- except in a general term that we

12   would need a new agreement if he left The Washington

13   Group.

14        Q    Okay.

15        A    And he knew from my conversation with him

16   that I wanted to go where he went.  So he is saying,

17   I'm leaving, what should we do about the new

18   agreement.

19        Q    Okay.  Were there any communications

20   between you and Mr. Sporidis about his departure or

21   potential departure between the initial conversation

22   that you've described when he informed you he was

Deborah Y. Kamin, Ph. D.

Page 42

1    thinking about leaving and this e-mail?

2        A    No.

3        Q    He hadn't called you a day or two before

4    and said I'm thinking about talking to Susan, I've

5    made my decision?

6        A    No.

7        Q    Up until the time you got this e-mail from

8    him on September 22nd -- I'm sorry, September 26th,

9    all you knew was that he was thinking about leaving?

10       A    That's right.

11       Q    This e-mail chain, if you keep moving up

12   the page, suggests that Mr. Sporidis was going to call

13   you the next day, meaning September 27th, and give you

14   the down load on his conversation with Susan Molinari.

15       A    Uh-huh.

16       Q    Did indeed you and Mr. Sporidis talk on

17   September 26th?

18       A    I think we did.

19            MR. STRASSER:  Excuse me.  You said 26th.

20   Did you mean 27th?

21            MS. LALIK:  I did.  Thank you for

22   correcting me.

**Deborah Y. Kamin, Ph. D.**

Page 51

```
 1        A     No.

 2        Q     Has anyone from either Ketchum or The

 3   Washington Group tried to reach you --

 4        A     No.

 5        Q     -- since mid September 2007?

 6        A     No.

 7        Q     Did you send or did ASCO send, to your

 8   knowledge, some sort of termination notice to The

 9   Washington Group?

10        A     Not that I -- I didn't send it, and I don't

11   know if anyone did.

12        Q     And I've lost track of whether I asked you

13   this question.  But to your knowledge, has anyone

14   tried to contact you from The Washington Group or

15   Ketchum since mid September 2007?

16        A     No.

17        Q     To your knowledge, has anybody from Ketchum

18   or The Washington Group tried to contact someone else

19   at ASCO since that time?

20        A     I'm not -- not that I know of.  Noam

21   Gelfond may have talked to Kristin about the rest of

22   the year contract terms.
```

**Deborah Y. Kamin, Ph. D.**

Page 70

1    that, was that information you wanted -- you would

2    have wanted to know?

3            MS. LALIK:  Objection to the form.  You can

4    go ahead and answer.

5            MR. STRASSER:  If you understand my

6    question, you can answer it, or I'll rephrase it.

7            THE WITNESS:  If I knew that I would not be

8    able to work with Harry or there was some provision

9    that would prevent us from continuing a relationship

10   with him, I would absolutely want to know that.

11   BY MR. STRASSER:

12       Q    And how would that have effected your

13   thinking about working with The Washington Group?

14       A    I would have had no interest in continuing

15   to work with The Washington Group if it did not

16   include Harry.

17       Q    Let me ask you a little more generally

18   about this kind of post-employment restriction.  Is a

19   post-employment restriction on the work of a lobbyist

20   for ASCO, do you think that is something that is

21   helpful to ASCO?

22           MS. LALIK:  Objection to the form.  Go

Deborah Y. Kamin, Ph. D.

Page 71

1    ahead and answer.

2            THE WITNESS:  Not -- as I said earlier,

3    we've invested at least two years into this

4    relationship, and getting anybody that helps us --

5    it's a fairly intimate relationship.  And when it's no

6    longer available, you basically have to start over

7    from Square 1 and reinvest that same energy and bring

8    people up to speed.  It's very damaging to be in a

9    situation and not be able to continue a relationship

10   like that.

11        Q     And let me ask you to -- if Mr. Sporidis is

12   somehow forbidden to continue to work for ASCO, will

13   ASCO seek government relation services from The

14   Washington Group?

15        A     No.

16        Q     Why not?

17        A     Because we don't have a relationship with

18   people there.  This -- this situation has dismayed us,

19   to put it mildly, and we would not want to have a

20   relationship with a group that would behave in such a

21   way.  So we would seek help elsewhere, and it will be

22   at great cost and a reinvestment of time that we've

**Deborah Y. Kamin, Ph. D.**

Page 72

1  built over the last couple of years.

2      Q    So do I take it then -- well, what would

3  ASCO's preference be?

4      A    Our preference would be to continue working

5  with Mr. Sporidis.

6          MR. STRASSER:  That's all the questions I

7  have.

8          MS. LALIK:  I have one follow-up.

9      FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

10 BY MS. LALIK:

11     Q    Do you know if ASCO has any kind of

12 post-employment restrictions that it requires its

13 employees to sign?

14     A    I do not believe we do, but I would have to

15 look for sure.

16     Q    Do you have an agreement you've signed with

17 ASCO that contains some sort of post-employment

18 restriction?

19     A    Not that I'm aware of.

20         MS. LALIK:  Okay.  I think we're all set.

21         VIDEOTAPE OPERATOR:  This concludes today's

22 proceedings, the deposition of Deborah Kamin, Ph.D.

Paul Alan Lobo                                    October 31, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


THE WASHINGTON GROUP, INC.,


Plaintiff


v.                          Civil Action
                            No. 1:07-cv-1892(RBW)


HARRY SPORIDIS,


Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

PAUL ALAN LOBO

October 31, 2007
2:25 p.m.

Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP
1801 K Street, NW, Suite 411
Washington, DC

Tracy E. Barksdale, Certified Shorthand Reporter
and Notary Public in and for the District of Columbia

Paul Alan Lobo                                    October 31, 2007

Page 25

1          A.      That's correct.

2          Q.      And did she tell you that she

3    wanted Harry to speak to you so you could

4    have an accurate idea of what the firm's

5    revenue would be for the following year?

6          A.      I don't recall.

7          Q.      You don't recall her using those

8    words?

9          A.      I don't recall, yes, using those

10   words.

11         Q.      Now, when you heard this from Ms.

12   Molinari, were you surprised to hear this

13   about Mr. Sporidis?

14         A.      Yes.

15         Q.      Why were you surprised?

16         A.      I was surprised because Harry's a

17   part of the firm and kind of a friend, and I

18   thought we got along, and I guess someone

19   that was kind of part of our team.

20         Q.      Did you have some inkling that

21   maybe he was thinking about leaving?

22         A.      We had inkling just when, in

23   hindsight, the day that Harry sent an e-mail

24   saying that he was with a client all day,

25   which was an odd e-mail to send.

**Paul Alan Lobo**                                              **October 31, 2007**

Page 28

1        number, so this is the kind of e-mail you

2        were talking about which is unusual?

3            A.    Right.  I believe this is the

4        e-mail that we were discussing.

5            Q.    All right.  So did Mr. Sporidis

6        come talk to you on the day after your

7        conversation with Ms. Molinari?

8            A.    Yes, he did.

9            Q.    And are you able now to recall

10       that as September the 27th?

11           A.    I don't recall the exact date.

12           Q.    Was it in the morning?

13           A.    It was in the morning.

14           Q.    Were you in the office at the

15       time?

16           A.    Yes.

17           Q.    And Mr. Sporidis came to your

18       office?

19           A.    That's correct.

20           Q.    And he told you -- what did he

21       say when he first came?

22           A.    I don't recall exactly what he

23       first said.

24           Q.    Did he tell you he wanted to talk

25       to you about something?

Page 29

1          A.     I assume so, yes.

2          Q.     Did he tell you that he wanted to

3     talk to you about his departure from The

4     Washington Group?

5          A.     Yes.

6          Q.     And did you tell him that you

7     already knew about it?

8          A.     Yes.

9          Q.     And did you tell him how you knew

10    about it?

11         A.     Yes.

12         Q.     What did you say?

13         A.     I said, Susan told me last night.

14         Q.     Okay.  And did he tell you, then,

15    I'm going to be leaving?

16         A.     Yes.

17         Q.     And did you tell him that Susan

18    wanted his transition to be as easy as

19    possible?

20         A.     I don't recall.

21         Q.     Had Susan said that to you, that

22    she wanted his transition to be as easy as

23    possible?

24         A.     I don't recall.

25         Q.     Did you tell him that he ought to

Page 30

1          get his clients to terminate their contracts

2          by sending in their 30-day notices?

3              A.    No.

4              Q.    Did you say anything about his

5          clients to him?

6              A.    We discussed his clients; the two

7          clients that we discussed were Mentor

8          Corporation and ASCO Corporation.

9              Q.    What did you say about Mentor

10         Corporation to him?

11             A.    I asked him what the contract

12         status was with Mentor.

13             Q.    What did you mean by that?

14             A.    I believe I meant, what are the

15         conditions of the contract with Mentor

16         Corporation?

17             Q.    What did he tell you?

18             A.    He said that they had a 30-day

19         notification period.

20             Q.    Mr. Sporidis said that?

21             A.    Yes.

22             Q.    Okay.  What did you say then?

23             A.    I don't recall.

24             Q.    Now, you asked Mr. Sporidis about

25         the contract status with Mentor, because you

**Paul Alan Lobo**                                              **October 31, 2007**

Page 31

```
 1              couldn't -- you didn't know it yourself?
 2              A.     I had not researched it myself.
 3              Q.     You didn't know it off the top of
 4         your head?
 5              A.     Correct.
 6              Q.     And some of the client contracts
 7         at The Washington Group have a 30-day
 8         termination provision in them, right?
 9              A.     Yes.
10              Q.     And some do not?
11              A.     That's correct.
12              Q.     And you obviously couldn't know
13         which kind this was, without looking at the
14         contract?
15              A.     That's correct.
16              Q.     And you assumed Mr. Sporidis would
17         know what the contract said?
18              A.     That's correct.
19              Q.     So when he said they had a 30-day
20         notice provision, did you say anything about
21         what he should do about that?
22              A.     I don't recall.
23              Q.     Now, what did you say to him about
24         the ASCO contract?
25              A.     I asked him about the status of
```

**Paul Alan Lobo**                                              **October 31, 2007**

Page 32

1           the ASCO contract.

2                   Q.    What did he tell you?

3                   A.    He informed me that they did not

4           have a contract in place.

5                   Q.    What did you say?

6                   A.    I said -- I don't recall.

7                   Q.    You didn't say, I don't recall;

8           you don't recall what you said?

9                   A.    I don't recall what I said.

10                  Q.    Did you discuss anything else with

11          Mr. Sporidis in that conversation?

12                  A.    I did.

13                  Q.    What's that?

14                  A.    I asked Harry if he had any type

15          of noncompete.

16                  Q.    You asked him in that conversation?

17                  A.    In that conversation.

18                  Q.    Why did you ask that?

19                  A.    Because some employees of The

20          Washington Group have noncompetes, and some

21          people don't.

22                  Q.    And you didn't know whether Mr.

23          Sporidis did or didn't?

24                  A.    I did not know.

25                  Q.    Why did you ask him if he had

**Paul Alan Lobo**                                         **October 31, 2007**

Page 33

1       one?

2              A.     Because it would make a difference

3       on how we proceeded from this point forward.

4              Q.     Okay.  And what difference would

5       it make?

6              A.     A difference on how we proceeded

7       with current clients.

8              Q.     Okay.  Well, what would that

9       difference be?

10             A.     I guess how we arranged for his

11      departure from the firm.

12             Q.     Trying to understand what

13      difference there is, whether he has a

14      noncompete or not.

15             A.     If he had a noncompete, he would

16      not be in a place to move the clients that

17      he worked with at The Washington Group to his

18      new employer.

19             Q.     Why is that?

20             A.     Without knowing at the time what

21      the noncompete was, I just wanted to -- I

22      don't know what the specifics were, but I

23      knew that there would probably be some

24      ramifications that he would need to be aware

25      of.

**Paul Alan Lobo**                                              **October 31, 2007**

Page 34

1          Q.     So you were asking him about the

2     noncompete out of your concern for him?

3          A.     Yes.

4          Q.     Not for -- out of your concern for

5     The Washington Group?

6          A.     I would say, yeah -- I would say

7     out of my concern for both The Washington

8     Group and for Harry.

9          Q.     Now, when you asked him if he had

10    a noncompete, what did he tell you?

11         A.     He said emphatically, no.

12         Q.     He said he'd never had a

13    noncompete?

14         A.     Yes.

15         Q.     And he said he was told when he

16    joined the firm that he would not have to

17    sign a noncompete?

18         A.     I do not know.

19         Q.     He didn't say that to you, or you

20    don't remember him saying that to you?

21         A.     Restate your question.

22         Q.     Okay.  What I'm asking is, did he

23    say to you then in this meeting that you're

24    recounting now, that he had been told he

25    would never have to sign a noncompete while

Page 35

1      he was at The Washington Group?

2           A.     I don't recall if he said that in

3      that conversation, but it's -- in that

4      conversation or in a subsequent conversation

5      he did say that to me, yes.

6           Q.     Okay.  Would you describe his

7      reaction. You didn't tell him he didn't have

8      a noncompete, you were just asking him

9      whether he had?

10          A.     At the conversation I asked him if

11     he had a noncompete.  He said no.  I asked

12     him if he had received stock, and he said

13     yes.  I said, some of the stock agreements

14     granting of stock have noncompetes in them,

15     and he said he had never agreed or signed

16     anything that was a noncompete.

17          Q.     Okay.  Anything else you said?

18          A.     I don't recall.

19          Q.     Now, did you have a discussion in

20     that initial meeting that day about how Mr.

21     Sporidis would notify other people in The

22     Washington Group about his departure?

23          A.     Yes.

24          Q.     And what was that discussion that

25     you had?

Paul Alan Lobo                                                    October 31, 2007

Page 43

1          Q.      When you use the word "trying"

2      here, it suggests present tense, doesn't it?

3          A.      Right.

4          Q.      Suggests somebody is actually

5      taking a step to try to keep him here.

6          A.      Right.

7          Q.      What I'm asking is what was that

8      step and who took it?

9          A.      I was trying to get -- my step in

10     that is trying to get in touch with Lorraine

11     to find out what are our options here.

12         Q.      So she said, let's discuss it and

13     see what we can do, right?

14         A.      Right.

15         Q.      Then she asked you, how much

16     business are we going to lose?

17         A.      She did.

18         Q.      And you told her $540,000?

19         A.      That's correct.

20         Q.      What did that estimate of yours

21     reflect?

22         A.      That estimate included the

23     annualized revenue from Mentor Corporation and

24     ASCO.

25         Q.      No other clients?

**Paul Alan Lobo**                                          **October 31, 2007**

Page 47

1          saying that he had a noncompete agreement?

2          A.    Yes, I did.

3          Q.    And what did he say to that?

4          A.    He said he never signed a

5     noncompete agreement.

6          Q.    Was he angry?

7          A.    Yes.

8          Q.    He actually spoke angrily to you,

9     didn't he?

10         A.    Yes.

11         Q.    He later sent you an e-mail

12    apologizing for his outburst, didn't he?

13         A.    I don't recall.

14         Q.    Did he ask you to show him the

15    agreement?

16         A.    Yes.

17         Q.    What did you say to him?

18         A.    I said, I don't have a copy.

19         Q.    Did you say Ketchum didn't have a

20    copy either?

21         A.    I don't recall.

22         Q.    Did you say someone was looking

23    for the copy?

24         A.    Yes.

25         Q.    Who did you tell him was looking

**Paul Alan Lobo**                                    **October 31, 2007**

Page 55

1        that?

2            A.      Uh-huh.

3            Q.      Less than two minutes after that,

4        sounds reasonable to me.

5                    Were you agreeing with this

6        proposed deal with Mr. Sporidis?

7            A.      I said, it sounds reasonable to

8        me.

9            Q.      I see that's what it says.  I'm

10       asking what it means.

11           A.      Sounds reasonable to me.

12           Q.      What sounds reasonable to you?

13           A.      The proposal sounds reasonable to

14       me.

15           Q.      To proposal to let Mr. Sporidis

16       take Mentor and ALTA if he would leave behind

17       ASCO, or if he would split on ASCO?

18           A.      Yes.

19           Q.      Either of those sounded reasonable

20       to you?

21           A.      Yes.

22           Q.      Okay.  And then you add, we really

23       need to see this no compete language he

24       supposedly agreed to.

25                   Why did you say "supposedly agreed

**Paul Alan Lobo**                                    **October 31, 2007**

Page 56

1           to"?

2                A.    Because Harry felt strongly that he

3           had not agreed to any noncompete language.

4                Q.    At this point, you had not seen

5           any noncompete language?

6                A.    I had not seen it yet.

7                Q.    But you had been told by somebody

8           at Ketchum that he had agreed to it?

9                A.    Yes.

10               Q.    But you were skeptical about it

11          because you hadn't seen it yourself?

12               A.    Yes.

13               Q.    Now, did you believe that the

14          clients were permitted to terminate their

15          contracts by e-mail?

16               A.    I don't know.

17               Q.    Did you think there was anything

18          in the Ketchum contracts or Washington Group

19          contracts that would prevent a client from

20          sending a termination notice by e-mail?

21               A.    I'm not familiar with any clause

22          of that sort.

23               Q.    Did you tell Mr. Sporidis that his

24          clients could terminate their clients with The

25          Washington Group by e-mail?

**Paul Alan Lobo**                                      **October 31, 2007**

Page 56

1      to"?

2           A.    Because Harry felt strongly that he

3      had not agreed to any noncompete language.

4           Q.    At this point, you had not seen

5      any noncompete language?

6           A.    I had not seen it yet.

7           Q.    But you had been told by somebody

8      at Ketchum that he had agreed to it?

9           A.    Yes.

10          Q.    But you were skeptical about it

11     because you hadn't seen it yourself?

12          A.    Yes.

13          Q.    Now, did you believe that the

14     clients were permitted to terminate their

15     contracts by e-mail?

16          A.    I don't know.

17          Q.    Did you think there was anything

18     in the Ketchum contracts or Washington Group

19     contracts that would prevent a client from

20     sending a termination notice by e-mail?

21          A.    I'm not familiar with any clause

22     of that sort.

23          Q.    Did you tell Mr. Sporidis that his

24     clients could terminate their clients with The

25     Washington Group by e-mail?

**Paul Alan Lobo**                                      **October 31, 2007**

```
                                                      Page 57
 1              A.      I don't recall.
 2              Q.      Did you tell him an e-mail would
 3      suffice to terminate the contract?
 4              A.      I don't recall.
 5              Q.      Did you tell him it was important
 6      for him to get them to send in termination
 7      notices to start the clock ticking?
 8              A.      I don't recall.
 9              Q.      Did you -- do you report to a CFO
10      at Ketchum?
11              A.      Yes.
12              Q.      Who is that?
13              A.      Robert Lorfink.
14              Q.      Would you spell that for us.
15              A.      L-o-r-f-i-n-k.
16              Q.      Would you say this Mr. Lorfink is
17      a stickler about having timely termination
18      notices?
19              A.      I would say Mr. Lorfink is a
20      stickler.
21              Q.      About everything?
22              A.      He is -- Mr. Lorfink is a
23      consummate professional and runs a tight ship.
24              Q.      We're done that with No. 14.
25                      Now, did you talk with Ms.
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


THE WASHINGTON GROUP, INC.,


Plaintiff


v.                        Civil Action
                          No. 1:07-cv-1892(RBW)


HARRY SPORIDIS,


Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

SUSAN MOLINARI

October 31, 2007
10:10 a.m.

Robbins, Russell, Englert, Orseck, Untereiner & Sauber, LLP
1801 K Street, NW, Suite 411
Washington, DC

Tracy E. Barksdale, Certified Shorthand Reporter
and Notary Public in and for the District of Columbia

**Susan Molinari**                                              **October 31, 2007**

Page 32

1         A.      Honestly, I can't remember.  I

2    don't know if Dr. Belsh was there at the

3    time.  There were several people.  I imagine

4    Deb Kamen was there, but honestly, I can't

5    remember.

6         Q.      Once ASCO became a client of The

7    Washington Group, Mr. Sporidis was the primary

8    person on that account?

9         A.      Yes, sir.

10        Q.      In fact, he did just about

11   everything on the account?

12        A.      Yes, sir.  Overwhelmingly.

13        Q.      Do you know who his contacts were

14   at ASCO?

15        A.      Everybody.  Sheila Foster, Deborah

16   Kamen. That's, to the best of my knowledge,

17   the people that he would work with.

18        Q.      Is there anybody else at The

19   Washington Group who did work on ASCO

20        A.      I would go from time to time.  I

21   gave a speech for them at a convention and

22   would go meet with them on occasion when

23   Harry would ask me to.

24        Q.      Anybody else at The Washington

25   Group?

Susan Molinari                                    October 31, 2007

Page 34

1          Q.     And they hope the lobbyists will

2     understand their business?

3          A.     Yes.

4          Q.     And be able to advance whatever

5     agenda the client decides to pursue?

6          A.     Yes, sir.

7          Q.     And not just any old lobbyist can

8     do that, correct?

9          A.     Yes, sir.

10          Q.     That's part of what you're selling,

11     right, is your expertise and your insight and

12     your strategic advice?

13          A.     Yes, sir.

14          Q.     That's what any lobbyist is

15     selling?

16          A.     Yes, sir.

17          Q.     So you can't just substitute in

18     another lobbyist for one who's had a good

19     relationship with a client?

20          A.     Usually not, sir.

21          Q.     Often even clients have views about

22     who their lobbyists should be?

23          A.     Yes, sir.

24          Q.     And did you ever have any contact

25     with anyone at ASCO about what they thought

Susan Molinari                                October 31, 2007

Page 35

1     of the job that Mr. Sporidis was doing?

2          A.    On occasions that I would

3     participate in a meeting, it was clear that

4     they were very satisfied with Harry's

5     representation.

6          Q.    Let's talk about another of Mr.

7     Sporidis' clients.  He also represented a

8     company called Mentor?

9          A.    Yes, sir.

10         Q.    Do you know what line of work --

11         A.    They make silicone breast implants.

12         Q.    Do you know how that client came

13    to The Washington Group?

14         A.    I don't, sir.

15         Q.    Who was the primary person on that

16    account?

17         A.    Clearly Harry.

18         Q.    Did anybody else work on that?

19         A.    Very occasionally.  I took the CEO

20    around the capital one day.  That was the

21    extent of my interaction, I believe.

22         Q.    That was something you did because

23    Harry asked you to do it?

24         A.    Yes, sir.

25         Q.    Do you remember the CEO's name?

Susan Molinari                                    October 31, 2007

Page 40

1        clients?

2            A.      Yes.

3            Q.      You see at the very first

4        paragraph of this document, the second

5        sentence, the memo says, most of my work

6        product is done with little assistance from

7        my colleagues.

8                    Did you think that was accurate?

9            A.      With regard to his clients, yes.

10           Q.      Okay.  Let's have another one.  2,

11       please.

12                   (Thereafter Exhibit-2 was marked

13       for identification.)

14       BY MR. STRASSER:

15           Q.      I'd ask you to have a look at

16       Exhibit No. 2.  Tell me whether you recognize

17       what that is.

18           A.      You know what, honest to goodness,

19       I don't recognize this, but I'm familiar with

20       what's in the text of it.

21           Q.      Okay.  Let's start with what it

22       is.  Does it look to you to be a document

23       that's like Exhibit No. 1?

24           A.      Yes.

25           Q.      And when you say you're not

Page 48

1          Q.      What do you mean by that?

2          A.      That Harry would -- let me say no,

3     we have not.

4          Q.      I got that answer already.  Now

5     I've asked you why.

6          A.      At a certain point, we were hoping

7     that we would be able to negotiate something

8     with Harry with regard to ASCO, and then

9     Harry got lawyers involved, and we all just

10    decided it was best to not continue down that

11    road at this point.

12         Q.      Not continue down the road of --

13         A.      Of even looking at the contracts

14    that may be in dispute between Harry and

15    Ketchum.

16         Q.      So you decided, because Mr.

17    Sporidis got a lawyer involved, not to

18    identify a substitute individual for ASCO?

19         A.      I guess we figured it would all be

20    worked out here, one way or the other.

21         Q.      Here meaning where?

22         A.      Between the lawyers.

23         Q.      So I take it, then, no one at The

24    Washington Group has contacted ASCO since Mr.

25    Sporidis left The Washington Group?

Page 49

1          A.     No, sir.

2          Q.     Nobody has?

3          A.     Not to my knowledge.

4          Q.     Well, you would know, wouldn't you?

5          A.     I would hope.

6          Q.     And have you taken any steps to

7    identify a substitute individual for ASCO?

8          A.     No, sir.

9          Q.     Has anyone else taken any steps to

10   identify a substitute individual for ASCO?

11         A.     No, sir.

12         Q.     When you say The Washington Group

13   hoped to continue working with Mr. Sporidis,

14   what did you mean by that?

15         A.     There has been precedence that when

16   people have left Ketchum, or The Washington

17   Group, with a noncompete, for maintaining that

18   client, if there is some kind of amicable

19   split based on revenue, and that was our

20   hope.

21         Q.     So you hoped that The Washington

22   Group would continue to receive revenue from

23   ASCO?

24         A.     With Harry being able to maintain

25   his relationship with them, yes, sir.

Susan Molinari                                            October 31, 2007

Page 50

```
1              Q.    And your assumption, based on that,
2         would be Mr. Sporidis would continue to
3         provide services for ASCO?
4              A.    Yes, sir.
5              Q.    And he would continue to provide
6         those services, regardless of where he worked?
7              A.    Yes, sir.
8              Q.    And so your hope was that Mr.
9         Sporidis would continue to serve ASCO at
10        whatever his new employer would be and that
11        The Washington Group would receive some
12        portion of the revenue?
13                   MR. GREENBERG:  Objection.  Asked
14        and answered.
15                   Answer him again, if you have
16        anything to add.
17                   THE WITNESS:  Yes.
18             BY MR. STRASSER:
19             Q.    Ketchum also provided services to
20        ASCO?
21             A.    They did, yes.
22             Q.    Mr. Gelfond works for Ketchum, but
23        not for The Washington Group?
24             A.    Yes, that's correct.
25             Q.    So he's in the public affairs
```

Susan Molinari                                          October 31, 2007

Page 54

1              Mentor, right, he was -- he assumed primary

2              responsibility for Mentor, right?

3                  A.    Yes.

4                  Q.    Let's look at the second page of

5              this exhibit.  You see there's a paragraph

6              that's crossed out on that page?

7                  A.    Yes, sir.

8                  Q.    The second full paragraph.  When

9              The Washington Group sent this document to

10             Mr. Mentor, was that paragraph crossed out by

11             hand like that?

12                 A.    I don't know.

13                 Q.    You think it might have been sent

14             that way?

15                 A.    It might have been, but I don't

16             know at what point it was crossed out.

17                 Q.    Surely, you didn't send a proposed

18             engagement letter to a client with a typed

19             paragraph that was crossed out by hand?

20                 A.    The correction is that I know

21             Harry said Mr. Levine didn't want it in

22             there, and we took it out. So I'm not sure

23             if there was the first one or eventual.

24                 Q.    In this paragraph, the crossed-out

25             paragraph contains a proposed agreement between

Susan Molinari                                        October 31, 2007

Page 55

1          -- the proposed term of this agreement

2          between Mentor and The Washington Group that

3          would have forbidden Mentor from using any

4          employee of The Washington Group if that

5          employee had left The Washington Group, right?

6              A.    If that is --

7                    MR. GREENBERG:  Objection.  Speaks

8          for itself.

9                    But you can answer it to your own

10         understanding.

11                   THE WITNESS:  That's my

12         understanding.

13            BY MR. STRASSER:

14             Q.    And Mr. Sporidis, you say, told

15         you Mr. Levine didn't want that provision in

16         there?

17             A.    To the best of my recollection,

18         yes, sir.

19             Q.    You're sure Mr. Levine didn't just

20         send it back with that paragraph crossed out?

21             A.    I'm not sure.

22             Q.    But you took the crossing out of

23         that paragraph to mean that Mentor was

24         unwilling to agree to that provision?

25             A.    Yes, sir.

Susan Molinari                                          October 31, 2007

Page 56

1          Q.     And the date on this letter is

2     November of '06?

3          A.     That is correct.

4          Q.     And this was to govern the

5     services provided by The Washington Group from

6     November 15th, 2006, through November 14th,

7     2007?

8          A.     Correct.

9          Q.     So even with that paragraph crossed

10    out, The Washington Group then provided

11    services to Mentor?

12         A.     Yes, sir.

13         Q.     So you understood, both from the

14    first sentence of the second paragraph on

15    page 1 and from the crossing out of that

16    paragraph on page 2, that Mentor thought it

17    was important that Mr. Sporidis be available

18    to it to provide services?

19              MR. GREENBERG:  Objection.

20              You can answer to your

21    understanding, but I think it mischaracterizes

22    her testimony.

23              THE WITNESS:  That would be my

24    understanding.

25              BY MR. STRASSER:

Susan Molinari                                    October 31, 2007

Page 57

1      Q.     Since the time that Mr. Sporidis

2   left The Washington Group, have you identified

3   any other lobbyist to provide services to

4   Mentor?

5      A.     No, sir.

6      Q.     And why is that?

7      A.     We all think the world of Harry,

8   and we didn't want to hurt him, and so we

9   just didn't.

10      Q.     You don't want to hurt him?  What

11   does that mean?

12      A.     I just -- we were concerned about

13   Harry, and we just didn't.

14      Q.     So you were concerned enough about

15   Harry not to identify someone else to provide

16   services to this client?

17      A.     As long as continuing conversations

18   were going on between Ketchum and Harry, we

19   did not, that is correct.

20      Q.     I see.  And you think -- okay.

21          Has anyone at The Washington Group

22   contacted Mentor since Harry left?

23      A.     No.

24      Q.     Did you think that bringing a

25   lawsuit might hurt Harry?

Susan Molinari                                    October 31, 2007

Page 59

1          Q.      That was on September the 26th?

2          A.      Yes, sir.

3          Q.      You were in your office at the

4     time?

5          A.      Yes.

6          Q.      Do you remember what time of day

7     it was?

8          A.      It was evening.

9          Q.      Can you be more specific about the

10    time than that?

11         A.      I could guess it was around 6:30.

12         Q.      Why do you say you're guessing?

13         A.      Because I'm not sure.

14         Q.      And did you suspect before Mr.

15    Sporidis came to talk to you on the 26th

16    that he might be leaving The Washington

17    Group?

18         A.      I suspected that he might have

19    been looking.

20         Q.      What made you suspect that?

21         A.      Harry was always very good about

22    telling me and others where he was at all

23    times, and the last few weeks we were getting

24    e-mails saying he was going to be up on The

25    Hill.  I wasn't sure if he was potentially

Susan Molinari                                    October 31, 2007

Page 61

1          A.     Harry was always very meticulous.

2                 MR. GREENBERG:  Let him finish his

3          question.

4          BY MR. STRASSER:

5          Q.     When you got the e-mail saying

6          Harry would be out all day with a client,

7          without any detail, that made you think he

8          was out looking?

9          A.     Yes.

10         Q.     When he came to you on the 26th,

11         it wasn't a complete surprise to you that he

12         was going to leave?

13         A.     No, sir.

14         Q.     What did he say -- what was the

15         first thing he said to you as he came into

16         your office?

17         A.     That this was -- to the best of

18         my recollection, this was a very difficult

19         conversation for him, that he had thought

20         about it, that he enjoyed working with me,

21         but there were some other issues, and he

22         found a place that he thought would be a

23         better fit for him and his life going

24         forward, to the best of my recollection.

25         Q.     If fact, he emphasized how much he

Susan Molinari                                    October 31, 2007

Page 62

1         enjoyed working with you, didn't he?

2         A.      Yes, sir.

3         Q.      You're under oath, you have to

4    say.

5         A.      Yes.

6         Q.      Did he tell you where he was

7    going?

8         A.      No, he did not.

9         Q.      Did he tell you he was going to a

10   law firm?

11        A.      He did tell me that day he was

12   going to a lobbying firm within a law firm,

13   yes.

14        Q.      Did you tell him that you were

15   happy for him?

16        A.      Yes, sir.

17        Q.      Were you happy for him?

18        A.      Yes, sir.

19        Q.      Why were you happy for him?

20        A.      I'm happy when Harry's happy.

21        Q.      Why do you say that?

22        A.      Because I think of him as a

23   terrific person and a good friend, and if he

24   thought this was a better fit for him, I

25   thought I was happy for him.

Susan Molinari                                    October 31, 2007

Page 63

1          Q.     Did you also tell him it was also

2    a good idea for him and his family?

3          A.     If he thought it was, yes.

4          Q.     But did you tell him that?

5          A.     To the best of my recollection, I

6    don't recall that.  I could have, but for

7    him, I thought, if he was happy in making

8    this move, and he felt it was better for him

9    and his family, then I was not going to

10   argue.

11         Q.     Was anybody else in the room with

12   you?

13         A.     No.

14         Q.     About how long did the whole

15   conversation take?

16         A.     15 minutes.

17         Q.     Did you talk with him about his

18   transition?

19         A.     Yes.

20         Q.     Did you tell him you wanted it to

21   be a smooth transition?

22         A.     Yes.

23         Q.     Wanted it to be an easy transition

24   for him?

25         A.     Yes.

Susan Molinari                                      October 31, 2007

Page 64

1          Q.    Why did you say that?

2          A.    Because I like and respect Harry

3     very much.

4          Q.    Did you talk to him about what he

5     should do about his clients?

6          A.    Yes.

7          Q.    What did you say?

8          A.    I asked him how long he thought

9     he'd stay at The Washington Group.

10         Q.    What did he say?

11         A.    He said, to the best of my

12    recollection, he wasn't sure.  He wanted it

13    to be a smooth transition, and then I

14    proceeded to tell him that he needed to make

15    sure that the clients that he was taking gave

16    us 30-day notice.

17         Q.    Why would you say that?

18         A.    Number one, because I was not

19    aware of any sort of noncompete that he was

20    under, and more concerned with knowing that

21    Ketchum and The Washington Group has been

22    very steadfast in making sure that all our

23    clients adhere to the 30-day opt-out clause.

24    That's in all their contracts, I believe.

25         Q.    Okay.  And is there a clause like

Susan Molinari                                    October 31, 2007

Page 65

1          that in the Mentor contract?

2              A.    I don't know.

3              Q.    Let's go look.  And we're looking

4          at Exhibit 4.

5                    Is there -- I'm not seeing it

6          here, is there some particular thing that

7          you're thinking of?

8              A.    It was my understanding that that

9          was written into, I thought, all of our

10         contracts.

11             Q.    And when you say that was written

12         in, it is a requirement that the client give

13         30 days' notice of the termination?

14             A.    Correct.

15             Q.    And you wanted Mr. Sporidis to

16         have his client submit those termination

17         notices timely?

18             A.    Yes.

19             Q.    Did you tell him that Mr. Lorfink

20         was a stickler about that?

21             A.    Yes, sir.

22             Q.    Who is he?

23             A.    He's the CFO to Ketchum.

24             Q.    When you say he's a stickler, what

25         did you mean?

Susan Molinari                                    October 31, 2007

Page 66

1          A.    That they wanted to make sure, if

2     that was the terms of the contract, that that

3     was upheld.

4          Q.    And you wanted to minimize the

5     overlap between the services provided, that

6     Harry provided to those clients at The

7     Washington Group and the services he would

8     provide at his new place?

9          A.    I just want Harry to be aware that

10    that was something that Ketchum took very

11    seriously.

12         Q.    Okay.  And I think you said along

13    the way here that you were not aware of any

14    noncompete clause that governed Mr. Sporidis

15    at that time?

16         A.    At that time, that's correct.

17         Q.    All right.  Was there anything

18    else that you said during that conversation?

19         A.    I'm sure I said that I wished him

20    well and that we would miss him, and I

21    wanted him to be happy.

22         Q.    Did you make him promise to call

23    you up every Tuesday and gossip with you?

24         A.    Probably.

25         Q.    Did you make him promise to have

Susan Molinari                                    October 31, 2007

Page 80

1          with Mr. Sporidis had arisen?

2              A.    Yes.

3              Q.    Now, after Mr. Lobo told you that

4          Ketchum said that Harry had a noncompete

5          agreement, did you tell Harry that?

6              A.    I don't know.

7              Q.    Did Mr. Lobo tell you that he had

8          told Harry that?

9              A.    That's -- I'm not sure.  I'm sure

10         someone told Harry.  I'm not -- I believe it

11         was Paul, but I'm not sure.

12             Q.    You know that that would have been

13         important to Mr. Sporidis to know that

14         Ketchum thought that?

15             A.    Oh, clearly.

16             Q.    And if you thought that Mr. Lobo

17         had not told Mr. Sporidis, then you would

18         have felt that you should tell him, right?

19             A.    Yes.

20             Q.    But you can't remember whether you

21         did in fact tell him?

22             A.    I can't recall whether Paul had

23         the conversation first or I did.

24             Q.    You had a conversation with Mr.

25         Sporidis about the noncompete?

Page 81

1          A.      Yes.

2          Q.      When was that?

3          A.      Several days after he gave his

4     notice.

5          Q.      What did you say to him?

6          A.      Ketchum says that you've got a

7     noncompete.

8          Q.      What did he say?

9          A.      He said, I don't.  You know what,

10    now that I'm going back, I think he had this

11    conversation first with Paul, because I did

12    not have any of the specific conversations

13    with Harry, to the best of my recollection,

14    about the stock, looking at it, and clicking

15    on, clicking off, that stuff.  I don't

16    believe those are conversations I had with

17    Harry.

18         Q.      You believe Paul Lobo had those

19    conversations with Harry?

20         A.      I believe so.

21         Q.      And Mr. Lobo told you about

22    conversations he'd had with Harry?

23         A.      Correct.

24         Q.      And you talked to Mr. Sporidis on

25    the 28th or 29th of September; he said, no,

Susan Molinari                                    October 31, 2007

Page 103

1          A.     No.

2          Q.     Do you know how they came to stop

3    being a client?

4          A.     I believe Harry told me that they

5    were terminating.  They had only hired us for

6    a specific point of time.  They had extended

7    and did not want to fulfill the terms of

8    their extension, I believe.

9          Q.     And do you remember what Harry

10   said about their terminating their relationship

11   with The Washington Group?

12         A.     No.

13         Q.     Let's mark this as 9, please.

14                (Thereafter Exhibit-9 was marked

15   for identification.)

16   BY MR. STRASSER:

17         Q.     Okay.  Now, Exhibit 9 consists of

18   three pages of e-mails.  Have you seen any

19   of these e-mails before?

20         A.     Yes, sir.

21         Q.     Let's look at the second page of

22   the exhibit.  There is an e-mail there from

23   William Moroney that's addressed to you, with

24   copies to Mr. Sporidis.

25                Do you remember receiving this

Susan Molinari                                                    October 31, 2007

Page 104

1       e-mail?

2            A.    Yes.

3            Q.    This was the termination of the

4       relation with SHRM?

5            A.    Yes.

6            Q.    And you see here on the second

7       paragraph there's a statement that the letter,

8       presumably referring to the e-mail, serves to

9       reaffirm our verbal termination notice provided

10      to Mr. Sporidis.  Do you see that?

11           A.    Yes.

12           Q.    Had Mr. Sporidis talked to you

13      about SHRM before you got this e-mail from

14      Mr. Moroney?

15           A.    I believe he did.

16           Q.    What did he tell you about it?

17           A.    Well, at one point he thought they

18      were going to stay on longer, and I believe

19      we put him in the projections for the future,

20      and he told us they were going to cancel.

21           Q.    When you say he --

22           A.    Harry said.

23           Q.    -- Harry said that SHRM was going

24      to cancel?

25           A.    Yes.

**Capital Reporting Company**

Page 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

------------------------------:

THE WASHINGTON GROUP, INC.      :

        Plaintiff,      : Case No.:

       v      : 07CV01892

HARRY SPORIDIS,      :

        Defendant.      :

------------------------------:

Washington, D.C.

Thursday, November 1, 2007

LORRAINE THELIAN,

called for oral examination telephonically by counsel

for Defendant, pursuant to notice at the Offices of

Robbins, Russell, Englert, Orseck, Untereiner & Sauber,

LLP, 1801 K Street, Northwest, Washington, D.C. before

Natalia Kornilova of Capital Reporting, a Notary Public

in and for the District of Columbia, beginning at 11:08

a.m., when were present on behalf of the respective

parties:

Page 6

1        A      Good question.  I'm responsible for the

2    success of our North American operations which include

3    five regional operations in the U.S., a Canadian

4    operation and I'm also responsible for The Washington

5    Group.

6        Q      And what is The Washington Group?

7        A      Excuse me?

8        Q      Tell us what The Washington Group is.

9        A      The Washington Group is a lobbying firm

10   owned by Ketchum.

11       Q      Okay.  Now, Ms. Thelian, is somebody typing

12   there right in the same room as you are?

13              MS. LALIK:  I am.  I'm taking notes.  Is it

14          causing -- is it bothering you on your end?

15              MR. STRASSER:  The noise is interfering a

16          little bit.

17              MS. LALIK:  Okay.  Let me try to move and

18          you tell me if it gets any better.  Go ahead.

19   BY MR. STRASSER:

20       Q      Ms. Thelian, you said it's a lobbying group,

21   The Washington Group is?

22       A      Yes, it is.  It's a government relations

**Capital Reporting Company**

Page 13

1        Q      And Mr. Sporidis has been the primary

2    lobbyist for ASCO during the entire time that ASCO has

3    been a client of Ketchum, correct?

4        A      Yes, that's correct.

5        Q      Did there -- did there come a time when you

6    learned that Mr. Sporidis was leaving The Washington

7    Group?

8        A      Did there come a time?

9        Q      Yeah.

10       A      Yes.

11       Q      And how did you learn?

12       A      I believe -- I'm trying to remember as to

13    whether it was a phone call but I also got an e-mail

14    from -- I actually see it in front of me.  But it was

15    from Paul Lobo telling me that Harry was leaving.

16       Q      Okay.   Now, do you have in front of you a

17    document that bears Bates labels TWG-80 and 81?

18            MS. LALIK:  Yes, this is Beth.  That's the

19        document you mentioned you'd be using first off so

20        we have that in front of her.

21    BY MR. STRASSER:

22       Q      Okay.  And that one was previously marked as

Page 14

1   Exhibit -- as Defense Exhibit 5.  So, do you have that

2   in front of you, Ms. Thelian?

3        A    Yes.

4        Q    All right.  Okay.  And you see there's an e-

5   mail that is from Mr. Lobo to you, September 27th and

6   the time is listed as 1451?

7        A    Yes, I do.

8        Q    Did you receive that e-mail from Mr. Lobo?

9        A    Yes.

10        Q    And was that, to your memory, the first you

11   learned of Mr. Sporidis' departure?

12        A    Based on my reaction to it, yes, I guess, it

13   was my first knowledge of his --

14        Q    And I -- is it fair to characterize your

15   reaction as dismay?

16        A    No.  No, it's just -- it was aggravation,

17   you know, losing somebody.  No, I wouldn't call it

18   dismay.

19        Q    Why do you say aggravation?

20        A    Because -- because first of all, you know,

21   Harry has been a long-time employee of The Washington

22   Group.  I think we've treated him very well and I was, I

**Capital Reporting Company**

Page 15

1    think, I was just pretty upset that he would do that.

2         Q      You were upset that he would do what?

3         A      Leave The Washington Group.  I think Susan's

4    been unbelievably good to him.  I think the organization

5    has been unbelievably good to him and I'm a person who

6    really values loyalty.

7         Q      So is it fair to say you were upset with Mr.

8    Sporidis for leaving?

9         A      Yes, I guess it would be -- that would be

10   accurate.

11        Q      And your first reaction expressed in the e-

12   mail is "Any way to keep him?"

13        A      Right.

14        Q      If I understood your earlier answer, you say

15   that you value loyalty very highly?

16        A      Yes.

17        Q      Did you think Mr. Sporidis leaving the

18   organization was disloyal?

19        A      I -- without having talked to him at the

20   time, that would be my immediate reaction, yes.

21        Q      And you see a little farther up on this

22   document there's a slightly later e-mail from you.  I'm

Page 16

1    sorry, let's back up a bit.

2              Your response to Mr. Lobo comes at 4:14 in

3    the afternoon on the 27th?

4         A    Right.

5         Q    Had you talked to anyone in between the time

6    he sent you this e-mail which is at 2:51 and the time

7    you sent your response?

8         A    I honestly don't remember.  I don't remember

9    the timing.  I'm sure I was on the phone with Paul at

10   some point.

11        Q    Right.  And then you sent an e-mail to Mr.

12   Lobo.  Who is Mr. Lobo?

13        A    Paul Lobo is at The Washington Group.  He

14   works very closely with Susan and he does a lot of the

15   operating officer -- he has a lot of the operating

16   officer responsibilities at The Washington Group.

17        Q    Does he act as --

18        A    He and Eugene Patrone, cause you see both

19   their names interchangeably.  They both share with those

20   responsibilities.   So, you know, a lot of times I don't

21   remember if it's Paul -- if I spoke to Paul Lobo or

22   Eugene Patrone because they -- you know, they share a

Page 18

1      Q      All right.  So, let's look at your message

2    to Mr. Lobo at 4:28 on September 27th.  The first

3    sentence says, "Let's discuss what it is and see if we

4    can create something for him." What did you mean by

5    that?

6      A      Trying to create some kind of incentive

7    program that would keep him at The Washington Group or

8    at least look at the incentives and see what they were

9    and if there was something additional that could be

10   done.

11     Q      And did you have something in mind at that

12   point?

13     A      Not specifically, no.

14     Q      Did you have some sort of financial

15   incentive or some other kind of incentive?

16     A      I probably was thinking it's financial but

17   that it would include bonuses.

18     Q      Right.  I'm asking you that but I'm also

19   asking you were you thinking of giving him some sort of

20   different role at The Washington Group?

21     A      Not specifically at that time, no.

22     Q      Okay.  And you next sentence says, "How much

Page 19

1    biz are we going to lose?"

2         A     That's right.

3         Q     And what did you mean by that?

4         A     How much revenue is Harry planning on taking

5    with him?

6         Q     Why did you want to know that?

7         A     Because that would be certainly something

8    that would be significant for The Washington Group.

9         Q     Okay.   And Mr. Lobo gives you an answer to

10   that question, doesn't he?

11        A     Yes, he does.

12        Q     And he tells you $540,000.

13        A     Right.

14        Q     And did you have some idea that in September

15   of '07, what fraction of The Washington Group revenue

16   was represented by $540,000?

17        A     It wasn't what I was thinking at that moment

18   but I know what fraction it is of their revenue.

19        Q     And what fraction is it?

20        A     I believe it -- again, I probably won't know

21   exactly, but I believe it is about 12 percent.

22        Q     And so that was a pretty significant hit to

**Capital Reporting Company**

Page 20

1    the revenue of The Washington Group?

2        A    Yes.

3        Q    And would you expect it would be about the

4    same kind of hit to the profit of The Washington Group

5    about 12 percent of the profit?

6            MS. LALIK:  Actually, Alan --

7            THE WITNESS:  Can I correct myself?  I'm

8        just not doing math here because I'm actually

9        trying to think of what their revenue is for the

10       year.  It's more like about 8 percent.

11   BY MR. STRASSER:

12       Q    It's about one-twelfth?

13       A    Yeah, exactly.  Yes.  They're running at

14   about five-and-a-half to six million.

15       Q    Five-and-a-half to six million -- I'm sorry.

16    Let me ask you the question.  It's five-and-a-half to

17   six million a year in revenue?

18       A    Yes.

19       Q    Okay.  And is it about the same fraction of

20   the profit of The Washington Group that would be

21   represented by that business, about 8 percent?

22       A    Yeah, I would assume so, yes.

Page 21

1      Q      Okay.  Now, all right, so your thought then

2  was you wondered if you could possibly reach some kind

3  of -- you could make a -- some kind of offer to Mr.

4  Sporidis that would induce him to stay.  Was that what

5  you were thinking?

6      A      That's correct.

7      Q      Okay.  Now, did you also have a conversation

8  with Ms. Molinari that night on the 27th?

9      A      I do know I spoke to Susan.  I wouldn't

10  recall if it was that evening or the next day.  But I do

11  know I spoke to Susan at some point.

12      Q      All right.  And did you tell Ms. Molinari on

13  the 27th of September that you were willing to have Mr.

14  Sporidis leave with Mentor and the American Land Title

15  Association if he would make a deal regarding ASCO?

16      A      I did not.

17      Q      Okay.  Let me ask you to look at the

18  document that bears the Bates label TWG-34.

19      A      (Witness complies.)

20           I see it.

21      Q      Okay.  And that's -- you see, that's an e-

22  mail from Ms. Molinari to Mr. Lobo on the morning of the

Page 24

1   for.

2        Q    Okay.  And if I understood your answer of a

3   moment ago, you were saying that we had to be strong to

4   protect both clients.  And the both clients you're

5   talking about are Mentor and ASCO?

6        A    Yes.

7        Q    And you needed to protect the clients if you

8   were to have any negotiating position in the future?

9        A    Yes.

10       Q    What do you mean by that?

11       A    I mean, having a negotiating position

12  certainly with Harry but, again, these are agreements we

13  take extremely seriously and any agreement we have with

14  Harry also has ramifications for every other Washington

15  Group employee that we have as well as every Ketchum

16  employee that signs these agreements.  So we do take

17  them extremely seriously.

18       Q    And you believed on the -- on the evening of

19  the

20  27th that Harry had signed a non-compete agreement?         MS. LALIK:

21  I'm going to object, Alan, on the grounds that that'

22   not what she testified to.  She testified about a

Page 33

1    because he was

2    working on accounts with Ketchum Public Affairs.  So,

3    you know, of course, we would hate to lose somebody like

4    Harry.

5         Q     So your goal was to devise a strategy to

6    keep Mr. Sporidis at The Washington Group rather than to

7    negotiate with him about which clients would stay and

8    which clients would leave?

9         A     Absolutely.

10        Q     And were you involved in planning how to

11   implement that strategy with the management of The

12   Washington Group?

13        A     I was not involved in planning it.  I think

14   Paul probably had a conversation with me strategically

15   on what he was thinking and I said, you know, put

16   something together that's specific and then we'll talk

17   about it.

18        Q     Did he give you an idea of what he had in

19   mind strategically?

20        A     Yeah, he did.

21        Q     What was that?

22        A     To think about a compensation system that

Page 38

1   BY MR. STRASSER:

2       Q     All right.  So this is an e-mail that you

3   sent to Mr. Lorfink, isn't it, Ms. Thelian?

4       A     Yes.

5       Q     And you were describing what Mr. Patrone had

6   told you that he said at lunch to Mr. Sporidis; isn't

7   that correct?

8       A     Yes.

9       Q     And he had told you that Ketchum was not

10  going to let Mr. Sporidis walk with his clients, right?

11      A     Yes.

12      Q     And that Ketchum would make it ugly?

13      A     Which means sue him.

14      Q     Well, let's just start with what the e-mail

15  says.  That's how you described it; isn't it?

16          MS. LALIK:  Objection to the form.  She just

17          asked -- she just answered that question and

18          described her understanding of it, but go ahead

19          and answer.

20          THE WITNESS:  I'm sorry, now I've lost track

21          of the question.

22  BY MR. STRASSER:

**Capital Reporting Company**

Page 39

1       Q      You described what Mr. Patrone said to Mr.

2    Sporidis as that "Ketchum was going to make it ugly for

3    Mr. Sporidis"?

4       A      I used the -- yes, I said it was going to be

5    made ugly.  It was going to -- yeah, if he walked with

6    the clients or tried to walk with the clients.

7       Q      And, of course, Mr. -- and that Mr. Patrone

8    had communicated to Mr. Sporidis that this would

9    endanger his chance of having a real job at the law firm

10   he was going to, right, that's --

11              MS. LALIK:  I'm going to object on the

12          grounds that this witness may or may not know what

13          took place in that conversation between Mr.

14          Patrone and Mr. Sporidis.  She was not present.

15              MR. STRASSER:  Well, I agree with that.  But

16          --

17   BY MR. STRASSER:

18       Q      All right.  Ms. Thelian, we're reading your

19   description of what Mr. Patrone told you, aren't we?

20       A      Yes.

21       Q      So this is what Mr. Patrone -- Mr. Patrone

22   told you that he told Mr. Sporidis that "Ketchum would

Page 43

1       A       I just say the message that I wrote could be

2   misconstrued because of the word "ugly," but, again,

3   since Robert -- Rob Lorfink and myself had had

4   conversations about this, the word "ugly" was simply a

5   word that meant we would sue and that would be, of

6   course, unpleasant.

7       Q       Okay.  And so do I take your answer to be

8   that you agree with everything else in that message?

9       A       You know, again, same thing in terms of

10  having something misconstrued, out of context,

11  "endangering his chance of having a real job at the law

12  firm" sounds kind of scary.  The reality is it was -- it

13  is just a reality check that if we were successful

14  keeping our clients, Harry would have no clients to

15  bring to a law firm, in which case, you know, based on

16  our -- I think our general understanding of how this

17  works, they were hiring him for his clients and so that

18  would be a problem.

19      Q       So do you agree with the content of the

20  message that Mr. Patrone was sending to Mr. Sporidis or

21  not?

22      A       I only agree --

Page 50

1    you informed ASCO that they cannot use Mr. Sporidis?

2         A    Yes.

3         Q    And you believe that Ketchum --

4         A    Now wait.

5         Q    Go ahead.

6         A    I don't know what we said to ASCO honestly,

7    but we did call ASCO and say this is a problem and that

8    we -- again, I know we let them know.

9              MS. LALIK:  Yeah, I just -- neither Mr.

10        Strasser nor I want you to speculate about things

11        you don't know about, so --

12             THE WITNESS:  Okay.

13             MS. LALIK:  -- only testify about what you

14        know.

15             THE WITNESS:  I do know we contacted ASCO.

16        I do not know exactly what we said.

17   BY MR. STRASSER:

18        Q    And who is it who contacted ASCO?

19        A    I don't know who had the conversation.  I

20   know Noam Gelfond tried to call them.

21        Q    And do you believe that Mr. Gelfond told

22   them that ASCO was not permitted to use Mr. Sporidis?

Page 51

1          A      No, I don't think he did.

2          Q      Do you -- what do you think Mr. Gelfond said

3     to ASCO?

4          A      I don't know if he ever actually talked to

5     them.  He tried to call them and left them a number of

6     messages.

7          Q      And what do you think the messages were that

8     he left?

9          A      Just that there were some --

10             MR. LALIK:  Do you know what messages he

11         left?  Do you have some knowledge of -- I don't

12         want you speculating.  So if you have knowledge,

13         testify about it.

14             THE WITNESS:  I do know he reached out to

15         ASCO.  I don't know what message he left.

16    BY MR. STRASSER:

17         Q      And how about for Mentor, who do you think

18    it is he tried to contact at Mentor?

19         A      I do not know.

20         Q      Has The Washington Group provided ASCO with

21    the name of some other lobbyist who might serve them?

22         A      I don't know if they did provide names.  But

Page 52

1    I know we could.

2         Q     Do you know if The Washington Group has

3    provided the name of another lobbyist who might serve

4    Mentor to Mentor?

5         A     I do not know but I also know we could.

6         Q     And who is it at The Washington Group who

7    would be a suitable lobbyist for ASCO?

8         A     There would be a number of them.

9         Q     Just name two or three of them.

10        A     Do I have to answer that right now?  I

11   honestly do believe there are a number of them with

12   healthcare capability as well as just general counsel.

13   I think one thing that's important -- that's why I don't

14   want to give names, cause there are probably five of

15   them.  ASCO, in particular, we could have brought any

16   lobbyist into that meeting with us.  It did not require

17   Harry Sporidis.  We could have brought Eugene Patrone

18   and we would have won just the same way as Harry.

19        Q     You didn't think there was anything unique

20   about Harry's services to ASCO?

21        A     I did not.

22        Q     And how about for Mentor?  Did you think

Page 53

1    Harry's services were unique for Mentor?

2        A    You know, honestly, I've never thought about

3    it. You know, Harry had some healthcare capabilities so,

4    you know, I think that was obviously important to Mentor

5    but, again, based on what I believe the issue was, if

6    I'm not mistaken it's breast implants?

7        Q    Right.  That's one of their products, yes.

8        A    You know, I think there are a lot of people

9    who could handle that.  I mean, we've done breast

10   implant issues at Ketchum for years.

11       Q    So you don't think that Harry's services

12   were unique for Mentor?

13       A    No, I don't.

14       Q    I'm sorry, I couldn't hear you.

15       A    I do not.

16            And now we have a person, and I'm just

17            trying to

18   remember his last name but if you want a name, we have a

19   person by the name of Brett.  I can't think of his last

20   name who has total healthcare capability and could move

21   in there in, you know, a minute.

22       Q    So I -- let's go back to the -- an earlier

Page 73

1                THE WITNESS:  I see it.

2    BY MR. STRASSER:

3        Q    This was an e-mail you received on October

4    the 10th?

5        A    Right.

6        Q    And what was Mr. Patrone's voicemail to you

7    about Harry?

8        A    I believe it was that Harry had elected not

9    to take our offer.

10        Q    Do you know when the offer was made to

11    Harry?

12        A    No, but it looks like it was made sometime

13    that day or -- I don't know.  But it had -- well, it

14    just had to be made between the e-mail trail that you

15    pointed out yesterday or just a moment ago which was

16    October 9th at 3 o'clock and October 10th at 5 o'clock.

17    I don't know when he gave it.

18        Q    Okay.  All right.  And did Mr. Patrone say

19    anything else in the voicemail?

20        A    I don't -- no, I don't recollect.

21        Q    Now, were you part of the -- let me ask the

22    question differently.